**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------- x
         :

In re:           :      Chapter 11
         :

GLOBAL EAGLE ENTERTAINMENT     :      Case No. 20-11835 (JTD)
INC., *et al.*,[1]         :
         :

         Debtors.     :      (Jointly Administered)
         :

-------------------------------------------------------- x

**DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION FOR GLOBAL EAGLE ENTERTAINMENT INC. AND ITS AFFILIATE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**LATHAM & WATKINS LLP**

Ted A. Dillman (admitted *pro hac vice*)
Helena G. Tseregounis (admitted *pro hac vice*)
Nicholas J. Messana (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:    (213) 485-1234
Facsimile:    (213) 891-8763
Email:    ted.dillman@lw.com
    helena.tseregounis@lw.com
    nicholas.messana@lw.com
-and-

George A. Davis (admitted *pro hac vice*)
Andrew C. Ambruoso (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
885 Third Avenue
New York, New York 10022
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:    george.davis@lw.com
    andrew.ambruoso@lw.com
    jon.weichselbaum@lw.com

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Betsy L. Feldman (No. 6410)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:    mnestor@ycst.com
    kcoyle@ycst.com
    bfeldman@ycst.com

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are: Global Eagle Entertainment Inc. (7800), Airline Media Productions Inc. (2314), Emerging Markets Communications, LLC (0735), Entertainment in Motion, Inc. (3908), Global Eagle Entertainment Operations Solutions, Inc. (3375), Global Eagle Services, LLC (7899), Global Eagle Telecom Licensing Subsidiary LLC (2547), IFE Services (USA), Inc. (2120), Inflight Productions USA, Inc. (8493), Maritime Telecommunications Network, Inc. (9974), MTN Government Services, Inc. (6069), MTN International, Inc. (8559), MTN License Corp. (0314), N44HQ, LLC (0570), Post Modern Edit, Inc. (6256), Row 44, Inc. (2959), and The Lab Aero, Inc. (9831). The Debtors' address is 1821 E. Dryer Road, Suite 125, Santa Ana, California 90045.

*Counsel to the Debtors and Debtors in Possession*

Dated:  November 13, 2020
Wilmington, Delaware

## IMPORTANT NOTICES

---

### Plan Voting

**The voting deadline to accept or reject the Plan is 4:00 p.m. Eastern time (the "Voting Deadline"), on January 19, 2021, unless extended by the Debtors.  The record date for determining which Holders of Claims may vote on the Plan is December 16, 2020 (the "Voting Record Date").**

**For your vote to be counted, you must return your properly completed Ballot in accordance with the voting instructions on the Ballot so that it is actually received by the Debtors' balloting agent, Prime Clerk LLC (the "Balloting Agent"), before the Voting Deadline.**

**Ballots may be returned to the Balloting Agent via:**

| | |
|---|---|
| **Mail, Courier, or Personal Delivery:** | **GEE Ballot Processing**<br>**c/o Prime Clerk LLC**<br>**One Grand Central Place**<br>**60 East 42nd Street, Suite 1440**<br>**New York, NY, 10165** |
| **Online Upload:** | **https://cases.primeclerk.com/GEE** |

**Additional details on voting are discussed herein and set forth on the Ballots delivered to Voting Nominees and Holders of Claims entitled to vote on the Plan.**

---

### Third-Party Releases

**You may be deemed to grant releases to third parties under the Plan.  Pursuant to Article X.C of the Plan, each Holder of a Claim or Interest that (a) submits a Ballot accepting the Plan, (b) is entitled to vote on the Plan and either abstains from voting or submits a Ballot rejecting the Plan, but in each case does not affirmatively opt-out of the Third-Party Release as provided on its Ballot or (c) (other than Holders of Claims and/or Interests in Classes 5 and 6) is presumed to accept or deemed to reject and does not affirmatively opt-out of the Third Party Release), in each case, shall be deemed to grant the Third-Party Release. This release is discussed further in Article V.H of this Disclosure Statement.**

---

ii

Global Eagle Entertainment Inc. ("**GEE**") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), are providing you with the information in this Disclosure Statement because you may be a creditor of the Debtors and may be entitled to vote on the *Joint Plan of Liquidation for Global Eagle Entertainment Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (including all exhibits and schedules thereto, and as may be amended, modified, or supplemented from time to time, the "**Plan**"). The Plan is attached hereto as **Exhibit A**. All exhibits to this Disclosure Statement are incorporated into, and are a part of, this Disclosure Statement as if set forth in full herein. Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan.

The Debtors believe that the Plan is in the best interests of their creditors and other stakeholders. All creditors entitled to vote on the Plan are urged to vote in favor of the Plan. Detailed voting instructions are contained on the Ballots distributed to the creditors entitled to vote on the Plan and a summary of these instructions is set forth in Article I.B of this Disclosure Statement and in the Disclosure Statement Order (Docket No. [●]). For your vote to be counted, your Ballot must be properly completed and returned to either your Voting Nominee (as defined herein) or the Balloting Agent, as applicable, in accordance with the voting instructions on your Ballot and *actually received* by the Balloting Agent, via regular mail, overnight courier, personal delivery at the appropriate address, or the Balloting Agent's electronic ballot upload site, by the Voting Deadline.

This Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements and annexes hereto are the only documents to be used in connection with the solicitation of votes on the Plan, and they may not be relied upon for any purpose other than to determine how to vote on the Plan. Neither the Bankruptcy Court nor the Debtors have authorized any person to give any information or make any representation in connection with the Plan or the solicitation of acceptances of the Plan other than as contained in this Disclosure Statement*,* the Plan Supplement, and any attachments, exhibits, supplements or annexes attached hereto. Any such information or representation given or made may not be relied upon as having been authorized by the Bankruptcy Court or the Debtors. The statements contained in this Disclosure Statement are made as of the date hereof unless otherwise specified.

This Disclosure Statement shall not constitute an offer to sell, or solicitation of an offer to buy any of the securities described herein.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREOF, THE PLAN ATTACHED AS EXHIBIT A HERETO AND THE PLAN SUPPLEMENT, AS WELL AS TO CONSULT THEIR OWN ADVISORS, BEFORE VOTING ON THE PLAN.**

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto that will be included in the Plan Supplement, and documents described therein as filed prior to approval of this Disclosure Statement or subsequently as part of the Plan Supplement. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, or between the Plan Supplement and the Plan, the terms of the Plan will control. Except as otherwise indicated herein or in the Plan, the Debtors will file all Plan Supplement documents with the Bankruptcy Court and make them available for review at the Debtors' document website located at *https://cases.primeclerk.com/GEE* no later than seven (7) days before the Plan Objection Deadline.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan. The Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, subject to the terms of the Plan. The statements contained in this Disclosure

Statement are made as of the date of this Disclosure Statement and there can be no assurance that the statements contained herein will be correct at any time after this date. The information contained in this Disclosure Statement, including information regarding the Debtors' history, businesses, operations, financial information and liquidation analysis, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings (if any), is not to be construed as an admission or stipulation, but rather as a statement made in settlement negotiations as part of the Debtors' attempt to settle and resolve claims and controversies pursuant to the Plan. This Disclosure Statement will not be admissible in any non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities or other legal effects of the Plan as to Holders of Claims against, or Interests in, the Debtors. Except where specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

The Debtors believe that the solicitation of votes on the Plan made in connection with this Disclosure Statement does not require registration under the Securities Act of 1933, as amended (the "**Securities Act**") and related state statutes.

The effectiveness of the Plan is subject to material conditions precedent. See Article V.F below and Article IX.B of the Plan. There is no assurance that these conditions will be satisfied or waived.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Interests in, the Debtors will be bound the by the terms of the Plan and the transactions contemplated thereby, including the Third-Party Releases contained therein (including, without limitation those Holders who do not submit Ballots to accept or reject the Plan or who are not entitled to vote on the Plan, but excluding Holders who are entitled to, and do, opt out of providing the Third-Party Release).

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses and assets. Forward-looking statements can often be identified by the use of terminology such as "subject to," "believe," "anticipate," "plan," "expect," "intend," "estimate," "project," "may," "will," "should," "would," "could," "can," the negatives thereof, variations thereon and similar expressions, or by discussions of strategy. These forward-looking statements are subject to a number of risks, uncertainties, and assumptions, including those described below in Article IX of this Disclosure Statement. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. The Debtors do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events, or otherwise.

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, the Plan Supplement, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or the Debtors' Chapter 11 Cases generally, please contact the Debtors' Balloting Agent, Prime Clerk LLC ("**Prime Clerk**") by (i) visiting the Debtors' document website at https://cases.primeclerk.com/GEE, (ii) calling 877-930-4318 (for U.S. callers) or 347-897-4054 (for international callers), or (iii) sending an e-mail to GEEinfo@PrimeClerk.com.

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................................................1

    A.    Material Terms of the Plan ..........................................................................2
    B.    Voting on the Plan ......................................................................................3
    C.    Confirmation Hearing .................................................................................7
    D.    Advisors .....................................................................................................7

II. OVERVIEW OF THE PRE-SALE DEBTORS' OPERATIONS ........................................8

    A.    The Debtors' Corporate Structure ..............................................................8
    B.    The Debtors' Corporate History .................................................................9
    C.    The Debtors' Business Operations and Revenue ........................................9
    D.    The Debtors' Prepetition Capital Structure ................................................9
    E.    First Lien Credit Facility ..........................................................................10
    F.    Second Lien Notes ...................................................................................11
    G.    Convertible Senior Notes .........................................................................12
    H.    Trade Debt ...............................................................................................12

III. EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES .................12

    A.    COVID-19 Impact ...................................................................................12
    B.    Prepetition Restructuring Efforts ..............................................................12
    C.    Restructuring Support Agreement ............................................................13

IV. OVERVIEW OF THE CHAPTER 11 CASES ...................................................................14

    A.    Commencement of Chapter 11 Cases .......................................................14
    B.    First Day Motions ....................................................................................14
    C.    Procedural Motions ..................................................................................15
    D.    DIP Financing ..........................................................................................15
    E.    Appointment of Creditors' Committee ......................................................15
    F.    Exclusivity ...............................................................................................15
    G.    Sale of Substantially all of the Debtors' Assets and the Committee
            Settlement ................................................................................................16
    H.    Schedules and Bar Dates ..........................................................................17

V. SUMMARY OF THE PLAN ..............................................................................................18

    A.    Classification and Treatment of Claims and Interests under the Plan ..................27
    B.    Acceptance or Rejection of the Plan; Effect of Rejection of Plan .......................28
    C.    Treatment of Executory Contracts and Unexpired Leases; Employee
            Benefits; and Insurance Policies ..............................................................28
    D.    Provisions Governing Distributions ..........................................................29

E.    Procedures for Resolving Disputed, Contingent, and Unliquidated Claims
      or Interests.................................................................................................30
F.    Conditions Precedent to Confirmation.....................................................32
G.    Conditions Precedent to the Effective Date .............................................32
H.    Releases....................................................................................................34

VI. MEANS FOR IMPLEMENTATION.......................................................................37

A.    Transaction Effective as of the Effective Date ........................................37
B.    Closing of Sale Transaction and Uses of Cash ........................................37
C.    Plan Administrator ...................................................................................38
D.    The Plan Administration Assets................................................................39
E.    Merger of Debtors; Closing Cases of Debtor Affiliates ...........................39
F.    Cancellation of Existing Securities and Agreements................................39
G.    Corporate Action......................................................................................41
H.    Exemption from Certain Transfer Taxes ..................................................41
I.    Directors, Managers, and Officers of the Debtors ...................................42
J.    D&O and Insurance Policies....................................................................42
K.    Preservation of Rights of Action..............................................................42
L.    Closing of the Chapter 11 Cases ..............................................................43

VII. CONFIRMATION OF THE PLAN .......................................................................43

A.    Confirmation Hearing ..............................................................................43
B.    Objections to Confirmation......................................................................43
C.    Confirmation ............................................................................................44
D.    Standards Applicable to Releases ............................................................47
E.    Classification of Claims and Interests......................................................48
F.    Consummation .........................................................................................48
G.    Dissolution of Committee .........................................................................48
H.    Modification of Plan ................................................................................48
I.    Revocation or Withdrawal of the Plan.....................................................48
J.    Post-Confirmation Jurisdiction of the Bankruptcy Court .......................49
K.    Ad Hoc DIP and First Lien Lender Fees and Expenses............................51

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ........................................................................................................................51

A.    Continuation of Chapter 11 Cases ...........................................................51
B.    Liquidation under Chapter 7 ....................................................................51
C.    Dismissal of Chapter 11 Cases ................................................................52

IX. FACTORS TO CONSIDER BEFORE VOTING .................................................52

A.    Certain Bankruptcy Law Considerations.................................................52
B.    Additional Factors....................................................................................54

X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................55

ii

**A.**      **General**.................................................................................................55

**B.**      **Certain Material U.S. Federal Income Tax Consequences to the U.S. Holders of Claims**.................................................................................56

**C.**      **Backup Withholding and Information Reporting** ...........................................57

**D.**      **Certain U.S. Federal Income Tax Consequences to the Debtors**....................58

CONCLUSION AND RECOMMENDATION................................................................................58

EXHIBIT A:    Plan

EXHIBIT B:    Organizational Chart

EXHIBIT C:    Liquidation Analysis

EXHIBIT D:    Wind-Down Budget

EXHIBIT E:    Asset Purchase Agreement

# I.
# INTRODUCTION

This is the disclosure statement (the "**Disclosure Statement**") of Global Eagle Entertainment Inc.; Airline Media Productions Inc.; Emerging Markets Communications, LLC; Entertainment in Motion, Inc.; Global Eagle Entertainment Operations Solutions, Inc.; Global Eagle Services, LLC; Global Eagle Telecom Licensing Subsidiary LLC; IFE Services (USA), Inc.; Inflight Productions USA, Inc.; Maritime Telecommunications Network, Inc.; MTN Government Services, Inc.; MTN International, Inc.; MTN License Corp.; N44HQ, LLC; Post Modern Edit, Inc.; Row 44, Inc.; and The Lab Aero, Inc. (each, a "**Debtor**" and, collectively, the "**Debtors**") in the above-captioned Chapter 11 Cases pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), filed pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") and in connection with the *Joint Plan of Liquidation for Global Eagle Entertainment Inc. and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* dated November 13, 2020 (as may be amended, modified, or supplemented from time to time, the "**Plan**").[2]

The purpose of this Disclosure Statement is to provide Holders of Claims entitled to vote to accept or reject the Plan with adequate information about (i) the Debtors' pre-sale businesses and certain historical events, (ii) the Chapter 11 Cases, (iii) the Plan, (iv) the rights of Holders of Claims and Interests under the Plan, and (v) other matters necessary to enable each Holder of a Claim entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject the Plan.  Only Holders of Claims in Classes 2, 3a, 3b, and 3c are entitled to vote on the Plan; Holders of Claims in other Classes and Holders of Interests are not entitled to vote on the Plan (*see* discussion at Article V of this Disclosure Statement).

Pursuant to section 1125 of the Bankruptcy Code, the Debtors submit this Disclosure Statement to all Holders of Claims against the Debtors entitled to vote on the Plan to provide information in connection with the solicitation of votes to accept or reject the Plan.  This Disclosure Statement is also available to all Holders of Claims against and Interests in the Debtors not eligible to vote on the Plan for informational purposes, including to detail the impact the Plan will have on such Holders' Claims and Interests.

As reflected in that certain restructuring support agreement (the "**Restructuring Support Agreement**") [Docket No. 34] entered into immediately prior to the commencement of the Chapter 11 Cases by and between the Debtors and an ad hoc group representing approximately 90% of the Debtors' first lien term loan and consisting of approximately 78% of the Debtors' first lien lenders (the "**Ad Hoc DIP and First Lien Lender Group**"), the Debtors initiated the Chapter 11 Cases in order to pursue a competitive sale process for their assets.  The sale process culminated in the sale of substantially all of the Debtors' assets pursuant to that certain asset purchase agreement (the "**Asset Purchase Agreement**") by and between the Debtors and GEE Acquisition Holdings Corp. as Purchaser (the "**Sale Transaction**").  GEE Acquisition Holdings Corp. is a special purpose entity formed for the benefit of the First Lien Lenders (as defined below) which, pursuant to the Asset Purchase Agreement, will, among other things and as set forth in more detail herein, in the Sale Order and in the Plan, credit bid a portion of the First Lien Loan Claims and ensure the administrative solvency of the Debtors and an orderly liquidation and wind-down of the Post-Effective Date Debtors.  The Sale Transaction was approved by the Bankruptcy Court on October 15, 2020.  The closing of the Sale Transaction is a condition precedent to the Plan becoming effective.

**The Plan includes certain release, injunctive, and exculpatory provisions described in greater detail in Section V.H below.**

---

[2]   Capitalized terms used in this Disclosure Statement, but not otherwise defined herein shall have the meanings given to them in the Plan.  To the extent there are any inconsistencies between this Disclosure Statement and the Plan, the Plan shall govern.

This Disclosure Statement sets forth certain information regarding the prepetition operating and financial history of the Debtors, the events leading up to the commencement of the Chapter 11 Cases, and material events that have occurred during the Chapter 11 Cases. This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation and effectiveness of the Plan, certain risk factors, the manner in which distributions will be made under the Plan, and certain alternatives to the Plan.

On [ ● ], 2020, the Bankruptcy Court entered the Disclosure Statement Order approving this Disclosure Statement as containing "adequate information," *i.e.*, information of a kind and in sufficient detail to enable a hypothetical reasonable investor to make an informed judgment about the Plan.

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

### A.      Material Terms of the Plan

The Bankruptcy Court entered an order (the "**Sale Order**") [Docket No. 518] on October 15, 2020, approving the Sale Transaction. The Debtors intend to consummate the Sale Transaction as promptly as practicable and in advance of, or concurrent with, the consummation of the Plan. As described in detail in Article IV.H. of this Disclosure Statement, the Plan reflects the terms of the Committee Settlement among the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lender Group incorporated into the Sale Order pursuant to which the Purchaser will (a) pay up to $8.5 million in cash in Additional Sale Consideration to be distributed in accordance with the terms of the Plan (in lieu of an equal amount of credit bid consideration), and (b) through funding of the Wind-Down Reserve and the Professional Fee Escrow (as each may be supplemented pursuant to the terms of the Plan and the Committee Settlement), in accordance with the Wind-Down Budget, pay all amounts as necessary to ensure the satisfaction of all Administrative Claims, Other Priority Claims, Priority Tax Claims, and Professional Fee Claims under the Plan. In addition, pursuant to the Asset Purchase Agreement, the Purchaser has agreed to repay and satisfy the debtor-in-possession financing and related obligations in connection with the closing of the Sale Transaction.

In addition, the terms of the Plan reflect the terms of an agreement in principle among the Debtors, the Ad Hoc DIP and First Lien Lender Group and the Searchlight Parties, in their capacity as Holders of Second Lien Note Claims, pursuant to which, the Debtors, the Searchlight Parties, and the Ad Hoc DIP and First Lien Lender Group support the treatment of the Second Lien Note Claims as set forth in Article III.B.3(c)(1) of the Plan and the Holders of Convertible Notes Claims and General Unsecured Claims will receive their Pro Rata Share of $4 million.

Distributions under the Plan shall be funded from the Additional Sale Consideration Escrow Account, the Wind-Down Reserve or the Professional Fee Escrow Account, as applicable, in accordance with the Wind-Down Budget, attached as **Exhibit D** hereto, upon consummation of the Sale Transaction. In addition, on the Effective Date, the Plan Administrator shall sign the Plan Administration Agreement and will accept, on behalf of Holders of Allowed Claims entitled to distributions under the Plan, the Plan Administration Assets. The Additional Sale Consideration Escrow Account and the Wind-Down Reserve, but not the Professional Fee Escrow Account, shall vest in the Debtors and their Estates pursuant to Article V.D of the Plan as Plan Administration Assets.

The individual or entity designated in the Plan Supplement shall serve as Plan Administrator and shall, among other things, facilitate Distributions under the Plan until the Chapter 11 Cases of all of the Debtors have been fully administered.

After the Effective Date, upon payment of all Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims and Plan Administration Expenses, and to the extent that the Plan Administrator determines in good faith, in consultation with the Ad Hoc DIP and First Lien Lender Group and on a reasonable basis that substantially all of the claims and expenses for which the Wind-Down Amount was held in escrow are no longer outstanding or otherwise satisfied in full, the Plan Administrator shall remit any remaining unused Wind-Down Amount and Plan Administration Assets (or proceeds thereof) to the Purchaser.

Article V of this Disclosure Statement provides a more detailed description of the Plan.

### B.    Voting on the Plan

The Disclosure Statement Order approved certain procedures governing the solicitation of votes on the Plan from Holders of Claims against the Debtors, including setting the Voting Deadline, determining which Holders of Claims are eligible to vote on the Plan, and setting other voting procedures.

**THE DISCLOSURE STATEMENT ORDER IS HEREBY INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.   YOU SHOULD READ THE DISCLOSURE STATEMENT ORDER, THE CONFIRMATION HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS SECTION, AS THEY SET FORTH IN DETAIL PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.**

The Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor. Therefore, the classifications set forth in the Plan apply separately with respect to each Plan proposed by, and the Claims against and Interests in, each Debtor.  Your vote with respect to a Claim will count as a vote for or against, as applicable, the Plan proposed by each Debtor against which you hold that Claim.

### 1.    Parties Entitled to Vote on the Plan

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on the plan (unless, for reasons discussed below, such holders are deemed to reject the plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

The following table summarizes which Classes are Impaired and which are entitled to vote on the Plan. The table is qualified in its entirety by reference to the full text of the Plan.

3

| Class | Claim | Status | Voting Rights | Est. Amount | Est. Recovery |
|---|---|---|---|---|---|
| 1. | Other Secured Claims | Unimpaired | Presumed to Accept | N/A | 100% |
| 2. | First Lien Loan Claims | Impaired | Entitled to Vote | $608.4 million[3] | 96% |
| 3a. | Second Lien Note Claims | Impaired | Entitled to Vote | $196.6 million[4] - $277.1 million[5] | <1%[6] |
| 3b. | Convertible Note Claims | Impaired | Entitled to Vote | $83.5 million[7] | 2.4 - 3.2%[8] |
| 3c. | General Unsecured Claims | Impaired | Entitled to Vote | $40 – 80 million | 2.4 - 3.2%[9] |
| 4. | Section 510 Claims | Impaired | Deemed to Reject | N/A | 0% |
| 5. | Intercompany Claims | Impaired | Deemed to Reject | N/A | 0% |
| 6. | Intercompany Interests | Impaired | Deemed to Reject | N/A | 0% |
| 7. | Equity Interests | Impaired | Deemed to Reject | N/A | 0% |

Accordingly, only Holders of record of Claims in Classes 2, 3a, 3b, and 3c as of **December 16**, 2020, the Voting Record Date established by the Debtors for purposes of the solicitation of votes on the Plan, are entitled to vote on the Plan.  If your Claim is not in one of these Classes, you are not entitled to vote on the Plan and you will not receive a Ballot with this Disclosure Statement.  If your Claim is in one of these Classes, you should read your Ballot and follow the voting instructions carefully.  In addition, the Disclosure Statement Order sets forth certain assumptions and procedures for determining the amount of Claims that each creditor is entitled to vote in these Chapter 11 Cases and how votes will be counted under various scenarios.  Please review the Disclosure Statement Order in its entirety prior to submitting your Ballot and submit only the Ballot that accompanies this Disclosure Statement.

---

[3]   Amount includes accrued, but unpaid interest and fees as of the Petition Date.

[4]   Amount includes $38.7 million of interest that has been paid-in-kind and added to the principal and $7.9 million of accrued interest.

[5]   In addition to the amounts set forth in footnote 4 *supra*, this amount also includes an asserted "make whole" payment amount of approximately $80 million under the Securities Purchase Agreement. *See* Article II.F., *infra*.

[6]   As noted herein, the recovery assumes that the Holders of Second Lien Note Claims vote in favor of the Plan, and consistent with Article III.B.3(c)(1) of the Plan, such Holders will receive their Pro Rata Share of the Class 3a Additional Sale Consideration Amount, which shall not be subject to any right or claim for turnover or recovery pursuant to the Intercreditor Agreement, including pursuant to the Turnover and Subordination Provisions thereof, or otherwise.

[7]   Amount includes $1.0 million of accrued interest.

[8]   Recovery assumes that Holders of Allowed Convertible Note Claims in Class 3b will receive their Pro Rata Share of the Class 3b and 3c Additional Sale Consideration Amount pursuant to terms of the Plan.

[9]   Recovery assumes that Holders of Allowed General Unsecured Claims in Class 3c will receive their Pro Rata Share of the Class 3b and 3c Additional Sale Consideration Amount pursuant to terms of the Plan.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not cast, solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**Your vote on the Plan is important**. The Bankruptcy Code requires as a condition to confirmation of a chapter 11 plan that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. Section 1129(b) permits confirmation of a chapter 11 plan, notwithstanding the nonacceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both. In addition, with respect to Classes that are deemed to have rejected the Plan, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code defines acceptance of a plan by a class of claims or interests as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the claims or interests of that class that cast ballots for acceptance or rejection of a plan. Thus, acceptance by a class of claims or interests occurs only if at least two-thirds (⅔) in dollar amount and a majority in number of the holders of claims or interests voting cast their ballots to accept the plan.

### 2.    Parties Not Entitled to Vote on the Plan

Holders of Claims and Interests in Classes 1, 4, 5, 6 and 7 are not entitled to vote to accept or reject the Plan (collectively, the "**Non-Voting Holders**"). In lieu of receiving the Solicitation Package (as defined below), Non-Voting Holders in Classes 1, 4 and 7 will receive the Notice of Non-Voting Status along with an Opt-Out Release Form, which will provide detailed instructions on how to "opt-out" of the Third Party Release contained in the Plan. In light of the fact that Intercompany Interests and Intercompany Claims are held by the Debtors, such Holders will not receive a Solicitation Package or the Notice of Non-Voting Status.

### 3.    Solicitation Package

The solicitation materials sent to Holders of Claims entitled to vote on the Plan contains (collectively, the "**Solicitation Package**"):

- a copy of the notice of the Confirmation Hearing (the "**Confirmation Hearing Notice**");

- a copy of this Disclosure Statement together with the exhibits hereto, including the Plan;

- a copy of the Disclosure Statement Order in its entered form (without exhibits attached);

- a cover letter from the Debtors explaining the solicitation process and urging Holders of Claims in the Voting Classes to vote to accept the Plan; and

- an appropriate form of Ballot, instructions on how to complete the Ballot, and a prepaid, pre-addressed Ballot return envelope.

In addition to the above, the Committee may include a letter in support of the Plan in the Solicitation Package sent to Holders entitled to vote on the Plan.

5

In addition, the Plan, this Disclosure Statement, and, once they are filed, all exhibits to both documents (including the Plan Supplement) will be made available online at no charge at the website maintained by the Debtors' Balloting Agent at https://cases.primeclerk.com/GEE.  The Debtors will also provide parties in interest (at no charge) with hard copies of the Plan and/or Disclosure Statement, as well as any exhibits thereto, upon request to the Balloting Agent by email at GEEinfo@PrimeClerk.com or by telephone at 877-930-4318 (for U.S. callers) or 347-897-4054.

### 4.        Voting Procedures, Ballots, and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot or Ballot(s) has been enclosed in your Solicitation Package for the purpose of voting on the Plan.  Please vote and return your Ballot(s) in accordance with the instructions accompanying your Ballot(s).

Prior to voting on the Plan, you should carefully review (1) the Plan and the Plan Supplement, (2) this Disclosure Statement, (3) the Disclosure Statement Order, (4) the Confirmation Hearing Notice and (5) the detailed instructions accompanying your Ballot(s).

Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement. If you (1) hold Claims in more than one voting Class, or (2) hold multiple Claims within one Class, including if you (a) are the beneficial owner of Claims held under the name of your broker, bank, dealer, or other agent or nominee (each, a "**Voting Nominee**") (rather than under your own name) through one or more than one Voting Nominee or (b) are the beneficial owner of Claims registered in your own name as well as the beneficial owner of Claims registered under the name of your Voting Nominee (rather than under your own name), you may receive more than one Ballot.

The Debtors believe that many Holders of Convertible Notes Claims entitled to vote on the Plan hold their Claims through Voting Nominees.  As a result, for your votes with respect to such Claims to be counted, your Ballots must be either (a) mailed to the appropriate Voting Nominees at the addresses on the envelopes enclosed with your Ballot(s) (or otherwise delivered to the appropriate Voting Nominees in accordance with such Voting Nominees' instructions) so that such Voting Nominees have sufficient time to record the votes of such beneficial owner on a master ballot aggregating votes of beneficial holders of Convertible Notes Claims, as applicable, (a "**Master Ballot**") and return such Master Ballot so it is actually received by the Balloting Agent by the Voting Deadline or (b) if the Voting Nominee elects to "pre-validate" the Ballots, in accordance with the solicitation procedures approved pursuant to the Disclosure Statement Order, mailed to the Balloting Agent so that such Ballot is received on or prior to the Voting Deadline.

All Ballots, including Master Ballots, in order to be counted, must be properly completed in accordance with the voting instructions on the Ballot or Master Ballot , as applicable, and **actually received** by the Balloting Agent no later than the Voting Deadline (*i.e.*, **January 19, 2021, at 4:00 p.m. (Eastern Time)**) by the Balloting Agent through one of the following means:

Mail, Courier, or Personal Delivery:        GEE Ballot Processing
                                             c/o Prime Clerk LLC
                                             One Grand Central Place
                                             60 East 42nd Street, Suite 1440
                                             New York, NY, 10165

Online Upload:                               https://cases.primeclerk.com/GEE

Detailed instructions for completing and transmitting Ballots and Master Ballots are included with the Ballots and Master Ballots, respectively, provided in the Solicitation Package.

If the Balloting Agent receives more than one timely, properly completed Ballot or Master Ballot with respect to a single Claim prior to the Voting Deadline, the vote that will be counted for purposes of determining whether sufficient acceptances to confirm the Plan have been received will be the vote recorded on the last timely, properly completed Ballot or Master Ballot, as determined by the Balloting Agent, received with respect to such Claim.

If you are a Holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning this Disclosure Statement, the Plan, the Ballot, or the procedures for voting on the Plan, please contact the Balloting Agent (at the phone numbers or email address listed above) or your Voting Nominee, as applicable.

Before voting on the Plan, each Holder of a Claim in Classes 2, 3a, 3b, or 3c should read, in its entirety, this Disclosure Statement, the Plan and the Plan Supplement, the Disclosure Statement Order, the Confirmation Hearing Notice, and the instructions accompanying the Ballot. These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated. Holders of Claims entitled to vote are also encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or consult their own legal, tax and/or financial advisors.

### C.    **Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for **January 26, 2020, at 1:00 p.m. (Eastern Time)**, before the Honorable Judge John T. Dorsey, United States Bankruptcy Judge for the District of Delaware, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 5th Floor, Courtroom #5, Wilmington, Delaware (or via telephonic or other electronic means, as the Bankruptcy Court may direct).[10] The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice. Any objection to Confirmation must (a) be in writing, (b) comply with the Bankruptcy Rules and the Local Rules, (c) set forth the name of the objector and the nature and amount of any claim or interest asserted by the objector against or in the Debtors, and (d) state with particularity the legal and factual bases for the objection. Any such objections must be filed and served upon the persons designated in the Confirmation Hearing Notice in the manner and by the deadline described therein.

### D.    **Advisors**

The Debtors' bankruptcy legal advisors are Latham & Watkins LLP and Young Conaway Stargatt & Taylor, LLP. Their financial advisors are Alvarez & Marsal North America, LLC and Greenhill & Co., LLC, which is also the Debtors' investment banker. The Debtors' advisors can be contacted at:

| Latham & Watkins LLP | Latham & Watkins LLP<br>355 South Grand Avenue, Suite 100<br>Los Angeles, California 90071 |
| --- | --- |

---

[10]    To the extent the Confirmation Hearing occurs virtually, participation instructions will be provided on the agenda filed on the docket prior to the Confirmation Hearing.

|  | Attn: Ted A. Dillman, Helena G. Tseregounis, and Nicholas J. Messana<br><br>-and-<br><br>Latham & Watkins LLP<br>885 Third Avenue<br>New York, New York 10022<br>Attn: George A. Davis, Andrew C. Ambruoso, and Jonathan J. Weichselbaum |
|---|---|
| Young Conaway Stargatt & Taylor, LLP | Young Conaway Stargatt & Taylor, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Attn: Michael R. Nestor, Kara Hammond Coyle, and Betsy L. Feldman |
| Alvarez & Marsal North America, LLC | Alvarez & Marsal North America, LLC<br>2029 Century Park East, Suite 2060<br>Los Angeles, California 90067<br>Attn: Jonathan Goulding, Jeff Liu, and Sam Cascante |
| Greenhill & Co., LLC | Greenhill & Co., LLC<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Attn: Neil Augustine, Jochen Schmitz, Michael Costelloe |
| Prime Clerk LLC | Prime Clerk LLC<br>One Grand Central Place<br>Suite 1440<br>New York, New York 10165<br>Attn: GEE Solicitation Group |

## II.
## OVERVIEW OF THE PRE-SALE DEBTORS' OPERATIONS

The following is an overview of the Debtors' historic operations, capital structure, and certain other matters. As noted above, upon closing of the Sale Transaction, substantially all of the Debtors' assets and operations will be transferred to the Purchaser, and the remainder of the Debtors' estates will be wound down and administered in accordance with the Plan.

### A.        The Debtors' Corporate Structure

GEE is the ultimate parent of all of the Debtors in these Chapter 11 Cases as well as their non-Debtor affiliates (the Debtors and their non-Debtor affiliates, together, collectively the "**Company**" or "**Global Eagle**").

A detailed organizational chart is attached hereto as **Exhibit B.**

8

### B.        The Debtors' Corporate History

In February 2011, Global Eagle Acquisition Corp. ("**GEAC**") was formed as a "special purpose acquisition company" with the purpose of effecting a merger, capital stock exchange, asset acquisition and/or similar business combination with one or more businesses.  In January 2013, GEAC acquired all of the outstanding shares of common stock of Row 44, Inc. and 86% of the issued and outstanding shares of Advanced Inflight Alliance AG, combining the two companies' respective leading inflight connectivity and inflight entertainment operations.  Upon completion of the business combination transaction, GEAC changed its name to Global Eagle Entertainment Inc.

Since January 2013, Global Eagle has acquired multiple other companies and assets, including Emerging Markets Communication ("**EMC**") in July 2016, which acquisition expanded the Company's connectivity and entertainment services portfolio into maritime, enterprise and government end-markets.

### C.        The Debtors' Business Operations and Revenue

**Debtors' Business Operations**

Global Eagle is a leading provider of media, content, connectivity and data analytics, focusing on the delivery of satellite-based Internet service and content to global aviation, maritime and land markets to markets across air, sea, and land.  Global Eagle and its predecessors pioneered the application of satellite-based connectivity in large airline fleets and cruise ships.  Global Eagle's aircraft Wi-Fi connectivity system was first deployed by a commercial airline in 2009, and in-flight broadband services became fully operational in 2010.

As described further in the *Declaration of Christian M. Mezger in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 2] (the "**First Day Declaration**"), Global Eagle's operations generate revenue through two primary sources:  (i) licensing and managing media and entertainment content and providing related services to customers in the airline, maritime and other "away-from-home" non-theatrical markets ("**Media & Content**"); and (ii) providing satellite-based Internet access and other connectivity solutions to airlines, cruise ships and other markets ("**Connectivity**").  The Company's customers are primarily in the airline, maritime, and enterprise and government industries.

**Debtors' Revenue**

Consolidated net revenue was approximately $657 million in 2019 and $560 million in LTM Q2 2020. These amounts were comprised of approximately $311 million and $246 million in revenues from its Media & Content segment, respectively, and approximately $346 million and $314 million in revenues from its Connectivity segment (excluding intersegment revenue), respectively.

**Debtors' Employees**

As of the Petition Date, Global Eagle had approximately 1,115 employees, of which approximately 470 were Debtor employees (the "**Employees**").  Of the 470 Debtor Employees, approximately 465 were employed on a full-time basis and approximately five were employed on a part-time basis.  The Debtors have historically maintained incentive and compensation programs designed to attract, retain, or incentivize key employees.

### D.        The Debtors' Prepetition Capital Structure

**Overview of the Debtors' Funded Debt**

As described in further detail below, the Debtors' prepetition funded debt consisted of: (a) a first lien secured term loan and revolving credit facility; (b) second lien secured notes due in 2023 and (c) unsecured convertible notes.  A summary overview is provided below:

| Instrument | Line Size/Original Amount | Approximate Amount Outstanding as of the Petition Date[11] | Priority of Prepetition Security Interests |
|---|---|---|---|
| First Lien Credit Facility | $540 million term loan facility<br><br>$85 million revolving credit facility | $608.4 million (includes accrued, but unpaid interest and fees) | First priority lien on the Collateral (as defined in the First Lien Credit Agreement) |
| Second Lien Notes | $150 million | $196.6 million (includes $38.7 million of interest that has been paid-in-kind and added to the principal and $7.9 million of accrued interest)[12] | Second priority lien on the Collateral |
| Convertible Notes | | $83.5 million (includes $1.0 million of accrued interest) | Unsecured |
| **Total** | | **$888.5 million** | |

### E.    First Lien Credit Facility

The Debtors are party to that certain Credit Agreement, dated as of January 6, 2017 (as amended, amended and restated, supplemented, or otherwise modified from time to time), by and among GEE, as borrower, each Debtor other than GEE, as guarantors (the "**First Lien Guarantors**"), and Citibank, N.A., as administrative and collateral agent (in such capacities, the "**First Lien Agent**"), for and on behalf of itself and the lenders party thereto (collectively, the "**First Lien Lenders**"), pursuant to which the First Lien Lenders agreed to provide GEE with a senior secured term loan facility (the "**First Lien Term Loan Facility**") in an aggregate principal amount of $540 million and a senior secured revolving credit facility (the "**First Lien Revolving Credit Facility**" and, together with the First Lien Term Loan Facility, the "**First Lien Credit Facility**") with $85 million of aggregate availability thereunder (including up to $15 million available for the issuance of letters of credit).  The First Lien Term Loan Facility matures on January 6, 2023 and the First Lien Revolving Credit Facility matures on January 6, 2022.

The First Lien Credit Facility is secured by a first priority lien on the Collateral.  The Collateral includes substantially all of the Debtors' tangible and intangible assets, including a pledge of all of the outstanding capital stock of substantially all of the Company's domestic subsidiaries and 100% of the shares or equity interests in any foreign subsidiary directly owned by a Debtor.  The First Lien Credit Agreement, as amended, also requires GEE to maintain a maximum consolidated first lien net leverage ratio (the "**Maximum Leverage Covenant**") of no greater than 6.75x as of June 30, 2020 (the requirement steps

---

[11]    Amount as of July 21, 2020.

[12]    *See* Article II.F., *infra*.

down .25 each quarter through September 30, 2022, resulting in a maximum consolidated first lien net leverage ratio of 5.00x as of September 30, 2022 and as of the last day of each fiscal quarter thereafter).

Beginning in April 2020, the Debtors entered into a series of amendments to the First Lien Credit Agreement, which included a tenth amendment, dated as of April 15, 2020 (the "**April 15 First Lien Amendment**").  The April 15 First Lien Amendment delayed the deadline under the First Lien Credit Agreement for furnishing audited year-end 2019 financial statements and unaudited financial statements for the first quarter of 2020.  In addition, the April 15 First Lien Amendment modified and exempted the Company from compliance with the Maximum Leverage Covenant for the first quarter of 2020, but subjected the Company to, among other reporting covenants, a liquidity covenant requiring the Company to maintain a minimum level of aggregate undrawn revolving commitments above $17.5 million in the aggregate plus unrestricted cash and cash equivalents (the "**Minimum Liquidity Covenant**").

On July 9, 2020, the Debtors entered into an eleventh amendment to the First Lien Credit Agreement (the "**July 9 Amendment**"), under which the lenders party thereto waived until August 1, 2020, any default or event of default arising from the failure to pay interest due on July 9, 2020.  The July 9 Amendment also provided for default interest to accrue and for payment of certain fees payable in-kind to the lender parties thereto.  On July 20, 2020, the Debtors entered into a twelfth amendment of the First Lien Credit Agreement (the "**July 20 Amendment**").  The July 20 Amendment exempted the Company from compliance with the Minimum Liquidity Covenant from the period commencing July 20, 2020 through August 1, 2020.

As of the Petition Date, certain of the Debtors had contingent reimbursement obligations (such reimbursement obligations, collectively, the "**Prepetition L/C Obligations**") in connection with letters of credit (the "**Prepetition L/Cs**") issued pursuant to the letter of credit sub-facility included in the First Lien Revolving Credit Facility (the "**Prepetition L/C Facility**") in an aggregate amount of $3,874,331.

F.      **Second Lien Notes**

Pursuant to the Securities Purchase Agreement dated March 8, 2018 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Securities Purchase Agreement**"), between GEE, as issuer, Cortland Capital Market Services (now known as Alter Domus LLC), as collateral agent (in such capacity, the "**Second Lien Agent**"), and Searchlight II TBO, L.P. and Searchlight II TBO-W, L.P. as purchasers (collectively, "**Searchlight**" or the "**Second Lien Noteholder**" and, together with the First Lien Lenders, the "**Prepetition Secured Parties**"), GEE issued to Searchlight $150 million in aggregate principal amount of secured second lien notes (the "**Second Lien Notes**"), together with two sets of warrants to acquire GEE's common stock.  As of the Petition Date, approximately $196.6 million in principal amount of Second Lien Notes remained outstanding, which includes $38.7 million of interest that had been paid-in-kind and added to the principal since issuance and $7.9 million of accrued interest.  The Second Lien Notes mature on June 30, 2023.

On November 10, 2020, Searchlight, on behalf of itself and certain of its affiliates, managed accounts or funds, as Holders of Second Lien Note Claims, filed a Proof of Claim [Claim No. 464], asserting a total Claim of approximately $277.1 million, including a claim for an asserted "make whole" payment under the Securities Purchase Agreement of approximately $80 million.  The Debtors, the Committee, and all parties in interest in the Chapter 11 Cases, reserve all their rights with respect to the claims (for the avoidance of doubt, including, without limitation, the "make whole" payment) asserted by Searchlight in their Proof of Claim.

The Second Lien Notes are guaranteed by each Debtor other than GEE (collectively, the "**Second Lien Guarantors**" and, together with the First Lien Guarantors, the "**Prepetition Guarantors**") pursuant to that certain Guaranty, dated as of March 27, 2018 (as amended, amended and restated, supplemented, or

11

otherwise modified from time to time) in favor of the Second Lien Noteholder.  The Second Lien Notes are secured by a second priority lien on the Collateral.

### G. Convertible Senior Notes

In addition to the secured debt described above, GEE also issued certain 2.75% convertible senior unsecured notes due February 15, 2035, in a private placement (the "**Convertible Notes**"), pursuant to the Purchase Agreement, dated as of February 12, 2015, between GEE, as issuer, and Piper Jaffray & Co., as representative of certain initial purchasers.  The terms of the Convertible Senior Notes are governed by the Indenture, dated February 18, 2015, between GEE and U.S. Bank National Association, as trustee.  The Convertible Notes are unsecured obligations and do not contain any financial covenants or restrictions on the payments of dividends, the incurrence of indebtedness, or further issuances of debt by GEE or the Prepetition Guarantors.  The Convertible Notes are not guaranteed by any of the other Debtors.  As of the Petition Date, the principal amount outstanding of the Convertible Notes was approximately $82.5 million.

### H. Trade Debt

In the ordinary course of their businesses, the Debtors incur trade debt with numerous vendors in connection with their operations.  The Debtors believe that their current unsecured trade debt on account of prepetition goods and services provided to the Debtors totals approximately $82.3 million in the aggregate.

### III.
### EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

The Debtors filed these Chapter 11 Cases to effect a going-concern sale of their assets and an orderly winding up of their Estates.  The Chapter 11 Cases provided the Debtors with the best path forward to de-leverage and re-capitalize their business.

### A. COVID-19 Impact

As a result of the global COVID-19 pandemic, the Debtors' customer base, namely the airline, cruise and travel industries, faced unprecedented challenges stemming from the significant reduction in demand for travel, compounded by government-imposed restrictions on travel, government- and business-imposed shutdowns and other operational issues.  Such factors negatively impacted the demand for the Debtors' services, the Debtors' operations and cash flows.

In an effort to address these unprecedented challenges, in the months leading up to the filing of the Chapter 11 Cases, the Debtors, in consultation with their advisors, engaged in numerous cost-saving initiatives to manage their near-term liquidity needs.  Such measures included, but were not limited to, working with customers, suppliers and vendors to optimize terms, as well as implementing internal operating expense protocols to bring down expenses and reduce labor costs.  While such efforts mitigated the impact that the COVID-19 pandemic had on Global Eagle, the Debtors still encountered significant liquidity challenges leading up to the filing of the Chapter 11 Cases.

### B. Prepetition Restructuring Efforts

Prior to the pandemic, the Debtors also faced liquidity challenges due to their substantial debt load, related debt services payments and ongoing strategic and operational turnaround.  As a result of significant interest payments arising from the Debtors' outstanding debt balance, the Debtors generated negative cash flows from operations in 2018 and 2019.  In 2019, Global Eagle incurred net losses of approximately $153 million.

12

In July 2019 the Debtors entered into an amendment to the First Lien Credit Agreement (the "**July 2019 Amendment**"), which among other accommodations, provided the Debtors with approximately $60 million of incremental liquidity over an eighteen-month period and relaxed certain financial covenants under the First Lien Credit Agreement.

Although the July 2019 Amendment provided the Debtors with liquidity and covenant relief to support the Debtors' operations, as described above, the unprecedented global spread of COVID-19 diminished the benefits otherwise afforded by the July 2019 Amendment. The Debtors drew down substantially all of their remaining availability under the First Lien Credit Facility in February 2020 and continued execution of their cost-streamlining program and cash preservation measures in response to the unfolding COVID-19 pandemic.

Shortly thereafter, in March 2020, the Company began evaluating potential strategic alternatives. As more fully described in the First Day Declaration, in an effort to navigate the impact of COVID-19, the Debtors along with their advisors, explored financial and restructuring solutions and made efforts to negotiate and engage with prepetition stakeholders, including the Ad Hoc DIP and First Lien Lender Group, the Second Lien Noteholder as well certain holders of Convertible Notes. In parallel, the Debtors evaluated and/or explored options to meet their financial challenges, including potential capital raises, a refinancing of their existing prepetition debt (including by way of certain federal government-driven COVID-19 programs), monetization of certain non-core assets, in-court and out-of-court restructuring solutions, as well as other capital structure alternatives, financing options, or strategic alternatives.

Specifically, the Debtors and their professionals reached out to numerous third parties to solicit and evaluate third-party strategic and financial sponsor interest in an investment in or an acquisition of all or substantially all of the Debtors' assets. Despite the significant outreach efforts the Debtors did not receive actionable proposals for a potential financing or strategic investment and/or acquisition from third parties (or from any of their key stakeholders, except from the Ad Hoc DIP and First Lien Lender Group as described below). In addition, as a result of government action in response to the COVID-19 pandemic, the Debtors and their advisors explored government backed loans. Ultimately, the Debtors did not qualify for government relief.

### C.    Restructuring Support Agreement

In June 2020, in parallel to the aforementioned initiatives, negotiations with the Ad Hoc DIP and First Lien Lender Group progressed substantially. The parties engaged in extensive discussions surrounding the terms of a potential restructuring through a formal chapter 11 process that would include debtor-in-possession financing. Following weeks of productive, arm's-length negotiations, the Debtors entered into the Restructuring Support Agreement with the Ad Hoc DIP and First Lien Lender Group.

The Restructuring Support Agreement provided that, among other things, the Company would pursue a sale of substantially all of its assets under section 363 of the Bankruptcy Code. In addition, the Ad Hoc DIP and First Lien Lender Group committed to serve (through an entity formed on behalf of the First Lien Lenders) as a stalking horse bidder (the "**Stalking Horse Bidder**") for the sale. Pursuant to the terms outlined in the term sheet attached as Exhibit A to the Restructuring Support Agreement (the "**RSA Term Sheet**"), the Stalking Horse Bidder agreed to purchase the Debtors' assets, subject to better or higher bids, through, in addition to other consideration, a credit bid of certain of the obligations under the First Lien Credit Agreement (the "**Stalking Horse Bid**").

In addition, pursuant to the Restructuring Support Agreement, the Ad Hoc DIP and First Lien Lender Group agreed to (i) consent to the Debtors' use of cash collateral during the Chapter 11 Cases as well as (ii) provide "new money" loans under the DIP Facility, in accordance with the terms of a budget prepared by the Debtors and approved by the required lenders under and pursuant to the DIP Credit Agreement in

13

accordance with Section 6.24 of the DIP Credit Agreement (as defined in the DIP Motion) (the "**Approved DIP Budget**").  Finally, the Restructuring Support Agreement also provided that the Ad Hoc DIP and First Lien Lender Group would ensure the Debtors retained sufficient cash following the closing of a sale transaction to wind-down their estates.

**IV.**
**OVERVIEW OF THE CHAPTER 11 CASES**

**A.      Commencement of Chapter 11 Cases**

On July 22, 2020, immediately following the execution of the Restructuring Support Agreement, each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

**B.      First Day Motions**

On the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court and authorizing the Debtors to maintain their operations in the ordinary course (the "**First Day Motions**").  The relief sought in the First Day Motions was aimed at ensuring a seamless transition between the Debtors' prepetition and postpetition business operations, facilitating a smooth going-concern sale through the chapter 11 process, and minimizing disruptions to the Debtors' businesses.  The Bankruptcy Court entered various orders authorizing the relief requested in the First Day Motions, including, among other things, authorizing the Debtors to:

- Jointly administer the Chapter 11 Cases [Docket No. 73];

- Retain Prime Clerk, LLC as claims and noticing agent [Docket No. 74];

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket No. 231];

- File a consolidated list of creditors and modify certain notice and identification requirements [Docket No. 76];

- Enforce the protections of the automatic stay with respect to certain non-Debtor affiliates [Docket No. 77];

- Establish a record date for notice and sell-down procedures for transfers of claims against the Debtors [Docket No. 197];

- Establish notice and hearing procedures for the trading of Global Eagle equity securities [Docket No. 316];

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 200];

- Pay certain prepetition taxes and fees [Docket No. 199];

- Continue insurance policies programs [Docket No. 198];

- Continue paying employee wages and benefits and processing workers' compensation claims [Docket No. 202];

- Pay certain critical vendors and lien claimants [Docket No. 201]; and

- Obtain postpetition financing and use of cash collateral (as further described below) [Docket No. 233].

### C.      Procedural Motions

Since the commencement of these Chapter 11 Cases, the Debtors have also filed various motions regarding procedural issues common to chapter 11 cases of similar size and complexity, including, without limitation, a motion for entry of an order establishing procedures for the interim compensation and reimbursement of expenses of professionals, a motion for entry of an order authorizing the Debtors to employ professionals used in the ordinary course of business and a motion for entry of an order establishing bar dates for the filing of Proofs of Claim related to certain prepetition Claims, among others.

### D.      DIP Financing

Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "**DIP Motion**") [Docket No. 40] filed on July 22, 2020, the Debtors requested authority to, among other things, enter into a(n) (i) superpriority, senior secured multi-draw term loan debtor-in-possession financing facility in a principal amount of $80 million (the "**DIP Facility**") and (ii) up to $10 million letter of credit facility to provide replacement and additional letter of credit capacity, inclusive of Prepetition L/Cs (the "**DIP L/C Facility**").  In addition to the financing contemplated in the DIP Facility and in exchange for the authorization to use collateral and cash collateral, the Debtors granted adequate protection to (a) the Prepetition Secured Parties, in the form of replacement liens, and (b) the First Lien Secured Parties, in the form of superpriority claims, reporting obligations, and the payment of advisor fees.  The DIP Facility continues to provide the Debtors with the cash necessary to meet their operational needs and administer the Chapter 11 Cases.

The Court entered the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* on August 18, 2020.  [Docket No. 233].

### E.      Appointment of Creditors' Committee

On August 5, 2020, the United States Trustee for the District of Delaware appointed a five (5) member official committee of unsecured creditors (the "**Committee**") pursuant to section 1102 of the Bankruptcy Code [Docket No. 190].  The Committee subsequently retained Akin Gump Strauss Hauer & Feld LLP as its primary legal advisor, Ashby & Geddes, P.A. as its Delaware co-counsel and Perella Weinberg Partner, LP as its investment banker.  The members of the Committee are U.S. Bank, N.A., as the Convertible Notes Indenture Trustee, New Skies Satellites B.V., QEST QUANTENELEKTRONISCHE SYSTEME GMBH, Lions Gate Films, Inc., and Citadel Equity Fund Ltd.

### F.      Exclusivity

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a chapter 11 plan (the "**Exclusive Plan Period**").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan

15

within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan, before the expiration of which no other party in interest may file a plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods. The Exclusive Plan Period currently expires on November 19, 2020; the Debtors intend to seek to extend the Exclusive Periods, prior to the expiration of the Exclusive Plan Period, to facilitate confirmation and consummation of the Plan.

### G.    Sale of Substantially all of the Debtors' Assets and the Committee Settlement

On July 24, 2020, the Debtors filed the *Motion of Debtors for Entry of Orders (I) Authorizing and Approving Bidding Procedures, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Certain Executory Contracts and Leases, and (V) Granting Related Relief* [Docket No. 95] (the "**Bidding Procedures Motion**"), pursuant to which the Debtors sought to establish certain procedures (the "**Proposed Bidding Procedures**") with respect to a competitive sale and marketing process for their assets. On August 12, 2020, the Committee filed an objection to the Bidding Procedures Motion [Docket No. 161] (the "**Bidding Procedures Objection**"). On August 19, 2020, the Bankruptcy Court entered an order approving the Bidding Procedures Motion (the "**Bidding Procedures Order**") [Docket No. 239], including the revised Proposed Bidding Procedures (as revised, the "**Bidding Procedures**").

Pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order, interested parties were invited to submit bids on the Debtors' assets no later than 4:00 p.m. (prevailing Eastern Time) on October 5, 2020 (the "**Qualified Bid Deadline**"). In order for a bid to be considered a "Qualified Bid" under the Bidding Procedures, the bid must have met the various requirements described therein. Pursuant to the Bidding Procedures, if the Debtors received two or more Qualified Bids before the Qualified Bid Deadline, an auction would be held (the "**Auction**"), at which the Debtors, in consultation with the Consultation Parties (as defined in the Bidding Procedures) would select the winning bidder for the Debtors' assets. No Qualified Bids, aside from the Stalking Horse Bid, were received by the Debtors. Accordingly, on October 7, 2020, the Debtors filed a notice cancelling the Auction and designating the Stalking Horse Bidder as the successful bidder [Docket No. 462].

On October 9, 2020, the Committee filed the *Objection of the Official Committee of Unsecured Creditors to the Sale of Substantially all of the Debtors' Assets to Stalking Horse Bidder* [Docket Nos. 475, 486-1] (the "**Committee Sale Objection**"), pursuant to which the Committee objected to the Stalking Horse Bidder's acquisition of certain of the Debtors' assets. The Committee Sale Objection asserted that these assets were arguably unencumbered by both the prepetition liens of the First Lien Secured Parties and the postpetition liens of the DIP Secured Parties and could not be acquired without the provision of additional sale consideration. Prior to the hearing to consider the proposed sale, the Debtors, the Ad Hoc DIP and First Lien Lender Group and the Committee reached a settlement (the "**Committee Settlement**") whereby the Purchaser agreed to pay up to $8.5 million in cash in Additional Sale Consideration in lieu of credit bidding an equal amount of First Lien Loan Claims. Pursuant to the terms of the Committee Settlement, the Additional Sale Consideration will be distributed pursuant to the Plan to Holders of Allowed General Unsecured Claims, Allowed Second Lien Note Claims and Allowed Convertible Note Claims; *provided, however,* that any Distribution of the Additional Sale Consideration to Holders of Allowed Second Lien Note Claims will be subject to the terms of the Intercreditor Agreement, including without limitation, the Turnover and Subordination Provisions (as to which all parties' rights are reserved). Pursuant to the Sale Order and the Plan, the First Lien Deficiency Claims will not directly participate in any distribution of the Additional Sale Consideration, but the First Lien Secured Parties retain all their rights under the Intercreditor Agreement with respect to, and will receive, the amounts distributable on account of the Second Lien Note Claims. Additionally, as more fully described in the Sale Order, pursuant to the

16

Committee Settlement, the Wind-Down Reserve and the Professional Fee Escrow Account will from time to time be increased and funded by the Purchaser in order to ensure the satisfaction of all Administrative Claims, Other Priority Claims, Priority Tax Claims, and Professional Fee Claims, including any adjustment upward, as necessary, to provide for payment in full of all accrued postpetition liabilities through the Closing Date of the types noted in section 2.02(h) of the Asset Purchase Agreement related to any assets that are designated to be "Excluded Assets" in the Asset Purchase Agreement but which have not been paid under the DIP Facility as of the Closing Date.  After the Effective Date, upon payment of all Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims and Plan Administration Expenses, and to the extent that the Plan Administrator determines in good faith, in consultation with the Ad Hoc DIP and First Lien Lender Group and on a reasonable basis that substantially all of the claims and expenses for which the Wind-Down Amount was held in escrow are no longer outstanding or otherwise satisfied in full, the Plan Administrator shall remit any remaining unused Wind-Down Amount and Plan Administration Assets (or proceeds thereof) to the Purchaser.

On October 15, 2020, the Bankruptcy Court entered the Sale Order approving (a) the sale of the Debtors' assets to the Stalking Horse Bidder on the terms described in the Asset Purchase Agreement, including without limitation, (i) selling the Purchased Assets free and clear of all Encumbrances (as defined in the Sale Order), except to the extent set forth in the Asset Purchase Agreement and (ii) assuming and assigning to the Purchaser pursuant to the Asset Purchase Agreement in connection with the Sale Transaction certain Executory Contracts and Unexpired Leases and (b) the Committee Settlement.  The Debtors have filed with the Bankruptcy Court notices of the potential assumption and assignment of such Executory Contracts and Unexpired Leases [Docket Nos. 244, 428, 488].  In relevant part, the Asset Purchase Agreement contemplates aggregate consideration consisting of (i) a credit bid pursuant to section 363(k) of the Bankruptcy Code against $586,500,000 of First Lien Loan Claims and, only to the extent necessary to acquire any DIP Collateral (as defined in the DIP Credit Agreement), up to $5,000,000 of the DIP Obligations, (ii) payment of the Wind-Down Amount, (iii) payment (or other satisfaction) of the DIP Payment Amount (as defined in the Asset Purchase Agreement), (iv) payment of up to $8.5 million in Additional Sale Consideration, and (v) the assumption of Assumed Liabilities (as defined in the Asset Purchase Agreement).

The Debtors anticipate that the Sale Transaction will be consummated as promptly as possible and in advance of the end of the first quarter of 2021.  Upon consummation of the Sale Transaction, the Purchaser will fund the Additional Sale Consideration Escrow Account, Professional Fee Escrow Account, and Wind-Down Reserve in accordance with the Wind-Down Budget, the Committee Settlement and the Sale Order. The Plan seeks to make Distributions to creditors in accordance with the priority of their Claims.

## H.     Schedules and Bar Dates

On August 28, 2020, the Debtors filed their schedules of assets and liabilities and statements of financial affairs.  On September 15, 2020, the Debtors filed the *Motion of Debtors for Entry of Order (I) Establishing (A) a General Bar Date to File Proofs of Claim, (B) a Bar Date to File Proofs of Claim by Governmental Units, (C) an Amended Schedules Bar Date, (D) a Rejection Damages Bar Date, (II) Approving the Form and Manner for Filing Proofs of Claim, (III) Approving the Form and Manner of Notice of Bar Dates, and (IV) Granting Related Relief* [Docket No. 391] (the "**Bar Date Motion**")  seeking to set a bar date for the filing of Proofs of Claim related to certain prepetition Claims.  Parties are advised to File Proofs of Claim in accordance with the Bar Date Order.

On October 5, 2020, the Bankruptcy Court entered the Claims Bar Date Order establishing (i) November 9, 2020 at 4:00 p.m. (prevailing Eastern Time) as the Deadline for each Person or entity, but not including Governmental Units, to file a proof of claim (each, a "**Proof of Claim**") in respect of a prepetition Claim, including, for the avoidance of doubt, Secured Claims, priority Claims, and Claims arising under section

17

503(b)(9) of the Bankruptcy Code, against any of the Debtors (the "**General Bar Date**"), (ii) January 19, 2020 at 4:00 p.m. (prevailing Eastern Time) as the deadline for Governmental Units to file Proofs of Claim in respect of any prepetition Claims against any of the Debtors (the "**Governmental Bar Date**"), (iii) the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 4:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days from the date on which the Debtors provide notice of an amendment or supplement to the Schedules (as defined in the Bar Date Order), as the deadline by which claimants holding Claims affected by such filing, amendment or supplement must file Proofs of Claim with respect to such Claim (the "**Amended Schedules Bar Date**"), and (iv) the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 4:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the effective date of the rejection ("**Rejection Date**") of an executory contract or unexpired lease as the deadline by which claimants asserting Claims resulting from the Debtors' rejection of such executory contract or unexpired lease must file Proofs of Claim for damages arising from such rejection (the "**Rejection Damages Bar Date**" and, together with the General Bar Date, Governmental Bar Date, and Amended Schedules Bar Date, the "**Bar Dates**").

Pursuant to Article VI.A of the Plan, except as otherwise provided in the Plan, as of the Effective Date, the Debtors will be deemed to have rejected all Executory Contracts and Unexpired Leases that (1) have not been previously rejected, assumed, or assumed and assigned, including in connection with the Sale Transaction, and are not the subject of a pending motion to reject, assume, or assume and assign as of the Effective Date, (2) are not identified on the Schedule of Assumed Contracts and (3) have not expired under their own terms prior to the Effective Date. **The Confirmation Order will constitute an order of the Court approving the rejections described in Article VI of the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.**

**All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Court within thirty (30) days after the Effective Date. Any Person or Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors or the Estates, and the Debtors and their Estates and their respective assets and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.E of the Plan; *provided* that Proofs of Claim may be filed with respect to such Claims in accordance with the terms of the Plan.**

**V.**
**SUMMARY OF THE PLAN**

**THE TERMS OF THE PLAN, A COPY OF WHICH IS ATTACHED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT, ARE INCORPORATED BY REFERENCE HEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN, WHICH ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO**

18

**THEREIN. HOLDERS OF CLAIMS AGAINST THE DEBTORS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.**

The following table summarizes the material terms of the Plan and certain related agreements:

| Treatment of Certain Claims and Interests | As further detailed therein, the Plan contemplates the following treatment of Claims and Interests: |
|---|---|
| | • General Administrative Claims. Except (a) with respect to Administrative Claims that are Professional Fee Claims or Statutory Fees, (b) to the extent an Administrative Claim constitutes an "Assumed Liability" pursuant to section 2.02 of the Asset Purchase Agreement, and/or (c) to the extent that a Holder of an Allowed Administrative Claim and the Debtors agree to less favorable treatment for such Holder's Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall be paid in full in Cash from the Wind-Down Reserve on or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable. For the avoidance of doubt, any Allowed Administrative Expense Claim that has been expressly assumed by the Purchaser under the Sale Transaction Documents shall not be an obligation of the Debtors and will be paid by the Purchaser in accordance with the Sale Transaction Documents. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote**. |
| | • Professional Fee Claims. All Professional Persons seeking an award by the Bankruptcy Court of Professional Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (b) shall be paid in full from the Professional Fee Escrow Account in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Professional Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Professional Fee Claim and the Plan Administrator. The Plan Administrator is authorized to Professional Fee Claims incurred after the Effective Date (including Professional Fee Claims incurred in accordance with Article XII.C of the Plan) in the ordinary course from the Professional Fee Escrow Account, without the need for Bankruptcy Court approval. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote**. |
| | • Statutory Fees. All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date. |

19

After the Effective Date, the Plan Administrator shall pay any and all such fees when due and payable from the Wind-Down Reserve. The Debtors shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Plan Administrator shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made by the Disbursing Agent during the applicable period, attested to by an authorized representative of the Disbursing Agent. Each and every one of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote.**

- Priority Tax Claims. Except to the extent a Priority Tax Claim constitutes an "Assumed Liability" pursuant to section 2.02 of the Asset Purchase Agreement, or to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors agree to less favorable treatment for such Holder's Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will be paid in full in Cash from the Wind-Down Reserve on or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Priority Tax Claim is Allowed; and (c) the date such Allowed Priority Tax Claim becomes due and payable in accordance with non-bankruptcy law. For the avoidance of doubt, any Allowed Priority Tax Claim that has been expressly assumed by the Purchaser under the Sale Transaction Documents shall not be an obligation of the Debtors and will be paid by the Purchaser in accordance with the Sale Transaction Documents. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote**.

- DIP Claims. Notwithstanding anything to the contrary in the Plan, in full and final satisfaction, settlement and release of and in exchange for release of all Allowed DIP Facility Claims, all Allowed DIP Facility Claims shall be repaid and satisfied in full by the Purchaser in accordance with the terms of the Asset Purchase Agreement. Upon the foregoing satisfaction of all Allowed DIP Facility Claims, all Liens and security interests granted by the Debtors to secure the obligations under the DIP Facility shall be of no further force or effect.

  Notwithstanding anything to the contrary in the Plan, in full and final satisfaction, settlement and release of and in exchange for release of all Allowed DIP L/C Facility Claims and all Allowed DIP L/C Superpriority Claims in respect of any Prepetition L/C, prior to or on the Closing Date, either (i) the Purchaser shall cash collateralize all Allowed DIP L/C Facility Claims and all Allowed

20

DIP L/C Superpriority Claims in respect of any Prepetition L/C at 100% of their face amount and in respect of any Postpetition L/C at 102% of their face amount, (ii) the Purchaser shall cause the establishment of a "backstop" letter of credit reasonably acceptable to the L/C Issuer at 100% of the face amount of such Prepetition L/Cs and 102% of the face amount of such Postpetition L/Cs, or (iii) the L/C Issuer and the Ad Hoc DIP and First Lien Lender Group shall agree on an alternative treatment or arrangement with respect to such Prepetition L/Cs and Postpetition L/Cs, in the case of each of the forgoing clauses (i) through (iii), pursuant to documentation reasonably satisfactory to the L/C Issuer and the Ad Hoc DIP and First Lien Lender Group. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote.**

- <u>Other Priority Claims</u>. Except to the extent an Other Priority Claim constitutes an "Assumed Liability" pursuant to section 2.02 of the Asset Purchase Agreement, or to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in Cash or other treatment, rendering such Claim Unimpaired. For the avoidance of doubt, any Allowed Other Priority Claim that has been expressly assumed by the Purchaser under the Sale Transaction Documents shall not be an obligation of the Debtors and will be paid by the Purchaser in accordance with the Sale Transaction Documents. **These Claims are unclassified under the Plan and are <u>not</u> entitled to vote**.

- <u>Other Secured Claims</u>. Except to the extent that a Holder of an Allowed Other Secured Claim (i) is an Assumed Liability pursuant to the Asset Purchase Agreement or the Sale Transaction Documents, or (ii) agrees to less favorable treatment, in exchange for full and final satisfaction, settlement and release of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim, at the option of the applicable Debtor, shall (A) be paid in full in Cash including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, (B) receive the collateral securing its Allowed Other Secured Claim, or (C) receive any other treatment that would render such Claim Unimpaired. **These Claims are Unimpaired under the Plan and Holders of such Claims are <u>not</u> entitled to vote (presumed to accept).**

- <u>First Lien Loan Claims</u>.

  (1)  In exchange for full and final satisfaction, settlement and release of each Allowed First Lien Loan Claim, each Holder of an Allowed First Lien Loan Claim shall, pursuant to the Sale Transaction Documents in accordance with the Sale Order, credit

21

bid its Pro Rata Share of Allowed First Lien Loan Secured Claims, in the aggregate, in the First Lien Credit Bid Amount, in accordance with Section 2.06 of the Asset Purchase Agreement in consideration of interests in the Purchaser and such other consideration set forth in Sale Transaction Documents, including the Asset Purchase Agreement, the Direction Letter and the Plan.

(2)  For the avoidance of doubt, no First Lien Loan Deficiency Claims shall receive any recovery directly on account of such claims from the Additional Sale Consideration; *provided, however,* that (a) the rights of the Holder of any First Lien Loan Claims in connection with the reduction of the Additional Sale Consideration on account of the Second Lien Turnover Amount pursuant to the Subordination and Turnover Provisions of the Intercreditor Agreement as provided in Article III.B.3(c) of the Plan, and (b) with respect to the Purchaser's right to receive any remainder of the Wind-Down Amount pursuant to Article V.D. of the Plan, shall be preserved and treated in accordance with Article V.D of the Plan. **These Claims are Impaired under the Plan and Holders of such Claims are entitled to vote.**

- Second Lien Note Claims.

  (1)  If and only if Class 3a votes to accept the Plan, and except to the extent that a Holder of an Allowed Second Lien Note Claim agrees in writing to less favorable treatment, in exchange for full and final satisfaction, settlement and release of each Allowed Second Lien Note Claim, including in resolution of any claims or rights pursuant to the Turnover and Subordination Provisions of the Intercreditor Agreement that could be properly asserted by any party thereto, each Holder of an Allowed Second Lien Note Claim shall receive in Cash its Pro Rata Share of the Class 3a Additional Sale Consideration Amount, which shall not be subject to any right or claim for turnover or recovery pursuant to the Intercreditor Agreement, including pursuant to the Turnover and Subordination Provisions thereof, or otherwise; or

  (2)  If Class 3a does not vote to accept the Plan, and except to the extent that a Holder of an Allowed Second Lien Note Claim, the Debtors, the Committee, and the Ad Hoc DIP and First Lien Group agree in writing to an alternative treatment, in exchange for full and final satisfaction, settlement and release of each Allowed Second Lien Note Claim, in accordance with the Committee Settlement and the Turnover and Subordination Provisions of the Intercreditor Agreement, each Holder of an Allowed Second Lien Note Claim shall be entitled to receive its Pro Rata Share of the Additional Sale Consideration, expressly subject to the following proviso; *provided, however*, that all Distributions to Holders of Allowed Second Lien Note Claims pursuant to the Plan shall be subject to the terms of the Intercreditor Agreement, including, without limitation, the

22

Turnover and Subordination Provisions, and all such Distributions to each Holder of an Allowed Second Lien Note Claim of its Pro Rata Share of the Additional Sale Consideration shall instead, at the option of the Ad Hoc DIP and First Lien Lender Group either (A) be distributed to the First Lien Agent or (B) reduce the amount of the Additional Sale Consideration to be paid by Purchaser or funded by Retained Cash, on a dollar-for-dollar basis, by the Second Lien Turnover Amount (but in no event, following and after accounting for such distribution to the First Lien Agent or reduction but before accounting for the Class 3b and Class 3c Additional Sale Consideration Amount, shall the Additional Sale Consideration be less than $4,000,000).  In the event that any Second Lien Party objects to, challenges, opposes, votes to reject, or otherwise seeks to impede the confirmation or consummation of the Plan, no such Second Lien Party shall constitute a Released Party, and the Distributions on account of any Second Lien Note Claims shall be as provided herein.

Except to the extent of any Distribution made in accordance with Article III.B.3(c)(1) of the Plan, all Distributions to Holders of Allowed Second Lien Note Claims pursuant to the Plan shall be subject to the terms of the Intercreditor Agreement, including, without limitation, the Turnover and Subordination Provisions (as to which all parties' rights are reserved), and the Disbursing Agent shall disburse the Additional Sale Consideration in accordance with the terms of the Plan. **These Claims are Impaired under the Plan and Holders of such Claims are entitled to vote.**

- Convertible Note Claims.  Except to the extent that a Holder of an Allowed Convertible Note Claim agrees in writing to less favorable treatment, in exchange for full and final satisfaction, settlement and release of each Allowed Convertible Note Claim, each Holder of an Allowed Convertible Note Claim shall receive its Pro Rata Share of the Class 3b and 3c Additional Sale Consideration Amount to which it is entitled. **These Claims are Impaired under the Plan and Holders of such Claims are entitled to vote.**

- General Unsecured Claims.  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees in writing to less favorable treatment, in exchange for full and final satisfaction, settlement and release of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of the Class 3b and 3c Additional Sale Consideration Amount to which it is entitled. **These Claims are Impaired under the Plan and Holders of such Claims are entitled to vote.**

| | |
|---|---|
| | • Section 510 Claims. All Section 510 Claims shall be cancelled and extinguished on the Effective Date. Each Holder of Section 510 Claims shall receive no recovery or Distribution on account of such Section 510 Claims. **These Claims are Impaired under the Plan and Holders of such Claims are <u>not</u> entitled to vote (deemed to reject)**. <br><br> • Intercompany Claims. Holders of Intercompany Claims shall not receive or retain any property under the Plan on account of such Claims. Unless otherwise provided for under the Plan, each Intercompany Claim will be canceled and released. **These Claims are Impaired under the Plan and Holders of such Claims are <u>not</u> entitled to vote (deemed to reject).** <br><br> • Intercompany Interests. Upon the completion of the Wind-Down pursuant to the Plan Administration Process and Article V.E of the Plan (as applicable), Intercompany Interests shall be cancelled and released, with the Holders of Intercompany Interests receiving no Distribution on account of such Intercompany Interests. **These Interests are Impaired under the Plan and Holders of such Interests are <u>not</u> entitled to vote (deemed to reject).** <br><br> • Equity Interests. Holders of Equity Interests shall receive no Distribution on account of their Equity Interests. On the Effective Date, all Equity Interests will be canceled and extinguished and will be of no further force or effect. **These Interests are Impaired under the Plan and Holders of such Interests are <u>not</u> entitled to vote (deemed to reject)**. |
| **Corporate Governance** | Following the Confirmation Date and prior to the occurrence of the Effective Date, the then-current officers, directors and managers of each of the Debtors shall continue in their respective capacities in accordance with the applicable by-laws or other organizational documents, and the Debtors shall execute such documents and take such other action as is necessary to effectuate the actions provided for in the Plan. <br><br> On and after the Effective Date, the Plan Administrator shall serve as the sole shareholder, interest holder, officer, director or manager of each of the Debtors, as applicable, under applicable state law. The Plan Administrator, subject to the terms and conditions of the Plan and the Plan Administration Agreement, shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. <br><br> On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file or record such contracts, |

24

| | |
|---|---|
| | securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.<br><br>On the Effective Date: (i) the Plan Administrator may dissolve such Debtor Affiliates and complete the winding up of such Debtor Affiliates without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities; (ii) all claims filed or scheduled in the Debtor Affiliates' cases shall be deemed to have been filed in these Chapter 11 Cases; and (iii) the Chapter 11 Cases of the Debtor Affiliates shall be closed. |
| **Wind-Down and Plan Administrator** | Prior to or on the Effective Date, the Debtors will be authorized to consummate the Sale Transaction to the Purchaser pursuant to the terms of the Sale Order, the applicable Sale Transaction Documents, the Plan, and the Confirmation Order, including, without limitation, (i) selling the Purchased Assets (as defined in the Asset Purchase Agreement) free and clear of certain claims, liens and encumbrances to the extent set forth in the Asset Purchase Agreement and (ii) assuming and assigning to the Purchaser pursuant to the Asset Purchase Agreement in connection with the Sale Transaction certain contracts and Unexpired Leases.<br><br>Upon consummation of the Sale Transaction, the Retained Cash shall be placed into accounts established and maintained by the Debtors. On the Effective Date, the Debtors shall fund the Wind-Down Reserve in accordance with the Wind-Down Budget and the Professional Fee Escrow Account. The Wind-Down Reserve, but not the Professional Fee Escrow Account, shall vest in the Debtors and their Estates as Plan Administration Assets pursuant to Article V.D of the Plan. |
| **Releases, Injunction and Exculpation** | Article X of the Plan contains certain release, injunction and exculpation provisions that are set forth in Article V.H below.<br><br>**Article X.C of the Plan contains a third-party release by Holders of Claims and Interests**. Pursuant to Article X.C of the Plan, each Holder of a Claim that (a) submits a Ballot accepting the Plan, (b) is entitled to vote on the Plan and either abstains from voting or submits a Ballot rejecting the Plan, but in each case does not affirmatively opt-out of the Third-Party Release as provided on their respective Ballot or (c) (other than Holders of Claims and Interests in Classes 5 and 6) are presumed to accept or deemed to reject and do not affirmatively opt-out of the Third Party Releases), shall be deemed to grant the Third-Party Release. |

25

| Means of Implementation | The Plan contains standard means of implementation, including provisions authorizing the steps necessary to consummate the Sale Transaction and the wind-down contemplated by the Plan (the "**Wind-Down**"), provisions regarding cancellation of prepetition debt agreements and equity interests, provisions specifying the sources of Plan distributions, and the vesting of assets in the Plan Administrator, among other matters. |
|---|---|
| Good Faith Compromise | Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, any Distribution to be made on account of such Allowed Claim or Allowed Interest, including, without limitation, all controversies among the Debtors, the First Lien Agent, the First Lien Lenders, the Second Lien Agents, the Second Lien Lenders, the DIP Secured Parties, the Committee, and all other Holders of Claims against and Interests in the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrator may compromise and settle Claims against them and Causes of Action against other Entities. |
| Proofs of Claim | On October 5, 2020, the Bankruptcy Court entered the *Order Establishing (A) a General Bar Date to File Proofs of Claim, (B) a Bar Date to File Proofs of Claim by Governmental Units, (C) an Amended Schedules Bar Date, (D) a Rejection Damages Bar Date, (II) Approving the Form and Manner for Filing Proofs of Claim, (III) Approving the Form and Manner of Notice of Bar Dates, and (IV) Granting Related Relief* [Docket No. 449] (the "**Claims Bar Date Order**") establishing bar dates for the filing of Proofs of Claim related to certain prepetition Claims.  Parties are advised to file Proofs of Claim in accordance with the Claims Bar Date Order.  In particular, the Plan expressly provides that (a) Administrative Claims must be filed by the Administrative Claims Bar Date, and (b) Claims arising from the Debtors' rejection (if any) of Executory Contracts or Unexpired Leases must be filed within thirty (30) days after entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. |

A.        **Classification and Treatment of Claims and Interests under the Plan**

Under the Bankruptcy Code, only "allowed" claims and Interests may receive distributions under a chapter 11 plan.  In general, an "allowed" claim or "allowed" interest means that the debtor agrees (or the bankruptcy court has ruled) that the claim or interest, including the amount, is in fact, a valid obligation of the debtor.

The Bankruptcy Code also requires that, for purposes of treatment and voting, the chapter 11 plan divide the different claims against, and interests in, the debtor into separate classes based upon their legal nature. Claims of substantially similar legal nature are usually classified together, as are interests of a substantially similar legal nature.  Because an entity may hold multiple claims or interests that give rise to different legal rights, the claims and interests themselves, rather than their holders, are classified.

Under a chapter 11 plan, the separate classes of claims and interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan).  If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims or interests, such as the right to vote on the plan (unless the plan has deemed the class to reject the plan), and the right to receive under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

Pursuant to section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (a) does not alter the legal, equitable, and contractual rights of the holders or (b) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case, or non-performance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights.  Typically, this means the holder of an unimpaired claim will receive on the later of the effective date of the plan and the date on which amounts owing are due and payable, payment in full, in cash, with postpetition interest to the extent provided under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms.  Thus, other than the right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the chapter 11 cases not been commenced.

Consistent with these requirements, as described in Articles VI.A and I.B above, the Plan divides the Claims against, and Interests in, the Debtors into 9 distinct Classes.  Pursuant to the Bankruptcy Code, not all Classes are entitled to vote on the Plan.  Under the Plan: (a) Classes 2, 3a, 3b, and 3c are Impaired and the Holders of Claims in such Classes are entitled to vote to accept or reject the Plan; (b) Class 1 is Unimpaired and the Holders of Claims in such Class are conclusively presumed to have accepted the Plan and are thus not entitled to vote on the Plan; (c) Classes 4, 6, and 7 are Impaired and the Holders of Claims and Interests in such Classes (i) shall receive no distributions under the Plan on account of their Claims or Interests, (ii) are deemed to have rejected the Plan, and (iii) are not entitled to vote to accept or reject the Plan; and (d) Class 5 is either Unimpaired or Impaired and the Holders of Intercompany Claims in such Class are conclusively presumed to have accepted or deemed to have rejected the Plan and are thus not entitled to vote on the Plan.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Post-Effective Date Debtors' rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

27

**B.**     **Acceptance or Rejection of the Plan; Effect of Rejection of Plan**

Articles III and IV of the Plan sets forth certain additional rules governing the tabulation of votes under the Plan, and related matters.  Among other things, Article III provides that (a) the Plan constitutes a separate chapter 11 plan of liquidation for each Debtor (III.A); (b) any Class of Claims that is not occupied as of the date of commencement of the Confirmation Hearing by the Holder of an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 (*i.e.*, no Ballots are cast in a Class entitled to vote on the Plan) shall be deemed eliminated from the Plan for purposes of voting (III.D); and (c) in the event a Class of Claims that is entitled to vote on the Plan rejects the Plan, the Debtors will seek confirmation of the Plan pursuant to 1129(b) of the Bankruptcy Code, which permits confirmation of a plan provided that at least one Class entitled to vote has voted to accept the plan and certain other requirements are met, including that the plan does not discriminate unfairly and is fair and equitable with respect to each impaired, non-consenting class of claims or interests under the Plan (IV.B).

**C.**     **Treatment of Executory Contracts and Unexpired Leases; Employee Benefits; and Insurance Policies**

**1.**     **Assumption and Assignment of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors shall be deemed to have rejected all Executory Contracts and Unexpired Leases that (1) have not been previously rejected, assumed, or assumed and assigned, including in connection with the Sale Transaction, and are not the subject of a pending motion to reject, assume, or assume and assign as of the Effective Date, (2) are not identified on the Schedule of Assumed Contracts, and (3) have not expired under their own terms prior to the Effective Date.

**Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the foregoing rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.**

The cure of all defaults under Executory Contracts and Unexpired Leases to be assumed and assigned under the Asset Purchase Agreement, including the resolution of all Adjourned Objections to the adequacy of amounts proposed to cure such defaults under such Executory Contracts and Unexpired Leases, shall be governed by the terms and conditions of the Sale Order and the Asset Purchase Agreement.

**2.**     **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any nonbankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

**3.**     **Rejection Damages Claims**

**All Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan must be filed with the Balloting Agent and served upon the Plan Administrator and counsel for the Debtors, as applicable, within thirty (30) days after the occurrence of the Effective Date in accordance with the instructions and procedures set forth in the Confirmation Order;** *provided*, **that the foregoing**

**deadline shall apply only to Executory Contracts or Unexpired Leases that are rejected automatically by operation of <u>Article VI.A</u> of the Plan, and the deadline for filing any rejection damage Claims relating to any Executory Contracts or Unexpired Leases rejected pursuant to a separate order of the Bankruptcy Court shall be the applicable deadline under such order or the Claims Bar Date Order, as applicable.  Any Claim arising from the rejection of an Executory Contract or Unexpired Lease that becomes an Allowed Claim will be classified and treated as a General Unsecured Claim against the applicable Debtor**.

### 4. Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts or Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### D. <u>Provisions Governing Distributions</u>

<u>Article VII</u> of the Plan sets forth the mechanics by which Plan Distributions will be made.  As set forth more fully therein, <u>Article VII</u> of the Plan provides, among other things, that, unless otherwise provided in the Plan, (a) all Distributions under the Plan shall be made by the Debtors as Disbursing Agent or such other Entity designated by the Debtors as Disbursing Agent on the Effective Date, which may be the Plan Administrator (VII.B); (b) on the Effective Date or as soon as reasonably practicable thereafter, but in no event later than ninety (90) days after the Effective Date) (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the amount of the Distribution that the Plan provides for Allowed Claims in the applicable Class which, with respect to Holders of Allowed Claims in Classes 3b and 3c, may be an initial amount subject to subsequent Distributions to the extent such Distribution is not the full amount of the Class 3b and 3c Additional Sale Consideration Amount (VII.A.1); (c) subsequent Distributions shall be made, if determined by the Plan Administrator to be practicable and appropriate, on a quarterly basis thereafter, *provided* that the Plan Administrator may refrain from making interim Distributions to the extent the Plan Administrator reasonably determines that the costs of making such Distributions are not reasonable in comparison to the amount of such Distributions and instead may reserve making any subsequent Distributions until a final Distribution (VII.A.1); (d) the Disbursing Agent shall be authorized (but not directed) to recognize and deal only with those Holders of Claims listed on the Debtors' books and records as of the Distribution Record Date and will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes under the Plan to recognize and distribute any securities, property, notices, and other documents only to those Holders of Allowed Claims who are Holders of Claims (or participants therein) as of the close of business on the Distribution Record Date (VII.A.2); (e) the Disbursing Agent shall make Distributions to Holders of Allowed Claims at the address for each such Holder as indicated on (i) such Holders' address on its Proof of Claim, if applicable, (ii) such Holders' address listed on a notice filed with the Bankruptcy Court, if applicable, or (iii) if neither (i) or (ii) are available, the address of record for the Holder listed on the Debtors' Schedules (VII.D.1); (f) in the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest; *provided*, *however*, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one hundred and eighty (180) days from the date the Distribution was returned (VII.D.2); (g) for purposes of making Distributions on the Initial Distribution Date only, the Disbursing Agent shall be authorized and entitled to recognize only those Holders of Claims reflected in the Debtors' books and records as of the close of business on the Distribution Record Date; *provided that* the Disbursing Agent shall be authorized to make

Distributions to certain transferees in accordance with the terms of the Plan (VII.D.3); (h) all Distributions on account of First Lien Loan Claims shall be made to the First Lien Agent and the First Lien Agent shall arrange to deliver or direct the delivery of such Distributions to or on behalf of the applicable Holders of First Lien Loan Claims (VII.D.4); (i) if Class 3a votes to accept the Plan, the Second Lien Agent shall be deemed to be the Holder of all applicable Second Lien Note Claims for purposes of distributions to be made, and all distributions on account of such Second Lien Note Claims shall be made to the Second Lien Agent and the Second Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the applicable Holders of Second Lien Note Claims in accordance with the terms of the Securities Purchase Agreement (as defined in the DIP Order), subject to any modifications to such distributions in accordance with the terms of the Plan (VII.D.5); (j) if Class 3a does not vote to accept the Plan, for purposes of Distributions to be made under the Plan to Holders of Second Lien Note Claims, all such Distributions shall be subject to the Turnover and Subordination Provisions of the Intercreditor Agreement and, at the option of the Ad Hoc DIP and First Lien Lender Group either (A) be distributed to the First Lien Agent or (B) reduce the amount of the Additional Sale Consideration to be paid by Purchaser or funded by Retained Cash, on a dollar-for-dollar basis by the Second Lien Turnover Amount (but in no event, following and after accounting for such distribution to the First Lien Agent or reduction, shall the Additional Sale Consideration be less than $4,000,000) (VII.D.5); (j) subject to the Convertible Notes Charging Lien and priority of payments rights, all Distributions on account of Convertible Notes Claims shall be made to the Convertible Notes Indenture Trustee and the Convertible Notes Indenture Trustee shall arrange to deliver or direct the delivery of such Distributions to or on behalf of the applicable Holders of Convertible Note Claims (VII.D.6); (k) no payment of fractional cents shall be made and whenever any payment of a fraction of a cent under would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down (VII.D.7); (l) the Disbursing Agent will not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $50 (VII.D.8); and (m) as a condition precedent to receiving any Distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled (VII.F).

### E. **Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or Interests**

Article VIII of the Plan governs the resolution of Disputed Claims and Interests. Pursuant to Article VIII, after the Effective Date, and except as otherwise provided in the Plan, the Plan Administrator shall have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim, including, without limitation, the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code. The Plan Administrator may contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

Article VIII.B provides that, except as otherwise specifically provided in the Plan, the Plan Administrator shall have the sole authority: (1) to file, settle, compromise, withdraw, or litigate to judgment objections to Claims; *provided* that the Committee and the Ad Hoc DIP and First Lien Lender Group also shall have the right to object to the allowance and amount of the Second Lien Note Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law, as necessary; *provided*, *however*, that for the avoidance of doubt, the underlying Claim shall remain under the

jurisdiction of the Bankruptcy Court and shall not be Disallowed other than by order of the Bankruptcy Court.

Article VIII.C addresses estimation of claims. It provides (i) that the Plan Administrator may (but is not required to) at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, (ii) and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

Article VIII.D addresses disputes related to the Adminsitrative Claims Reserve. It provides, among other things, that, on or after the Effective Date, the Plan Administrator shall have the right, but is not required, to establish a Disputed Administrative Claims Reserve and to determine the amount of any Disputed Administrative Claims Reserve based on good faith estimates (in consultation with the Committee and the Ad Hoc DIP and First Lien Lender Group) or an order of the Bankruptcy Court estimating such Disputed Administrative Claims, net of any taxes imposed thereon or otherwise payable by the Disputed Administrative Claims Reserve, and which may be held in the same account as the Wind-Down Amount. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Plan Administrator shall treat any Disputed Administrative Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently the foregoing for state and local income tax purposes. All parties (including, to the extent applicable, the Debtors, the Post-Effective Date Debtors, the Plan Administrator and Holders of Disputed Administrative Claims) shall be required to report for tax purposes consistently with the foregoing.

Article VIII.D further provides that, in the event Cash in the Disputed Administrative Claims Reserve is insufficient to satisfy all of the Disputed Administrative Claims that have become Allowed, such Allowed Claims shall be satisfied from the Wind-Down Reserve. After all Cash has been distributed from the Disputed Administrative Claims Reserve, no further distributions shall be made in respect of Disputed Administrative Claims. As such time as all Disputed Administrative Claims have been resolved, any remaining Cash in the Disputed Administrative Claims Reserve shall be remitted to the Wind-Down Reserve.

Article VIII.E addresses disputes related to General Unsecured Claims. It provides, among other things, that, on or after the Effective Date, the Plan Administrator shall have the right, but is not required, to establish a Disputed General Unsecured Claims Reserve and to determine the amount of the Disputed General Unsecured Claims Reserve based on the good faith estimates (in consultation with the Committee and the Ad Hoc DIP and First Lien Lender Group) or an order of the Bankruptcy Court estimating any such Disputed General Unsecured Claim, net of any taxes imposed thereon or otherwise payable by the Disputed General Unsecured Claims Reserve, and which such amount shall be deposited in the Disputed General Unsecured Claims Reserve, which may be held in the same account as the Additional Sale Consideration Escrow Account. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Plan Administrator shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the

31

extent permitted by applicable law, report consistently the foregoing for state and local income tax purposes. All parties (including, to the extent applicable, the Debtors, the Post-Effective Date Debtors, the Plan Administrator and Holders of Disputed General Unsecured Claims) shall be required to report for tax purposes consistently with the foregoing.

Article VIII.E further provides that, in the event Cash in the Disputed Claims Reserve is insufficient to satisfy all of the Disputed General Unsecured Claims that have become Allowed, such Allowed Claims shall be satisfied pro rata from such remaining Cash. After all Cash has been distributed from the Disputed Claims Reserve, no further distributions shall be made in respect of Disputed General Unsecured Claims. As such time as all Disputed General Unsecured Claims have been resolved, any remaining Cash in the Disputed Claims Reserve shall be distributed pro rata to holders of Allowed General Unsecured Claims.

Article VII.C.2 provides that (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and such Disputed Claim becomes an Allowed Claim; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order.

### F.    Conditions Precedent to Confirmation

Article IX.A of the Plan sets forth the conditions precedent to Confirmation, and related matters. The conditions precedent set forth at Article IX.A include that:

- the Disclosure Statement Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lender Group;

- the Sale Order shall constitute a Final Order and shall not have been vacated, amended or otherwise modified;

- the Sale Transaction Documentation shall not have been terminated in accordance with their terms; and

### G.    Conditions Precedent to the Effective Date

Article IX.B of the Plan sets forth the conditions precedent to the Effective Date, and related matters. The conditions precedent set forth at Article IX.B include that

- the Confirmation Order shall have been entered by the Bankruptcy Court and contain terms and conditions consistent in all material respects with the Sale Order and the Committee Settlement and otherwise be in form and substance reasonably acceptable to the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lender Group;

- the Plan, the Definitive Documents, and all other documents contemplated thereby, including any amendments, modifications, or supplements thereto, shall be consistent in all material respects with the Sale Order and the Committee Settlement and otherwise be in form and substance reasonably acceptable to the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lender Group;

- all conditions precedent to the effectiveness of the Sale Transaction Documents shall have been satisfied or waived pursuant to the terms thereof, and the consummation of such Sale Transaction shall have occurred on or prior to the Effective Date;

- all Definitive Documents shall have been executed, delivered, and filed (if applicable) and shall be in full force and effect, and all conditions precedent to effectiveness set forth in the Definitive Documents shall have been satisfied or waived in accordance with the terms thereof;

- the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan and the Definitive Documents and no order, injunction or judgment shall have been issued by any governmental authority or arbitrator to restrain, prohibit, enjoin or declare illegal the transactions contemplated by the Plan, and no law shall have been promulgated or enacted and be in effect that on a temporary or permanent basis restrains, enjoins, or invalidates the transactions contemplated by the Plan;

- the Plan Administration Agreement shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the Plan Administration Agreement shall otherwise be in form and substance reasonably acceptable to the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lender Group;

- all actions, documents, certificates, and agreements necessary to implement the Plan shall (i) have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws and (ii) be in full force and effect;

- the Wind-Down Reserve shall have been established and funded in an amount consistent with the Wind-Down Budget;

- the Additional Sale Consideration Escrow Account shall have been established and funded with the Additional Sale Consideration;

- the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

- the Convertible Notes Indenture Trustee Fees shall have been paid to the Convertible Notes Indenture Trustee in accordance with the provisions set forth in Article V.F of the Plan;

- all Statutory Fees due and payable prior to the Effective Date shall have been paid by the Debtors; and

- all unpaid reasonable and documented fees and expenses of the First Lien Agent, the DIP Agent, and the Ad Hoc DIP and First Lien Lender Group Expenses shall have been paid in full in Cash by the Debtors.

Article IX.C provides that the Debtors may waive any of the foregoing conditions precedent at any time and without any notice to parties in interest or further approval of the Bankruptcy Court *provided* that the Debtors may not waive the conditions to Consummation set forth paragraphs 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, and/or 14 of Article IX.B of the Plan, without the prior written consent of the Committee and the Ad Hoc DIP and First Lien Lender Group (which consent may be given by email).

Article IX.D addresses the effect of non-occurrence of the Effective Date.  It provides that if the Effective Date does not occur with respect to one or more of the Debtors, then the Plan will, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in the Plan or this Disclosure Statement will: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

Article X of the Plan addresses releases, injunctions and related provisions.  These provisions include preservation of the rights of the Debtors and Plan Administrator to setoff against Allowed Claims and Interests (X.F.); release of Liens (X.G).  In addition, Articles X.B, X.C, X.D, and X.E of the Plan contain important releases, injunctions, and exculpatory provisions.  These provisions are highlighted below.

**Pursuant to Article X.C of the Plan, each Holder of a Claim that (a) submits a Ballot accepting the Plan, (b) is entitled to vote on the Plan and either abstains from voting or submits a Ballot rejecting the Plan, but in each case does not affirmatively opt-out of the Third-Party Release as provided on their respective Ballot or (c) (other than Holders of Claims and Interests in Classes 5 and 6) are presumed to accept or deemed to reject and do not affirmatively opt-out of the Third Party Releases), shall be deemed to grant the Third-Party Release.**

## H.    Releases

The following definitions are important to understanding the scope of the releases being given under the Plan:

"**Exculpated Parties**" means collectively: (a) the Debtors; (b) the Debtors' Estates, (c) the Committee and each of members of the Committee, and (d) with respect to each of the foregoing entities in clauses (a) through (c), such entities' predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, Representatives, management companies, and other professionals, and such Persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

"**Released Party**" means collectively: (a) the Debtors; (b) the Debtors' Estates, (c) the DIP Secured Parties, (d) the First Lien Lenders and the First Lien Agent, (e) the Prepetition First Lien Secured Parties, (f) L/C Issuer, (g) the Purchaser, (h) the Committee and each of the members of the Committee, (i) the Second Lien Parties, (j) the Convertible Notes Indenture Trustee, (k) the Holders of Convertible Notes, and with respect to each of the foregoing entities in clauses (a) through (k), such entities' predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, Representatives, management companies, and other professionals, and such Persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such; *provided, however*, that, notwithstanding anything to the contrary, the Released Parties shall not include any Person or Entity, including any Second Lien Party, that, or whose Representative, objects to, challenges, opposes, votes to reject, or otherwise seeks to impede the confirmation or consummation of the Plan.

"**Releasing Party**" means collectively: (a) all Holders of Claims that vote to accept the Plan, (b) all Holders of Claims that are entitled to vote to accept or reject the Plan and that abstain from voting on the Plan or vote to reject the Plan but, in each case, do not "opt out" of the releases set forth in Article X.C of the Plan, (c) all Holders of Claims and Interests (other than Holders of Claims and Interests in Classes 5 and 6) that

34

are presumed to accept, or deemed to reject, the Plan and that do not "opt out" of the releases set forth in Article X.C of the Plan, and (d) the Released Parties.

> a.   Releases by the Debtors (X.B)

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Post-Effective Date Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and Representatives and any and all other Persons that may purport to assert any Causes of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Post-Effective Date Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Post-Effective Date Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the Post-Effective Date Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Debtors' in or out-of-court restructuring and recapitalization efforts, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, the Asset Purchase Agreement, the Bidding Procedures Order, the Sale Transaction, the Sale Order, the Committee Settlement, the Disclosure Statement, the DIP Order and the DIP Documents, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission.**

**Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any Person under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. Moreover, the foregoing release shall have no effect on the liability of, or any Cause of Action against, any Entity that results from any act or omission that is determined in a Final Order to have constituted fraud, gross negligence, bad faith or willful misconduct.**

**Notwithstanding anything to the contrary in the foregoing, other than to the extent Class 3a does vote to accept the Plan and any Distribution is made in accordance with <u>Article III.B.3(c)(1)</u> of the Plan, the release set forth in <u>Article X.B</u> of the Plan does not affect or release the rights of any party under the Intercreditor Agreement.**

> b.   Releases by Holders of Claims and Equity Interests (X.C)

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the obligations contemplated by the Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the**

**Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Releasing Parties, in each case from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Post-Effective Date Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the Post-Effective Date Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Debtors' in or out-of-court restructuring and recapitalization efforts, intercompany transactions between or among a Debtor and another Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, the Asset Purchase Agreement, the Bidding Procedures Order, the Sale Transaction, the Committee Settlement, the Sale Order, the Disclosure Statement, the DIP Order and the DIP Documents, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission.**

**Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any Person under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. Moreover, the foregoing release shall have no effect on the liability of, or any Cause of Action against, any Entity that results from any act or omission that is determined in a Final Order to have constituted fraud, gross negligence, bad faith or willful misconduct.**

**Notwithstanding anything to the contrary in the foregoing, other than to the extent Class 3a does vote to accept the Plan and any Distribution is made in accordance with Article III.B.3(c)(1) of the Plan, the release set forth in Article X.C of the Plan does not affect or release the rights of any party under the Intercreditor Agreement.**

c.   Exculpation (X.D)

**To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action in connection with or arising out of: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of Confirmation and consummation of the Plan, making Distributions, implementing the Wind-Down, the Disclosure Statement, the Sale Transaction, the Asset Purchase Agreement, the Committee Settlement, the Sale Order, or the solicitation of votes for, or Confirmation of, the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors; or the transactions in furtherance of any of the foregoing; *provided, however,* that none of the foregoing provisions shall operate to waive or release (i) any Claims or Causes of Action arising**

36

**out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud, criminal conduct, or willful misconduct, as determined by a Final Order, and (ii) the Exculpated Parties' rights and obligations under the Plan, the Plan Supplement documents, and the Confirmation Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.   The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes on the Plan and, therefore, are not, and will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or Distributions made pursuant to the Plan.   The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

> d.      Permanent Injunction (X.E)

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

## VI.
## MEANS FOR IMPLEMENTATION

### A.      Transaction Effective as of the Effective Date

The transactions contemplated by the Plan shall be approved and effective as of the Effective Date, without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their board of directors, their stockholders, or any other person or Entity.

### B.      Closing of Sale Transaction and Uses of Cash

Article V.B of the Plan provides that, prior to or on the Effective Date, the Debtors shall consummate the Sale Transaction to the Purchaser pursuant to the terms of the Sale Order and the applicable Sale Transaction Documents, including, without limitation, (i) selling the Purchased Assets free and clear of claims, liens and encumbrances except to the extent set forth in the Asset Purchase Agreement and (ii) assuming and assigning to the Purchaser pursuant to the Asset Purchase Agreement in connection with the Sale Transaction certain Executory Contracts and Unexpired Leases.

In accordance with the Sale Order, all corporate actions necessary to implement the Sale Transaction as contemplated in the Sale Order, including, without limitation, as may be necessary or appropriate to implement the G Reorganization Election (as defined in the Asset Purchase Agreement) pursuant to section 11.01(a) of the Asset Purchase Agreement, to the extent applicable, will be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person.

Article V.B of the Plan provides that, on the Closing Date, the Retained Cash shall be placed into accounts established and maintained by the Debtors, including, as applicable, the Additional Sale Consideration Escrow Account, the Professional Fee Escrow Account and the Wind-Down Reserve; *provided* that if the Retained Cash is insufficient to fund the Additional Sale Consideration, the Professional Fee Escrow Amount and the Wind-Down Reserve, the Purchaser shall fund all necessary additional amounts on the

37

Closing Date. On the Effective Date, the Wind-Down Reserve and the Additional Sale Consideration Escrow Account, but not the Professional Fee Escrow Account, will vest in the Post-Effective Date Debtors and their Estates pursuant to Article V.D of the Plan.

For the avoidance of doubt, pursuant to the Committee Settlement, the Wind-Down Budget shall be funded by the Purchaser from time to time in accordance with the Sale Order and the Asset Purchase Agreement in order to ensure the satisfaction of all Administrative Claims, Other Priority Claims, Priority Tax Claims, and Professional Fee Claims, including any adjustment, as necessary, to provide for payment in full of (i) all Professional Fee Claims, (ii) accrued postpetition liabilities through the Closing Date of the types noted in section 2.02(h) of the Asset Purchase Agreement related to any assets that are designated to be "Excluded Assets" in the Asset Purchase Agreement but which have not been paid under the DIP Facility as of the Closing Date, (iii) all Administrative Claims, Other Priority Claims, and Priority Tax Claims required to be paid pursuant to the Plan, including the anticipated expenses of the Wind-Down from and after the Effective Date (including anticipated Plan Administration Expenses), (iv) any Ad Hoc DIP and First Lien Lender Expenses, including anticipated Ad Hoc DIP and First Lien Lender Expenses to be incurred after the Effective Date that will be payable by the Debtors, and (v) any Agent Expenses.

### C.    **Plan Administrator**

Article V.C of the Plan vests the Plan Administrator with the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan.

Article V.C.3 of the Plan provides that, the Debtors shall indemnify and hold harmless (i) the Plan Administrator in connection with carrying out the obligations under the Plan Administration Agreement, including the maintenance or disposition of the Plan Administration Assets, and (ii) such other Persons retained by the Plan Administrator (collectively, the "**Plan Administration Indemnified Parties**"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Plan Administration Indemnified Party's willful misconduct or gross negligence, with respect to Debtors or the implementation or administration of the Plan. To the extent a Plan Administration Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Plan Administrator in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Plan Administration Indemnified Party (and such Plan Administration Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Plan Administration Indemnified Party is not entitled to be indemnified therefore) out of the Wind-Down Reserve or any insurance purchased using the Wind-Down Reserve

Article V.I of the Plan provides that, on and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file or record (in consultation with the Ad Hoc DIP and First Lien Lender Group) such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

Article V.J of the Plan provides that, on and after the Effective Date, the Plan Administrator shall serve as the sole shareholder, interest holder, officer, director or manager of each of the Debtors, as applicable, under applicable state law.

### D. The Plan Administration Assets

Article V.D. of the Plan provides that, on the Effective Date, the Plan Administrator shall sign the Plan Administration Agreement and accept the Wind-Down Reserve, the Professional Fee Escrow Account, the Additional Sale Consideration Escrow Account, and the Cash therein (the "**Plan Administration Assets**"). As of the Effective Date, all Plan Administration Assets and all assets dealt with in the Plan shall be free and clear of all Liens, Claims, and Interests except as otherwise further provided in the Plan or in the Confirmation Order. The Plan Administrator shall be authorized to use any proceeds of the Wind-Down Reserve in connection with the Wind-Down and use the Professional Fee Escrow Account and the Additional Sale Consideration Escrow Account for the purposes as explicitly set forth in the Plan.

After the Effective Date, upon payment of all Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims and Plan Administration Expenses, and distribution of the Class 3b and 3c Additional Sale Consideration Amount, and to the extent that the Plan Administrator determines in good faith, in consultation with the Ad Hoc DIP and First Lien Lender Group, and on a reasonable basis, that substantially all of the claims and expenses for which the Wind-Down Amount was held in escrow are no longer outstanding or otherwise satisfied in full, the Plan Administrator shall remit any remaining unused Wind-Down Amount and Plan Administration Assets (or proceeds thereof) to the Purchaser.

Article V.K provides that, on the Effective Date, the Debtors' rights under and to each D&O Policy and Insurance Policy not transferred to the Purchaser under the Sale Transaction Documents shall vest in the Debtors and their Estates as Plan Administration Assets.

### E. Merger of Debtors; Closing Cases of Debtor Affiliates

Article V.E of the Plan provides that, on or after the Effective Date: the Plan Administrator, in consultation with the Ad Hoc DIP and First Lien Lender Group, (i) may merge or dissolve such Affiliates of the Debtors and complete the winding up of such Affiliates of a Debtor without the necessity for any other or further actions to be taken by or on behalf of such Affiliates or their shareholder any payments to be made in connection therewith, other than the filing of a certificate of merger or dissolution, as applicable, with the appropriate governmental authorities; (ii) may merge or dissolve any Debtor and complete the winding up of such Debtor without the necessity for any other or further actions to be taken by or on behalf of such Debtor or its shareholders or any payments to be made in connection therewith, other than the filing of a certificate of merger or dissolution, as applicable, with the appropriate governmental authorities; *provided* that upon any merger with another Debtor, all Claims filed or scheduled in the non-surviving Debtor's Chapter 11 Case shall be deemed to have been filed in the surviving Debtor's Chapter 11 Case; and (iii) may seek authority from the Bankruptcy Court to close any Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### F. Cancellation of Existing Securities and Agreements

Article V.F of the Plan provides that, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any prepetition Claim or Interest shall be cancelled and of no further force and effect, except that each of the foregoing shall continue in effect solely to the extent necessary to (a) allow Holders of such Claims or Interests to receive Distributions under the Plan; (b) allow the Debtors, the Plan Administrator, the DIP Agent, the First Lien Agent, Second Lien Agent, and the Convertible Notes Indenture Trustee, as applicable, to make post-Effective Date Distributions or take such other actions pursuant to the Plan on account of such Claims or Interests; (c) allow Holders of Claims or Interests to retain their respective rights and obligations vis-à-vis other

Holders of Claims or Interests pursuant to any such applicable document or instrument (including the Intercreditor Agreement); (d) allow the DIP Agent, First Lien Agent, Second Lien Agent, the Convertible Notes Indenture Trustee, and the L/C Issuer to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including, but not limited to, any indemnifications rights or any rights with respect to priority or payment or to exercise charging liens (including the Convertible Notes Charging Lien and the Intercreditor Agreement); (e) preserve any rights of the DIP Agent, First Lien Agent, Second Lien Agent, and the Convertible Notes Indenture Trustee to payment of fees, expenses and indemnification obligations against money or property distributed to the lenders under the First Lien Loan Documents and DIP Documents, Holders under the Second Lien Note Documents, and Holders under the Convertible Notes Indenture, as applicable, including any rights of enforcement, rights to priority of payment or to maintain, exercise, and/or enforce charging liens (including the Convertible Notes Charging Lien); (f) preserve the rights of the DIP Agent, First Lien Agent, Second Lien Agent, Convertible Notes Indenture Trustee, and the L/C Issuer to appear and be heard in these Chapter 11 Cases to the extent such rights exist, and (g) permit the DIP Agent, First Lien Agent, Second Lien Agent, the Convertible Notes Indenture Trustee, and the L/C Issuer to perform any function necessary to effectuate the foregoing.  Notwithstanding the foregoing, any provision in any such agreement, instrument, note, certificates, indenture, mortgage, security document, or other instrument or document that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests as a result of the cancellations, terminations, satisfaction, or releases provided for in Article V.F of the Plan shall be deemed null and void and shall be of no force and effect.

Article V.F of the Plan provides that, upon the final distribution on account of the Convertible Notes, (a) the Convertible Notes shall thereafter be deemed to be worthless, and (b) at the request of the Convertible Notes Indenture Trustee, DTC shall take down the relevant position relating to the Convertible Notes without any requirement of indemnification or security on the part of the Debtors, the Plan Administrator or the Convertible Notes Indenture Trustee.

Except for the foregoing, subsequent to the performance by the DIP Agent, First Lien Agent, Second Lien Agent, the Convertible Notes Indenture Trustee, and the L/C Issuer of their respective obligations pursuant to the Plan, all further duties, obligations, liability, and responsibilities of the DIP Agent, First Lien Agent, Second Lien Agent, the Convertible Notes Indenture Trustee, and the L/C Issuer and their respective agents related to the DIP Documents, First Lien Loan Documents, Second Lien Note Documents, the DIP L/C Agreement, and the Convertible Notes Indenture (including the exercise or enforcement of rights under the Intercreditor Agreement), as applicable, shall terminate and the Convertible Notes Indenture Trustee shall be fully discharged and released from all obligations under the Convertible Notes Indenture.

The Convertible Notes Indenture Trustee shall be entitled to the reimbursement of the Convertible Notes Indenture Trustee Fees in an amount not to exceed $150,000.  The Convertible Notes Indenture Trustee shall provide the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lenders Group, with a summary invoice for the Convertible Notes Indenture Trustee Fees no later than three (3) business days prior to the Effective Date, which invoice may include estimates for the Convertible Notes Indenture Trustee Fees anticipated through and after the Effective Date.

40

If the Debtors object to any Convertible Notes Indenture Trustee Fees, including estimates thereof, the Debtors or the Plan Administrator, as applicable, shall (a) provide written notification within two (2) days of receipt of the invoice therefor and (b) on the Effective Date, (x) pay in Cash to the Convertible Notes Indenture Trustee the undisputed portion of the Convertible Notes Indenture Trustee Fees and (y) deposit the disputed portion of such fees and expenses into the Wind-Down Reserve pending any consensual resolution or resolution by the Bankruptcy Court of the dispute. Upon the receipt of such notification, the Convertible Notes Indenture Trustee may submit the dispute for resolution by the Bankruptcy Court.

Notwithstanding anything in the Plan or any Definitive Document to the contrary, other than to the extent Class 3a does vote to accept the Plan and any Distribution is made in accordance with Article III.B.3(c)(1) of the Plan, (i) the Intercreditor Agreement shall remain in full force and effect notwithstanding the confirmation of the Plan or the occurrence of the Effective Date and shall be fully enforceable according to its terms, (ii) no distribution to any Holder of a Second Lien Note Claim shall be made in contravention of the terms of the Plan and the Intercreditor Agreement, and (iii) all distributions to Holders of Allowed Second Lien Note Claims pursuant to the Plan shall be subject to the terms of the Intercreditor Agreement, including, without limitation, the Turnover and Subordination Provisions, and the Disbursing Agent shall make Distributions on account of Allowed Second Lien Note Claims in accordance with, and as provided by, the terms of the Plan.

### G.    Corporate Action

Article V.G of the Plan provides that, upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person.

### H.    Exemption from Certain Transfer Taxes

Article V.H of the Plan provides that, to the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale by any Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**I.      Directors, Managers, and Officers of the Debtors**

Article V.J. of the Plan provides that, following the Confirmation Date and prior to the occurrence of the Effective Date, the then-current officers, directors and managers of each of the Debtors shall continue in their respective capacities in accordance with the applicable by-laws or other organizational documents, and the Debtors shall execute such documents and take such other action as is necessary to effectuate the actions provided for in the Plan.

Article V.I of the Plan provides that, after the Effective Date, all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Tail Coverage for the full term of such D&O Policy, subject to and in accordance with the terms and conditions of such D&O Tail Coverage.

**J.      D&O and Insurance Policies**

Article V.K of the Plan provides that, notwithstanding anything to the contrary in the Plan, to the extent any Insurance Policies have not already been assumed and assigned to the Purchaser pursuant to the Sale Order or Sale Transaction Documents, (i) on the Effective Date, the Debtors shall be deemed to have assumed all of the Insurance Policies in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; and (ii) confirmation of the Plan will not impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

Article V.K of the Plan provides that, on the Effective Date, the Debtors' rights under and to (i) each D&O Policy and (ii) each other Insurance Policy not transferred to the Purchaser under the Sale Transaction Documents shall vest in the Post-Effective Date Debtors and their Estates as Plan Administration Assets. Confirmation and Consummation of the Plan, and the vesting of the Insurance Policies in the Post-Effective Date Debtors and their Estates, shall not impair or otherwise affect (x) any parties' rights to coverage thereunder, including in respect of any claims pending as of the Effective Date or pursued or made thereafter, or (y) any available defenses of the Debtors or the Plan Administrator or any Insurer under the Insurance Policies.

**K.      Preservation of Rights of Action**

Article V.L provides that, other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan, pursuant to the Sale Transaction, or by a Bankruptcy Court order, the Debtors reserve any and all Causes of Action. On and after the Effective Date, the Plan Administrator may pursue such Causes of Action in its sole discretion. No Entity may rely on the absence of a specific reference in the Plan or this Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator shall retain and shall have, including through their authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent

42

or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself and the occurrence of the Effective Date.

### L.   Closing of the Chapter 11 Cases

Article V.M provides that, after a Chapter 11 Case has been fully administered, including in accordance with Article V.E of the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close that Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## VII.
## CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan is (a) accepted by all Impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (b) in the "best interests" of the holders of Claims and Interests Impaired under the Plan; and (c) feasible.

### A.   Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. The Confirmation Hearing is scheduled for January 26, 2020 at 1:00 p.m. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket in the Chapter 11 Cases.

### B.   Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of Judge John T. Dorsey, together with proof of service thereof, and served upon all of the below parties so as to be received by the Plan Objection Deadline of **January 19, 2021 at 4:00 p.m. (prevailing Eastern time)**.

| Debtors |
| --- |
| Global Eagle Entertainment Inc.<br>1821 E. Dyer Road, Suite 125<br>Santa Ana, CA 92705<br>Attn: Joshua Marks, Christian Mezger, and Kim Nakamaru<br>Emails: Joshua.Marks@globaleagle.com, Christian.Mezger@globaleagle.com, and Kim.Nakamaru@globaleagle.com |

| Counsel to the Debtors |
|---|
| Latham & Watkins LLP<br>335 South Grand Avenue, Suite 100<br>Los Angeles, CA 90071<br>Attn: Ted A. Dillman and Helena Tseregounis<br>Emails: Ted.Dillman@lw.com and Helena.Tseregounis@lw.com |

| Counsel to the Ad Hoc DIP and First Lien Lender Group |
|---|
| Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, NY 10166<br>Attn:  Scott Greenberg, Michael J. Cohen and      Jason Zachary Goldstein<br>Emails:  sgreenberg@gibsondunn.com, mcohen@gibsondunn.com and<br>jgoldstein@gibsondunn.com |

| Counsel to the First Lien Agent |
|---|
| Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attn: David N. Griffiths and Bryan R. Podzius<br>Emails: david.griffiths@weil.com and bryan.podzius@weil.com |

| Counsel to the Creditors' Committee |
|---|
| Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park, Bank of America Tower<br>New York, NY 10036-6746<br>Attn:  Phillip C. Dublin and Jason Rubin<br>Emails:  pdublin@akingump.com and jrubin@akingump.com |

| United States Trustee |
|---|
| Office of the United States Trustee for the District of Delaware<br>J. Caleb Boggs Federal Building<br>844 North King Street, Suite 2207<br>Wilmington, DE 19801<br>Attn: Timothy J. Fox |

### C.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.

#### 1.    Confirmation Requirements.

Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

44

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- subject to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that holders of priority tax claims may receive deferred Cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims deferred Cash payments, over a period not exceeding 5 years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims);

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors, as the proponents of the Plan, have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a summary of certain relevant statutory confirmation requirements.

45

a.      Acceptance

Claims in Classes 2, 3a, 3b, and 3c are Impaired under the Plan and are entitled to vote to accept or reject the Plan; Class 1 is Unimpaired and is therefore conclusively presumed to have accepted the Plan; Classes 4, 5, 6, and 7 are Impaired and (i) shall receive no Distributions under the Plan on account of their Claims or Interests, (ii) are deemed to have rejected the Plan, and (iii) are not entitled to vote to accept or reject the Plan.

The Debtors also will seek confirmation of the Plan over the objection of any individual Holders of Claims who are members of an accepting Class.  There can be no assurance, however, that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

b.      Unfair Discrimination and Fair and Equitable Test

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests.  In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the Cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class.  The Debtors believe the Plan will not discriminate unfairly against any non-accepting Class.

c.      Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless contemplated by the Plan.  The Plan provides for the Distribution of the proceeds from the sale of substantially all of the Debtors' assets and the subsequent dissolution of the Debtors.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

## 2.      Best Interests Test

The "best interests" test requires that the Bankruptcy Court find either:

- that all members of each impaired class have accepted the plan; or

- that each holder of an allowed claim or interest in each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine what the Holders of Claims and Interests in each Impaired Class would receive if the Debtors were liquidated under chapter 7 on the Confirmation Date, the Bankruptcy Court must determine the dollar

46

amount that would have been generated from the liquidation of the Debtors' assets and properties in a liquidation under chapter 7 of the Bankruptcy Code.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, the Debtors have determined that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would have received pursuant to the liquidation of the Debtors under chapter 7.

Moreover, the Debtors believe that the value of distributions to each Class of Allowed Claims in a chapter 7 case would be materially less than the value of Distributions under the Plan because (a) the funds made available through the Committee Settlement are only available under the Plan and would not be available in a chapter 7 case and (b) the agreement by Holders of First Lien Loan Claims to waive their rights to distributions on account of their deficiency claims is only valid under the Plan. As such, there would be more claims and fewer assets available for distribution in a chapter 7 liquidation.

The Debtors, with the assistance of their advisors, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by Holders of Claims and Interests if the Chapter 11 Cases are converted to cases under chapter 7 on December 31, 2020 (the "**Liquidation Analysis**"), which is attached hereto as **Exhibit D**. The Liquidation Analysis provides a summary of the liquidation value of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court liquidates the assets of the Debtors' estates.

The Liquidation Analysis contains a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change and significant economic uncertainties and contingencies beyond the control of the Debtors and their management. The chapter 7 liquidation period is assumed to last between 3 and 6 months following the appointment of a chapter 7 trustee, given that substantially all the assets will have been sold as part of the Sale Transaction, but allowing for, among other things, evaluation of any other potential claims or causes of action. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

### D.      **Standards Applicable to Releases**

Article X of the Plan provides for releases of certain claims against non-Debtors in consideration of services provided to the Debtors and the contributions made by the Released Parties to the Debtors' Chapter 11 Cases. The Released Parties, the Releasing Parties, and the releases are set forth in full at Article V.H hereof.

The Debtors believe that the releases set forth in the Plan are appropriate because, among other things, the releases are expressly or impliedly consensual. Courts in the Third Circuit "have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected." *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013). In addition to the consent demonstrated by acceptance of the Plan by Holders entitled to vote, consent may be implied from Holders who are Unimpaired and deemed to accept the Plan. *Id.* at 306 (holding third-party releases are consensual as to unimpaired creditors paid in full); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (same). Consent is also demonstrated as to the Holders of Claims who are provided instructions on how to opt out of such releases and do not do so, either by abstaining from voting or by voting against the Plan but

47

not opting out of the releases. *Indianapolis Downs*, 486 B.R. at 305 (citing *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009); *In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003)).

Here, consistent with the above case law, the releases of Claims against non-Debtors are given upon express or implied consent by Holders entitled to vote to accept or reject the Plan who do not opt out by appropriately marking their Ballots, or Holders entitled to vote who abstain from voting on the Plan.

### E.   Classification of Claims and Interests

The Debtors believe that the Plan complies with the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

### F.   Consummation

The Plan will be Consummated on the Effective Date.  The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan (*see* Article V.G hereof and Article IX.B of the Plan) have been satisfied or waived pursuant to the Plan.  The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

### G.   Dissolution of Committee

The Committee shall dissolve, and the current and former members of the Committee shall be released from all rights and duties arising from, or related to, the Chapter 11 Cases on the Effective Date; *provided* that the Committee and its professionals shall have the right to file, prosecute, review, and object to any applications for compensation and reimbursement of expenses filed in accordance with Article II.A.2 of the Plan.

### H.   Modification of Plan

Subject in all respects to the limitations and consent rights contained in the Plan, (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order in accordance with section 1127(a) of the Bankruptcy Code and (b) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code; *provided* that all such modifications and amendments shall be made in consultation with the Committee and the Ad Hoc and First Lien Lender Group and, with respect to those modifications and amendments that may adversely impact (a) (i) the Committee Settlement, (ii) the rights and obligations of the Committee, its professionals or Holders of Claims in Classes 3a, 3b, or 3c, or (iii) the Distributions to Holders of Claims in Classes 3a, 3b, or 3c, shall require the prior written consent of the Committee or (b)(i) the Committee Settlement, (ii) the rights and obligations of the Ad Hoc DIP and First Lien Lender Group, the Ad Hoc DIP and First Lien Lender Group Advisors, or Holders of First Lien Loan Claims, (iii) Distributions to Holders of First Lien Loan Claims, (iv) the application of the Intercreditor Agreement, including, without limitation, the Turnover and Subordination Provisions, pursuant to the Plan, or (v) the provisions applicable to the Wind-Down, Wind-Down Amount, or Wind-Down Budget, shall require the prior written consent of the Ad Hoc DIP and First Line Lender Group.  A Holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

48

### I.      Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date and/or to file subsequent chapter 11 plans, with respect to one or more of the Debtors.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation of the Plan does not occur with respect to one or more of the Debtors, then with respect to the applicable Debtor or Debtors for which the Plan was revoked or withdrawn or for which Confirmation or Consummation of the Plan did not occur: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant hereto will be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in the Plan will: (a) constitute a waiver or release of any Claims by or against, or any Interests in, the applicable Debtors or any other Entity; (b) prejudice in any manner the rights of the applicable Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the applicable Debtors or any other Entity.

### J.      Post-Confirmation Jurisdiction of the Bankruptcy Court

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, except to the extent set forth herein, and in addition to the matters over which the Bankruptcy Court shall have retained jurisdiction pursuant to the Sale Order, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority or Secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any such Claim or Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to adjudicate and, if necessary, liquidate, any Claims arising therefrom;

- resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

- hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

- ensure that Distributions to Holders of Allowed Claims or Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes related thereto;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

- enforce all orders previously entered by the Bankruptcy Court;

49

- enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or this Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Person or Entity's obligations incurred in connection with the Plan;

- hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

- hear and determine disputes arising in connection with the interpretation, implementation, and enforcement of the Asset Purchase Agreement or other document(s) governing or relating to the Asset Purchase Agreement;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of the Plan;

- enforce the terms and conditions of the Plan, the Confirmation Order, and the Definitive Documents and maintain the integrity of the Plan following Consummation;

- hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

- resolve any cases, controversies, suits or disputes with respect to the Release, Exculpation, indemnification and other provisions contained in Article X of the Plan and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such provisions;

- enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any release or exculpation adopted in connection with the Plan;

- enter an order or orders concluding or closing the Chapter 11 Cases; and

- hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article XI of the Plan, such provisions shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

50

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

### K. Ad Hoc DIP and First Lien Lender Fees and Expenses

The Ad Hoc DIP and First Lien Lender Expenses and Agent Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court or comply with any guidelines of the U.S. Trustee, and without any requirement for review or approval by the Bankruptcy Court or any other party.  All Ad Hoc DIP and First Lien Lender Expenses and Agent Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (1) Business Days before the anticipated Effective Date; *provided*, that such estimate shall not be considered an admission or limitation with respect to such Ad Hoc DIP and First Lien Lender Expenses or Agent Expenses.  In addition, the Debtors and Plan Administrator (as applicable) shall continue to pay the Ad Hoc DIP and First Lien Lender Expenses and Agent Expenses (if any) after the Effective Date when due and payable in the ordinary course related to implementation, consummation and defense of the Plan, whether incurred before, on or after the Effective Date to the extent provided for and funded through the Wind-Down Budget.

### VIII.
### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan reflects a consensus among the Debtors and their key constituents.  The Debtors have determined that the Plan is the best alternative available to maximize value for all stakeholders.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (A) continuation of the Chapter 11 Cases, which could lead to the filing of an alternative plan, (B) a liquidation under chapter 7 of the Bankruptcy Code, or (C) dismissal of the Chapter 11 Cases, leaving Holders of Claims and Interests eligible to pursue available non-bankruptcy remedies.  These alternatives to the Plan, however, are not likely to benefit Holders of Claims and Equity Interests.

### A. Continuation of Chapter 11 Cases

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a chapter 11 plan has expired, any other party in interest) could attempt to formulate a different plan.  However, it is not certain that the Debtors would be able to secure the same settlements and funding negotiated in connection with the Plan in a subsequent plan.

### B. Liquidation under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.  The effect that the Debtors believe a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit D**.

As demonstrated in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things,

the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, and the potential loss of the Committee Settlement funds.

Substantially all of the Debtors' assets will be sold through the Sale Transaction.  The Debtors believe that the Plan provides a greater recovery to Holders of Allowed General Unsecured Claims, Allowed Second Lien Note Claims, Allowed Convertible Note Claims, and Allowed Other Priority Claims – in addition to the funds made available through the Committee Settlement under the Plan – than would a chapter 7 liquidation, for several reasons.  First, liquidation under chapter 7 of the Bankruptcy Code would both decrease the aggregate proceeds available to Holders of Claims and increase the magnitude of claims to those proceeds.  The Debtors believe that in a liquidation under chapter 7, before creditors receive any Distribution, additional administrative expenses involved in the appointment of a chapter 7 trustee and its retained professionals would cause a substantial diminution in the value of the Debtors' assets.  Further, the First Lien Lenders have a lien on all assets of the Debtors' Estates and have agreed pursuant to the Committee Settlement, to afford a recovery to Holders of Allowed General Unsecured Claims, Allowed Second Lien Note Claims, and Allowed Convertible Note Claims (*i.e.* the Additional Sale Consideration) pursuant to the terms of the Plan and the Sale Order, including subject to the Intercreditor Agreement.  The Debtors believe that such recovery would be unavailable to such creditors in a chapter 7 liquidation.

### C.      Dismissal of Chapter 11 Cases

If the Chapter 11 Cases are dismissed, Holders of Claims or Interests would be free to pursue non-bankruptcy remedies in their attempts to satisfy Claims against or Interests in the Debtors.  However, in that event, Holders of Claims or Interests would be faced with the costs and difficulties of attempting, each on its own, to recover from a non-operating entity.  Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims with the least delay.

**IX.**
**FACTORS TO CONSIDER BEFORE VOTING**

**BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, IN ADDITION TO THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT TOGETHER WITH ANY ATTACHMENTS, EXHIBITS, OR DOCUMENTS INCORPORATED BY REFERENCE HERETO.  THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION.**

### A.      Certain Bankruptcy Law Considerations

#### 1.      Risk of Non-Confirmation of Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modification to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all voting Classes voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of reorganization or otherwise.

52

### 2.      Risk of Failing to Satisfy the Vote Requirement

In the event that the Debtors are unable to obtain sufficient votes from the Classes entitled to vote, the Debtors will seek to accomplish an alternative chapter 11 plan or seek to "cram down" (*i.e.*, achieve non-consensual confirmation of—see note 3 below) the Plan on non-accepting Classes.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to Holders of Allowed Claims as those proposed in the Plan.

### 3.      Non-Consensual Confirmation

If any impaired class of claims or interests does not accept or is deemed not to accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  Should any Class vote to reject the plan, then these requirements must be satisfied with respect to such rejecting Class(es).  The Debtors believe that the Plan satisfies these requirements.

### 4.      Risks Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other clams or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

### 5.      Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

### 6.      Releases, Injunctions, Exculpation Provisions May Not Be Approved

Article X of the Plan provides for certain releases, injunctions, and exculpations for claims and Causes of Action that may otherwise be asserted against the Debtors, the Exculpated Parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### 7.      Risk of Non-Occurrence of Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date and the Closing Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article X of the Plan, then the Confirmation Order may be vacated, in which event no Distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of

the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 8.    Risks of Termination of the Restructuring Support Agreement

The Restructuring Support Agreement contains certain provisions that give the parties thereto the ability to terminate the Restructuring Support Agreement upon the occurrence or non-occurrence of certain events, including failure to achieve certain milestones in these Chapter 11 Cases. Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Sale Transaction or the Debtors' relationships with vendors, suppliers, employees, and major customers.

### 9.    Conversion into Chapter 7 Cases

If no chapter 11 plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

### 10.    Pro Rata Share Distributions

The Debtors and their advisors have made certain assumptions regarding the Allowance and Disallowance of certain Claims entitled to Pro Rata Share Distributions under the Plan. In the event that Claims in certain Classes entitled to Pro Rata Share Distributions are Allowed in amounts that exceed the assumptions the Debtors and their advisors have relied upon, the recoveries of Holders of Claims entitled to Pro Rata Distributions in other Classes would be impacted.

## B.    Additional Factors

### 1.    Debtors Could Withdraw Plan

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

### 2.    Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3.    No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

54

### 4.    No Legal or Tax Advice Is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5.    No Admission Made

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

### 6.    Risks Related to the Committee Settlement

Pursuant to the Committee Settlement and the terms of the Sale Order, (i) the Second Lien Note Claims may be Allowed in an amount in the higher range of recoveries as set forth herein and in the Plan and/or (ii) the Holders of Allowed Second Lien Note Claims may be entitled to receive their full Pro Rata Share of the Additional Sale Consideration. The occurrence of one or both of the two scenarios outlined in the foregoing sentence may reduce the recoveries to other Holders of Allowed Claims entitled to receive a Distribution under the Plan.

## X.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    General

The following discussion summarizes certain material U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "**Service**"). There can be no assurance that the Service will not take a contrary view or that such a contrary view would not be sustained by a court. No ruling from the Service has been or will be sought, nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth below. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to U.S. Holders (as defined below) or the Debtors. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described below.

The following summary is for general information only and, except for Section D below, is applicable only to Holders of Claims entitled to vote on the Plan. This summary does not discuss the tax consequences to the Debtors and Holders of First Lien Loan Claims arising from the Sale Transaction. Accordingly, with respect to a First Lien Loan Claim, this summary only discusses the remaining portion of such Claim not exchanged in connection with the Sale Transaction.

The tax treatment of a U.S. Holder may vary depending upon such U.S. Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a U.S. Holder, including any alternative minimum tax consequences, and does not address the tax consequences to a U.S. Holder that

55

has made an agreement to resolve its Claims in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or U.S. Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, partnerships and other pass-through entities, U.S. Holders that hold Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction, U.S. Holders that have a "functional currency" other than the United States dollar, U.S. Holders subject to special tax accounting rules as a result of any item of gross income with respect to a Claim being taken into account in an applicable financial statement and U.S. Holders that have acquired Claims in connection with the performance of services.

The following summary assumes that the Claims are held by U.S. Holders as "capital assets" within the meaning of section 1221 of the IRC and that the Claims will be respected for U.S. federal income tax purposes in accordance with their form.

The tax treatment of U.S. Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things, whether the U.S. Holder receives distributions under the Plan in more than one taxable year. Therefore, each U.S. Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such U.S. Holder of the transactions contemplated by the Plan.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of a Claim that, for U.S. federal income tax purposes, is or is treated as:

- an individual who is a citizen or resident of the United States;

- a corporation created or organized under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC), or (2) has a valid election in effect to be treated as a United States person for U.S. federal income tax purposes.

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN.

### B.    Certain Material U.S. Federal Income Tax Consequences to the U.S. Holders of Claims

A U.S. Holder of a Claim should generally be treated as receiving its distributions of Cash and, if applicable, other property under the Plan in a taxable exchange under Section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount

("**OID**")), each U.S. Holder of a Claim should recognize gain or loss equal to the difference between the (a) amount of Cash and fair market value of other property actually or constructively received in exchange for such Claim, and (b) such U.S. Holder's adjusted tax basis, if any, in such Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its Claims will depend on such U.S. Holder's own circumstances and may be restricted under the IRC.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including (but not limited to): (a) the tax status of the U.S. Holder of the Claim; (b) whether such Claim has been held for more than one year; (c) the extent to which the U.S. Holder previously claimed a loss or bad debt deduction with respect to such Claim; and (d) whether such Claim was acquired at a market discount. A U.S. Holder that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a de minimis exception), assuming that such U.S. Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

A portion of the consideration received by a U.S. Holder of a Claim may be attributable to accrued interest or OID on such Claim. Such amount should be taxable to that U.S. Holder as interest income if such accrued interest or OID has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest or OID on such Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. If the fair value of the consideration is not sufficient to fully satisfy all principal, interest or OID on the Claims, the extent to which such consideration will be attributable to accrued interest and OID is unclear. The Debtors intend to take the position, and the Plan provides, that, to the extent permitted by applicable law, the distributions in full or partial satisfaction of the Claims shall be allocated for income tax purposes first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued, including OID, on such Claims.

### C.    Backup Withholding and Information Reporting

All distributions or payments to Holders of Claims under the Plan are subject to any applicable tax withholding and applicable information reporting requirements. The IRS may make the information returns reporting such distributions and payments and withholding available to the tax authorities in the country in which a non-U.S. beneficiary is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, a U.S. Holder of a Claim may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan. Certain holders (including corporations) generally are not subject to backup withholding. A U.S. Holder that is not otherwise exempt generally may avoid backup withholding by providing such Holder's taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the U.S. Holder has not been notified by the Service that it is subject to backup withholding.

Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the Service.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and

57

whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

THE FOREGOING DISCUSSION OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE DEBTORS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

### D.  Certain U.S. Federal Income Tax Consequences to the Debtors

The Debtors estimate that, as of the Petition Date, the Debtors had sufficient tax attributes available such that the Debtors expect not to owe any material income tax liabilities as a result of the Sale Transaction or the Plan.  The use of the Debtors' tax attributes, if any, following the Sale Transaction may be subject to limitations.

### CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 2, 3a, 3b and 3c to vote in favor thereof.

Respectfully submitted, as of the date first set forth above,

> **Global Eagle Entertainment Inc. (on behalf of itself and all other Debtors)**
>
> By:     */s/ Christian Mezger*
> Name:   Christian Mezger
> Title:    Chief Financial Officer

59

**<u>Exhibit A</u>**

**Plan**

> **THIS IS NOT A SOLICITATION OF VOTES ON THIS PLAN.  VOTES MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

**FINAL VERSION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
:
In re: : Chapter 11
:
GLOBAL EAGLE ENTERTAINMENT : Case No. 20-11835 (JTD)
INC., *et al.*,[1]
:
Debtors. : (Jointly Administered)
:
---------------------------------------------------------------- x

## JOINT PLAN OF LIQUIDATION FOR GLOBAL EAGLE ENTERTAINMENT INC. AND ITS AFFILIATE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

| **LATHAM & WATKINS LLP** | **YOUNG CONAWAY STARGATT & TAYLOR, LLP** |
|---|---|
| Ted A. Dillman (admitted *pro hac vice*) | Michael R. Nestor (No. 3526) |
| Helena G. Tseregounis (admitted *pro hac vice*) | Kara Hammond Coyle (No. 4410) |
| Nicholas J. Messana (admitted *pro hac vice*) | Betsy L. Feldman (No. 6410) |
| 355 South Grand Avenue, Suite 100 | Rodney Square |
| Los Angeles, California 90071 | 1000 North King Street |
| Telephone:  (213) 485-1234 | Wilmington, Delaware 19801 |
| Facsimile:  (213) 891-8763 | Telephone:  (302) 571-6600 |
| Email:  ted.dillman@lw.com | Facsimile:  (302) 571-1253 |
|   helena.tseregounis@lw.com | Email:  mnestor@ycst.com |
|   nicholas.messana@lw.com |   kcoyle@ycst.com |
|  |   bfeldman@ycst.com |

-and-

George A. Davis (admitted *pro hac vice*)
Andrew C. Ambruoso (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
885 Third Avenue
New York, New York 10022
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email:  george.davis@lw.com
   andrew.ambruoso@lw.com

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are: Global Eagle Entertainment Inc. (7800), Airline Media Productions Inc. (2314), Emerging Markets Communications, LLC (0735), Entertainment in Motion, Inc. (3908), Global Eagle Entertainment Operations Solutions, Inc. (3375), Global Eagle Services, LLC (7899), Global Eagle Telecom Licensing Subsidiary LLC (2547), IFE Services (USA), Inc. (2120), Inflight Productions USA, Inc. (8493), Maritime Telecommunications Network, Inc. (9974), MTN Government Services, Inc. (6069), MTN International, Inc. (8559), MTN License Corp. (0314), N44HQ, LLC (0570), Post Modern Edit, Inc. (6256), Row 44, Inc. (2959), and The Lab Aero, Inc. (9831).  The Debtors' address is 1821 E. Dyer Road, Suite 125, Santa Ana, California 92705.

**FINAL VERSION**

jon.weichselbaum@lw.com

*Counsel for Debtors and Debtors in Possession*

Dated:   November 13, 2020
Wilmington, Delaware

ii

US-DOCS\117460541.10

**FINAL VERSION**

TABLE OF CONTENTS

Page

ARTICLE I. ...................................................................................................................1

RULES OF INTERPRETATION, COMPUTATION OF TIME AND DEFINED TERMS..........1

    **A.**    Rules of Interpretation; Computation of Time....................................................1
    **B.**    Defined Terms ..................................................................................................2

ARTICLE II. ADMINISTRATIVE AND PRIORITY TAX CLAIMS .......................................18

    **A.**    Administrative Claims ......................................................................................18
        1.    General Administrative Claims...............................................................18
        2.    Professional Fee Claims........................................................................19
        3.    Statutory Fees.......................................................................................20
    **B.**    Priority Tax Claims...........................................................................................20
    **C.**    DIP Claims.......................................................................................................20
    **D.**    Other Priority Claims .......................................................................................21

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
        AND INTERESTS................................................................................................21

    **A.**    Summary ..........................................................................................................21
    **B.**    Classification and Treatment of Claims and Interests .......................................22
        1.    Class 1 — Other Secured Claims...........................................................22
        2.    Class 2 — First Lien Loan Claims..........................................................23
        3.    Class 3a — Second Lien Note Claims.....................................................24
        4.    Class 3b — Convertible Note Claims......................................................24
        5.    Class 3c — General Unsecured Claims ..................................................25
        6.    Class 4 — Section 510 Claims................................................................25
        7.    Class 5 – Intercompany Claims .............................................................25
        8.    Class 6 – Intercompany Interests ..........................................................25
        9.    Class 7 — Equity Interests....................................................................26
    **C.**    Special Provision Governing Unimpaired Claims...............................................26
    **D.**    Elimination of Vacant Classes ..........................................................................26

ARTICLE IV. ACCEPTANCE OR REJECTION OF THIS PLAN ...........................................26

    **A.**    Acceptance or Rejection of this Plan..................................................................27
        1.    Presumed Acceptance of Plan................................................................27
        2.    Voting Classes .....................................................................................27
        3.    Deemed Rejection of this Plan...............................................................27
    **B.**    Nonconsensual Confirmation............................................................................27
    **C.**    Subordinated Claims.........................................................................................27
    **D.**    Votes Solicited in Good Faith............................................................................27

**FINAL VERSION**

ARTICLE V. MEANS FOR IMPLEMENTATION OF THIS PLAN ........................................28

 **A.** Transactions Effective as of the Effective Date .................................................28
 **B.** Closing of Sale Transaction and Uses of Cash ..................................................28
 **C.** Plan Administrator .............................................................................................29
  1. Appointment .........................................................................................29
  2. Authority ...............................................................................................29
  3. Indemnification .....................................................................................30
 **D.** The Plan Administration Assets .........................................................................31
 **E.** Merger of Debtors; Closing Cases of Debtor Affiliates .....................................31
 **F.** Cancellation of Existing Securities and Agreements ..........................................31
 **G.** Corporate Action ................................................................................................33
 **H.** Exemption From Certain Transfer Taxes ...........................................................33
 **I.** Effectuating Documents; Further Transactions ..................................................33
 **J.** Directors, Managers, and Officers of the Debtors ..............................................34
 **K.** D&O and Insurance Policies ..............................................................................34
 **L.** Preservation of Rights of Action ........................................................................35
 **M.** Closing of the Chapter 11 Cases ........................................................................35

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
 LEASES .......................................................................................................................35

 **A.** Assumption of Executory Contracts and Unexpired Leases ...............................35
 **B.** Preexisting Obligations to the Debtors Under Executory Contracts and
  Unexpired Leases ...............................................................................................36
 **C.** Rejection Damages Claims .................................................................................36
 **D.** Nonoccurrence of Effective Date .......................................................................36

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS .............................................36

 **A.** Timing and Calculation of Amounts to Be Distributed; Entitlement to
  Distributions ......................................................................................................36
  1. Timing and Calculation of Amounts to Be Distributed ...........................36
  2. Entitlement to Distributions ...................................................................37
 **B.** Disbursing Agent ...............................................................................................37
 **C.** Distributions on Account of Claims Allowed After the Effective Date ...............37
  1. Payments and Distributions on Disputed Claims ....................................37
  2. Special Rules for Distributions to Holders of Disputed Claims ...............37
 **D.** Delivery of Distributions and Undeliverable or Unclaimed Distributions ...........37
  1. Delivery of Distributions in General .......................................................37
  2. Undeliverable Distributions and Unclaimed Property .............................38
  3. Record Date for Distributions ................................................................38
  4. Delivery of Distributions on First Lien Loan Claims ..............................39
  5. Delivery of Turned-Over Distributions on Account of Second Lien
   Note Claims ..........................................................................................39
  6. Delivery of Distributions on Convertible Note Claims ...........................39
  7. Fractional Distributions .........................................................................40

ii

US-DOCS\117460541.10

**FINAL VERSION**

|  | 8. | De Minimis Distributions | 40 |
| E. | | Compliance with Tax Requirements/Allocations | 40 |
| F. | | Surrender of Cancelled Instruments or Securities | 41 |
| G. | | Claims Paid or Payable by Third Parties | 41 |
|  | 1. | Claims Paid by Third Parties | 41 |
|  | 2. | Claims Payable to Third Parties | 41 |
|  | 3. | Applicability of D&O Policies and Insurance Policies | 41 |
| H. | | Allocation of Plan Distributions between Principal and Interest | 42 |

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ...... 42

| A. | Allowance and Disallowance of Claims | 42 |
| B. | Prosecution of Objections to Claims | 42 |
| C. | Estimation of Claims | 43 |
| D. | Distributions After Allowance | 43 |

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THIS PLAN ...... 43

| A. | Conditions Precedent to Confirmation | 43 |
| B. | Conditions Precedent to the Effective Date | 44 |
| C. | Waiver of Conditions | 45 |
| D. | Effect of Non-Occurrence of Conditions to Confirmation or Consummation | 45 |
| E. | Substantial Consummation | 45 |

ARTICLE X. RELEASE, EXCULPATION, INJUNCTION AND RELATED PROVISIONS ...... 46

| A. | General | 46 |
| B. | **Debtor Release** | 46 |
| C. | **Release by Holders of Claims and Interests** | 47 |
| D. | **Exculpation** | 48 |
| E. | Permanent Injunction | 49 |
| F. | Setoffs | 49 |
| G. | Release of Liens | 49 |
| H. | Preservation of All Causes of Action Not Expressly Settled or Released | 50 |
| I. | Integral Part of Plan | 50 |

ARTICLE XI. RETENTION OF JURISDICTION ...... 50

ARTICLE XII. MISCELLANEOUS PROVISIONS ...... 52

| A. | Reservation of Rights | 52 |
| B. | Payment of Statutory Fees | 52 |
| C. | Ad Hoc DIP and First Lien Lender Fees and Expenses | 53 |
| D. | Statutory Committee | 53 |

US-DOCS\117460541.10

**FINAL VERSION**

| | | |
|---|---|---|
| **E.** | Modification of Plan | 53 |
| **F.** | Revocation or Withdrawal of Plan | 54 |
| **G.** | Successors and Assigns | 54 |
| **H.** | Reservation of Rights | 54 |
| **I.** | Further Assurances | 55 |
| **J.** | Severability | 55 |
| **K.** | Service of Documents | 55 |
| **L.** | Governing Law | 57 |
| **M.** | Tax Reporting and Compliance | 57 |
| **N.** | Schedules | 57 |
| **O.** | Conflicts | 57 |
| **P.** | Entire Agreement | 57 |
| **Q.** | 2002 Notice Parties | 58 |

iv

**FINAL VERSION**

---

### JOINT PLAN OF LIQUIDATION FOR GLOBAL
### EAGLE ENTERTAINMENT INC. AND ITS AFFILIATE
### DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

Global Eagle Entertainment Inc. ("**GEE**") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (each a "**Debtor**" and, collectively, the "**Debtors**"), jointly propose the following chapter 11 plan of liquidation (as may be amended, modified or supplemented from time to time in accordance with the terms hereof, this "**Plan**") for the resolution of the outstanding Claims (as defined below) against, and Interests (as defined below) in, each of the Debtors.  Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims against and Interests in each Debtor pursuant to the Bankruptcy Code (as defined below).  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.  Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, results of operations, and historical financial information, and for a summary and analysis of this Plan, the treatment provided for herein and certain related matters.  There also are other agreements and documents, which will be filed with the Bankruptcy Court (as defined below), that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Schedules (each as defined below).  All such Exhibits and Plan Schedules are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Fed. R. Bankr. P. 3019 and the terms and conditions set forth in this Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

This Plan reflects the terms of the Committee Settlement among the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lender Group (each as defined below) in respect of the Committee Sale Objection (as defined in the Sale Order) pursuant to which the Purchaser shall (a) pay up to $8.5 million in cash in Additional Sale Consideration to be distributed in accordance with the terms of this Plan, and (b) through funding of the Wind-Down Reserve and the Professional Fee Escrow (as each may be supplemented pursuant to the terms hereof and the Committee Settlement) in accordance with the Wind-Down Budget, pay all amounts as necessary to ensure the satisfaction of all Administrative Claims, Other Priority Claims, Priority Tax Claims, and Professional Fee Claims (each as defined below) under this Plan.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

### ARTICLE I.

### RULES OF INTERPRETATION, COMPUTATION OF TIME AND DEFINED TERMS

*A.*      *Rules of Interpretation; Computation of Time*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine,

1

feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced item will be substantially in that form or substantially on those terms and conditions; (c) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document will mean as it may be amended, modified or supplemented from time to time; (d) any reference to an Entity as a Holder of a Claim or an Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Schedules" are references to Articles, Sections, Exhibits and Plan Schedules hereof or hereto; (f) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, indenture, or other agreement or document entered into in connection with this Plan and except as expressly provided in herein, the rights and obligations arising pursuant to this Plan will be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to this Plan; (j) references to a specific article, section, or subsection of any statute, rule, or regulation expressly referenced herein will, unless otherwise specified, include any amendments to or successor provisions of such article, section, or subsection; (k) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (l) references to "shareholders," "directors," and/or "officers" will also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (m) all references to statutes, regulations, orders, rules of courts, and the like will mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) will apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to this Plan will occur on a day that is not a Business Day (as defined below), then such transaction will instead occur on the next succeeding Business Day.

**B.**    *Defined Terms*

Unless the context otherwise requires, the following terms will have the following meanings when used in capitalized form herein:

"*Ad Hoc DIP and First Lien Lender Group*" means the ad hoc group of holders of loans under the DIP Credit Agreement and First Lien Credit Agreement represented by the Ad Hoc DIP and First Lien Lender Group Advisors.

"*Ad Hoc DIP and First Lien Lender Group Advisors*" means Gibson, Dunn & Crutcher LLP, Pachulski Stang Ziehl & Jones LLP, Rothschild & Co US Inc., and Wilkinson Barker Knauer LLP.

2

"*Ad Hoc DIP and First Lien Lender Expenses*" means the reasonable and documented fees and expenses of the Ad Hoc DIP and First Lien Lender Group Advisors and Gould Advisory, LLC.

"*Additional Sale Consideration*" means, in accordance with and without modifying the terms of the Committee Settlement, $8,500,000 in Cash to be paid by the Purchaser or funded by Retained Cash on the Closing Date in exchange for Purchased Assets and in lieu of an equal amount of Credit Bid Consideration distributed pursuant to this Plan, subject to reduction by the following amounts paid in Cash by Purchaser or funded by Retained Cash: (a) if Class 3a votes to accept this Plan, (i) the Class 3a Additional Sale Consideration Amount, *plus* (ii) an amount equal to $4,500,000 minus the Class 3a Additional Sale Consideration Amount, *plus* (iii) the Class 3b and 3c Additional Sale Consideration Amount; and (b) if Class 3a does not vote to accept this Plan, (i) the Second Lien Turnover Amount, *plus* (ii) the Class 3b and 3c Additional Sale Consideration Amount.

"*Additional Sale Consideration Escrow Account*" means a segregated interest-bearing account to be established by the Debtors into which the Class 3b and 3c Additional Sale Consideration Amount shall be deposited on Closing Date.

"*Adjourned Objection*" has the meaning set forth in the Sale Order.

"*Administrative Claim*" means any Claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2), 507(b) of the Bankruptcy Code other than the DIP Claims and Professional Fee Claims, including, without limitation: (a) any actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Claims pursuant to section 503(b)(9) of the Bankruptcy Code; and (c) all fees and charges assessed against the Estates pursuant to section 1911 through 1930 of chapter 123 of title 28 of the United States Code.

"*Administrative Claims Bar Date*" means the Business Day that is thirty (30) days after the Effective Date, or such other date as approved by Final Order of the Bankruptcy Court, which shall be the deadline to file Administrative Claims.

"*Administrative Claims Objection Bar Date*" means the Business Day that is the later of (a) 120 days after the Effective Date and (b) 60 days after the filing of the applicable request for payment of an Administrative Claim; *provided* that the Administrative Claims Objection Bar Date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Plan Administrator after notice and a hearing.

"*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"*Agent Expenses*" means the reasonable and documented fees and expenses of Weil, Gotshal & Manges LLP and Troutman Pepper Hamilton Sanders LLP as advisors to the DIP Agent and First Lien Agent.

"*Allowed*" means, all or a portion of any Claim or Interest (a) that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not "disputed" or

3

"contingent," and with respect to which no contrary Proof of Claim or proof of Interest has been filed, (b) as to which no objection or request for estimation has been filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court, (c) as to which any objection has been settled, waived, withdrawn or denied by a Final Order, or (d) that is allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim or Interest and the Debtors prior to the Effective Date, or the Plan Administrator on or after the Effective Date or (iii) pursuant to the terms of this Plan.  For purposes of computing Distributions under this Plan, a Claim that has been deemed "Allowed" shall not include interest, costs, fees or charges on such Claim from and after the Petition Date, except as provided in section 506(b) of the Bankruptcy Code or as otherwise expressly set forth in this Plan.  For the avoidance of doubt, any Claim that relates to obligations that were assumed by the Purchaser pursuant to the Asset Purchase Agreement shall not be an Allowed Claim for purposes of this Plan.

"*Asset Purchase Agreement*" means the asset purchase agreement by and between the Debtors and the Purchaser, attached to the Sale Order as Exhibit A.

"*Assumed Liabilities*" has the meaning set forth in the Sale Transaction Documents (or such other similar term as may be used in the Sale Transaction Documents).

"*Avoidance Action*" means any avoidance, recovery, subordination claims or causes of action commenced, or that may be commenced, before or after the Effective Date pursuant to sections 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code or under applicable law.

"*Ballot*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of this Plan in accordance with this Plan and the procedures governing the solicitation process, and which must be actually received by the Balloting Agent on or before the Voting Deadline.

"*Balloting Agent*" means Prime Clerk, LLC, in its capacity as notice and balloting agent for the Debtors.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

"*Bidding Procedures Order*" means the *Order (I) Authorizing and Approving Bidding Procedures, (II) Scheduled an Auction and Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for Assumption and Assignment of*

4

*Certain Executory Contracts and Leases, and (V) Granting Related Relief* entered by the Bankruptcy Court on August 19, 2020 [Docket No. 239].

"*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"*Cash*" means the legal tender of the United States of America or the equivalent thereof.

"*Cash Collateral*" has the meaning set forth in the DIP Order.

"*Causes of Action*" means any action, Claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, Secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law; *provided* that Causes of Action shall not include any causes of action transferred or sold pursuant to the Sale Order (including, without limitation, Avoidance Actions).  For the avoidance of doubt, Causes of Action include (to the extent not transferred or sold pursuant to the Sale Order): (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; and (c) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

"*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered and procedurally consolidated chapter 11 cases pending for all of the Debtors in the Bankruptcy Court.

"*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code, against the Debtors or the Estates, whether or not asserted or Allowed.

"*Claims Bar Date*" means the applicable deadline by which Proofs of Claim must be filed under the Claims Bar Date Order.

"*Claims Bar Date Order*" means the *Order (I) Establishing (A) A General Bar Date to File Proofs of Claim, (A) A Bar Date to File Proofs of Claim by Governmental Units, (C) An Amended Schedules Bar Date, (D) A Rejection Damages Bar Date, (II) Approving the Form and Manner for Filing Proofs of Claim, (III) Approving the Form and Manner of Notice of Bar Dates, and (IV) Granting Related Relief* entered by the Bankruptcy Court on October 5, 2020 [Docket No. 449].

"*Claims Objection Deadline*" means the date that is six (6) months after the Effective Date, which date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Plan Administrator.

"*Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

5

"Class 3a Additional Sale Consideration Amount" means $1,750,000 in Cash, to be Distributed pursuant to Article III.B.3(c)(1) of this Plan.

"*Class 3b and 3c Additional Sale Consideration Amount*" means $4,000,000 in Cash.

"*Closing Date*" has the meaning set forth in the Asset Purchase Agreement.

"*Committee*" means the Official Committee of Unsecured Creditors (and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such committee may be reconstituted from time to time.

"*Committee Settlement*" has the meaning set forth in the Sale Order.

"*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A hereof having been: (a) satisfied; or (b) waived pursuant to Article IX.C hereof.

"*Confirmation Date*" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court regarding Confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

"*Confirmation Order*" means the final, non-appealable order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as such order may be amended, supplemented, or modified from time to time, which order shall be in form and substance reasonably acceptable to the Debtors, the Committee and the Ad Hoc DIP and First Lien Lender Group.

"*Consummation*" means the occurrence of the Effective Date of this Plan.

"*Controlled Investment Affiliate*" shall have the meaning ascribed to such term in the First Lien Credit Agreement.

"*Convertible Notes*" means those 2.75% Convertible Senior Unsecured Notes due February 2035 issued by GEE.

"*Convertible Notes Charging Lien*" means any lien or other property to which the Convertible Notes Indenture Trustee is entitled pursuant to the Convertible Notes Indenture for the payment of the Convertible Notes Indenture Trustee Fees that are not otherwise payable pursuant to the Plan.

"*Convertible Note Claim Amount*" means $83,489,427.08, plus unpaid Convertible Notes Indenture Trustee Fees.

"*Convertible Note Claims*" means those Claims held by holders of Convertible Notes.

6

"*Convertible Notes Indenture*" means that certain Indenture, dated as of February 18, 2015 (as supplemented, modified or amended from time to time), between GEE as the issuer and the Convertible Notes Indenture Trustee.

"*Convertible Notes Indenture Trustee*" means U.S. Bank National Association, as indenture trustee for the Convertible Notes, under the Convertible Notes Indenture.

*"Convertible Notes Indenture Trustee Fees"* means the reasonable and documented fees and expenses, indemnities, compensation, disbursements, advancements and any other amounts including legal fees, of the Convertible Notes Indenture Trustee accrued prior to the Petition Date through and including the Effective Date, which shall be paid as set forth in this Plan, in an amount not to exceed $150,000 payable pursuant to the Convertible Notes Indenture and secured by the Convertible Notes Indenture Charging Lien, *provided that* the Convertible Notes Indenture Trustee shall, to the extent practicable, provide the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lender Group with an invoice with a summary of work performed (but which shall not include individual time entries) at least three (3) Business Days prior to the Effective Date.

"*D&O Insurance Coverage*" means coverage for insureds under any applicable D&O Policies.

"*D&O Policies*" means all insurance policies (including policies providing D&O Tail Coverage) and related agreements of indemnity for directors', members', trustees' and officers' liability that have been issued at any time to, or provided coverage for, any of the Debtors or their Representatives and all agreements, documents or instruments relating thereto, for any policy period whatsoever.

"*D&O Tail Coverage*" means the extension of the D&O Insurance Coverage for any period beyond the end of the applicable policy period, including but not limited to any extension for a period of six (6) years after the Effective Date for claims based on conduct occurring prior to the Effective Date.

"*Debtor Release*" has the meaning set forth in Article X.B herein.

"*Definitive Documents*" shall include all definitive documents and agreements governing the transactions contemplated hereunder, including, without limitation, this Plan (including the Plan Supplement and all other exhibits and supplements hereto), the Disclosure Statement and other solicitation materials, and the Confirmation Order which, in each case, shall be in form and substance reasonably acceptable to the Debtors, the Committee and the Ad Hoc DIP and First Lien Lender Group.

"*DIP Agent*" has the meaning set forth in the DIP Order.

"*DIP Claim*" means a DIP Facility Claim, a DIP L/C Facility Claim or any DIP L/C Superpriority Claim in respect of a Prepetition L/C.

"*DIP Credit Agreement*" has the meaning set forth in the DIP Order.

"*DIP Documents*" has the meaning set forth in the DIP Order.

7

"*DIP Facility Claim*" means any Claim held by any DIP Secured Party derived from or based upon the DIP Credit Agreement or the DIP Order, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, indemnification, and other charges arising under or related to the DIP Credit Agreement, but excluding any Claim based upon the DIP L/C Agreement or any DIP L/C Superpriority Claim in respect of a Prepetition L/C.

"*DIP L/C Agreement*" has the meaning set forth in the DIP Order.

"*DIP L/C Facility Claim*" means any claim held by any DIP Secured Party derived from or based upon the DIP L/C Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, indemnification, and other charges arising under or related to the DIP L/C Agreement.

"*DIP L/C Superpriority Claim*" has the meaning set forth in the DIP Order.

"*DIP Order*" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Prepetition Secured Lenders, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* entered by the Bankruptcy Court on August 18, 2020 [Docket No. 233].

"*DIP Secured Parties*" has the meaning set forth in the DIP Order.

"*Direction Letter*" has the meaning set forth in the Asset Purchase Agreement.

"*Disallowed*" means, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtors which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn by agreement of the Holder thereof and the Debtors or Plan Administrator in whole or in part; (iii) has been withdrawn, in whole or in part, by the Holder thereof; (iv) if listed in the Schedules as zero or as Disputed, contingent or unliquidated and in respect of which a Proof of Claim or a proof of Interest, as applicable, has not been timely filed or deemed timely filed pursuant to this Plan, the Bankruptcy Code or any Final Order or other applicable law; (v) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the filed amount of any proof of Claim or proof of Interest; (vi) is evidenced by a proof of Claim or a proof of Interest which has been filed, or which has been deemed to be filed under applicable law or order of the Bankruptcy Court or which is required to be filed by order of the Bankruptcy Court but as to which such proof of Claim or proof of Interest was not timely or properly filed; (vii) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; and (viii) where the holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code.  In each case a Disallowed Claim or a Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

8

"*Disbursing Agent*" means the Debtors, or the Entity or Entities, chosen (at any time) by the Debtors or the Plan Administrator to make or facilitate Distributions pursuant to this Plan.

"*Disclosure Statement*" means the *Disclosure Statement for Joint Plan of Liquidation for Global Eagle Entertainment Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code*, dated November [ ● ], 2020, as the same may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to this Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law, which shall be in form and substance reasonably acceptable to the Debtors, the Committee and the Ad Hoc DIP and First Lien Lender Group.

"*Disclosure Statement Order*" means the order of the Bankruptcy Court approving the Disclosure Statement and the procedures for soliciting and tabulating votes on the Plan, which shall be in form and substance reasonably acceptable to the Debtors, the Committee and the Ad Hoc DIP and First Lien Lender Group.

"*Disputed*" means, with respect to any Claim or Interest, a Claim or Interest that (a) is neither Allowed nor Disallowed under this Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code; or (b) any party in interest has interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.

"*Disputed Administrative Claims Reserve*" means the reserve established pursuant to and governed by Article VIII.D of the Plan.

"*Disputed Claims Reserve*" means any reserve established pursuant to and governed by Article VIII.D or E of the Plan.

"*Disputed General Unsecured Claims Reserve*" means the reserve established pursuant to and governed by Article VIII.E of the Plan.

"*Distribution*" means a distribution made or facilitated by the Disbursing Agent pursuant to this Plan.

"*Distribution Date*" means a date or dates, including the Initial Distribution Date, as determined by the Disbursing Agent in accordance with the terms of this Plan, on which the Disbursing Agent makes a Distribution to Holders of Allowed Claims.

"*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims are eligible to receive Distributions under this Plan, which date shall be two (2) Business Days prior to the Effective Date.

"*DTC*" means the Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

"*Effective Date*" means the first Business Day on which all of the conditions specified in Article IX.B hereof have been satisfied or waived pursuant to Article IX.C hereof.

9

"*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

"*Equity Interests*" means, collectively, (a) any equity security (as defined in section 101(16) of the Bankruptcy Code) or any other equity or ownership interest (including any such interest in a partnership, limited liability company, or other Entity) in any Debtor, and (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, earn-out rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, including arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor, other than Intercompany Interests.

"*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

"*Exculpated Parties*" means collectively: (a) the Debtors; (b) the Debtors' Estates; (c) the Committee and each of the members of the Committee; and (d) with respect to each of the foregoing entities in clauses (a) through (c), such entities' predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, Representatives, management companies, and other professionals, and such Persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

"*Exculpation*" means the exculpation provision set forth in Article X.D hereof.

"*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"*Exhibit*" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time).

"*Final Order*" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

10

"*First Lien Agent*" means Citibank, N.A., as administrative agent under the First Lien Credit Agreement.

"*First Lien Credit Agreement*" means that certain Credit Agreement, dated as of January 6, 2017, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, by and among certain Debtors, the First Lien Agent and the First Lien Lenders.

"*First Lien Loan Documents*" means the "Loan Documents" as defined in the First Lien Credit Agreement.

"*First Lien Credit Agreement Secured Obligations*" has the meaning set forth in the Intercreditor Agreement.

"*First Lien Credit Bid Amount*" means $586.5 million of First Lien Loan Claims to be credit bid pursuant to the Asset Purchase Agreement and Sale Order.

"*First Lien Deficiency Amount*" means the aggregate amount of any First Lien Loan Claims that are not First Lien Loan Secured Claims.

"*First Lien Lenders*" means the lenders under the First Lien Credit Agreement.

"*First Lien Loan Claim*" means any and all Claims against any of the Debtors, arising under, related to, on account of or evidenced by the First Lien Loan Documents or comprising First Lien Credit Agreement Secured Obligations.

"*First Lien Loan Claim Amount*" means the aggregate amount of Claims on account of the First Lien Credit Agreement.

"*First Lien Loan Deficiency Claim*" means any First Lien Loan Claim that is not a First Lien Loan Secured Claim.

"*First Lien Loan Secured Claim*" means any First Lien Loan Claim that is a Secured Claim.

"*First Lien Secured Parties*" has the meaning set forth in the DIP Order.

"*General Unsecured Claim*" means any unsecured Claim against any of the Debtors that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a Professional Fee Claim, a First Lien Loan Claim, a Second Lien Note Claim, a Convertible Note Claim, an Other Secured Claim, an Intercompany Claim, or a Section 510 Claim; *provided*, *however* that, for the avoidance of doubt, no First Lien Loan Deficiency Claims shall directly participate in the Distributions to General Unsecured Claims from the Additional Sale Consideration, other than pursuant to the enforcement of the Intercreditor Agreement or as otherwise provided in the Plan; *provided* that the Holders of First Lien Loan Claims shall be permitted to receive Distributions received by the First Lien Agent or otherwise pursuant to this Plan in accordance with, or pursuant to, the Intercreditor Agreement, including the Turnover and Subordination Provisions, and/or to the reduction of the Additional Sale Consideration in accordance with this Plan.

"*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

11

"*Holder*" means any Person or Entity that is the owner of record of a Claim or an Interest, as applicable.

"*Impaired*" means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"*Initial Distribution*" means the first Distribution that the Disbursing Agent, makes to Holders of Allowed Claims.

"*Initial Distribution Date*" means the date selected by the Debtors on or as soon as reasonably practicable after the Effective Date on which the Initial Distribution occurs.

"*Intercreditor Agreement*" has the meaning set forth in the DIP Order.

"*Insurance Policies*" means all insurance policies and related agreements of indemnity that have been issued at any time to, or provide coverage for, any of the Debtors and all agreements, documents, or instruments relating thereto, including any D&O Policies.

"*Insurer*" means any company or other Entity that issued an Insurance Policy, and any respective predecessors or affiliates thereof.

"*Intercompany Claim*" means a Claim against any Debtor by an Affiliate of such Debtor, which Affiliate may be another Debtor.

"*Intercompany Interest*" means, collectively, (a) any equity security (as defined in section 101(16) of the Bankruptcy Code) or any other equity or ownership interest (including any such interest in a partnership, limited liability company, or other Entity) in any Debtor, and (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, earn-out rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, including arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor held by an Affiliate of such Debtor, which Affiliate may be another Debtor.

"*Interests*" means, collectively, Equity Interests and Intercompany Interests.

"*IRC*" means the U.S. Internal Revenue Code of 1986, as amended.

"*L/C Issuer*" has the meaning set forth DIP L/C Agreement.

"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"*Notice of Non-Voting Status*" means the notice provided to Holders of Claims and Interests in Classes 1, 4, 5, 6, and 7 pursuant to the Solicitation Procedures.

"*Other Priority Claim*" means any Claim against any of the Debtors entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

12

"*Other Secured Claim*" means any Secured Claim against any of the Debtors other than First Lien Loan Claims, Second Lien Term Loan Claims, and DIP Claims.

"*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

"*Petition Date*" means July 22, 2020.

"*Plan Administration Indemnified Parties*" has the meaning set forth in Article V.C.3. of this Plan.

"*Plan Administration Process*" means the process for resolving and paying Claims described in Article VIII of this Plan.

"*Plan Administration Agreement*" means the agreement to be entered into by and among the Debtors and the Plan Administrator with respect to the Plan Administration Process, which shall be included in the Plan Supplement and be in form and substance reasonably acceptable to the Debtors, the Committee and the Ad Hoc DIP and First Lien Lender Group.

"*Plan Administration Assets*" has the meaning set forth in Article V.D of this Plan.

"*Plan Administration Expenses*" means all reasonable and documented fees, expenses, and costs incurred by the Plan Administrator in connection with carrying out the obligations under the Plan Administration Agreement in accordance with the Wind-Down Budget and in consultation with the Purchaser, including the maintenance or disposition of the Plan Administration Assets (including, but not limited to, Plan Administrator fees, attorneys' fees, the fees of professionals, and other Persons retained by the Plan Administrator, personnel-related expenses, any Taxes imposed in respect of the Plan Administration Assets), and any other expenses incurred in accordance with the Plan Administration Agreement, which shall be funded as part of the Wind-Down Reserve in accordance with the terms of this Plan.

"*Plan Administrator*" means the trustee of the Plan Administration Trust or any successor(s) thereto pursuant to the terms of the Plan Administration Trust Agreement, which shall be selected by the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lender Group and disclosed in the Plan Supplement.

"*Plan Schedule*" means a schedule annexed to this Plan or an appendix to the Disclosure Statement (as amended, modified or otherwise supplemented from time to time).

"*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, the Exhibits and Plan Schedules, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, supplemented, or modified from time to time, which, in each case, shall be in form and substance reasonably acceptable to the Debtors, the Committee and the Ad Hoc DIP and First Lien Lender Group. The Exhibits and Plan Schedules (or substantially final forms thereof) will be filed with the Bankruptcy Court at least seven (7) days prior to the deadline to object to Confirmation.

US-DOCS\117460541.10

"*Post-Effective Date Debtors*" means the Debtors after the Effective Date.

"*Postpetition L/Cs*" has the meaning set forth in the DIP Order.

"*Prepetition First Lien Secured Parties*" has the meaning set forth in the DIP Order.

"*Prepetition L/Cs*" has the meaning set forth in the DIP Order.

"*Prepetition Second Liens*" has the meaning set forth in the DIP Order.

"*Priority Tax Claim*" means any Secured or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"*Pro Rata Share*" means, with respect to any Distribution on account of an Allowed Claim, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in its Class; *provided* that if Class 3a does not vote to accept this Plan, the Allowed Claims of Classes 3a, 3b, and 3c for all Debtors shall be aggregated for purposes of calculating the appropriate distribution ratio for Class 3a; *provided*, *further*, only the Allowed Claims in Classes 3b and 3c shall be aggregated for purposes of calculating the applicable Pro Rata Share of the Class 3b and 3c Additional Sale Consideration Amount.

"*Professional Fee Claim*" means a Claim for professional services, including legal, financial, advisory, accounting, and other services rendered or costs incurred (a) on or after the Petition Date through the Effective Date or (b) to the extent consistent with this Plan, including Article XII.C hereof, after the Effective Date, by Professional Persons.

"*Professional Fee Escrow Account*" means a segregated interest-bearing account to be established by the Debtors into which the Professional Fee Escrow Amount shall be deposited on the Closing Date, which account shall be supplemented by the Purchaser from time to time, if necessary, in accordance with the Wind-Down Budget and the Committee Settlement.

"*Professional Fee Escrow Amount*" means the aggregate amount of (a) Professional Fee Claims incurred or estimated in good faith to be incurred in connection with the Chapter 11 Cases prior to and as of the Effective Date and (b) Professional Fee Claims following the Effective Date, as reasonably agreed by the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lender Group consistent with the terms of this Plan (including pursuant to Article XII.C hereof) and the Sale Order, which, for the avoidance of doubt, shall (i) be funded by the Purchaser into the Professional Fee Escrow Account, (ii) include the transaction fees for Greenhill & Co and Perella Weinberg Partners LP, and (iii) otherwise be consistent with the Sale Order and the Asset Purchase Agreement.

"*Professional Persons*" means any Person retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

14

"*Proof of Claim*" means a proof of claim filed against any of the Debtors in the Chapter 11 Cases.

"*Purchaser*" means has the meaning set forth in the Sale Order.

"*Released Parties*" means collectively: (a) the Debtors; (b) the Debtors' Estates, (c) the DIP Secured Parties, (d) the First Lien Lenders and the First Lien Agent, (e) the Prepetition First Lien Secured Parties, (f) the L/C Issuer, (g) the Purchaser, (h) the Committee and each of the members of the Committee, (i) the Second Lien Parties, (j) the Convertible Notes Indenture Trustee, (k) the Holders of Convertible Notes, and with respect to each of the foregoing entities in clauses (a) through (k), such entities' predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, Representatives, management companies, and other professionals, and such Persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such; *provided*, *however*, that, notwithstanding anything to the contrary, the Released Parties shall not include any Person or Entity, including any Second Lien Party, that, or whose Representative, objects to, challenges, opposes, votes to reject, or otherwise seeks to impede the confirmation or consummation of this Plan.

"*Releasing Parties*" means collectively: (a) all Holders of Claims that vote to accept this Plan, (b) all Holders of Claims that are entitled to vote to accept or reject this Plan and that abstain from voting on this Plan or vote to reject this Plan but, in each case, do not "opt out" of the releases set forth in Article X.C of this Plan, (c) all Holders of Claims and Interests (other than Holders of Claims and Interests in Classes 5 and 6) that are presumed to accept, or deemed to reject, this Plan and that do not "opt out" of the releases set forth in Article X.C of this Plan, and (d) the Released Parties.

"*Representatives*" means, with respect to a Person, such Person's current and former (i) officers, (ii) directors, (iii) managers, (iv) principals, (v) members, (vi) employees, (vii) agents, (viii) advisory board members, (ix) financial advisors, (x) partners, (xi) attorneys, (xii) accountants, (xiii) investment bankers, (xiv) consultants, (xv) representatives, and (xvi) other professionals, each in their capacity as such.

"*Retained Cash*" has the meaning set forth in the Asset Purchase Agreement.

"*Sale Order*" means that certain *Order (A) Approving the Asset Purchase Agreement; (B) Authorizing the Sale of Assets; (C) Authorizing the Assumption and Assignment of Contracts and Leases; and (D) Granting Related Relief* entered on October 15, 2020, by the Bankruptcy Court [Docket No. 518].

"*Sale Transaction*" means the sale of substantially all of the Debtors' assets to Purchaser pursuant to the Asset Purchase Agreement and the Sale Order.

"*Sale Transaction Documents*" means the Asset Purchase Agreement and related documents pursuant to which the Debtors will effectuate the Sale Transaction.

15

"*Schedule of Assumed Contracts*" means the schedule of Executory Contracts and Unexpired Leases to be filed on or before the Closing Date setting forth any Executory Contracts and Unexpired Leases (i) to be assumed and assigned to the Purchaser pursuant to the Asset Purchase Agreement and (ii) to be assumed by the Debtors (if any) which, in each case, shall be in form and substance acceptable to the Debtors and the Ad Hoc DIP and First Lien Lender Group.

"*Schedules*" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

"*Searchlight Parties*" means Searchlight Capital Partners, L.P., Searchlight II TBO, L.P., and Searchlight II TBO-W L.P, and their respective Controlled Investment Affiliates, and any Entity or natural person that is a current or former Affiliate, officer, director, principal, shareholder, member, partner, employee, agent, advisory board member, investment committee member, financial advisor, attorney, accountant, investment banker, consultant, Representative, management company, and/or other professional, in each case, of or retained by Searchlight Capital Partners, L.P, Searchlight II TBO, L.P., and/or Searchlight II TBO-W L.P.

"*Second Lien Agent*" means the Prepetition Second Lien Administrative Agent (as defined in the DIP Order).

"*Second Lien Note Claims*" means Claims held by the Prepetition Second Lien Secured Parties pursuant to the Second Lien Note Documents (each as defined in the DIP Order).

"*Second Lien Lenders*" means the Holders of Second Lien Note Claims.

"*Second Lien Parties*" means the Second Lien Agent, the Second Lien Lenders and their Controlled Investment Affiliates, the Searchlight Parties, and, in the case of the foregoing, each of their Representatives.

"*Second Lien Turnover Amount*" means the amount of Distributions as calculated pursuant to Article III.B.3(c)(2) of this Plan that, pursuant to the Turnover and Subordination Provisions of the Intercreditor Agreement and the terms of the Committee Settlement, shall reduce the Additional Sale Consideration to the Class 3b and 3c Additional Sale Consideration Amount.

"*Section 510 Claim*" means any Claim (i) arising from: (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim or (ii) subject to subordination in accordance with section 510(c) of the Bankruptcy Code or otherwise.

"*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined

16

pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code; or (b) otherwise Allowed pursuant to this Plan as a Secured Claim.

"*Solicitation*" means the solicitation of votes on this Plan.

"*Solicitation Procedures*" means the procedures concerning Solicitation established pursuant to a motion of the Debtors for an order, *inter alia*, (a) approving the adequacy of the Disclosure Statement, (b) approving the Solicitation and voting procedures with respect to this Plan, (c) approving the forms of ballots and notices in connection with this Plan, (d) scheduling certain dates with respect to the Solicitation and approval of this Plan, and (e) granting related relief, to be filed by the Debtors.

"*Statutory Fees*" means all fees and charges assessed against the Estates under section 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

"*Third-Party Release*" means the Releases by Holders of Claims and Interests as set forth in Article X.C herein.

"*Turnover and Subordination Provisions*" means, collectively, any provision of the Intercreditor Agreement governing the respective rights of the parties thereto, including, without limitation, Articles IV and VIII thereof.

"*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

"*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"*Unimpaired*" means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

"*Voting Class*" means Classes 2, 3a, 3b, and 3c.

"*Voting Deadline*" means [_____, 2020].

"*Voting Record Date*" means [_____, 2020].

"*Wind-Down*" means the process of winding down the Debtors' businesses and Estates, and winding down and dissolving the Debtor-entities, after the Effective Date and/or closing of the Sale Transaction, and all actions related to, necessary for, or otherwise appropriate to effectuate the foregoing.

"*Wind-Down Amount*" has the meaning set forth in the Asset Purchase Agreement.

"*Wind-Down Budget*" means the budget, as modified from time to time, setting forth, among other things, (a) the aggregate amounts of Administrative Claims, Other Priority Claims, Priority Tax Claims, and Other Secured Claims, in each case against the Debtors, to be paid under this Plan; (b) the Professional Fee Escrow Amount; (c) the Convertible Notes Indenture Trustee Fees (to the extent not paid on the Effective Date); (d) the anticipated expenses of the Wind-Down

17

US-DOCS\117460541.10

from and after the Effective Date, including anticipated Plan Administration Expenses; and (e) any Ad Hoc DIP and First Lien Lender Expenses, including anticipated Ad Hoc DIP and First Lien Lender Expenses to be incurred after the Effective Date that will be payable by the Debtors; *provided that*, pursuant to the Committee Settlement, the Wind-Down Budget shall be funded by the Purchaser in accordance with the Sale Order and the Asset Purchase Agreement as needed in order to ensure the satisfaction of all Administrative Claims, Other Priority Claims, Priority Tax Claims, and Professional Fee Claims, including any adjustment, as necessary, to provide for payment in full of (i) all Professional Fee Claims, (ii) accrued postpetition liabilities through the Closing Date of the types noted in section 2.02(h) of the Asset Purchase Agreement related to any assets that are designated to be "Excluded Assets" in the Asset Purchase Agreement but which have not been paid under the DIP Facility as of the Closing Date, and (iii) all Administrative Claims, Other Priority Claims, and Priority Tax Claims required to be paid pursuant to this Plan, including the anticipated expenses of the Wind-Down from and after the Effective Date (including Plan Administration Expenses as contemplated in the Wind-Down Budget); *provided*, *further*, *however*, that any Retained Cash shall reduce, on a dollar-for-dollar basis but without duplication, the Wind-Down Amount to be paid by the Purchaser on the Closing Date to fund the Wind-Down pursuant to the Wind-Down Budget.

"*Wind-Down Reserve*" means a segregated account to be established by the Debtors into which the Wind-Down Amount, as reflected in the Wind-Down Budget *less* the Professional Fee Escrow Amount, shall be deposited on the Closing Date, which account shall vest in the Post-Effective Date Debtors and their Estates as of the Effective Date and shall be supplemented from time to time by the Purchaser in accordance with the Wind-Down Budget and the Committee Settlement.

## ARTICLE II.

## ADMINISTRATIVE AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, DIP Claims and Other Priority Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

*A.*     *Administrative Claims*

1. General Administrative Claims

Except (a) with respect to Administrative Claims that are Professional Fee Claims or Statutory Fees, (b) to the extent an Administrative Claim constitutes an "Assumed Liability" pursuant to section 2.02 of the Asset Purchase Agreement, and/or (c) to the extent that a Holder of an Allowed Administrative Claim and the Debtors agree to less favorable treatment for such Holder's Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall be paid in full in Cash from the Wind-Down Reserve on or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable.  For the avoidance of doubt, any Allowed Administrative Expense Claim that has been expressly assumed by the Purchaser

18

under the Sale Transaction Documents shall not be an obligation of the Debtors and shall be paid by the Purchaser in accordance with the Sale Transaction Documents.

Except as otherwise provided in this Plan and section 503(b)(1)(D) of the Bankruptcy Code, unless previously filed or paid, requests for payment of Administrative Claims must be filed and served on the Plan Administrator pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order or the occurrence of the Effective Date (as applicable) no later than the Administrative Claims Bar Date; *provided*, that the foregoing shall not apply to either (a) the Holders of Claims under section 503(b)(1)(D) of the Bankruptcy Code or (b) the Bankruptcy Court or U.S. Trustee as Holders of Administrative Claims.  Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims that do not file and serve such request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors and their respective Estates and property, and such Administrative Claims shall be deemed satisfied as of the Effective Date.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.E hereof.  Nothing in this Article II.A shall limit, alter, or impair the terms and conditions of the Claims Bar Date Order with respect to the Claims Bar Date for filing administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code.

Objections to requests for payment of Administrative Claims must be filed and served on the Plan Administrator and the requesting party by the Administrative Claims Objection Bar Date.

2. Professional Fee Claims

All Professional Persons seeking an award by the Bankruptcy Court of Professional Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (b) shall be paid in full from the Professional Fee Escrow Account in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Professional Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Professional Fee Claim and the Plan Administrator.  The Plan Administrator is authorized to pay Professional Fee Claims incurred after the Effective Date (including Professional Fee Claims incurred in accordance with Article XII.C hereof) in the ordinary course from the Professional Fee Escrow Account, without the need for Bankruptcy Court approval.

On the Closing Date, the Debtors shall establish the Professional Fee Escrow Account and the Purchaser shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  Funds held in the Professional Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Plan Administrator but, pursuant to Article V.D hereof, the Purchaser shall have a reversionary interest in any unused portion of the Professional Fee Escrow Account after all Professional Fee Claims (other than any Professional Fee Claims that have been Disallowed by the Bankruptcy Court) have been irrevocably paid in full.  On and after the Effective Date, the Professional Fee Escrow Account shall be held by the Plan Administrator on behalf of the Post-Effective Date Debtors for Professional Persons and for no other parties until all Professional Fee Claims (other than any Professional Fee Claims that have

19

US-DOCS\117460541.10

been Disallowed by the Bankruptcy Court) have been paid in full. Professional Fee Claims owing to the applicable Professional Persons shall be paid in full, in Cash, to such Professional Persons from funds held in the Professional Fee Escrow Account when such Claims are (a) Allowed by an order of the Bankruptcy Court or (b) authorized to be paid under (i) the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals and (II) Granting Related Relief* [Docket No. 262] or (ii) with respect to Professional Fee Claims incurred after the Effective Date (including Professional Fee Claims incurred in accordance with Article XII.C hereof), this Plan. The Post-Effective Date Debtors' obligations with respect to Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Professional Fee Escrow Account as of the Effective Date. To the extent that funds held in the Professional Fee Escrow Account are ever insufficient to satisfy the amount of accrued Professional Fee Claims from time to time owing to Professional Persons, the Purchaser, in accordance with the Committee Settlement, shall deposit additional Cash into the Professional Fee Escrow Account in an amount sufficient to cover such deficiency. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account in any way, other than customary liens in favor of the depository bank at which the Professional Fee Escrow Account is maintained.

3. Statutory Fees

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Plan Administrator shall pay any and all such fees when due and payable from the Wind-Down Reserve. The Debtors shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Plan Administrator shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made by the Disbursing Agent during the applicable period, attested to by an authorized representative of the Disbursing Agent. Each and every one of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**B.** *Priority Tax Claims*

Except to the extent a Priority Tax Claim constitutes an "Assumed Liability" pursuant to section 2.02 of the Asset Purchase Agreement, or to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors agree to less favorable treatment for such Holder's Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will be paid in full in Cash from the Wind-Down Reserve on or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Priority Tax Claim is Allowed; and (c) the date such Allowed Priority Tax Claim becomes due and payable in accordance with non-bankruptcy law. For the avoidance of doubt, any Allowed Priority Tax Claim that has been expressly assumed by the Purchaser under the Sale Transaction Documents shall not be an obligation of the Debtors and shall be paid by the Purchaser in accordance with the Sale Transaction Documents.

**C.** *DIP Claims*

The DIP Claims shall be deemed to be Allowed under this Plan.

20

Notwithstanding anything to the contrary herein, in full and final satisfaction, settlement and release of and in exchange for release of all Allowed DIP Facility Claims, all Allowed DIP Facility Claims shall be repaid and satisfied in full by the Purchaser in accordance with the terms of the Asset Purchase Agreement.  Upon the foregoing satisfaction of all Allowed DIP Facility Claims, all Liens and security interests granted by the Debtors to secure the obligations under the DIP Facility shall be of no further force or effect.

Notwithstanding anything to the contrary herein, in full and final satisfaction, settlement and release of and in exchange for release of all Allowed DIP L/C Facility Claims and all Allowed DIP L/C Superpriority Claims in respect of any Prepetition L/C, prior to or on the Closing Date, either (i) the Purchaser shall cash collateralize all Allowed DIP L/C Facility Claims and all Allowed DIP L/C Superpriority Claims in respect of any Prepetition L/C at 100% of their face amount and in respect of any Postpetition L/C at 102% of their face amount, (ii) the Purchaser shall cause the establishment of a "backstop" letter of credit reasonably acceptable to the L/C Issuer at 100% of the face amount of such Prepetition L/Cs and 102% of the face amount of such Postpetition L/Cs, or (iii) the L/C Issuer and the Ad Hoc DIP and First Lien Lender Group shall agree on an alternative treatment or arrangement with respect to such Prepetition L/Cs and Postpetition L/Cs, in the case of each of the forgoing clauses (i) through (iii), pursuant to documentation reasonably satisfactory to the L/C Issuer and the Ad Hoc DIP and First Lien Lender Group.

### D.      Other Priority Claims

Except to the extent an Other Priority Claim constitutes an "Assumed Liability" pursuant to section 2.02 of the Asset Purchase Agreement, or to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in Cash or other treatment, rendering such Claim Unimpaired.  For the avoidance of doubt, any Allowed Other Priority Claim that has been expressly assumed by the Purchaser under the Sale Transaction Documents shall not be an obligation of the Debtors and shall be paid by the Purchaser in accordance with the Sale Transaction Documents.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND INTERESTS

### A.      Summary

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent

21

that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

This Plan, though proposed jointly, constitutes a separate plan proposed by each Debtor. Therefore, the classifications set forth in Article III.B herein apply separately with respect to each Plan proposed by each Debtor.  This joint Plan and the classifications set forth herein shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a substantive consolidation of any of the Debtors, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities. Notwithstanding the joint nature of this Plan, nothing herein shall permit or grant a party in interest in the Chapter 11 Case of one Debtor with standing, or the right to vote to accept or reject this Plan, in the Chapter 11 Case of another Debtor.  If there are no Claims or Interests in a particular Class for a particular Debtor, then such Class of Claims or Interests shall not exist for all purposes of this Plan for that Debtor.

If the Bankruptcy Court does not confirm this Plan with respect to one or more of the Debtors, it may still confirm this Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

**Summary of Classification and Treatment of Claims and Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1. | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2. | First Lien Loan Claims | Impaired | Entitled to Vote |
| 3a. | Second Lien Note Claims | Impaired | Entitled to Vote |
| 3b. | Convertible Note Claims | Impaired | Entitled to Vote |
| 3c. | General Unsecured Claims | Impaired | Entitled to Vote |
| 4. | Section 510 Claims | Impaired | Deemed to Reject |
| 5. | Intercompany Claims | Impaired | Deemed to Reject |
| 6. | Intercompany Interests | Impaired | Deemed to Reject |
| 7. | Equity Interests | Impaired | Deemed to Reject |

**B.**     *Classification and Treatment of Claims and Interests*

1.     Class 1 — Other Secured Claims

(a)     *Classification*: Class 1 consists of all Other Secured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim (i) is an Assumed Liability pursuant to the Asset Purchase Agreement or the Sale Transaction Documents, or (ii) agrees to less favorable treatment, in exchange for full and final satisfaction, settlement and release of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim, at the option of the applicable Debtor, shall (A) be paid in full in Cash including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, (B) receive the collateral securing

22

its Allowed Other Secured Claim, or (C) receive any other treatment that would render such Claim Unimpaired.

(c)   *Voting*: Class 1 is Unimpaired and Holders of Class 1 Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Other Secured Claims are not entitled to vote to accept or reject this Plan.

2.    Class 2 — First Lien Loan Claims

(a)   *Classification*: Class 2 consists of First Lien Loan Claims.

(b)   *Allowance*: On the Effective Date, the First Lien Loan Claims shall be Allowed in the aggregate principal amount, as of the Petition Date, of not less than $608,399,377.94, which includes the First Lien Credit Bid Amount.

(c)   *Treatment*:

(1)   In exchange for full and final satisfaction, settlement and release of each Allowed First Lien Loan Claim, each Holder of an Allowed First Lien Loan Claim shall, pursuant to the Sale Transaction Documents in accordance with the Sale Order, credit bid its Pro Rata Share of Allowed First Lien Loan Secured Claims, in the aggregate, in the First Lien Credit Bid Amount, in accordance with Section 2.06 of the Asset Purchase Agreement in consideration of interests in the Purchaser and such other consideration set forth in the Sale Transaction Documents, including the Asset Purchase Agreement, the Direction Letter and this Plan.

(2)   For the avoidance of doubt, no First Lien Loan Deficiency Claims shall receive any recovery directly on account of such claims from the Additional Sale Consideration; *provided, however,* that (a) the rights of the Holder of any First Lien Loan Claims in connection with the reduction of the Additional Sale Consideration on account of the Second Lien Turnover Amount pursuant to the Subordination and Turnover Provisions of the Intercreditor Agreement as provided in Article III(B)(3)(c) of this Plan, and (b) with respect to the Purchaser's right to receive any remainder of the Wind-Down Amount pursuant to Article V.D. of this Plan, shall be preserved and treated in accordance with Article V.D of this Plan.

(d)   *Voting*: Class 2 is Impaired, and Holders of Class 2 Allowed First Lien Loan Claims are entitled to vote to accept or reject this Plan.

23

3.    <u>Class 3a — Second Lien Note Claims</u>

(a)    *Classification*:  Class 3a consists of all Second Lien Note Claims.

(b)    *Allowance*:  If, and only if, Class 3a votes to accept this Plan, on the Effective Date, the Second Lien Note Claims shall be Allowed.

(c)    *Treatment*:

    (1)    If and only if Class 3a votes to accept this Plan, and except to the extent that a Holder of an Allowed Second Lien Note Claim agrees in writing to less favorable treatment, in exchange for full and final satisfaction, settlement and release of each Allowed Second Lien Note Claim, including in resolution of any claims or rights pursuant to the Turnover and Subordination Provisions of the Intercreditor Agreement that could be properly asserted by any party thereto, each Holder of an Allowed Second Lien Note Claim shall receive in Cash its Pro Rata Share of the Class 3a Additional Sale Consideration Amount, which shall not be subject to any right or claim for turnover or recovery pursuant to the Intercreditor Agreement, including pursuant to the Turnover and Subordination Provisions thereof, or otherwise; or

    (2)    If Class 3a does not vote to accept this Plan, and except to the extent that a Holder of an Allowed Second Lien Note Claim, the Debtors, the Committee, and the Ad Hoc DIP and First Lien Group agree in writing to an alternative treatment, in exchange for full and final satisfaction, settlement and release of each Allowed Second Lien Note Claim, in accordance with the Committee Settlement and the Turnover and Subordination Provisions of the Intercreditor Agreement, each Holder of an Allowed Second Lien Note Claim shall be entitled to receive its Pro Rata Share of the Additional Sale Consideration, expressly subject to the following proviso; *provided*, *however*, that all Distributions to Holders of Allowed Second Lien Note Claims pursuant to this Plan shall be subject to the terms of the Intercreditor Agreement, including, without limitation, the Turnover and Subordination Provisions, and all such Distributions to each Holder of an Allowed Second Lien Note Claim of its Pro Rata Share of the Additional Sale Consideration shall instead, at the option of the Ad Hoc DIP and First Lien Lender Group either (A) be distributed to the First Lien Agent or (B) reduce the amount of the Additional Sale Consideration to be paid by Purchaser or funded by Retained Cash, on a dollar-for-dollar basis by the Second Lien Turnover Amount (but in no event, following and after

24

accounting for such distribution to the First Lien Agent or reduction but before accounting for the Class 3b and Class 3c Additional Sale Consideration Amount, shall the Additional Sale Consideration be less than $4,000,000).  In the event that any Second Lien Party objects to, challenges, opposes, votes to reject, or otherwise seeks to impede the confirmation or consummation of this Plan, no such Second Lien Party shall constitute a Released Party, and the Distributions on account of any Second Lien Note Claims shall be as provided herein.

(d)   *Intercreditor Agreement*: Except to the extent of any Distribution made in accordance with Article III.B.3(c)(1) of this Plan, all Distributions to Holders of Allowed Second Lien Note Claims pursuant to this Plan shall be subject to the terms of the Intercreditor Agreement, including, without limitation, the Turnover and Subordination Provisions (as to which all parties' rights are reserved), and the Disbursing Agent shall disburse the Additional Sale Consideration in accordance with the terms of this Plan.

(e)   *Voting*: Class 3a is Impaired, and Holders of Class 3a Second Lien Note Claims are entitled to vote to accept or reject this Plan.

4.   Class 3b — Convertible Note Claims

(a)   *Classification*:  Class 3b consists of all Convertible Note Claims.

(b)   *Allowance*:  On the Effective Date the Convertible Note Claims shall be Allowed in the aggregate principal amount of the Convertible Note Claim Amount.

(c)   *Treatment*:   Except to the extent that a Holder of an Allowed Convertible Note Claim agrees in writing to less favorable treatment, in exchange for full and final satisfaction, settlement and release of each Allowed Convertible Note Claim, each Holder of an Allowed Convertible Note Claim shall receive its Pro Rata Share of the Class 3b and 3c Additional Sale Consideration Amount to which it is entitled.

(d)   *Voting*:  Class 3b is Impaired, and Holders of Class 3b Convertible Note Claims are entitled to vote to accept or reject this Plan.

5.   Class 3c — General Unsecured Claims

(a)   *Classification*:  Class 3c consists of General Unsecured Claims.

(b)   *Treatment*:   Except to the extent that a Holder of an Allowed General Unsecured Claim agrees in writing to less favorable treatment, in exchange for full and final satisfaction, settlement and release of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured

25

Claim shall receive its Pro Rata Share of the Class 3b and 3c Additional Sale Consideration Amount to which it is entitled.

(c)     *Voting*: Class 3c is Impaired, and Holders of Class 3c General Unsecured Claims are entitled to vote to accept or reject this Plan.

6.      Class 4 — Section 510 Claims

(a)     *Classification*: Class 4 consists of all Section 510 Claims.

(b)     *Treatment*: All Section 510 Claims shall be cancelled and extinguished on the Effective Date.  Each Holder of Section 510 Claims shall receive no recovery or Distribution on account of such Section 510 Claims.

(c)     *Voting*: Class 4 is Impaired and Holders of Class 4 Section 510 Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 4 Section 510 Claims are not entitled to vote to accept or reject this Plan.

7.  Class 5 – Intercompany Claims

(a)     *Classification*: Class 5 consists of the Intercompany Claims.

(b)     *Treatment*: Holders of Intercompany Claims shall not receive or retain any property under this Plan on account of such Claims.  Unless otherwise provided for under the Plan, each Intercompany Claim will be canceled and released.

(c)     *Voting*: Class 5 is Impaired and Holders of Class 5 Intercompany Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 5 Intercompany Claims are not entitled to vote to accept or reject this Plan.

8.  Class 6 – Intercompany Interests

(a)     *Classification*: Class 6 consists of the Intercompany Interests.

(b)     *Treatment*: Upon the completion of the Wind-Down pursuant to the Plan Administration Process and Article V.E of this Plan (as applicable), Intercompany Interests shall be cancelled and released with the Holders of Intercompany Interests receiving no Distribution on account of such Intercompany Interests.

(c)     *Voting*: Class 6 is Impaired and Holders of Class 6 Intercompany Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 6 Intercompany Interests are not entitled to vote to accept or reject this Plan.

26

9.     Class 7 — Equity Interests

(a)     *Classification*:  Class 7 consists of all Equity Interests.

(b)     *Treatment*:  Holders of Equity Interests shall receive no Distribution on account of their Equity Interests.  On the Effective Date, all Equity Interests will be canceled and extinguished and will be of no further force or effect.

(c)     *Voting*:  Class 7 is Impaired and Holders of Class 7 Equity Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 7 Equity Interests are not entitled to vote to accept or reject this Plan.

**C.**     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in this Plan, nothing under this Plan shall affect, diminish, or impair the rights of the Debtors or the Purchaser, as applicable, with respect to any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**D.**     *Elimination of Vacant Classes*

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THIS PLAN

**A.**     *Acceptance or Rejection of this Plan*

1.     Presumed Acceptance of Plan

Claims in Class 1 are Unimpaired under this Plan and, therefore, Holders of such Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 1 are not entitled to vote on this Plan and the votes of such Holders shall not be solicited.

2.     Voting Classes

Claims in Classes 2, 3a, 3b and 3c are Impaired under this Plan, and the Holders of Allowed Claims in Classes 2, 3a, 3b, and 3c are entitled to vote to accept or reject this Plan.

27

3.      Deemed Rejection of this Plan

Claims and Interests in Classes 4, 5, 6 and 7 are Impaired under this Plan and Holders of such Claims or Interests shall receive no Distributions under this Plan on account of their Claims or Interests (as applicable) and are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims and Interests in Classes 4, 5, 6 and 7 are not entitled to vote on this Plan and the votes of such Holders shall not be solicited.

**B.      *Nonconsensual Confirmation***

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

**C.      *Subordinated Claims***

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective Distributions and treatments under this Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Plan Administrator, reserves the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

**D.      *Votes Solicited in Good Faith***

The Debtors have, and upon the Confirmation Date will be deemed to have, solicited votes on this Plan from the Voting Classes in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.  Accordingly, the Debtors will be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THIS PLAN

**A.      *Transactions Effective as of the Effective Date***

The transactions contemplated by this Plan shall be approved and effective as of the Effective Date, without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their board of directors, their stockholders, or any other Person or Entity.

28

***B.***     *Closing of Sale Transaction and Uses of Cash*

Prior to or on the Effective Date, the Debtors shall be authorized to consummate the Sale Transaction to the Purchaser pursuant to the terms of the Sale Order and the applicable Sale Transaction Documents, including, without limitation, (i) selling the Acquired Assets (as defined in the Asset Purchase Agreement) free and clear of claims, liens and encumbrances except to the extent set forth in the Asset Purchase Agreement and (ii) assuming and assigning to the Purchaser pursuant to the Asset Purchase Agreement in connection with the Sale Transaction certain Executory Contracts and Unexpired Leases.

In accordance with the Sale Order, all corporate actions necessary to implement the Sale Transaction as contemplated in the Sale Order, including, without limitation, as may be necessary or appropriate to implement the G Reorganization Election (as defined in the Asset Purchase Agreement) pursuant to section 11.01(a) of the Asset Purchase Agreement, to the extent applicable, shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person.

On the Closing Date, the Retained Cash shall be placed into accounts established and maintained by the Debtors, including, as applicable, the Additional Sale Consideration Escrow Account, the Professional Fee Escrow Account and the Wind-Down Reserve; *provided* that if the Retained Cash is insufficient to fund the Additional Sale Consideration, the Professional Fee Escrow Amount and the Wind-Down Reserve, the Purchaser shall fund all necessary additional amounts on the Closing Date.  On the Effective Date, the Wind-Down Reserve and the Additional Sale Consideration Escrow Account, but not the Professional Fee Escrow Account, shall vest in the Post-Effective Date Debtors and their Estates pursuant to Article V.D of this Plan.

For the avoidance of doubt, pursuant to the Committee Settlement, the Wind-Down Budget shall be funded by the Purchaser from time to time in accordance with the Sale Order and the Asset Purchase Agreement in order to ensure the satisfaction of all Administrative Claims, Other Priority Claims, Priority Tax Claims, and Professional Fee Claims, including any adjustment, as necessary, to provide for payment in full of (i) all Professional Fee Claims, (ii) accrued postpetition liabilities through the Closing Date of the types noted in section 2.02(h) of the Asset Purchase Agreement related to any assets that are designated to be "Excluded Assets" in the Asset Purchase Agreement but which have not been paid under the DIP Facility as of the Closing Date, (iii) all Administrative Claims, Other Priority Claims, and Priority Tax Claims required to be paid pursuant to this Plan, including the anticipated expenses of the Wind-Down from and after the Effective Date (including anticipated Plan Administration Expenses), (iv) any Ad Hoc DIP and First Lien Lender Expenses, including anticipated Ad Hoc DIP and First Lien Lender Expenses to be incurred after the Effective Date that will be payable by the Debtors, and (v) any Agent Expenses.

***C.***     *Plan Administrator*

1. <u>Appointment</u>  The Person designated in the Plan Supplement shall serve as Plan Administrator for each of the Debtors.

29

2. <u>Authority</u>   On and after the Effective Date, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of this Plan, including, without limitation, to:

(a)   except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors;

(b)   make Distributions to Holders of Allowed Claims in accordance with this Plan, including, without limitation, to establish sufficient reserves (including the Disputed Claims Reserves) necessary to make distributions on account of Claims that may become Allowed after the Effective Date;

(c)   exercise its reasonable business judgment to direct and control the Wind-Down, liquidation, sale and/or abandoning of the remaining assets of the Debtors under this Plan and in accordance with applicable law as necessary to maximize Distributions to Holders of Allowed Claims;

(d)   prosecute all Causes of Action on behalf of the Post-Effective Date Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Post-Effective Date Debtors and their Estates;

(e)   make payments to existing professionals who will continue to perform in their current capacities;

(f)   retain professionals to assist the Plan Administrator in performance of its duties under this Plan;

(g)   maintain the books and records and accounts of the Debtors and obtain any necessary insurance;

(h)   invest Cash of the Debtors, including any Cash proceeds realized from the liquidation of any assets of the Debtors, including any Causes of Action, and any income earned thereon;

(i)   incur and pay all Plan Administration Expenses;

(j)   administer each Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its Estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Petition Date through the liquidation of such Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

30

US-DOCS\117460541.10

(k)     prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(l)     pay Statutory Fees in accordance with Article II.A.3 of this Plan; and

(m)     perform other duties and functions that are consistent with the implementation of this Plan.

3. Indemnification    The Debtors shall indemnify and hold harmless (i) the Plan Administrator in connection with carrying out the obligations under the Plan Administration Agreement, including the maintenance or disposition of the Plan Administration Assets, and (ii) such other Persons retained by the Plan Administration (collectively, the "**Plan Administration Indemnified Parties**"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Plan Administration Indemnified Party's willful misconduct or gross negligence, with respect to Debtors or the implementation or administration of the Plan.    To the extent a Plan Administration Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Plan Administrator in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Plan Administration Indemnified Party (and such Plan Administration Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Plan Administration Indemnified Party is not entitled to be indemnified therefore) out of the Wind-Down Reserve or any insurance purchased using the Wind-Down Reserve.

## D.     *The Plan Administration Assets*

On the Effective Date, the Plan Administrator shall sign the Plan Administration Agreement and accept the Wind-Down Reserve, the Professional Fee Escrow Account, the Additional Sale Consideration Escrow Account, and the Cash therein (the "**Plan Administration Assets**").  As of the Effective Date, all Plan Administration Assets and all assets dealt with in this Plan shall be free and clear of all Liens, Claims, and Interests except as otherwise further provided in this Plan or in the Confirmation Order.  The Plan Administrator shall be authorized to use any proceeds of the Wind-Down Reserve in connection with the Wind-Down and use the Professional Fee Escrow Account and the Additional Sale Consideration Escrow Account for the purposes as explicitly set forth in the Plan.

After the Effective Date, upon payment of all Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims and Plan Administration Expenses, and distribution of the Class 3b and 3c Additional Sale Consideration Amount, and to the extent that the Plan Administrator determines in good faith, in consultation with the Ad Hoc DIP and First Lien Lender Group, and on a reasonable basis, that substantially all of the claims and expenses for which the Wind-Down Amount was held in escrow are no longer outstanding or otherwise satisfied

31

in full, the Plan Administrator shall remit any remaining unused Wind-Down Amount and Plan Administration Assets (or proceeds thereof) to the Purchaser.

**E.**     *Merger of Debtors; Closing Cases of Debtor Affiliates*

On or after the Effective Date: the Plan Administrator, in consultation with the Ad Hoc DIP and First Lien Lender Group, (i) may merge or dissolve such Affiliates of the Debtors and complete the winding up of such Affiliates of a Debtor without the necessity for any other or further actions to be taken by or on behalf of such Affiliates or their shareholders or any payments to be made in connection therewith, other than the filing of a certificate of merger or dissolution, as applicable, with the appropriate governmental authorities; (ii) may merge or dissolve any Debtor and complete the winding up of such Debtor without the necessity for any other or further actions to be taken by or on behalf of such Debtor or its shareholders or any payments to be made in connection therewith, other than the filing of a certificate of merger or dissolution, as applicable, with the appropriate governmental authorities; *provided* that upon any merger with another Debtor, all Claims filed or scheduled in the non-surviving Debtor's Chapter 11 Case shall be deemed to have been filed in the surviving Debtor's Chapter 11 Case; and (iii) may seek authority from the Bankruptcy Court to close any Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**F.**     *Cancellation of Existing Securities and Agreements*

1. On the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any prepetition Claim or Interest shall be cancelled and of no further force and effect , except that each of the foregoing shall continue in effect solely to the extent necessary to (a) allow Holders of such Claims or Interests to receive Distributions under this Plan; (b) allow the Debtors, the Plan Administrator, the DIP Agent, the First Lien Agent, Second Lien Agent, and the Convertible Notes Indenture Trustee, as applicable, to make post-Effective Date Distributions or take such other actions pursuant to this Plan on account of such Claims or Interests; (c) allow Holders of Claims or Interests to retain their respective rights and obligations vis-à-vis other Holders of Claims or Interests pursuant to any such applicable document or instrument (including the Intercreditor Agreement); (d) allow the DIP Agent, First Lien Agent, Second Lien Agent, the Convertible Notes Indenture Trustee, and the L/C Issuer to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including, but not limited to, any indemnification rights or any rights with respect to priority or payment or to exercise charging liens (including the Convertible Notes Charging Lien and the Intercreditor Agreement); (e) preserve any rights of the DIP Agent, First Lien Agent, Second Lien Agent, and the Convertible Notes Indenture Trustee to payment of fees, expenses and indemnification obligations against money or property distributed to the lenders under the First Lien Loan Documents and DIP Documents, Holders under the Second Lien Note Documents, and Holders under the Convertible Notes Indenture, as applicable, including any rights of enforcement, rights to priority of payment or to maintain, exercise, and/or enforce charging liens (including the Convertible Notes Charging Lien); (f) preserve the rights of the DIP Agent, First Lien Agent, Second Lien Agent, Convertible Notes Indenture Trustee, and the L/C Issuer to appear and be heard in these Chapter 11 Cases to the extent such rights exist, and (g) permit the DIP Agent, First Lien Agent, Second Lien Agent, the Convertible Notes Indenture Trustee, and the L/C Issuer to perform any function necessary to effectuate the foregoing.   Notwithstanding the

32

foregoing, any provision in any such agreement, instrument, note, certificates, indenture, mortgage, security document, or other instrument or document that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests as a result of the cancellations, terminations, satisfaction, or releases provided for in this Article V.F shall be deemed null and void and shall be of no force and effect.

2.    Upon the final distribution on account of the Convertible Notes, (a) the Convertible Notes shall thereafter be deemed to be worthless, and (b) at the request of the Convertible Notes Indenture Trustee, DTC shall take down the relevant position relating to the Convertible Notes without any requirement of indemnification or security on the part of the Debtors, the Plan Administrator or the Convertible Notes Indenture Trustee.

3.    Except for the foregoing, subsequent to the performance by the DIP Agent, First Lien Agent, Second Lien Agent, the Convertible Notes Indenture Trustee, and the L/C Issuer of their respective obligations pursuant to this Plan, all further duties, obligations, liability, and responsibilities of the DIP Agent, First Lien Agent, Second Lien Agent, the Convertible Notes Indenture Trustee, and the L/C Issuer and their respective agents related to the DIP Documents, First Lien Loan Documents, Second Lien Note Documents, the DIP L/C Agreement, and the Convertible Notes Indenture (including the exercise or enforcement of rights under the Intercreditor Agreement), as applicable, shall terminate and the Convertible Notes Indenture Trustee shall be fully discharged and released from all obligations under the Convertible Notes Indenture.

4.    The Convertible Notes Indenture Trustee shall be entitled to the reimbursement of the Convertible Notes Indenture Trustee Fees in an amount not to exceed $150,000.  The Convertible Notes Indenture Trustee shall provide the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lender Group, with a summary invoice for the Convertible Notes Indenture Trustee Fees no later than three (3) business days prior to the Effective Date, which invoice may include estimates for the Convertible Notes Indenture Trustee Fees anticipated through and after the Effective Date.

5.    If the Debtors object to any Convertible Notes Indenture Trustee Fees, including estimates thereof, the Debtors or the Plan Administrator, as applicable, shall (a) provide written notification within two (2) days of receipt of the invoice therefor and (b) on the Effective Date, (x) pay in Cash to the Convertible Notes Indenture Trustee the undisputed portion of the Convertible Notes Indenture Trustee Fees and (y) deposit the disputed portion of such fees and expenses into the Wind-Down Reserve pending any consensual resolution or resolution by the Bankruptcy Court of the dispute.  Upon the receipt of such notification, the Convertible Notes Indenture Trustee may submit the dispute for resolution by the Bankruptcy Court.

6.    Notwithstanding anything in this Plan or any Definitive Document to the contrary, other than to the extent Class 3a does vote to accept this Plan and any Distribution is made in accordance with Article III.B.3(c)(1) of this Plan, (i) the Intercreditor Agreement shall remain in full force and effect notwithstanding the confirmation of this Plan or the occurrence of the Effective Date and shall be fully enforceable according to its terms, (ii) no distribution to any Holder of a Second Lien Note Claim shall be made in contravention of the terms of this Plan and the Intercreditor Agreement, and (iii) all distributions to Holders of Allowed Second Lien Note Claims pursuant to this Plan shall be subject to the terms of the Intercreditor Agreement, including,

33

without limitation, the Turnover and Subordination Provisions, and the Disbursing Agent shall make Distributions on account of Allowed Second Lien Note Claims in accordance with, and as provided by, the terms of this Plan.

### G.    *Corporate Action*

Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by this Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

### H.    *Exemption From Certain Transfer Taxes*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale by any Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with this Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### I.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file or record (in consultation with the Ad Hoc DIP and First Lien Lender Group) such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

### J.    *Directors, Managers, and Officers of the Debtors*

Following the Confirmation Date and prior to the occurrence of the Effective Date, the then-current officers, directors and managers of each of the Debtors shall continue in their respective capacities in accordance with the applicable by-laws or other organizational documents, and the Debtors shall execute such documents and take such other action as is necessary to effectuate the actions provided for in this Plan.

34

On and after the Effective Date, the Plan Administrator shall serve as the sole shareholder, interest holder, officer, director or manager of each of the Debtors, as applicable, under applicable state law. The Plan Administrator, subject to the terms and conditions of this Plan and the Plan Administration Agreement, shall be authorized to execute, deliver, file or record (in consultation with the Ad Hoc DIP and First Lien Lender Group) such documents, contracts, instruments, releases and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

### K.    *D&O and Insurance Policies*

Before the Petition Date, the Debtors obtained the D&O Tail Coverage for their current and former directors, officers, and managers. After the Effective Date, all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Tail Coverage for the full term of such D&O Policy, subject to and in accordance with the terms and conditions of such D&O Tail Coverage.

Notwithstanding anything to the contrary in this Plan, to the extent any Insurance Policies have not already been assumed and assigned to the Purchaser pursuant to the Sale Order or Sale Transaction Documents, (i) on the Effective Date, the Debtors shall be deemed to have assumed all of the remaining Insurance Policies in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; and (ii) confirmation of the Plan shall not impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

On the Effective Date, the Debtors' rights under and to (i) each D&O Policy and (ii) each other Insurance Policy not transferred to the Purchaser under the Sale Transaction Documents shall vest in the Post-Effective Date Debtors and their Estates as Plan Administration Assets. Confirmation and Consummation of this Plan, and the vesting of the D&O Policies and Insurance Policies in the Post-Effective Date Debtors and their Estates, shall not impair or otherwise affect (x) any parties' rights to coverage thereunder, including in respect of any claims pending as of the Effective Date or pursued or made thereafter, or (y) any available defenses of the Debtors or the Plan Administration or any Insurer under the D&O Policies and Insurance Policies.

### L.    *Preservation of Rights of Action*

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in this Plan, pursuant to the Sale Transaction, or by a Bankruptcy Court order, the Debtors reserve any and all Causes of Action. On and after the Effective Date, the Plan Administrator may pursue such Causes of Action in its sole discretion. No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of

35

the Confirmation or Consummation. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator shall retain and shall have, including through their authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of this Plan itself shall be resolved only by Confirmation of this Plan itself and the occurrence of the Effective Date.

*M.*     *Closing of the Chapter 11 Cases*

After a Chapter 11 Case has been fully administered, including in accordance with Article V.E hereof, the Plan Administrator shall seek authority from the Bankruptcy Court to close that Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE VI.**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

*A.*     *Assumption of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, as of the Effective Date, the Debtors shall be deemed to have rejected all Executory Contracts and Unexpired Leases that (1) have not been previously rejected, assumed, or assumed and assigned, including in connection with the Sale Transaction, and are not the subject of a pending motion to reject, assume, or assume and assign as of the Effective Date, (2) are not identified on the Schedule of Assumed Contracts, and (3) have not expired under their own terms prior to the Effective Date.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the foregoing rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

The cure of all defaults under Executory Contracts and Unexpired Leases to be assumed and assigned under the Asset Purchase Agreement, including the resolution of all Adjourned Objections to the adequacy of amounts proposed to cure such defaults under such Executory Contracts and Unexpired Leases, shall be governed by the terms and conditions of the Sale Order and the Asset Purchase Agreement.

*B.*     *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

36

***C.***      *Rejection Damages Claims*

All Claims arising from the rejection of Executory Contracts or Unexpired Leases under this Plan must be filed with the Balloting Agent and served upon the Plan Administrator and counsel for the Debtors, as applicable, within thirty (30) days after the occurrence of the Effective Date in accordance with the instructions and procedures set forth in the Confirmation Order; *provided*, that the foregoing deadline shall apply only to Executory Contracts or Unexpired Leases that are rejected automatically by operation of Article VI.A above, and the deadline for filing any rejection damage Claims relating to any Executory Contracts or Unexpired Leases rejected pursuant to a separate order of the Bankruptcy Court shall be the applicable deadline under such order or the Claims Bar Date Order, as applicable.  Any Claim arising from the rejection of an Executory Contract or Unexpired Lease that becomes an Allowed Claim shall be classified and treated as a General Unsecured Claim against the applicable Debtor.

***D.***      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

***A.***      *Timing and Calculation of Amounts to Be Distributed; Entitlement to Distributions*

1.    <u>Timing and Calculation of Amounts to Be Distributed and Date of Distributions</u>

Unless otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter, but in no event later than ninety (90) days after the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the amount of the Distribution that this Plan provides for Allowed Claims in the applicable Class which, with respect to Holders of Allowed Claims in Classes 3b and 3c, may be an initial amount subject to subsequent Distributions to the extent such Distribution is not the full amount of the Class 3b and 3c Additional Sale Consideration Amount.  Subsequent Distributions shall be made, if determined by the Plan Administrator to be practicable and appropriate, on a quarterly basis thereafter, *provided* that the Plan Administrator may refrain from making interim Distributions to the extent the Plan Administrator reasonably determines that the costs of making such Distributions are not reasonable in comparison to the amount of such Distributions and instead may reserve making any subsequent Distributions until a final Distribution.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Article VII and Article VIII.  Except only for DIP Claims, Holders of

Claims shall not be entitled to postpetition interest, dividends, or accruals on their Claims, regardless of whether Distributions on account of such Claims are delivered before, on or at any time after the Effective Date.

### 2. Entitlement to Distributions

On and after the Effective Date, the Disbursing Agent shall be authorized (but not directed) to recognize and deal only with those Holders of Claims listed on the Debtors' books and records as of the Distribution Record Date. Accordingly, the Disbursing Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute any securities, property, notices, and other documents only to those Holders of Allowed Claims who are Holders of Claims (or participants therein) as of the close of business on the Distribution Record Date.

### B. *Disbursing Agent*

Except as otherwise provided herein, all Distributions under this Plan shall be made by the Debtors as Disbursing Agent or such other Entity designated by the Debtors as a Disbursing Agent on the Effective Date, which may be the Plan Administrator.

### C. *Distributions on Account of Claims Allowed After the Effective Date*

#### 1. Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

#### 2. Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in this Plan and except as otherwise agreed to by the Disbursing Agent, (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and such Disputed Claim becomes an Allowed Claim; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order. Any Distributions to Holders of Allowed Claims in a Class under this Plan shall be made, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such Distributions were earlier paid to Holders of Allowed Claims in such Class.

### D. *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

#### 1. Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make Distributions to Holders of Allowed Claims at the address for each such Holder as indicated on (a) such Holders'

address on its Proof of Claim, if applicable, (b) such Holders' address listed on a notice filed with the Bankruptcy Court, if applicable, or (c) if neither (a) or (b) are available, the address of record for the Holder listed on the Debtors' Schedules.

2. Undeliverable Distributions and Unclaimed Property

(a)    Failure to Claim Undeliverable Distributions

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest; *provided*, *however*, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one hundred and eighty (180) days from the date the Distribution was returned.  After such date, all unclaimed property or interests in property shall revert to the Post-Effective Date Debtors and their Estates (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be cancelled and forever barred.

(b)    Failure to Present Checks

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the relevant Allowed Claim for which such check was originally issued.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within one hundred and eighty (180) days after the issuance of such check shall have its Claim for such un-negotiated check cancelled, forever barred, and estopped, and such Holder shall be enjoined from asserting any such Claim against the Post-Effective Date Debtors and their Estates.  In such cases, any Cash held for payment on account of such Claims shall be property of the Post-Effective Date Debtors and their Estates as Plan Administration Assets free of the Claims of such Holder with respect thereto.  Nothing contained herein shall require the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

3. Record Date for Distributions

For purposes of making Distributions on the Initial Distribution Date only, the Disbursing Agent shall be authorized and entitled to recognize only those Holders of Claims reflected in the Debtors' books and records as of the close of business on the Distribution Record Date.  If a Claim is transferred (a) twenty-one (21) or more days before the Distribution Record Date and reasonably satisfactory documentation evidencing such transfer is filed with the Bankruptcy Court, the Disbursing Agent shall make the applicable Distributions to the applicable transferee, or (b) twenty (20) or fewer days before the Distribution Record Date, the Disbursing Agent shall make Distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form is filed with the Bankruptcy Court and contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

4. Delivery of Distributions on First Lien Loan Claims

39

The First Lien Agent shall be deemed to be the Holder of all applicable First Lien Loan Claims for purposes of Distributions to be made hereunder, and all Distributions on account of such First Lien Loan Claims shall be made to the First Lien Agent.  As soon as practicable following the Effective Date, the First Lien Agent shall arrange to deliver or direct the delivery of such Distributions to or on behalf of the applicable Holders of First Lien Loan Claims in accordance with the terms of the First Lien Credit Agreement, subject to any modifications to such Distributions in accordance with the terms of this Plan.  Notwithstanding anything in this Plan to the contrary, and without limiting the exculpation and release provisions of this Plan, the First Lien Agent shall not have any liability to any Entity with respect to Distributions made or directed to be made by the First Lien Agent, except liability resulting from gross negligence, actual fraud, or willful misconduct of the First Lien Agent or otherwise as set forth in the applicable First Lien Loan Documents (as defined in the DIP Order).

5.   Delivery of Distributions on Second Lien Note Claims and Turned-Over Distributions on Account of Second Lien Note Claims

If Class 3a votes to accept this Plan, pursuant to Article III.B.3(c)(1) of this Plan, the Second Lien Agent shall be deemed to be the Holder of all applicable Second Lien Note Claims for purposes of distributions to be made hereunder, and all distributions on account of such Second Lien Note Claims shall be made to the Second Lien Agent.  As soon as practicable following the Effective Date, the Second Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the applicable Holders of Second Lien Note Claims in accordance with the terms of the Securities Purchase Agreement (as defined in the DIP Order), subject to any modifications to such distributions in accordance with the terms of the Plan.  Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Second Lien Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the Second Lien Agent, except liability resulting from gross negligence, actual fraud, or willful misconduct of the Second Lien Agent.

If Class 3a does not vote to accept this Plan, pursuant to Article III.B.3(c)(2) of this Plan, for purposes of Distributions to be made hereunder to Holders of Second Lien Note Claims, all such Distributions shall be subject to the Turnover and Subordination Provisions of the Intercreditor Agreement and, at the option of the Ad Hoc DIP and First Lien Lender Group either (A) be distributed to the First Lien Agent or (B) reduce the amount of the Additional Sale Consideration to be paid by Purchaser or funded by Retained Cash, on a dollar-for-dollar basis by the Second Lien Turnover Amount (but in no event, following and after accounting for such distribution to the First Lien Agent or reduction, shall the Additional Sale Consideration be less than $4,000,000).  Notwithstanding anything in this Plan to the contrary, and without limiting the exculpation and release provisions of this Plan, neither the Disbursing Agent nor the First Lien Agent shall have any liability to any Entity with respect to Distributions made or directed to be made by the First Lien Agent, except liability resulting from gross negligence, actual fraud, or willful misconduct of the First Lien Agent.

6.  Delivery of Distributions on Convertible Note Claims

The Convertible Notes Indenture Trustee shall be deemed to be the Holder of all applicable Convertible Note Claims for purposes of Distributions to be made hereunder, and, subject to the

40

Convertible Notes Charging Lien and priority of payments rights, all Distributions on account of such Convertible Note Claims shall be made to the Convertible Notes Indenture Trustee. As soon as practicable following the Effective Date, the Convertible Notes Indenture Trustee shall arrange to deliver or direct the delivery of such Distributions to or on behalf of the applicable Holders of Convertible Note Claims in accordance with the terms of the Convertible Notes Indenture, subject to any modifications to such Distributions in accordance with the terms of this Plan. To the extent the Convertible Notes Indenture Trustee provides services or incur costs or expense on or after the Effective Date, including professional fees, related to or in connection with the Plan, the Confirmation Order or the Convertible Notes Indenture, including, without limitation, in connection with making distributions to Holders of Convertible Notes Claims, the Convertible Notes Indenture Trustee shall be entitled to receive from the Plan Administrator any amount of the Convertible Notes Indenture Trustee Fees, if any, that was not paid on the Effective Date, without further order of the Bankruptcy Court within ten (10) days of presentation of a summary invoice to the Plan Administrator. Notwithstanding anything in this Plan to the contrary, and without limiting the exculpation and release provisions of this Plan, the Convertible Notes Indenture Trustee shall not have any liability to any Entity with respect to Distributions made or directed to be made by the Convertible Notes Indenture Trustee, except liability resulting from gross negligence, actual fraud, or willful misconduct of the Convertible Notes Indenture Trustee to the extent set forth in the Convertible Notes Indenture. Upon final administration of the Distributions made to the Convertible Notes Indenture Trustee in accordance with the Plan and the Convertible Notes Indenture, the Convertible Notes Indenture Trustee shall be discharged from any further responsibility under this Plan.

7. Fractional Distributions

Notwithstanding anything in this Plan to the contrary, no payment of fractional cents shall be made pursuant to this Plan. Whenever any payment of a fraction of a cent under this Plan would otherwise be required, the actual distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

8. De Minimis Distributions

Notwithstanding anything to the contrary contained in this Plan, the Disbursing Agent shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $50. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $50 shall be forever barred from asserting such Claim against the Estates.

**E.**    *Compliance with Tax Requirements/Allocations*

In connection with this Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding

41

and reporting requirements, including liquidating a portion of the Distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Disbursing Agent reserves the right to allocate all Distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

The Debtors, the Plan Administrator, or the Disbursing Agent may require, as a condition to the receipt of a Distribution, that a Holder furnish to the Debtors, Plan Administrator, or Disbursing Agent, as applicable, any necessary or appropriate tax documentation, including a Form W-8 or Form W-9, as applicable to each Holder.  If any Holder fails to comply with such a request within three (3) months thereof, such Distribution in respect of such Holder may be withheld as required by applicable law and in such event, shall be deemed an undeliverable Distribution and shall be treated in accordance with Article VII.D.2 hereof.  Without limitation of the generality of the foregoing, the Debtors, the Plan Administrator, or the Disbursing Agent may condition any Distribution it may make to a Holder on such Entity's receipt of such information and documentation as the Debtors, the Plan Administrators, or the Disbursing Agent, as applicable, determines in its reasonable discretion is necessary to effect a Distribution in accordance with applicable law, including tax law, and withhold, as required by applicable law, a Distribution to any Holder who fails to provide such documentation and information.

### F.     *Surrender of Cancelled Instruments or Securities*

As a condition precedent to receiving any Distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled, except to the extent otherwise provided herein.

### G.     *Claims Paid or Payable by Third Parties*

#### 1. Claims Paid by Third Parties

The Debtors or the Plan Administrator, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed upon an order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Plan Administrator.  To the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor or the Plan Administrator on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the Plan Administrator to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the total Allowed amount of such Claim as of the Distribution Date.

#### 2. Claims Payable to Third Parties

No Distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court

42

of competent jurisdiction), then immediately upon payment from such insurer, such Claim may be expunged upon an order or approval of the Bankruptcy Court or deemed satisfied in full.

### 3. Applicability of D&O Policies and Insurance Policies

Except as otherwise provided in this Plan, Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable D&O Policy or Insurance Policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against their insurers under any D&O Policies or Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### *H.*      *Allocation of Plan Distributions between Principal and Interest*

To the extent that any Allowed Claim entitled to a Distribution under this Plan is comprised of indebtedness and accrued but unpaid interest (or original issue discount) thereon, such Distribution shall be allocated first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest (or original issue discount).

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

### *A.*      *Allowance and Disallowance of Claims*

Except as expressly provided herein or any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code, under this Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided in any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Sale Order and Confirmation Order), the Plan Administrator after Consummation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the Petition Date.

### *B.*      *Prosecution of Objections to Claims*

The Plan Administrator shall have the authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan; *provided* that the Committee and the Ad Hoc DIP and First Lien Lender Group also shall have the right to object to the allowance and amount of the Second Lien Note Claims. From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Plan Administrator may also resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law, as necessary; *provided*, *however*, that for the avoidance of doubt, the underlying Claim shall remain under the jurisdiction of the Bankruptcy Court and shall not be Disallowed other than by order of the Bankruptcy Court.

43

With respect to the foregoing duties of the Plan Administrator to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims, the Plan Administrator, as the case may be, shall stand in the same position as the Debtors with respect to any claim the Debtors may have to an attorney-client privilege, the work-product doctrine or any other privilege, and the Plan Administrator shall succeed to all of the Debtors' rights to preserve, assert or waive any such privilege.

### C.    *Estimation of Claims*

The Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Plan Administrator has previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the applicable Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

### D.    *Disputed Administrative Claims Reserve*

1.    On or after the Effective Date, the Plan Administrator shall have the right, but is not required, to establish a Disputed Administrative Claims Reserve and to determine the amount of any Disputed Administrative Claims Reserve based on good faith estimates (in consultation with the Committee and the Ad Hoc DIP and First Lien Lender Group) or an order of the Bankruptcy Court estimating such Disputed Administrative Claims, net of any taxes imposed thereon or otherwise payable by the Disputed Administrative Claims Reserve, and which may be held in the same account as the Wind-Down Amount.

2.    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Plan Administrator shall treat any Disputed Administrative Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently the foregoing for state and local income tax purposes. All parties (including, to the extent applicable, the Debtors, the Post-Effective Date Debtors, the Plan Administrator and Holders of Disputed Administrative Claims) shall be required to report for tax purposes consistently with the foregoing.

3.    The Plan Administrator shall hold in any Disputed Administrative Claims Reserve all payments to be made on account of Disputed Administrative Claims for the benefit of Holders of Disputed Administrative Claims whose Claims are subsequently Allowed. All taxes imposed on the assets or income of any Disputed Administrative Claims Reserve shall be payable by the Plan Administrator from the assets of the Disputed Administrative Claims Reserve.

44

4.      In the event Cash in the Disputed Administrative Claims Reserve is insufficient to satisfy all of the Disputed Administrative Claims that have become Allowed, such Allowed Claims shall be satisfied from the Wind-Down Reserve.  After all Cash has been distributed from the Disputed Administrative Claims Reserve, no further distributions shall be made in respect of Disputed Administrative Claims.  As such time as all Disputed Administrative Claims have been resolved, any remaining Cash in the Disputed Administrative Claims Reserve shall be remitted to the Wind-Down Reserve.

5.      The Plan Administrator may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Disputed Administrative Claims Reserve for all taxable periods through the date on which final distributions are made.

### *E.      Disputed General Unsecured Claims Reserve*

1.      On or after the Effective Date, the Plan Administrator shall have the right, but is not required, to establish a Disputed General Unsecured Claims Reserve and to determine the amount of the Disputed General Unsecured Claims Reserve based on the good faith estimates (in consultation with the Committee and the Ad Hoc DIP and First Lien Lender Group) or an order of the Bankruptcy Court estimating any such Disputed General Unsecured Claim, net of any taxes imposed thereon or otherwise payable by the Disputed General Unsecured Claims Reserve, and which such amount shall be deposited in the Disputed General Unsecured Claims Reserve, which may be held in the same account as the Additional Sale Consideration Escrow Account.

2.      Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Plan Administrator shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently the foregoing for state and local income tax purposes.  All parties (including, to the extent applicable, the Debtors, the Post-Effective Date Debtors, the Plan Administrator and Holders of Disputed General Unsecured Claims) shall be required to report for tax purposes consistently with the foregoing.

3.      The Plan Administrator shall hold in the Disputed Claims Reserve all payments to be made on account of Disputed General Unsecured Claims for the benefit of Holders of Disputed General Unsecured Claims whose Claims are subsequently Allowed.  All taxes imposed on the assets or income of the Disputed Claims Reserve shall be payable by the Plan Administrator from the assets of the Disputed Claims Reserve.

4.      In the event Cash in the Disputed Claims Reserve is insufficient to satisfy all of the Disputed General Unsecured Claims that have become Allowed, such Allowed Claims shall be satisfied pro rata from such remaining Cash.  After all Cash has been distributed from the Disputed Claims Reserve, no further distributions shall be made in respect of Disputed General Unsecured Claims.  As such time as all Disputed General Unsecured Claims have been resolved, any remaining Cash in the Disputed Claims Reserve shall be distributed pro rata to holders of Allowed General Unsecured Claims.

45

5.    The Plan Administrator may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Disputed Claims Reserve for all taxable periods through the date on which final distributions are made.

### F.    *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide to the Holder of such Claim the Distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THIS PLAN

### A.    *Conditions Precedent to Confirmation*

Unless satisfied or waived pursuant to the provisions of Article IX.C hereof, the following are conditions precedent to Confirmation of this Plan:

1.    The Disclosure Statement Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lender Group.

2.    The Sale Order shall constitute a Final Order and shall not have been vacated, amended or otherwise modified.

3.    The Sale Transaction Documents shall not have been terminated in accordance with their terms.

### B.    *Conditions Precedent to the Effective Date*

In addition to the satisfaction of the provisions of Article IX.A hereof, unless satisfied or waived pursuant to the provisions of Article IX.C hereof, the following are conditions precedent to the occurrence of the Effective Date of this Plan:

1.    The Confirmation Order shall have been entered by the Bankruptcy Court and contain terms and conditions consistent in all material respects with the Sale Order and the Committee Settlement and otherwise be in form and substance reasonably acceptable to the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lender Group.

2.    This Plan, the Definitive Documents, and all other documents contemplated thereby, including any amendments, modifications, or supplements thereto, shall be consistent in all material respects with the Sale Order and the Committee Settlement and otherwise be in form and

46

substance reasonably acceptable to the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lender Group.

3.   All conditions precedent to the effectiveness of the Sale Transaction Documents shall have been satisfied or waived pursuant to the terms thereof, and the consummation of such Sale Transaction shall have occurred on or prior to the Effective Date.

4.   All Definitive Documents shall have been executed, delivered, and filed (if applicable) and shall be in full force and effect, and all conditions precedent to effectiveness set forth in the Definitive Documents shall have been satisfied or waived in accordance with the terms thereof.

5.   The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate this Plan and the Definitive Documents and no order, injunction or judgment shall have been issued by any governmental authority or arbitrator to restrain, prohibit, enjoin or declare illegal the transactions contemplated by this Plan, and no law shall have been promulgated or enacted and be in effect that on a temporary or permanent basis restrains, enjoins, or invalidates the transactions contemplated by this Plan.

6.   The Plan Administration Agreement shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the Plan Administration Agreement shall otherwise be in form and substance reasonably acceptable to the Debtors, the Committee, and the Ad Hoc DIP and First Lien Lender Group.

7.   All actions, documents, certificates, and agreements necessary to implement this Plan shall (i) have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws and (ii) be in full force and effect.

8.   The Wind-Down Reserve shall have been established and funded in an amount consistent with the Wind-Down Budget.

9.   The Additional Sale Consideration Escrow Account shall have been established and funded with the Additional Sale Consideration.

10. The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount.

11. The Convertible Notes Indenture Trustee Fees shall have been paid to the Convertible Notes Indenture Trustee in accordance with the provisions set forth in Article V.F hereof.

12. All Statutory Fees due and payable prior to the Effective Date shall have been paid by the Debtors.

13.  All unpaid reasonable and documented fees and expenses of the First Lien Agent, the DIP Agent, and the Ad Hoc DIP and First Lien Lender Group Expenses shall have been paid in full in Cash by the Debtors.

47

*C.*      *Waiver of Conditions*

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of this Plan set forth in this Article IX may be waived by the Debtors with or without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan; *provided* that the Debtors may not waive the conditions to Consummation set forth paragraphs 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, and/or 14 of Article IX.B hereof without the prior written consent of the Committee and the Ad Hoc DIP and First Lien Lender Group (which consent may be given by email).  The failure of the Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

*D.*      *Effect of Non-Occurrence of Conditions to Confirmation or Consummation*

If the Confirmation or the Consummation of this Plan does not occur with respect to one or more of the Debtors, then this Plan will, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in this Plan or the Disclosure Statement will: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

*E.*      *Substantial Consummation*

On the Effective Date, this Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## ARTICLE X.

## RELEASE, EXCULPATION, INJUNCTION AND RELATED PROVISIONS

*A.*      *General*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall collectively constitute an integrated and global good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, any Distribution to be made on account of such Allowed Claim or Allowed Interest, including, without limitation, all controversies among the Debtors, the First Lien Agent, the First Lien Lenders, the Second Lien Parties, the DIP Secured Parties, the Committee, and all other Holders of Claims against and Interests in the Debtors and including Claims, Interests and controversies relating to the Intercreditor Agreement and the Turnover and Subordination Provisions and the settlements embodied in the Committee Settlement, which Committee Settlement incorporates the application of the Intercreditor Agreement and which is integrated with, and non-severable from, the provisions of this Plan and the global comprise and settlement embodied herein, as well as the integrated settlement embodied in the treatment of Second Lien Note Claims set forth in Article

48

III.B.3(c)(1) of this Plan. The provisions of this Plan, the Committee Settlement and the integrated settlement embodied in the treatment of Second Lien Note Claims set forth in Article III.B.3(c)(1) of this Plan, including, without limitation, the global settlement of all Claims, Interests and controversies and the release, injunction, exculpation and compromise provisions provided herein, are mutually dependent. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of all of the provisions of this Plan and implementation of the Committee Settlement collectively as an integrated and global compromise and settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such integrated compromise and settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of this Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrator may compromise and settle Claims against them and Causes of Action against other Entities.

## B.    *Debtor Release*

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan and the obligations contemplated by this Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Post-Effective Date Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and Representatives and any and all other Persons that may purport to assert any Causes of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Post-Effective Date Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Post-Effective Date Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the Post-Effective Date Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the Debtors' in or out-of-court restructuring and recapitalization efforts, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, the Asset Purchase Agreement, the Bidding Procedures Order, the Sale Transaction, the Sale Order, the Committee Settlement, the Disclosure Statement, the DIP Order and the DIP Documents, this Plan, and related agreements, instruments, and other documents, and the negotiation, formulation,**

49

preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to this Plan, or any other act or omission.

Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any Person under this Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan.  Moreover, the foregoing release shall have no effect on the liability of, or any Cause of Action against, any Entity that results from any act or omission that is determined in a Final Order to have constituted fraud, gross negligence, bad faith or willful misconduct.

Notwithstanding anything to the contrary in the foregoing, other than to the extent Class 3a does vote to accept this Plan and any Distribution is made in accordance with Article III.B.3(c)(1) of this Plan, the release set forth in this Article X.B does not affect or release the rights of any party under the Intercreditor Agreement.

C.      *Release by Holders of Claims and Interests*

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan, and the obligations contemplated by this Plan and the documents in the Plan Supplement, or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Releasing Parties, in each case from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Post-Effective Date Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, Representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the Post-Effective Date Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the Debtors' in or out-of-court restructuring and recapitalization efforts, intercompany transactions between or among a Debtor and another Debtor, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the documents in the Plan Supplement, the Asset Purchase Agreement, the Bidding Procedures Order, the Sale Transaction, the Committee Settlement, the Sale Order, the Disclosure Statement, the DIP Order and the DIP Documents, this Plan, and related agreements, instruments, and other documents, and the negotiation, formulation,

50

**preparation, dissemination, filing, pursuit of consummation, or implementation thereof, the solicitation of votes with respect to this Plan, or any other act or omission.**

**Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any Person under this Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan. Moreover, the foregoing release shall have no effect on the liability of, or any Cause of Action against, any Entity that results from any act or omission that is determined in a Final Order to have constituted fraud, gross negligence, bad faith or willful misconduct.**

**Notwithstanding anything to the contrary in the foregoing, other than to the extent Class 3a does vote to accept this Plan and any Distribution is made in accordance with Article III.B.3(c)(1) of this Plan, the release set forth in this Article X.C does not affect or release the rights of any party under the Intercreditor Agreement.**

*D.     Exculpation*

**To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action in connection with or arising out of: the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of Confirmation and consummation of this Plan, making Distributions, implementing the Wind-Down, the Disclosure Statement, the Sale Transaction, the Asset Purchase Agreement, the Committee Settlement, the Sale Order, or the solicitation of votes for, or Confirmation of, this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of securities under or in connection with this Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors or the Post-Effective Date Debtors; or the transactions in furtherance of any of the foregoing; *provided, however,* that none of the foregoing provisions shall operate to waive or release (i) any Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud, criminal conduct, or willful misconduct, as determined by a Final Order, and (ii) the Exculpated Parties' rights and obligations under this Plan, the Plan Supplement documents, and the Confirmation Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes on this Plan and, therefore, are not, and will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or Distributions made pursuant to this Plan. The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

*E.     Permanent Injunction*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits,

51

judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to this Plan, including the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan or the Confirmation Order.

### F.    *Setoffs*

Except as otherwise expressly provided for in this Plan, each Debtor and the Plan Administrator, pursuant to the Bankruptcy Code (including section 558 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the Distributions to be made pursuant to this Plan on account of such Allowed Claim or Allowed Interest (before any Distribution is made on account of such Allowed Claim or Allowed Interest), any Claims, rights and Causes of Action of any nature that such Debtor or the Plan Administrator, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such Claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to this Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to this Plan shall constitute a waiver or release by such Debtor of any such Claims, rights and Causes of Action that such Debtor may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to set off any Claim or Interest against any claim, right or Cause of Action of the Debtor unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date.  For the avoidance of doubt, the filing of a Proof of Claim is sufficient to preserve a right of set off hereunder.

### G.    *Release of Liens*

Except as otherwise provided in this Plan or in any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and cancelled, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their Estates.

### H.    *Preservation of All Causes of Action Not Expressly Settled or Released*

The Debtors expressly reserve all Causes of Action not transferred to the Purchaser as part of Sale Transaction for later adjudication by, as applicable, the Debtors or the Plan Administrator (including, without limitation, Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the Confirmation or Consummation of this Plan based on the

52

Disclosure Statement, this Plan, or the Confirmation Order, except in each case where such Causes of Action have been expressly waived, relinquished, released, compromised or settled in this Plan (including, without limitation, and for the avoidance of doubt, the Debtor Release contained in Article X.B, the Third-Party Release contained in Article X.C and the Exculpation contained in Article X.D hereof) or any other Final Order (including, without limitation, the Sale Order or the Confirmation Order).  In addition, the Debtors and the Plan Administrator, as applicable, expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

**I.**      *Integral Part of Plan*

Each of the provisions set forth in this Plan with respect to the settlement, release, cancellation, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action is an integral part of this Plan and essential to its implementation. Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision and such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, and in addition to the matters over which the Bankruptcy Court shall have retained jurisdiction pursuant to the Sale Order, the Bankruptcy Court will, on and after the Effective Date, retain exclusive jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or Secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any such Claim or Interest;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

3.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to adjudicate and, if necessary, liquidate, any Claims arising therefrom;

4.    resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

5.    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

53

6. ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes related thereto;

7. decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

8. enforce all orders previously entered by the Bankruptcy Court;

9. enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

10. resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Person or Entity's obligations incurred in connection with this Plan;

11. hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

12. hear and determine disputes arising in connection with the interpretation, implementation, enforcement of the Asset Purchase Agreement or other document(s) governing or relating to the Asset Purchase Agreement, and all matters arising in connection with the Sale Transaction;

13. issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of this Plan;

14. enforce the terms and conditions of this Plan, the Confirmation Order, and the Definitive Documents and maintain the integrity of this Plan following Consummation;

15. hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

16. resolve any cases, controversies, suits or disputes with respect to the Release, Exculpation, indemnification and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such provisions;

17. enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

54

18. resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any release or exculpation adopted in connection with this Plan;

19. enter an order or orders concluding or closing the Chapter 11 Cases;

20. hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

# ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.    *Reservation of Rights*

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Neither the filing of this Plan, any statement or provision contained in this Plan, nor any action taken or not taken by any Debtor with respect to this Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests before the Effective Date.

### B.    *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code to the extent necessary, shall be paid by each of the Debtors (or the Disbursing Agent on behalf of each of the Debtors), as applicable, for each quarter (including any fraction thereof) until the earliest to occur of the entry of (a) a final decree closing such Debtor's Chapter 11 Case, (b) an order dismissing such Debtor's Chapter 11 Case, or (c) an order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

### C.    *Ad Hoc DIP and First Lien Lender Fees and Expenses*

The Ad Hoc DIP and First Lien Lender Expenses and Agent Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court or comply with any guidelines of the U.S. Trustee, and without any requirement for review or approval by the Bankruptcy Court or any other party. All Ad Hoc DIP and First Lien Lender Expenses and Agent Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (1) Business Days before the anticipated Effective Date; *provided*, that such estimate shall not be considered an admission or limitation with respect to such Ad Hoc DIP and First Lien Lender Expenses or Agent Expenses. In addition, the Debtors and Plan Administrator (as applicable) shall continue to pay the Ad Hoc DIP and First Lien Lender Expenses and Agent Expenses (if any) after the Effective Date when due and payable in the ordinary course related to implementation, consummation and defense of the Plan, whether

55

incurred before, on or after the Effective Date to the extent provided for and funded through the Wind-Down Budget.

### D.    *Statutory Committee*

On the Effective Date, the current and former members of the Committee, and their respective officers, employees, counsel, advisors and agents, will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases and the Committee will dissolve; *provided*, *however*, that following the Effective Date, the Committee will continue in existence and have standing and a right to be heard for the following limited purposes: (i) pursuing claims and final fee applications filed pursuant to sections 330 and 331 of the Bankruptcy Code in accordance with Article II.A; (ii) (b) any appeals of the Confirmation Order or (b) appeals of any Cause of Action to which the Committee is a party or that impacts the distributions provided to Holders of Claims in Classes 3a, 3b or 3c.  Following the completion of the Committee's remaining duties set forth above, the Committee will be dissolved, and the retention or employment of the Committee's respective attorneys, accountants and other agents will terminate without further notice to, or action by, any Entity.

### E.    *Modification of Plan*

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order in accordance with section 1127(a) of the Bankruptcy Code and (b) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify this Plan in accordance with section 1127(b) of the Bankruptcy Code; *provided* that all such modifications and amendments shall be made in consultation with the Committee and the Ad Hoc and First Lien Lender Group and, with respect to those modifications and amendments that may adversely impact (a) (i) the Committee Settlement, (ii) the rights and obligations of the Committee, its professionals or Holders of Claims in Classes 3a, 3b, or 3c, or (iii) the Distributions to Holders of Claims in Classes 3a, 3b, or 3c, such modifications and amendments shall require the prior written consent of the Committee or (b)(i) the Committee Settlement, (ii) the rights and obligations of the Ad Hoc DIP and First Lien Lender Group, the Ad Hoc DIP and First Lien Lender Group Advisors, or Holders of First Lien Loan Claims, (iii) Distributions to Holders of First Lien Loan Claims, (iv) the application of the Intercreditor Agreement, including, without limitation, the Turnover and Subordination Provisions, pursuant to the Plan, or (v) the provisions applicable to the Wind-Down, Wind-Down Amount, or Wind-Down Budget, such modifications and amendments shall require the prior written consent of the Ad Hoc DIP and First Line Lender Group.  A Holder of a Claim that has accepted this Plan will be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

### F.    *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and/or to file subsequent chapter 11 plans, with respect to one or more of the Debtors.  If the

56

Debtors revoke or withdraw this Plan, or if Confirmation or Consummation of this Plan does not occur with respect to one or more of the Debtors, then with respect to the applicable Debtor or Debtors for which this Plan was revoked or withdrawn or for which Confirmation or Consummation of this Plan did not occur: (1) this Plan will be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto will be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan will: (a) constitute a waiver or release of any Claims by or against, or any Interests in, the applicable Debtors or any other Entity; (b) prejudice in any manner the rights of the applicable Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the applicable Debtors or any other Entity.

### G.    *Successors and Assigns*

This Plan will be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, other parties-in-interest, and their respective heirs, executors, administrators, successors, and assigns. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

### H.    *Reservation of Rights*

Except as expressly set forth herein, this Plan will have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and this Plan is Consummated. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan will be or will be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Interests or other Entity; or (2) any Holder of a Claim or an Interest or other Entity prior to the Effective Date.

### I.    *Further Assurances*

The Debtors, all Holders of Claims receiving Distributions hereunder, and all other Entities will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

### J.    *Severability*

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted; *provided, however,* that notwithstanding the foregoing, the terms of the Committee Settlement as approved in the Sale Order and implemented by this Plan (including the application of the Intercreditor Agreement) are integrated with one another and the Plan and are non-severable. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and

57

provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### *K.    Service of Documents*

Any notice, direction or other communication given regarding the matters contemplated by this Plan (each, a "**Notice**") must be in writing, sent by personal delivery, electronic mail or courier, and addressed as follows:

**If to the Debtors**:

> Global Eagle Entertainment Inc.
> 1821 E. Dyer Road, Suite 125
> Santa Ana, California 92705
> Attn: Josh Marks
>     Christian Mezger
>     Kim Nakamaru
> Telephone:  (310) 437-6000
> Email:  Joshua.Marks@globaleagle.com
>     Christian.Mezger@globaleagle.com
>     Kim.Nakamaru@globaleagle.com

with a copy to:

> Latham & Watkins LLP
> 355 South Grand Avenue, Suite 100
> Los Angeles, California 90071
> Attn:  Ted A. Dillman
>     Helena Tseregounis
> Telephone:  (213) 485-1234
> Email:  Ted.Dillman@lw.com
>     Helena.Tseregounis@lw.com

**If to the Plan Administrator**:

58

US-DOCS\117460541.10

**If to the Ad Hoc DIP and First Lien Lender Group**:

> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, NY 10166
> Attn:  Scott J. Greenberg
>          Michael J. Cohen
>          Jason Zachary Goldstein
> Telephone:  (212) 351-4000
> Email:  sgreenberg@gibsondunn.com
>          mcohen@gibsondunn.com
>          jgoldstein@gibsondunn.com

**If to the Committee**:

> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park, Bank of America Tower
> New York, NY 10036-6746
> Attn:  Phillip C. Dublin
>          Jason Rubin
> Telephone:  (212) 872-1000
> Email:  pdublin@akingump.com
>          jrubin@akingump.com

A Notice is deemed to be given and received (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by facsimile, on the Business Day following the date of confirmation of transmission by the originating facsimile, or (c) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt; *provided* that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section.  Any party may change its address for service from time to time by providing a Notice in accordance with the foregoing.  Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed.  Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice to that party.  The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

### L.    *Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that a Definitive Document or an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan will be governed by, and construed and enforced in accordance with, the laws of the state of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

US-DOCS\117460541.10

*M.*      *Tax Reporting and Compliance*

The Debtors are hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

*N.*      *Schedules*

All exhibits and schedules to this Plan, including the Exhibits and Plan Schedules, are incorporated herein and are a part of this Plan as if set forth in full herein.

*O.*      *Conflicts*

Except as set forth in this Plan, to the extent that any provision of the Disclosure Statement or any order (other than the Confirmation Order or the Sale Order) referenced in this Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of this Plan, this Plan shall govern and control; *provided* that, in the event of any conflict with any provision of this Plan and/or the Confirmation Order, the Confirmation Order shall govern; *provided further* that, in the event of any conflict between the Plan, on the one hand, and the Sale Order, on the other hand, with respect to the Sale Transaction, the Sale Order shall govern.

*P.*      *Entire Agreement*

Except as otherwise provided herein or therein, this Plan and the Definitive Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan and the Definitive Documents.

*Q.*      *2002 Notice Parties*

After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed a renewed request after the Confirmation Hearing to receive documents pursuant to Bankruptcy Rule 2002.

[*Remainder of page intentionally left blank.*]

US-DOCS\117460541.10

Respectfully submitted, as of the date first set forth above,

**Global Eagle Entertainment, Inc.**
**(on behalf of itself and all other Debtors)**

By:      */s/ Christian Mezger*
Name:   Christian Mezger
Title:    Chief Financial Officer

US-DOCS\117460541.10

**Exhibit B**

**Organizational Chart**

**GLOBAL EAGLE ENTERTAINMENT INC.**
Global Corporate Entity Organizational Chart
As of June 30, 2020

- Americas
- EMEA
- APAC
- Issuer/Borrower/Subsidiary guarantor under the Company's Credit Facilitates
- Majority Ownership held by Third-Party

**Global Eagle Entertainment Inc.**
Delaware

- Norwegian Air Shuttle ASA — Norway — 0.35%
- Post Modern Edit, Inc. — Delaware
- Global Eagle Entertainment Operations Solutions, Inc. — Delaware
- Western Outdoor Interactive Private Limited — India — 82.98%/17.02% (4)
- Airline Media Productions Inc. — Delaware
- Entertainment in Motion, Inc. — California
- Row 44, Inc. — Delaware
  - Row 44 — Russia
  - N44HQ, LLC — Delaware
  - 3222177 Nova Scotia Limited — Canada
  - Global Eagle Services, LLC — Delaware
- Global Eagle Telecom Licensing Subsidiary LLC — Delaware
- Inflight Productions USA, Inc. — California
  - The Lab Aero, Inc. — California

GEE Financing Limited — United Kingdom
- Global Eagle Holdings GmbH — Germany
  - PMG California, Inc. — Canada
  - NavAero Avionics AB — Sweden
  - DTI Software Inc. — Canada
    - DTI Software FZ-LLC — United Arab Emirates
  - Fairdeal Studios Private Limited — India — 99.99%
  - Emphasis Video Entertainment Ltd. — Hong Kong
    - Global Eagle Entertainment Media Technology (Beijing) Co., Ltd — China

Emerging Markets Communications, LLC — Delaware
- Iraq Branch Office
- EMC HoldCo 3 Coöperatief U.A. — Netherlands
  - EMC HoldCo 4 B.V. — Netherlands
    - EMC Mobility Services, S.A. — Spain
    - General Industry Systems AS — Norway
    - Vodanet Telecomunicacoes Ltda — Brazil — 94%/6% (1)
      - Global Eagle Servicos De Telecomunicacoes Ltda — Brazil — 99.646%/0.354% (2)
    - GIS Wavelink Pte. Ltd — Singapore

- Emerging Markets Communications UK Limited — United Kingdom
- Emerging Markets Communications FZE — United Arab Emirates
- Emerging Markets Communications (Kenya), Limited — Kenya — 80%
- Emerging Markets Communications Deutschland, GmbH — Germany
- Maritime Telecommunications Network, Inc. — Colorado
- Emerging Markets Communications Argentina S.R.L. — Argentina — 95% (3)
- Ground and Wireless Infrastructure Limited — Nigeria — 99.99%
  - EMC Networks (Nigeria) Limited — Nigeria — 49%

- Wireless Maritime Services, LLC — Delaware — 49%
- MTN Government Services, Inc. — Delaware
- MTN International, Inc. — Delaware
  - Antibes Rep Office
- Santander Teleport S.L. — Spain — 49%
- MTN License Corp. — Washington

- Global Eagle GmbH — Germany
- Inflight Productions Limited — United Kingdom
  - Volo Holdings Limited — United Kingdom — 2.7794%
- IFE Services (USA), Inc. — Delaware
- Global Eagle Entertainment Limited — United Kingdom
  - IFE Services SA (Pty) Limited — South Africa
  - Inflight Productions Limited — New Zealand
  - Global Eagle Entertainment Pty Limited — Australia
  - Inflight Productions Pte Ltd — Singapore
  - Inflight Productions B.V. — Netherlands
  - Global Eagle Entertainment FZ-LLC — United Arab Emirates
- Global Eagle Entertainment Spain SL — Spain
  - Transmedia Publicidad, S.L. — Spain
- IFE Services Limited — United Kingdom

**Footnotes**
1. Vodanet Telecomunicacoes Ltda – Owned 94% by EMC HoldCo 4 B.V. and 6% by EMC HoldCo 3 Coöperatief U.A.
2. Global Eagle Servicos De Telecomunicacoes Ltda — Owned 99.646% by Vodanet Telecomunicacoes Ltda and 0.354% by EMC HoldCo 3 Coöperatief U.A.
3. Emerging Markets Communications Argentina S.R.L. Argentina – Owned 95% by Emerging Markets Communications, LLC and 5% by EMC HoldCo 4 B.V.
4. Western Outdoor Interactive Private Limited – Owned 82.98% by Global Eagle Entertainment Inc. and 17.02% by Global Eagle Holdings GmbH.



**Exhibit C**

**Liquidation Analysis**

[To come]

**Exhibit D**

**Wind-Down Budget**

**Global Eagle Entertainment Inc. -  Wind Down Budget Summary**

*($ in 000s)*

| Description | | Amount |
|---|---|---|
| Accrued unpaid professional fees at transaction close | $ | 9,015 |
| Transaction fees for professionals net of crediting | | 11,175 |
| Operating expenses | | 6,365 |
| Excluded tax liabilities | | 5,100 |
| Other excluded liabilities | | TBD |
| **Total** | $ | **31,654** |

*Note: Pursuant to the Committee Settlement, the Wind-Down Budget shall be funded by the Purchaser from time to time in accordance with the Sale Order and the Asset Purchase Agreement in order to ensure the satisfaction of all Administrative Claims, Other Priority Claims, Priority Tax Claims, and Professional Fee Claims, including any adjustment, as necessary, to provide for payment in full of (i) all Professional Fee Claims, (ii) accrued postpetition liabilities through the Closing Date of the types noted in section 2.02(h) of the Asset Purchase Agreement related to any assets that are designated to be "Excluded Assets" in the Asset Purchase Agreement but which have not been paid under the DIP Facility as of the Closing Date, (iii) all Administrative Claims, Other Priority Claims, and Priority Tax Claims required to be paid pursuant to the Plan, including the anticipated expenses of the Wind-Down from and after the Effective Date (including anticipated Plan Administration Expenses), (iv) any Ad Hoc DIP and First Lien Lender Expenses, including anticipated Ad Hoc DIP and First Lien Lender Expenses to be incurred after the Effective Date that will be payable by the Debtors, and (v) any Agent Expenses*

## Exhibit E

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**by and among**

**GEE ACQUISITION HOLDINGS CORP.,**

**as Buyer**

**and**

**GLOBAL EAGLE ENTERTAINMENT INC.**

**and**

**THE OTHER SELLERS NAMED HEREIN,**

**as Sellers**

**October 17, 2020**

**TABLE OF CONTENTS**

PAGE

ARTICLE 1 DEFINITIONS ........................................................................................................ 1

    SECTION 1.01      Definitions.......................................................................... 1
    SECTION 1.02      Construction ..................................................................... 13

ARTICLE 2 PURCHASE AND SALE ...................................................................................... 14

    SECTION 2.01      Purchase and Sale ............................................................ 14
    SECTION 2.02      Assumed Liabilities ......................................................... 17
    SECTION 2.03      Excluded Assets ............................................................... 17
    SECTION 2.04      Excluded Liabilities ......................................................... 19
    SECTION 2.05      Assignment of Contracts and Rights................................ 20
    SECTION 2.06      Purchase Price.................................................................. 22
    SECTION 2.07      Purchase Price Allocation ................................................ 23
    SECTION 2.08      Closing ............................................................................ 24
    SECTION 2.09      Withholding ..................................................................... 25

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLERS............................... 26

    SECTION 3.01      Organization and Qualification........................................ 26
    SECTION 3.02      Authorization; Execution and Delivery; Enforceability .............. 26
    SECTION 3.03      Noncontravention; Consents and Approvals ................................. 26
    SECTION 3.04      Purchased Entities; JV Entities ........................................ 27
    SECTION 3.05      Title to and Sufficiency of Purchased Assets ............................ 28
    SECTION 3.06      Litigation.......................................................................... 28
    SECTION 3.07      Permits; Compliance with Laws ...................................... 28
    SECTION 3.08      Material Contracts............................................................ 29
    SECTION 3.09      Intellectual Property ........................................................ 31
    SECTION 3.10      Real Property ................................................................... 32
    SECTION 3.11      Environmental, Health and Safety Matters................................. 32
    SECTION 3.12      Taxes ............................................................................... 33
    SECTION 3.13      Employee Benefits ........................................................... 35
    SECTION 3.14      Labor Matters.................................................................. 36
    SECTION 3.15      Absence of Certain Changes............................................ 37
    SECTION 3.16      Insurance Policies ............................................................ 37
    SECTION 3.17      Affiliate Transactions....................................................... 38
    SECTION 3.18      Material Customers and Suppliers .................................... 38
    SECTION 3.19      Company SEC Reports; Financial Statements; Internal Controls  38
    SECTION 3.20      Brokers............................................................................ 39

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 39

    SECTION 4.01      Corporate Existence and Power....................................... 39
    SECTION 4.02      Authorization; Execution and Delivery; Enforceability .............. 39

i

SECTION 4.03     Noncontravention; Consents and Approvals ............................... 40
SECTION 4.04     Availability of Funds; Solvency ................................................. 40
SECTION 4.05     Litigation..................................................................................... 41
SECTION 4.06     Brokers......................................................................................... 41
SECTION 4.07     Transfer Taxes ............................................................................ 41
SECTION 4.08     Credit Bid .................................................................................... 41

ARTICLE 5 COVENANTS OF SELLERS ............................................................ 41

SECTION 5.01     Conduct of the Business.............................................................. 41
SECTION 5.02     Access to Information .................................................................. 44
SECTION 5.03     Bidding Protections..................................................................... 44

ARTICLE 6 COVENANTS OF BUYER.................................................................. 44

SECTION 6.01     Preservation of and Access to Books and Records...................... 44
SECTION 6.02     Insurance Matters........................................................................ 45
SECTION 6.03     Governance Matters .................................................................... 45

ARTICLE 7 COVENANTS OF BUYER AND SELLERS ......................................... 46

SECTION 7.01     Confidentiality ............................................................................ 46
SECTION 7.02     Further Assurances...................................................................... 46
SECTION 7.03     Certain Filings............................................................................. 47
SECTION 7.04     Public Announcements ................................................................ 49
SECTION 7.05     Employee Matters ....................................................................... 49
SECTION 7.06     Tax Matters ................................................................................. 51
SECTION 7.07     Misallocated Assets .................................................................... 52
SECTION 7.08     Payments from Third Parties after Closing.................................. 52
SECTION 7.09     Bulk Transfer Laws..................................................................... 53
SECTION 7.10     Bankruptcy Court Approval......................................................... 53
SECTION 7.11     No Successor Liability.................................................................. 55
SECTION 7.12     Change of Name .......................................................................... 56
SECTION 7.13     Communications with Customers and Suppliers.......................... 56
SECTION 7.14     Wind-Down Budget ..................................................................... 56
SECTION 7.15     Investigation................................................................................ 56

ARTICLE 8 CONDITIONS TO CLOSING............................................................... 56

SECTION 8.01     Conditions to Obligations of Buyer and Sellers .......................... 56
SECTION 8.02     Conditions to Obligation of Buyer............................................... 57
SECTION 8.03     Conditions to Obligation of Sellers.............................................. 57

ARTICLE 9 SURVIVAL ......................................................................................... 58

SECTION 9.01     Survival........................................................................................ 58

ii

ARTICLE 10 TERMINATION ........................................................................................... 58

    SECTION 10.01      Grounds for Termination ............................................................. 58
    SECTION 10.02      Effect of Termination.................................................................. 60
    SECTION 10.03      Costs and Expenses .................................................................... 61

ARTICLE 11 TAXES..................................................................................................... 61

    SECTION 11.01      G Reorganization ....................................................................... 61

ARTICLE 12 MISCELLANEOUS ...................................................................................... 62

    SECTION 12.01      Notices ...................................................................................... 62
    SECTION 12.02      Amendments and Waivers .......................................................... 63
    SECTION 12.03      Successors and Assigns............................................................... 64
    SECTION 12.04      Governing Law .......................................................................... 64
    SECTION 12.05      Jurisdiction................................................................................ 64
    SECTION 12.06      WAIVER OF JURY TRIAL........................................................ 64
    SECTION 12.07      Counterparts; Third-Party Beneficiaries ..................................... 65
    SECTION 12.08      Specific Performance ................................................................. 65
    SECTION 12.09      Entire Agreement....................................................................... 65
    SECTION 12.10      No Strict Construction ................................................................ 65
    SECTION 12.11      Severability ............................................................................... 66
    SECTION 12.12      Disclosure Schedules ................................................................. 66
    SECTION 12.13      No Recourse............................................................................... 66

**ASSET PURCHASE AGREEMENT**

THIS **ASSET PURCHASE AGREEMENT**, dated as of October 17, 2020 (the "**Agreement**"), is made and entered into by and among GEE Acquisition Holdings Corp., a Delaware corporation ("**Buyer**"), Global Eagle Entertainment Inc., a Delaware corporation (the "**Company**"), and those certain Subsidiaries of the Company signatory hereto (collectively with the Company, "**Sellers**" and each entity individually, a "**Seller**").  Sellers and Buyer are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party**."  Capitalized terms used herein and not otherwise defined herein have the meanings set forth in Article 1.

**W I T N E S E T H:**

**WHEREAS**, on July 22, 2020 (the "**Petition Date**"), the Company and certain of its affiliates as debtors and debtors in possession (collectively, the "**Debtors**") sought relief under Chapter 11 of Title 11, §§ 101-1330 of the United States Code (as amended, the "**Bankruptcy Code**") by filing cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS**, subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, the Parties desire to enter into this Agreement, pursuant to which Sellers shall sell, assign, transfer, and convey to Buyer, and Buyer shall purchase and acquire from Sellers, all of Sellers' right, title and interest in and to the Purchased Assets, and Buyer shall assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement, upon the terms and conditions hereinafter set forth in a sale authorized by the Bankruptcy Court pursuant to, inter alia, Sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order; and

**WHEREAS**, Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

ARTICLE 1

DEFINITIONS

SECTION 1.01     *Definitions*.

(a)     The following terms, as used herein, have the following meanings:

1

"**Action**" means any claim, action, suit, arbitration or proceeding by or before any Governmental Authority.

"**Affiliate**" means, with respect to any Person, another Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise. For the avoidance of doubt, ownership of more than fifty percent (50%) of the voting securities shall be deemed to be "control" for purposes of this definition.

"**Alternative Transaction**" means any reorganization, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets, financing (debt or equity), or restructuring or similar transaction of or by any of the Sellers, other than the transactions contemplated by and in accordance with the RSA. For the avoidance of doubt, an Alternative Transaction shall not include (i) pursuit of the Sale Process (as defined in the RSA) or a sale determined to be higher or otherwise better by the Company in accordance with the Bidding Procedures (as defined in the RSA), or (ii) pursuit of confirmation of a chapter 11 plan of liquidation, confirmation of which plan shall take place solely following the Bankruptcy Court's entry of the Sale Order, with the occurrence of any "effective date" or similar concept under such plan subject to the occurrence of the Closing Date, if applicable, provided, that such chapter 11 plan is not inconsistent with the Sale Process (as defined in the RSA) or Sale Transaction (as defined in the RSA).

"**Antitrust Laws**" means any antitrust, competition, trade regulation or merger control Laws promulgated by any Governmental Authority.

"**Auction**" means an auction or auctions, if any, for the sale of Sellers' assets conducted pursuant to the terms and conditions of the Bid Procedures Order.

"**Bankruptcy and Equity Exception**" means any Laws relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in any Proceeding in equity or at Law).

"**Bid Procedures Order**" means an order of the Bankruptcy Court in form and substance acceptable to the Company and the Required Consenting First Lien Lenders (as defined in the RSA) approving the Bidding Procedures (as defined in the RSA) attached as Exhibit B to the RSA.

"**Business**" means the business of (a) purchasing, producing, managing and distributing wholly owned and licensed media content, video and music programming, advertising, applications and video games, and providing post-production services, for and to customers in the airline, maritime and other away-from-home non-theatrical markets and (b) providing satellite-based passenger connectivity and operational services for airliners, cruise ships and other maritime, enterprise and government markets, in each case, as conducted by Sellers.

2

"**Business Day**" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"**CARES Act**" means the CARES Act (Pub. L. 116-136 (2020)) and any similar Law providing for the deferral of Taxes, the conditional deferral, reduction, or forgiveness of Taxes, the increase in the utility of Tax attributes, or other Tax-related measures, in each case, intended to benefit taxpayers in response to the COVID-19 pandemic and associated economic downturn.

"**Cash and Cash Equivalents**" means all of Sellers' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"**Claim**" means a "claim" as defined in Section 101 of the Bankruptcy Code.

"**Closing Date**" means the date of the Closing.

"**COBRA**" means the health care continuation coverage requirements of the Consolidated Omnibus Reconciliation Act of 1985, as codified in Section 4980B of the Code and Section 601 et seq. of ERISA.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" means any Contract that any Seller or any of its Subsidiaries has entered into with any union, works council or collective bargaining agent with respect to terms and conditions of employment of its employees, not including any agreements covering non-U.S. employees which are applicable on an industry-wide basis to employees and which are not individually negotiated by any Seller or any Subsidiary of a Seller.

"**Contract**" means any contract, agreement, license, sublicense, Lease, sales order, purchase order, instrument, undertaking or legally binding commitment.

"**Cure Costs**" means, with respect to any Purchased Contract, the Liabilities that must be paid or otherwise satisfied to cure all monetary defaults under such Purchased Contract to the extent required by Section 365(b) of the Bankruptcy Code in connection with the assignment and assumption of such Purchased Contract.

"**Cut-Off Date**" means the earlier of (a) twelve (12) months following the Closing and (b) the closing of the Chapter 11 Cases.

"**DIP Credit Agreement**" means that certain debtor-in-possession financing agreement dated as of July 24, 2020, and as agreed to by and among the Debtors, the DIP Agent (as defined therein) and the lenders party thereto.

3

"**DIP Facility**" means a superpriority senior secured new money debtor-in-possession financing facility as further described in the DIP Credit Agreement, as approved by the Bankruptcy Court.

"**DIP Obligations**" means all "Obligations" under and as defined in the DIP Credit Agreement.

"**DIP Order**" means any order of the Bankruptcy Court approving the Debtors' entry into the DIP Facility.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Sellers to Buyer on the date hereof.

"**Employees**" means all employees of Sellers, including those on disability or a leave of absence, whether paid or unpaid.

"**Encumbrance**" means any mortgage, lien, pledge, security interest, charge, easement, purchase option, right of first refusal or offer, covenant running with the land, right of way, option, claim, license, title defect or other survey defect and other similar impositions, imperfections or restrictions on transfer or use or other encumbrance of any kind.

"**Environmental, Health and Safety Requirements**" means all applicable Laws concerning or relating to worker/occupational health and safety, or pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, threatened release, control or other action or failure to act involving cleanup of any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise or radiation.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means any entity which is a member of (a) a controlled group of corporations (as defined in Section 414(b) of the Code), (b) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (c) an affiliated service group (as defined under Section 414(m) of the Code) or (d) any group specified in Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included any Seller.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**Exit Financing Agreement**" means that certain credit agreement with Buyer (or a Buyer Designee) as borrower in form and substance consistent with the terms set forth in the RSA acceptable to Buyer and the Required Consenting First Lien Lenders (as defined in the RSA).

4

"**Expense Reimbursement**" means an amount in cash equal to the amount of all reasonable and documented out-of-pocket third-party expenses (including attorneys' fees and expenses) incurred by Buyer in connection with the consideration, evaluation and negotiation of this Agreement and the transactions contemplated hereby, to the extent not otherwise covered by the terms of the DIP Facility.

"**FCC**" means the Federal Communications Commission, including any official bureau or division thereof acting on delegated authority, and any successor governmental agency performing functions similar to those performed by the Federal Communications Commission on the date of this Agreement.

"**FCC Applications**" means, collectively, each requisite application or other request filed or to be filed with the FCC for approval to assign the FCC Licenses pursuant to this Agreement.

"**FCC Approval**" means the FCC's grant of the FCC Applications; provided that the possibility that an appeal, request for stay, or petition for rehearing or review by a court or administrative agency may be filed with respect to such grant, or that the FCC may reconsider or review such grant on its own authority, shall not prevent such grant from constituting FCC Approval for purposes of this Agreement.

"**FCC Licenses**" means Permits issued by the FCC.

"**FFCRA**" means the Families First Coronavirus Response Act, Pub. L. No. 116-127 (116th Cong.) (Mar. 18, 2020).

"**Final Order**" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented in writing to by Buyer) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Action or Order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Governmental Authority**" means any (a) multinational, tribal, federal, state, municipal, local or other governmental or public department, central bank, court, commission, commissioner,

5

tribunal, board, bureau, agency or instrumentality, domestic or foreign, (b) subdivision or authority of any of the foregoing or (c) regulatory or administrative authority.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder.

"**Indebtedness**" of any Person means, without duplication, (a) the principal of and premium (if any) in respect of (i) indebtedness of such Person for money borrowed, and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, (b) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable for goods and services and other accrued current liabilities arising in the Ordinary Course), (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, (e) the liquidation value of all redeemable preferred stock of such Person, (f) all obligations of the type references in clauses (a) through (e) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guaranties of such obligations, and (g) all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any Encumbrance on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"**Intellectual Property**" means any and all intellectual property of every kind, whether protected or arising under the Laws of the United States or any other jurisdiction, including all intellectual or industrial property rights in any of the following: (a) all trademarks and service marks, and all registrations, renewals and applications therefor, and all brand names, product names, trade dress, logos, protectable distinguishing guises and indicia, slogans and other similar designations of source or origin and, in each case, all worldwide rights, title and interest associated with the foregoing, whether registered or not, in any form including abbreviation, derivation, variation, diffusion or otherwise, whether stylized or not stylized, and for all purposes and for all goods, products and services (collectively, "**Trademarks**"), (b) methods, techniques, ideas, know-how, research and development, technical data, molds, prototypes, models and designs, programs, materials, specifications, processes, inventions (patentable or unpatentable), patents, and other similar materials and improvements thereto, and all tangible embodiments of the foregoing (collectively, "**Patents**"), (c) all copyrights (registered or unregistered), works of authorship, and software (including source code, object code, operating systems and specifications), including applications and registrations thereof (collectively, "**Copyrights**"), (d) all trade secrets, confidential or proprietary business information, such as business data bases, data analytics, know-how, techniques, concepts, methods, processes, specifications, product designs, blue prints, surveys, customer reviews, customer/vendor lists, customer contact information, email lists, data bases, sales plans, formulae, reports, and other proprietary or confidential information and know-how (collectively, "**Trade Secrets**"), (e) all rights of publicity, (f) all moral and economic rights of authors, inventors, however denominated, and (g) all other intellectual property and proprietary rights.

6

"**IRS**" means the Internal Revenue Service.

"**Knowledge of Sellers**" means the actual knowledge of the individuals set forth on Section 1.02(a) of the Disclosure Schedules, after reasonable inquiry.

"**Law**" means any law, treaty, statute, ordinance, code, directive, decree, Order, rule or regulation of any Governmental Authority.

"**Lease**" means any lease, together with any other subleases and similar agreements under which any Seller leases, uses or occupies, or has the right to use or occupy, any real property.

"**Leased Real Property**" any real property leased, subleased or which a Seller has the right to use or occupy, pursuant to a Lease.

"**Liability**" means any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including, whether arising out of any Contract or tort based on negligence or strict liability) and whether or not the same would be required to be reflected in financial statements or disclosed in the notes thereto.

"**Material Adverse Effect**" means any change, effect, event, circumstance, occurrence or state of facts that, individually or in the aggregate, (a) has, or would reasonably be expected to have, a material adverse effect on the Purchased Assets or the Assumed Liabilities, taken as a whole, or (b) prevents or materially impairs, or would reasonably be expected to prevent or materially impair, the consummation of the transactions contemplated by this Agreement and the other Transaction Documents; provided, however, that in the case of clause (a), in no event shall any change, effect, event, circumstance, occurrence or state of facts that results from or arises out of the following be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (i) general changes or developments in global or national political, economic, business, monetary, financial or capital or credit market conditions or trends; (ii) general political, economic, business, monetary, financial or capital or credit market conditions or trends (including interest rates); (iii) geopolitical conditions or any outbreak or escalation of hostilities, acts of terrorism or war, civil unrest, regional, national or international emergency, or any acts of God or similar force majeure events; (iv) the failure of the financial or operating performance of any Seller or any of its respective businesses to meet any projections, forecasts, budgets estimates or predictions for any period (it being understood that the underlying cause of such failure to meet such projections, forecasts, budgets, estimates or predictions may be taken into account in determining whether a Material Adverse Effect has occurred); (v) changes in Laws first proposed after the date hereof; (vi) changes in GAAP or other accounting regulations or principles first proposed after the date hereof; (vii) the announcement of this Agreement and the transactions contemplated hereby (provided, however, that this clause shall not limit any representation, warranty or covenant contained in this Agreement); (viii) any global or national health concern, epidemic, disease outbreak or pandemic (including the COVID-19 pandemic); (ix) any Law issued by a Governmental Authority requiring business closures, quarantine or sheltering-

7

in-place or similar restrictions in connection with the COVID-19 pandemic; or (x) the Chapter 11 Cases, including, without limitation, (A) the Auction and any announced liquidation of Sellers or any of their respective assets, (B) any objections in the Bankruptcy Court to this Agreement or any of the transactions contemplated hereby, the reorganization of Sellers, the bidding procedures order, the assumption or rejection of any Purchased Contract otherwise in compliance with this agreement, and (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers or their Subsidiaries required to be taken (or not taken) to comply therewith; provided, further, that in the case of clause (i), (ii), (iii), (v), (vi), (viii) or (ix), to the extent that the effects of any such change, effect, event, circumstance, occurrence or state of facts is disproportionately adverse to the Purchased Assets or the Assumed Liabilities, taken as a whole, relative to other similarly situated businesses in the industries in which Sellers and the Purchased Entities operate, then such matter, event, change, development, occurrence, circumstance or effect may be taken into account in determining whether there has been or will be, a Material Adverse Effect.

"**NASDAQ**" means NASDAQ Stock Market LLC.

"**Order**" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, precept, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority.

"**Ordinary Course**" means the ordinary course of business consistent with past practice. For the avoidance of doubt, any actions taken (or not taken) in good faith and reasonably necessary to comply with any Laws issued in connection with the COVID-19 pandemic shall be deemed Ordinary Course.

"**Owned Real Property**" means any real property owned in fee by any Seller.

"**Pandemic Response Laws**" means the CARES Act, the FFCRA, and other any similar, additional, or future federal, state, local, or foreign law, or administrative guidance intended to benefit taxpayers in response to the COVID-19 pandemic and associated economic downturn.

"**Permits**" means any franchises, permits, licenses, consents, certificates, clearances, approvals, exceptions, variances, permissions, filings, publications, declarations, notices, waivers, and authorizations, including environmental permits, of or with any Governmental Authority held, used or made by any Seller in connection with the Purchased Assets or the Assumed Liabilities.

"**Permitted Encumbrances**" means the following Encumbrances: (a) statutory Encumbrances for current Taxes, assessments or other governmental charges or levies that are not yet due or payable or that are being contested in good faith by appropriate Proceedings and for which adequate reserves have been established in accordance with GAAP; (b) mechanics', materialmen's, repairmen's and other statutory Encumbrances incurred in the Ordinary Course and for adequate reserves have been established in accordance with GAAP and which would not, individually or in the aggregate, have a material impact on the business or impair the ability of Sellers or the Purchased Entities to use or operate the property to which they relate; (c) Encumbrances incurred or deposits made in the Ordinary Course and on a basis consistent with

8

past practice in connection with workers' compensation, unemployment insurance or other types of social security; (d) with respect to Owned Real Property or Leased Real Property, easements, declarations, covenants or rights-of-way, restrictions and similar non-monetary Encumbrances (that would be disclosed by an accurate survey of real property and otherwise affecting title to real property and other title defects) which do not, individually or in the aggregate, materially impair the use or occupancy of such Owned Real Property or Leased Real Property; (e) zoning ordinances, variances, conditional use permits and similar regulations, permits, approvals and conditions; (f) Encumbrances that will be released at the Closing with no Liability to Buyer or its Affiliates; (g) any Encumbrance granted or incurred pursuant to an Order of the Bankruptcy Court; and (h) outbound Intellectual Property licenses, covenants not to sue and similar rights or licenses that are subject to Section 365(n) of the Bankruptcy Code.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group or Governmental Authority.

"**Post-Closing Tax Period**" means any Tax period beginning after the Closing Date and with respect to any taxable period that begins on or prior to the Closing Date and ending after the Closing Date, the portion thereof beginning after the Closing Date.

"**Pre-Closing Tax Period**" means any Tax period ending on or before the Closing Date and with respect to any taxable period that includes but does not end on the Closing Date, the portion thereof ending on the Closing Date.

"**Pre-Petition Credit Agreement**" means that certain Credit Agreement, dated as of January 6, 2017, by and among the Company, the other loan parties, the Lenders named therein and Citibank N.A., as administrative agent, (a) as amended by (i) the First Amendment and Limited Waiver to Credit Agreement, dated as of May 4, 2017, (ii) the Amendment to First Amendment and Limited Waiver to Credit Agreement and Second Amendment to Second Amendment to Credit Agreement, dated as of June 29, 2017, (iii) the Third Amendment to Limited Waiver to Credit Agreement and Third Amendment to Credit Agreement, dated as of October 2, 2017, (iv) the Fourth Amendment to Limited Waiver to Credit Agreement and Fourth Amendment to Credit Agreement, dated as of October 31, 2017, (v) the Fifth Amendment to Limited Waiver to Credit Agreement and Fifth Amendment to Credit Agreement, dated as of December 22, 2017, (vi) the Sixth Amendment to Credit Agreement dated as of March 8, 2018, and (vii) the Omnibus Incremental Term Loan and Seventh Amendment to Credit Agreement and Amendment to Security Agreement, dated as of July 19, 2019, (viii) the Eighth Amendment to Credit Agreement, dated as of April 7, 2020, (ix) the Ninth Amendment to Credit Agreement, dated as of April 9, 2020, (x) the Tenth Amendment to Credit Agreement, dated as of April 15, 2020, (xi) the Eleventh Amendment to Credit Agreement, dated as of July 9, 2020 and (xii) the Twelfth Amendment to Credit Agreement, dated as of July 20, 2020 and (b) as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Proceedings**" means any legal, governmental or regulatory suits, proceedings, arbitrations or actions, related to Liabilities, preference actions and preferential transfers,

9

Contracts, debts, breaches of fiduciary duties, accounts, bills, covenants, agreements, damages, judgments, third-party Claims, counterclaims, and cross-claims, whether, reduced to judgment or not reduced to judgment, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereinafter arising, in law or equity or otherwise.

"**RSA**" means the Restructuring Support Agreement, dated as of July 22, 2020, among Sellers and the Consenting First Lien Lenders (as defined therein).

"**RSA Termination Event**" means an event described in Section 7 of the RSA which with the passage of time or the taking of action thereunder would result in the termination of the RSA.

"**Sale Hearing**" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"**Sale Order**" means an Order by the Bankruptcy Court, in form and substance reasonably acceptable to Buyer and Sellers, among other things, (a) approving this Agreement, (b) authorizing the sale of the Purchased Assets to Buyer pursuant to section 363 of the Bankruptcy Code, pursuant to the terms and conditions set forth herein, free and clear of any Encumbrances (other than Permitted Encumbrances), (c) authorizing the assumption by, and assignment to, Buyer of the Purchased Contracts and the Assumed Liabilities pursuant to section 365 of the Bankruptcy Code and (d) authorizing the other transactions contemplated by this Agreement.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Seller Plan**" means each (i) "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not subject to ERISA, (ii) end of service or severance, termination protection, retirement, pension, profit sharing, deferred compensation, phantom, equity or equity-based, health or welfare, employment, independent contractor, vacation, change in control, transaction, retention, bonus or other incentive, fringe benefit, paid time off or similar plan, agreement, arrangement, program or policy, or (iii) other plan, Contract, policy or arrangement providing compensation or benefits, in each case whether or not written, in the case of clauses (i)-(iii), that is sponsored, maintained, administered, contributed to or entered into by any Seller or any Subsidiary of any Seller, for the benefit of any of its current or former Service Providers, or for which any Seller or any Subsidiary of any Seller has any direct or indirect liability.

"**Service Provider**" means a director, officer, employee or individual independent contractor.

"**Subsidiary**" means, with respect to any Person, another Person in which such Person beneficially owns, directly or indirectly, capital stock or other equity securities representing more than fifty percent (50%) of the outstanding voting stock or other equity interests; provided that no JV Entity shall be a Subsidiary of any Seller for purposes of this Agreement.

10

"**Tax**" means all federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, special assessment, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding tax, profits, lease, service, recording, documentary, filing, permit or authorization, gains, escheat, unclaimed property, import, export, intangibles, or any other taxes, fees, assessments or charges of any kind whatsoever including any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"**Tax Return**" means any report, return, election, extension or similar document (including declarations, disclaimers, notices, disclosures, estimates, claims (including claims for refunds), real property transfer tax returns, information returns, schedules or any related or supporting information) filed or required to be filed with respect to Taxes with any Governmental Authority or other authority in connection with the determination, assessment or collection of any Tax or the administration of any Laws or administrative requirements relating to any Tax, including any information return, claim for refund, amended return or declaration of estimated Taxes.

"**Transaction Document**" means this Agreement, the Assignment and Assumption Agreements, the Bills of Sale, the Assignment of Patents, the Assignment of Trademarks and any other agreements, instruments or documents entered into pursuant to, or as contemplated by, this Agreement.

"**Transfer Taxes**" means any sales, use, purchase, excise, gross receipts, ad valorem, direct or indirect real property, business and occupation, value added (including VAT), filing, permit or authorization, leasing, license, lease, severance, franchise, profits, fixed asset, property transfer or gains, documentary, stamp, registration, intangible, conveyance, recording or similar Tax (including, for certainty, goods and services tax, harmonized sales tax and land transfer tax) and any recording costs or fees, however styled or designated, or other amounts in the nature of transfer Taxes payable in connection with the sale or transfer of the Purchased Assets contemplated by this Agreement.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988 and all similar state and local Laws.

(b)    Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Allocation Schedule | Section 2.07 |
| Antitrust Laws | Section 3.03(b) |
| Assignment of Patents | Section 2.08(a)(iii) |
| Assignment of Trademarks | Section 2.08(a)(iii) |
| Assumed Liabilities | Section 2.02 |
| Assumed Plans | Section 2.01(i) |
| Assignment and Assumption Agreements | Section 2.08(b)(ii) |

11

| | |
|---|---|
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Period | Section 12.05 |
| Bills of Sale | Section 2.08(a)(ii) |
| Buyer | Preamble |
| Buyer Benefit Plan | Section 7.05(a) |
| Buyer Designee | Section 2.01 |
| Buyer Plans | Section 7.05(b) |
| Chapter 11 Cases | Recitals |
| Closing | Section 2.08 |
| Closing Date Payment | Section 2.06 |
| Company | Preamble |
| Company SEC Reports | Section 3.19(a) |
| Contract & Cure Update Schedule | Section 2.05(a) |
| Credit Bid | Section 2.06 |
| DIP Payment Amount | Section 2.06 |
| Direction Letter | Section 4.08 |
| Disputed Amount Contract | Section 2.05(e) |
| Debtors | Preamble |
| D&O Claims | Section 2.03(k) |
| End Date | Section 10.01(b) |
| Excluded Assets | Section 2.03 |
| Excluded Contracts | Section 2.03(c) |
| Excluded Plans | Section 2.03(g) |
| Excluded Records | Section 2.03(b) |
| Excluded Liabilities | Section 2.04 |
| G Reorganization | Section 11.01(a) |
| G Reorganization Election | Section 11.01(a) |
| JV Entity | Section 2.01(g) |
| L5 | Section 11.01(b) |
| Later Excluded Assets | Section 2.01(a) |
| Later Excluded Contract | Section 2.05(a) |
| Long Range Plan | Section 7.05(a) |
| Material Contracts | Section 3.08(a) |
| Material Customers | Section 3.18(a) |
| Material Suppliers | Section 3.18(b) |
| Offered Employee | Section 7.05(a) |
| Original Contract & Cure Schedule | Section 2.05(a) |
| Party or Parties | Preamble |
| Permit Approvals | Section 7.03(b) |
| Petition Date | Recitals |
| Purchased Contracts | Section 2.01(a) |
| Purchased Entity | Section 2.01(d) |
| Purchased Shares | Section 2.01(d) |

12

| | |
|---|---|
| Purchased Assets | Section 2.01 |
| Purchased Intellectual Property | Section 2.01(e) |
| Purchase Price | Section 2.06 |
| Renewal Period | Section 10.01(b) |
| Retained Cash | Section 2.06 |
| Seller or Sellers | Preamble |
| Straddle Period | Section 7.06(c) |
| Surviving Post-Closing Covenants | Section 9.01 |
| Terminated Employee | Section 7.05(a) |
| Title IV Plans | Section 3.13(d) |
| Transfer Consent | Section 2.05(c) |
| Transferred Employee | Section 7.05(a) |
| Transition Employees | Section 7.02(c) |
| Transition Period | Section 7.02(c) |
| Wind-Down Amount | Section 2.06 |
| Wind-Down Budget | Section 7.14 |

SECTION 1.02    *Construction*. In construing this Agreement, including the Exhibits and Schedules hereto, the following principles shall be followed: (a) the terms "herein," "hereof," "hereby," "hereunder" and other similar terms refer to this Agreement as a whole and not only to the particular Article, Section or other subdivision in which any such terms may be employed unless otherwise specified; (b) except as otherwise set forth herein, references to Articles, Sections, Disclosure Schedules, Schedules and Exhibits refer to the Articles, Sections, Disclosure Schedules, Schedules and Exhibits of this Agreement, which are incorporated in and made a part of this Agreement; (c) a reference to any Person shall include such Person's successors and assigns; (d) the word "includes" and "including" and their syntactical variants mean "includes, but is not limited to" and "including, without limitation," and corresponding syntactical variant expressions; (e) a defined term has its defined meaning throughout this Agreement, regardless of whether it appears before or after the place in this Agreement where it is defined, including in any Schedule; (f) the word "dollar" and the symbol "$" refer to the lawful currency of the United States of America; (g) unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa; (h) the words "to the extent" shall mean "the degree by which" and not "if"; (i) the word "will" will be construed to have the same meaning and effect as the word "shall," and the words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive; (j) where a word is defined herein, references to the singular will include references to the plural and vice versa; (k) all references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless Business Days are expressly specified; (l) any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived; (m) any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation

or non-compliance or alleged violation or non-compliance; (n) references to "written" or "in writing" include in electronic form; (o) the headings contained in this Agreement and the other Transaction Documents are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement and the other Transaction Documents; (p) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day; and (q) the word "or" shall not be exclusive.

ARTICLE 2

PURCHASE AND SALE

SECTION 2.01    *Purchase and Sale*.  Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement and the Sale Order, on the Closing Date, Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer or one or more other Affiliates of Buyer or an entity formed in compliance with Section 11.01 as designated by Buyer (a "**Buyer Designee**"), and Buyer shall, and shall cause its Buyer Designees (if any) to, purchase, acquire and accept from Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances), all of Sellers' right, title and interest in the properties, interests, rights and other assets of Sellers as of the Closing of every kind and nature, whether tangible or intangible (including goodwill), real, personal or mixed, known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP or specifically referred to in this Agreement, including any such properties, rights, interests, and other assets acquired by Sellers after the date hereof and prior to the Closing in accordance with Section 5.01, including the following properties, rights, interests and other assets of Sellers (collectively, the "**Purchased Assets**" and, for the avoidance of doubt, the transfer of the Purchased Shares held by any Seller to Buyer or a Buyer Designee will constitute the transfer of any Purchased Assets owned by such Purchased Entity and such Purchased Assets shall not be separately transferred other than as required by applicable Law), other than the Excluded Assets, which, notwithstanding the foregoing provisions of this Section 2.01 to the contrary, will remain, as applicable, the assets, properties, interests and rights of Sellers and their Affiliates:

(a)    subject to Section 2.05, all Contracts (including Leases with respect to Leased Real Property and licenses and other Contracts with respect to Intellectual Property), including (i) any confidentiality or non-disclosure agreements executed by any Person for the benefit of any Seller to the extent relating to the Purchased Assets or the Assumed Liabilities and (ii) all purchase orders (collectively, the "**Purchased Contracts**");

(b)    (i) the Owned Real Property set forth on Section 2.01(b)(i) of the Disclosure Schedules and (ii) the Leased Real Property set forth on Section 2.01(b)(ii) of the Disclosure Schedules, in each case, together with any buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto;

14

(c)     all tangible assets, including, without limitation, machinery, equipment, computers, information management systems (including software and hardware related thereto), telephone systems, supplies and other tangible personal property owned by any Seller, including any such personal property located at any Owned Real Property or Leased Real Property and any such property on order to be delivered to any Seller;

(d)     all warranties, indemnities or guaranties from any Person with respect to any Purchased Asset, including any item of real property, personal property or equipment;

(e)     all Intellectual Property owned by Sellers that is used or held for use by Sellers in the conduct of the Business, including the Intellectual Property set forth on Section 2.01(e) of the Disclosure Schedules (the "**Purchased Intellectual Property**");

(f)     all of Sellers' interests (the "**Purchased Shares**") in the Persons listed in Section 2.01(f) of the Disclosure Schedules (each, a "**Purchased Entity**," and collectively, the "**Purchased Entities**");

(g)     all of Sellers' interests in each entity set forth on Section 2.01(g) of the Disclosure Schedules (each, a "**JV Entity**") and any Contract (including any joint venture or services agreement) related to such JV Entity;

(h)     all rights of Sellers under non-disclosure or confidentiality, invention assignment, work made for hire, non-compete, or non-solicitation agreements with current or former Service Providers of any Seller;

(i)     all of the Seller Plans other than Excluded Plans (the "**Assumed Plans**"), all funding arrangements related thereto (including all assets, trusts, insurance policies (other than, for the avoidance of doubt, any director and officer insurance policy) and administrative service Contracts related thereto), and all rights and obligations thereunder;

(j)     all Permits set forth on Section 2.01(j) of the Disclosure Schedules;

(k)     all Cash and Cash Equivalents (other than Retained Cash, if any);

(l)     all bank accounts of Sellers;

(m)     all deposits, credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items and duties related to the Purchased Assets (including Purchased Contracts);

(n)     all accounts receivable, notes, negotiable instruments and chattel paper owned or held, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, and other amounts receivable from any Person before the Closing, whether or not in the Ordinary Course;

15

(o)      all rights and obligations under or arising out of all insurance policies (other than, for the avoidance of doubt, any director and officer insurance policy) relating to the Purchased Assets or the Assumed Liabilities (including returns and refunds of any premiums paid, or amounts due back to Sellers, with respect to cancelled insurance policies);

(p)      all confidentiality, non-competition, non-solicitation or similar agreements entered into by any Seller or any of their respective representatives in connection with a sale of any Seller, any Purchased Asset (including any Purchased Entity) or any Assumed Liabilities;

(q)      other than D&O Claims, all rights against any Person (including (i) customers, suppliers, vendors, lessors, lessees, licensees, licensors of any Seller and (ii) Buyer, its Affiliates or any of its or their respective directors, officers, members, partners, shareholders, managers, advisors or representatives) arising under or related to any Purchased Contract, other Purchased Asset (including any use, ownership, possession, operation, sale or lease thereof) or Assumed Liability or the operation or conduct of the Business, including Proceedings, Claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (including any Tax refunds, Tax overpayments or Tax attributes, other than Tax refunds of Sellers relating to a Post-Closing Tax Period), cash Tax deposits, rights of set off, rights of recovery (including rights to insurance proceeds), rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants, indemnities, exculpation, advancement, reimbursement of expenses or contract renewal rights and other similar rights, in each case, whether direct or derivative, known or unknown, liquidated or unliquidated, contingent or otherwise;

(r)      all avoidance, recovery, subordination claims or causes of action of any Seller under Sections 544 through 553 of the Bankruptcy Code or under applicable Law;

(s)      all goodwill related to the Purchased Assets (including the goodwill associated with the Trademarks and other Intellectual Property included in the Purchased Assets); and

(t)      other than the Excluded Records, all of the Company's and its Subsidiaries' current or historical written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, Tax Returns, ledgers, journals, title policies, customer lists, supplier lists, vendor lists, price lists, mailing lists, invoices, shipping records, standard forms of documents, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, *etc.*), user documentation (installation guides, user manuals, training materials, release notes, working papers, *etc.*), marketing documentation (catalogs, sales brochures, flyers, pamphlets, web pages, *etc.*), consulting materials, opinions and other documents commissioned by or on behalf of the Company or its Subsidiaries, development, quality control, quality assurance, regulatory, pharmacovigilance records and other regulatory documents, all personnel and employment records for the Transferred Employees or any individual independent contractors of the Company or its

16

Subsidiaries, and other books and records of Sellers and any rights thereto owned by any Seller, in each case whether stored in hard copy form or on electronic, magnetic, optical or other media.

At any time but in any event no later than three (3) days prior to the Closing, Buyer may, in its sole discretion, by written notice to the Company, and following good faith consultation with the Company, designate any of the Purchased Assets as additional Excluded Assets, which notice shall set forth in reasonable detail the Purchased Assets so designated ("**Later Excluded Assets**"). Notwithstanding any other provision hereof to the contrary, the Liabilities of Sellers under or related to any Purchased Asset designated as an Excluded Asset pursuant to this paragraph will constitute Excluded Liabilities.  The Parties acknowledge and agree that there will be no reduction in, or increase to, the Purchase Price as a result of any addition or elimination of any asset as a Purchased Asset.

SECTION 2.02   *Assumed Liabilities*.  Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of the Closing, to assume the following Liabilities, and only such Liabilities, of Sellers (the "**Assumed Liabilities**"):

(a)      all Liabilities relating to or arising out of the ownership or operation of the Purchased Assets by Buyer solely for periods following the Closing;

(b)      all Cure Costs to the extent they have not been paid on or before the Closing;

(c)      all Liabilities with respect to the Assumed Plans;

(d)      the Liabilities assumed by Buyer pursuant to Section 7.05 and Section 2.06;

(e)      all Liabilities of each Seller (and each Purchased Entity) relating to or arising out of the Purchased Contracts solely following the Closing and not to the extent relating to or arising out of any breach or default thereof or other activities on or prior to the Closing;

(f)      any and all Liabilities for Transfer Taxes;

(g)      accrued compensation, employee expenses and benefits, in each case for Transferred Employees; and

(h)      all (i) accrued trade and non-trade payables, (ii) open purchase orders (except any purchase order entered into in connection with, or otherwise governed by, any Excluded Contract), (iii) Liabilities arising under drafts or checks outstanding at Closing, (iv) accrued royalties and (v) all Liabilities arising from rebates, returns, recalls, chargebacks, coupons, discounts, failure to supply claims and similar obligations, but in each case, to the extent (and solely to the extent) (y) incurred in the Ordinary Course and otherwise in compliance with the terms and conditions of this Agreement (including Section 5.01) and (z) not arising under or otherwise relating to any Excluded Asset.

SECTION 2.03   *Excluded Assets*.  Notwithstanding any provision in this Agreement to the contrary, Sellers shall not be deemed to sell, transfer, assign, convey or deliver, and Sellers will

17

retain all right, title and interest to, in and under the following assets, properties, interests and rights of Sellers and their Affiliates (whether owned, licensed, leased or otherwise) (the "**Excluded Assets**"):

(a)     the organizational documents, corporate records and minute books, in each case to the extent solely pertaining to the organization, existence or capitalization of Sellers;

(b)     any (i) records, documents or other information solely to the extent relating to current or former Employees who is not or does not become a Transferred Employee and any materials to the extent containing information about any Employee, disclosure of which would violate applicable Law and (ii) all attorney-client privilege and attorney work-product protection of Sellers or associated with their businesses solely to the extent arising with respect to legal counsel representation of Sellers or its Affiliates or their businesses in connection with the transactions contemplated by this Agreement or any of the Transaction Documents (such documents described in clauses (i) and (ii), collectively, the "**Excluded Records**");

(c)     subject to Section 2.05, any Contract that is not a Purchased Contract and Contracts with Affiliates of Sellers (collectively, the "**Excluded Contracts**");

(d)     all rights, claims or causes of action that accrue or will accrue to any Seller or any of their Subsidiaries pursuant to this Agreement or any of the other Transaction Documents;

(e)     subject to Section 2.01(q), all Tax attributes that are not transferred by operation of applicable Tax Law;

(f)     other than the Purchased Shares, all shares of capital stock or other equity interests of any Seller or any Subsidiary of any Seller;

(g)     any Seller Plans set forth on Section 2.03(g) of the Disclosure Schedules (the "**Excluded Plans**" which such Excluded Plans include, in all events, all equity incentive plans and grants thereunder), together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts related thereto), and all rights and obligations thereunder;

(h)     all Retained Cash (if any) and the Wind-Down Amount;

(i)     all proceeds received from the sale or liquidation of any other Excluded Assets;

(j)     all director and officer insurance policies (including, for the avoidance of doubt, all current and prior director and officer insurance policies), and all rights and benefits of any nature of Sellers with respect thereto (including any claims arising under such policies and all credits, premium refunds, proceeds, causes of action or rights thereunder)

(k)     all rights of any Seller against any current or former directors, officers, members, members, partners, shareholders, managers, advisors or other professionals of such Seller, including any Proceedings and Claims ("**D&O Claims**"); and

18

(l)      any deposits, escrows, surety bonds or other financial assurances and any cash or cash equivalents securing any surety bonds or financial assurances, in each case, to the extent solely relating to the Excluded Assets or the Excluded Liabilities.

SECTION 2.04   *Excluded Liabilities*.  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume, be required to pay, perform or discharge, or be liable hereunder for any Liabilities of any Seller, of whatever nature, whether presently in existence or arising hereafter, whether or not related to the Business or the Purchased Assets, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, matured or unmatured, direct or indirect, and however arising, whether existing prior to or on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities, and Sellers shall retain and be responsible for all other Liabilities of Sellers (other than the Assumed Liabilities), including the following (collectively, the "**Excluded Liabilities**"):

(a)      all Liabilities for any Taxes (other than Transfer Taxes) (including, without limitation, Taxes payable by reason of contract, assumption, transferee or successor Liability, operation of Law, pursuant to Treasury Regulation Section 1.1502-6 (or any similar provision of any state or local law) or otherwise) (i) owed with respect to the Purchased Assets arising or relating to any Pre-Closing Tax Period (including any Straddle Period Taxes that are part of a Pre-Closing Tax Period), (ii) owed by any Seller (whether or not relating to a Pre-Closing Tax Period), including pursuant to any Tax sharing, Tax indemnity or similar agreement or arrangement to which any Seller (or any Affiliate thereof) is obligated under or a party to, (iii) arising in connection with the consummation of the transactions contemplated by this Agreement, (iv) imposed on any Person that are the responsibility of Sellers pursuant to Section 7.06 or (v) arising from or in connection with an Excluded Asset;

(b)      all Liabilities arising under any Excluded Contract;

(c)      except to the extent of any Liabilities expressly assumed pursuant to Section 2.02(e) or Section 2.02(h), all Liabilities of Sellers for Indebtedness, including any intercompany Indebtedness among Sellers;

(d)      all Liabilities relating to (i) payroll (including salary, wages and commissions), vacation, sick leave, parental leave, long service leave, workers' compensation claims and unemployment benefits of any current or former Employee who is not or does not become a Transferred Employee and (ii) all severance and termination agreements with any current or former Employee who is not or does not become a Transferred Employee;

(e)      all Liabilities arising out of, relating to or with respect to any Excluded Plan, if any;

(f)      all Liabilities arising in connection with any violation of any applicable Law (by Sellers) relating to the period prior to the Closing;

19

(g)     all Liabilities of Sellers arising under or pursuant to any Environmental Health and Safety Requirements, including with respect to any real property owned, operated, leased or otherwise used by Sellers, whether or not used in the Ordinary Course, including any Liabilities for noncompliance with any Environmental Health and Safety Requirements (including the release of hazardous substances), in each case only to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing;

(h)     all Liabilities arising out of, relating to or with respect to any Order or Proceeding involving, against or affecting any Purchased Asset, the Business, any Seller or any assets or properties of any Seller (i) commenced, filed, initiated or threatened as of the Closing or (ii) relating to facts, events or circumstances arising or occurring prior the Closing; and

(i)     all other Liabilities of Sellers that are not expressly included as Assumed Liabilities.

SECTION 2.05     *Assignment of Contracts and Rights.*

(a)     Sellers shall deliver to Buyer a schedule that contains a substantially complete list of each Contract of Sellers and Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract (the "**Original Contract & Cure Schedule**") within thirty (30) days of the date of this Agreement, which Original Contract & Cure Schedule shall be served on the counterparties to each such Contract in accordance with the Bid Procedures Order.  From the date on which such Original Contract & Cure Schedule is provided to Buyer through (and including) the date which is three (3) days prior to the Closing Date, promptly following any changes to the information set forth on the Original Contract & Cure Schedule (including any new Contracts to which any Seller becomes a party and any change in the Cure Cost of any Contract), or as reasonably requested by Buyer, Sellers shall provide Buyer with a schedule that updates and corrects such information (as such schedule may be amended, supplemented or otherwise modified from time to time prior to the Closing Date in accordance with the terms of this Agreement, the "**Contract & Cure Update Schedule**").  Sellers shall be responsible for the verification of all Cure Costs for each Purchased Contract and shall, in consultation with and subject to the consent of Buyer, use commercially reasonable efforts to establish proper Cure Costs for each Purchased Contract prior to the Closing Date.  At any time but in any event no later than three (3) days prior to the Closing Date, Buyer may, by written notice to the Company, and following good faith consultation with the Company, add or eliminate any Contract (including any Lease) as a Purchased Contract (any such eliminated contract, a "**Later Excluded Contract**").  Automatically upon the addition of any Contract as a Purchased Contract in accordance with the first sentence of this Section 2.05(a), such Contract will constitute a Purchased Asset and will be assigned to Buyer under, and in accordance with the terms of, this Agreement at Closing (and, if applicable, will cease to constitute an Excluded Asset).  Automatically upon the elimination of any Contract as a Purchased Contract in accordance with the first sentence of this Section 2.05(a), such Contract will constitute an Excluded Asset and will not be assigned to Buyer, and no Liabilities arising thereunder or relating thereto shall be assumed by Buyer.  The Parties acknowledge and agree that there will be no reduction in, or increase to, the Purchase Price as a result of any addition or elimination of any Contract as a Purchased Contract; provided, however, that any such addition or

20

elimination may increase or decrease (as applicable) the extent of the Assumed Liabilities, Purchased Assets or Excluded Contracts.

(b)     Sellers shall use commercially reasonable efforts to take all actions required to assign the Purchased Contracts to Buyer, including taking all actions reasonably required to facilitate any negotiations with the counterparties to such Purchased Contracts and to obtain an Order containing a finding that the proposed assumption and assignment of the Purchased Contracts to Buyer satisfies all requirements of Section 365 of the Bankruptcy Code.

(c)     Except as to Purchased Contracts assigned pursuant to Section 365 of the Bankruptcy Code, this Agreement shall not constitute an agreement to contribute, transfer, assign or deliver any Purchased Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted contribution, transfer, assignment, or delivery thereof without the consent of a third party or Governmental Authority (each, a "**Transfer Consent**"), would conflict with, violate, constitute a breach or default under any related Contract or violate any applicable Law or in any way otherwise adversely affect the rights of Buyer or Sellers thereunder.  If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365 of the Bankruptcy Code, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, Sellers and Buyer will reasonably cooperate in a mutually agreeable arrangement under which Buyer would obtain the claims, rights or benefits and assume the obligations thereunder in accordance with this Agreement without any further additional consideration; provided, however, that subject to Buyer receiving the claims, rights or benefits of, or under, the applicable Purchased Asset under any such arrangement, from and after the Closing, Buyer shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Purchased Asset (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Purchased Asset had been assigned or transferred at the Closing.  For the avoidance of doubt, the failure to obtain any Transfer Consent with respect to any Purchased Asset shall not delay the Closing; provided that, from and after the Closing, Sellers and Buyer shall use commercially reasonable efforts to obtain such Transfer Consent with respect to such Purchased Asset.  Notwithstanding the foregoing, Sellers' obligations under this Section 2.05(c) shall not restrict or limit their ability to wind-down or otherwise liquidate their estates, in each case, after the Closing, including by confirming and consummating a Chapter 11 plan of liquidation, or limit their ability to close the Chapter 11 Cases, after the Closing.  Sellers' obligations under this Section 2.05(c) shall terminate upon the Cut-Off Date; provided that if the Transfer Consent to which the applicable Purchased Asset has not been obtained by the Cut-Off Date, then if elected by Buyer prior to the Cut-Off Date, Sellers shall use their commercially reasonable efforts to ensure that Buyer shall (at Buyer's cost and expense) continue to have the benefit of this Section 2.05(c) following the Cut-Off Date.  Upon obtaining any such Transfer Consent with respect to the applicable Purchased Asset after the Closing, such Purchased Asset shall promptly be transferred and assigned to Buyer or a Buyer Designee in accordance with the terms of this Agreement, the Sale Order, and the Bankruptcy Code without any further additional consideration.  Buyer may request, in its reasonable business judgment, certain modifications and amendments to any Contract as a condition to such Contract being designated as a Purchased Contract, and Sellers shall use their commercially reasonable efforts to obtain such modifications or amendments.

21

(d)      At Closing, pursuant to the Sale Order and the Assignment and Assumption Agreements, Sellers shall assign or cause to be assigned to Buyer (the consideration for which is included in the Purchase Price) each of the Purchased Contracts that is capable of being assigned.

(e)      If any Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, and such Cure Costs are undetermined on the Closing Date because a non-Seller counterparty to such Contract proposed Cure Costs in an amount that is different than the amount of Cure Costs proposed by Sellers and such difference will not be resolved prior to the Closing Date (each such Contract, a "**Disputed Amount Contract**"), then Sellers shall provide Buyer, not less than three (3) days prior to the Closing Date, with a schedule that lists each such Disputed Amount Contract and the amount of Cure Costs that has been proposed by each such non-Seller counterparty; provided that Sellers shall agree to any Cure Costs for any Contract irrevocably designated by Buyer in writing as a Purchased Contract if instructed to do so by Buyer.  If Sellers, with the consent of Buyer, and the non-Seller counterparty with respect to any Disputed Amount Contract, are unable to agree on Cure Costs for such Disputed Amount Contract within five (5) Business Days following the Closing Date, solely upon Buyer's written request, Sellers shall, at the expense of Buyer, seek to have the amount of Cure Costs related to such Disputed Amount Contract determined by the Bankruptcy Court.  Upon final determination of such Cure Costs, Buyer may elect to re-designate such Purchased Contract as an Excluded Contract.  If such Purchased Contract is not so re-designated, (x) the applicable Sellers shall promptly take such steps as are reasonably necessary, including, if applicable and reasonably practicable, promptly on delivery of no less than five (5) Business Days' notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller and assigned to Buyer, including by executing and delivering to Buyer an Assignment and Assumption Agreement with respect to such Purchased Contract, and (y) Buyer shall pay the Cure Costs with respect to such Purchased Contract either (i) concurrently with Sellers' assumption and assignment thereof to Buyer or (ii) as agreed in writing by Buyer and the applicable counterparty to such Purchased Contract, and execute and deliver to the applicable Sellers an Assignment and Assumption Agreement with respect to such Purchased Contract.  Notwithstanding the foregoing, if, following the Closing, it is discovered that a Contract that should have been listed on the Original Contract & Cure Schedule or any Contract & Cure Update Schedule was not so listed, Sellers shall, to the extent Sellers are still debtors-in-possession in the Chapter 11 Cases, promptly following the discovery thereof, notify Buyer in writing of any such Contract and the Seller's good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any such Contract, the amount of such Cure Cost shall be designated for such Contract as "$0.00"), and upon Buyer's request, take all actions reasonably required to assume and assign to Buyer such Contract, provided that Buyer pay the applicable Cure Cost.

SECTION 2.06   *Purchase Price*.  On the terms and subject to the conditions contained herein, the aggregate consideration for the Purchased Assets (the "**Purchase Price**") shall consist of (a) a credit bid pursuant to Section 363(k) of the Bankruptcy Code against (i) $586,500,000 of the "Secured Obligations" (as defined in the Pre-Petition Credit Agreement) as of the Closing and (ii) only to the extent necessary to acquire any DIP Collateral (as defined in the DIP Credit Agreement), up to $5,000,000 of the DIP Obligations (the "**Credit Bid**"), (b) an amount in cash

22

(the "**Closing Date Payment**") equal to the sum of (i) the amount set forth in the Wind-Down Budget (the "**Wind-Down Amount**"), (ii) an amount equal to the DIP Obligations outstanding as of the Closing less the amount of the DIP Obligations, if any, used in the foregoing clause (a)(i) (the "**DIP Payment Amount**") and (iii) the Additional Sale Consideration (as defined in the Sale Order), and (c) the assumption of the Assumed Liabilities; provided, however, that Buyer reserves the right, in its sole discretion, to increase the Purchase Price (including any component thereof), subject to the Bid Procedures Order and applicable Law.  At the Closing, (A) in lieu of paying all or any portion of the Wind-Down Amount or the Additional Sale Consideration, Buyer may, by delivery of a written notice to the Company no later than three (3) Business Days prior to the Closing Date, instruct Sellers to retain a portion of (but not to exceed) the cash actually held at the Closing by Sellers in an amount set forth in such written notice (any such cash retained by Sellers, "**Retained Cash**") and such Retained Cash shall reduce, on a dollar-for-dollar basis, the Wind-Down Amount and the Additional Sale Consideration to be paid by Buyer at the Closing and (B) in lieu of paying all of the DIP Payment Amount, Buyer may, by delivery of a written notice to the Company no later than three (3) Business Days prior to the Closing Date, elect to assume the DIP Obligations outstanding as of the Closing, and in such event, (x) the DIP Obligations outstanding as of the Closing shall become Assumed Liabilities hereunder and (y) the DIP Payment Amount to be paid by Buyer at Closing shall be reduced to zero (0).  The Parties agree that the obligations of the Company under the "DIP L/C Facility" and Prepetition L/Cs (as defined in the DIP Order) will be addressed as provided for in the DIP Order and the Sale Order, and the Wind-Down Amount and Wind-Down Budget shall be subject to adjustment as provided in the Sale Order.

SECTION 2.07   *Purchase Price Allocation*.  Unless Buyer timely elects to structure the transactions contemplated by this Agreement as a G Reorganization in accordance with and pursuant to Article 11, no later than thirty (30) days after to the Closing Date, the Company shall deliver to Buyer a schedule allocating the Purchase Price (and any adjustments thereto as determined for U.S. federal income tax purposes) (i) between each Seller and (ii) among the Purchased Assets (the "**Allocation Schedule**"); provided, notwithstanding the foregoing, the Company shall timely prepare, subject to consent of Buyer which shall not be unreasonably withheld, any portion of the Allocation Schedule necessary for the Parties to comply with Section 4.07.  The Allocation Schedule shall be prepared in accordance with Section 1060 of the Code, the regulations promulgated thereunder, and any similar provision of applicable Law.  The Allocation Schedule shall be deemed final unless Buyer notifies the Company in writing that Buyer objects to one or more items reflected in the Allocation Schedule within forty-five (45) Business Days after delivery of the Allocation Schedule to Buyer.  In the event of any such objection, Buyer and the Company shall negotiate in good faith to resolve such dispute.  If Buyer and the Company reach an agreement regarding the Allocation Schedule, the Parties shall file all Tax Returns, including Form 8594 (Asset Acquisition Statement under Code Section 1060), in a manner consistent with the Allocation Schedule and shall not take any position inconsistent therewith upon examination of any Tax Return, in any Tax refund claim, in any Action related to Taxes, or otherwise unless otherwise required by applicable Law.  If Buyer and the Company are unable to reach a timely resolution of any dispute regarding the Allocation Schedule, each of the Parties shall be entitled to adopt its own position regarding the Allocation Schedule and to report the federal, state and local income and other Tax consequences of the purchase and sale contemplated hereby in a manner consistent with its own position regarding the Allocation Schedule.

23

SECTION 2.08    *Closing*.    The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place via the exchange of documents by mail or electronic delivery services as soon as possible following entry of the Sale Order, but in no event later than three (3) Business Days, after satisfaction of the conditions set forth in Article 8, or at such other time or place as Buyer and the Company may agree in writing.  At the Closing:

(a)    Sellers shall deliver, or cause to be delivered, to Buyer:

(i)    one or more assignment and assumption agreements, in a form and substance reasonably acceptable to the Company and Buyer (the "**Assignment and Assumption Agreements**"), duly executed by each applicable Seller;

(ii)    one or more bills of sale, in a form and substance reasonably acceptable to the Company and Buyer (the "**Bills of Sale**"), duly executed by each applicable Seller;

(iii)    (x) one or more instruments of assignment of the Patents in form and substance reasonably acceptable to the Company and Buyer (the "**Assignment of Patents**") and (y) one or more instruments of assignment of Trademarks in a form and substance reasonably acceptable to the Company and Buyer (the "**Assignment of Trademarks**"), in each case, duly executed by each applicable Seller;

(iv)    a letter of direction directing the administrative agent of the DIP Facility to release to Buyer (or a Buyer Designee) original stock, unit or interest certificates evidencing the Purchased Shares (if any) duly endorsed in blank or accompanied by stock powers or other instruments of transfer duly executed in blank, with any required stock transfer tax stamps affixed thereto;

(v)    a certificate, dated as of the Closing Date, executed by a duly authorized officer of the Company certifying that the conditions set forth in Section 8.02(a) and Section 8.02(b) have been satisfied;

(vi)    each third party consent, waiver, authorization or approval set forth on Section 2.08(a)(vi) of the Disclosure Schedules, each in form and substance reasonably acceptable to Buyer;

(vii)    either (A) an IRS Form W-9 of each Seller that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or (B) if such Seller is unable to provide an IRS Form W-9, such other documentation as permitted by the Code, Treasury Regulations or IRS guidance in effect as of the Closing Date to establish an exemption from withholding under Code Sections 1445 and 1446(f); and

(viii)    such other deeds, bills of sale, assignments, share transfer forms and other good and sufficient instruments of conveyance and assignment, each in form reasonably satisfactory to Buyer and Sellers, as Buyer deems reasonably necessary to vest in, and

24

transfer to, Buyer all right, title and interest in, to and under the Purchased Assets (including the Purchased Shares).

(b)    Buyer shall deliver, or cause to be delivered, to the Company or to such other Person(s) as may be entitled to payment therefrom (for the satisfaction and discharge of the DIP Obligations and the Cure Costs), as applicable:

(i)    the Closing Date Payment (which shall include (x) the Wind-Down Amount and the Additional Sale Consideration to the extent that the Wind-Down Amount and the Additional Sale Consideration are not reduced to zero (0) by Retained Cash and (y) the DIP Payment Amount to the extent the DIP Payment Amount is not reduced to zero (0) pursuant to Section 2.06) *plus*, if applicable, any amounts contemplated to be paid to Sellers by Section 4.07, by wire transfer of immediately available funds, to the bank account(s) designated in writing by the Company at least three (3) Business Days prior to the Closing Date;

(ii)    the Assignment and Assumption Agreements, duly executed by Buyer or the applicable Buyer Designee;

(iii)    the Bills of Sale, duly executed by Buyer or the applicable Buyer Designee;

(iv)    the Assignment of Patents and the Assignment of Trademarks, in each case, duly executed by Buyer or the applicable Buyer Designee;

(v)    a certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer certifying that the conditions set forth in Section 8.03(a) and Section 8.03(b) have been satisfied;

(vi)    a fully executed copy of the Exit Financing Agreement; and

(vii)    such other deeds, bills of sale, assignments, share transfer forms and other good and sufficient instruments of conveyance and assumption and transfer, in form reasonably satisfactory to Buyer and Sellers, as Sellers may reasonably request to transfer and assign the Purchased Assets and Assumed Liabilities to Buyer.

SECTION 2.09    *Withholding*.  Buyer shall be entitled to deduct and withhold (or cause to be deducted and withheld) from the consideration otherwise payable pursuant to this Agreement to any Person such amounts as Buyer is required to deduct and withhold under the Code, or any Tax Law, with respect to the making of such payment; provided, however, that at least three (3) Business Days prior to the Closing, Buyer must notify Sellers of any potentially applicable withholding requirement and, in the event any Seller informs Buyer that such Seller believes such deduction or withholding is inapplicable, the Parties shall use commercially reasonable efforts to cooperate to eliminate or reduce any such withholding obligation; provided, further, that Buyer shall have no obligation to eliminate or reduce withholding (a) arising as a result of Sellers' failure to provide the documentation described in Section 2.08(a)(vii) on or prior to the Closing, or (b) that relates to compensation, benefits and other terms of employment.  To the extent that amounts are

25

withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Disclosure Schedules and as otherwise disclosed or identified in the Company SEC Reports filed prior to the date hereof (other than any forward looking disclosures contained in the "Forward Looking Statements" and "Risk Factors" sections of the Company SEC Reports), each Seller hereby jointly and severally represents and warrants to Buyer as follows:

SECTION 3.01   *Organization and Qualification*.  Each Seller is duly organized, validly existing and in good standing (where applicable) under the Laws of its respective jurisdiction of formation or organization and, subject to the provisions of the Bankruptcy Code, has requisite power and authority to own, lease and operate its properties and conduct its business (including the Business) as currently conducted.  Each Seller is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where such qualification is required for the ownership or operation of the Purchased Assets, except for failures to be so qualified or to be in such good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

SECTION 3.02   *Authorization; Execution and Delivery; Enforceability*.  The execution, delivery and performance of this Agreement and each Transaction Document to which each Seller is a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the Closing will be, duly authorized by all necessary corporate or other action on the part of such Seller.  Each Seller has all necessary power and authority to execute and deliver this Agreement and each other Transaction Document to which such Seller is a party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder.  Subject to entry of the Sale Order and any other Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, this Agreement has been, and at or prior to the Closing, each Transaction Document to which each Seller is a party will be, duly and validly executed and delivered by such Seller and, assuming due authorization, execution and delivery by the other Parties and the entry of the Sale Order, this Agreement constitutes, and each other Transaction Document (when duly and validly executed and delivered) will constitute, the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, subject to the Bankruptcy and Equity Exception.

SECTION 3.03   *Noncontravention; Consents and Approvals*.

(a)      Neither the execution and delivery by Sellers of this Agreement and each other Transaction Document to which any Seller is a party, nor the consummation of the transactions contemplated hereunder or thereunder, will, subject to entry of the Sale Order, (i) conflict with or result in a breach of the organizational documents of any Seller, (ii) violate any Law or Order to which any Seller, or its assets or properties, or any of the Purchased Assets may be subject, or (iii)

26

conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel or require any notice under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on, any Material Contract, after giving effect to the Sale Order and any applicable Order of the Bankruptcy Court authorizing the assignment and assumption of any such Material Contract hereunder, except, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)      Except for (i) the entry of the Sale Order, (ii) compliance with applicable requirements of the HSR Act or any other Antitrust Laws, (iii) the Permit Approvals, (iv) as may be required under the Exchange Act and the rules and regulations of NASDAQ and (v) as set forth on Section 3.03(b) of the Disclosure Schedules, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Seller in connection with the execution and delivery of this Agreement or any other Transaction Document which any Seller is a party, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of transactions contemplated hereby or thereby or any other action by any Seller contemplated hereby or thereby (with or without notice or lapse of time, or both), except for such consents, waivers, approvals, Orders, authorizations, declarations, filings or notifications, the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 3.04     *Purchased Entities; JV Entities.*

(a)      Section 3.04(a) of the Disclosure Schedules sets forth, with respect to each Purchased Entity, (i) the name, (ii) the jurisdiction of formation or organization, (iii) the authorized, issued and outstanding equity interests and (iv) each owner of record of the Purchased Shares of such Purchased Entity (including the Purchased Shares).  The Purchased Shares have been duly authorized and validly issued, are fully paid and non-assessable (where applicable) and have not been issued in violation of any preemptive rights, rights of first offer, rights of first refusal or similar rights, and are owned beneficially, of record and with good and valid title by the applicable Seller as set forth on Section 3.04(a) of the Disclosure Schedules, free and clear of any Encumbrances (other than Permitted Encumbrances).

(b)      Section 3.04(a) of the Disclosure Schedules sets forth, with respect to each Purchased Entity, any Subsidiary or any other Person in which such Purchased Entity owns, of record or beneficially, any direct or indirect equity or similar interests or any right (contingent or otherwise) to acquire any direct or indirect equity or similar interests.

(c)      No Purchased Entity is under any obligation, or is bound by any Contract (other than the organizational documents of any Purchased Entity) pursuant to which such Purchased Entity may become obligated to, (i) declare, make or pay any dividends or distributions, whether current or accumulated or due or payable or (ii) make any loan to, investment in, or capital contribution to, any Person.   There are no outstanding options, warrants, calls, rights,

27

subscriptions, arrangements, claims, commitments (contingent or otherwise) or any other agreement or Contract to which any Purchased Entity is a party, or is otherwise subject, that requires the issuance, sale or transfer of any additional shares of capital stock or other equity securities of any Purchased Entity convertible into, exchangeable for or evidencing the right to subscribe for or purchase capital stock or other equity securities of any Purchased Entity. No Seller or any Purchased Entity is a party, or is otherwise subject, to any voting trust or other voting agreement with respect to the Purchased Shares or to any agreement or Contract relating to the issuance, sale, redemption, transfer, acquisition, disposition or registration of the Purchased Shares.

(d)    Section 3.04(d) of the Disclosure Schedules sets forth each Seller's interests (if any) in, and the capitalization of, each JV Entity. Except as set forth on Section 3.04(d) of the Disclosure Schedules, there are no other limited liability companies, partnerships, joint ventures, associations or other entities or Persons in which any Seller holds any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same.

SECTION 3.05    *Title to and Sufficiency of Purchased Assets*. Sellers have good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to the Sale Order and obtaining any Transfer Consent, Sellers will transfer, convey and assign good and valid title to, or valid leasehold interests in, the Purchased Assets (including record and beneficial ownership of the Purchased Shares) free and clear of all Encumbrances (other than Permitted Encumbrances). The Purchased Assets collectively with the Excluded Assets described in Section 2.03(c), Section 2.03(g) and Section 2.03(j) constitute all of the material assets, properties and rights held for use or necessary to operate and conduct the Business in the Ordinary Course.

SECTION 3.06    *Litigation*. Except as set forth on Section 3.06 of the Disclosure Schedules, there are no Proceedings pending, or, to the Knowledge of Sellers, threatened against any Seller, the Purchased Assets, the Assumed Liabilities or the Business, or any Order outstanding, which, in each case, would adversely affect the ability of any Seller to enter into this Agreement or to consummate the transactions contemplated hereby or otherwise would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 3.07    *Permits; Compliance with Laws*.

(a)    Sellers are in possession of all Permits necessary for Sellers to own, lease and use the Purchased Assets as currently owned, leased or used and to carry on and operate the Business as currently conducted, except where the failure to possess such Permit, individually or in the aggregate, has not had, and would not reasonably be expected to be material to the Business, taken as a whole. Section 2.01(j) of the Disclosure Schedule is a true, correct and complete list of all material Permits used by Sellers with respect to the Purchased Assets and the Assumed Liabilities. To the Knowledge of Sellers, there is no fact or circumstance relating to the Permits or Sellers that would cause a Governmental Authority to deny or refrain from issuing any Permit Approval.

28

(b)      Except as set forth in Section 3.07(b) of the Disclosure Schedules, (i) all material Permits held by Sellers are valid and in full force and effect, except where such failure to be valid or in full force and effect would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole, (ii) Sellers are, and in the last three (3) years have been, in compliance with the terms of all material Permits except where the failure to comply with the terms of such material Permit would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole, and there are no Proceedings pending or, to the Knowledge of Sellers, threatened that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Permits or that could result in the imposition of a substantial fine, forfeiture, or civil penalty against any Seller except as would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole, (iii) Sellers have timely filed applications to renew all material Permits other than any failure to timely file to renew that would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole and no Governmental Authority has commenced, or given written notice to Sellers that it intends to commence, any Proceeding to revoke, or suspend, rescind, modify or not renew, or to impose any materially adverse condition on, any Permit, except as would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole and (iv) all material reports and filings required to be filed with any Governmental Authority by Sellers with respect to any Permit have been timely filed, and all regulatory fees, contributions and surcharges required to be paid by Sellers with respect to the Permits have been timely paid, except where such failure to be filed or paid have now been remedied or would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole.

(c)      Sellers are in compliance with applicable Laws with respect to the Purchased Assets and the Assumed Liabilities, except where any non-compliance, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect.  No Seller has received any written notice from any Governmental Authority relating to violations or alleged violations of, failure to comply with or defaults under, any Law, Order or Permit, in each case, with respect to the Purchased Assets and the Assumed Liabilities, except where any non-compliance or default, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect.

SECTION 3.08      *Material Contracts*.

(a)      Section 3.08(a) of the Disclosure Schedules sets forth a true, correct and complete list of the following Purchased Contracts as of the date hereof (the "**Material Contracts**") (and Sellers have made available to Buyer true, correct and complete copies of all such Material Contracts, together with all amendments, modifications or supplements thereto):

(i)      any partnership, joint venture, strategic alliance or similar Contract involving a sharing of profits, losses, costs or liabilities with any other Person (including the organizational documents with respect to each JV Entity);

29

(ii)     any Contract relating to any options, rights (preemptive or otherwise), warrants, calls, convertible securities or commitments or any other agreements or arrangements with respect to any equity securities of the Purchased Entities;

(iii)     any Contract relating to (A) the Indebtedness of any Seller or (B) the mortgage or pledge of, or otherwise creating an Encumbrance (other than a Permitted Encumbrance) on, any of the Purchased Assets in each case, other than (x) intercompany Indebtedness amongst Sellers, (y) Indebtedness which will be fully discharged under the Bankruptcy Code or (z) the Pre-Petition Credit Agreement and the DIP Credit Agreement;

(iv)     any Contract relating to the acquisition or disposition of any business, assets or properties for consideration in excess of $10,000,000 (whether by merger, sale of stock, sale of assets or otherwise) (A) entered into in the last (3) years and (B) pursuant to which any material earn-out or deferred or contingent payment obligations remain outstanding (in each case, excluding for the avoidance of doubt, purchase of inventory in the Ordinary Course);

(v)     any Lease with respect to the Leased Real Property;

(vi)     any Contract for the lease of personal property (tangible or intangible) to or from any Person providing for lease payments in excess of $250,000 per annum;

(vii)     any Contract with any Material Customer;

(viii)     any Contract with any Material Supplier;

(ix)     any prime Contract with any Governmental Authority;

(x)     any Contract with a Material Customer or Material Supplier that (A) prohibits or limits the freedom of any Seller of the Business to compete in any line of business with any Person or in any geographic area or (B) contains exclusivity obligations or restrictions binding on any Seller of the Business or (C) grants any right of first refusal or right of first offer obligations or restrictions to any Person;

(xi)     any Contract to which any Seller is a party (A) pursuant to which any Seller is granted a right to use any third party Intellectual Property that is material to the Business, other than non-exclusive licenses for commercially available or off-the-shelf software or software that is subject to click-through or shrink wrap agreements entered into by Sellers in the Ordinary Course, (B) pursuant to which any Seller grants a third party the right to use any Purchased Intellectual Property that is material to the Business, other than any Contract with any end user of any Seller's products or services which is entered into in the Ordinary Course or any marketing agreement which contains an incidental trademark license to use the Seller's Trademarks in the scope of providing such services, (C) covering the settlement of any claims related to any Intellectual Property and (D) pursuant to which any Seller is prohibited or restricted in any manner from using any Purchased Intellectual Property; or

30

(xii)   any Contract with any Employee that includes base annual compensation in excess of $200,000 that is not terminable at-will on no more than sixty (60) days' advance notice and includes no severance-type benefits; and

(xiii)   any Contract that is a Collective Bargaining Agreement.

(b)   With respect to each Contract set forth on Section 3.08(a) of the Disclosure Schedules, (i) such Contract is in full force and effect and constitutes the legal, valid and binding of the Seller party thereto and, to the Knowledge of Sellers, the counterparty thereto, enforceable against such Seller and, to the Knowledge of Sellers, the counterparty thereto in accordance with its terms and conditions, subject to the Bankruptcy and Equity Exception and (ii) neither the Seller party thereto nor, to the Knowledge of Sellers, the counterparty thereto is in material breach or default thereof that would permit or give rise to a right of termination, modification or acceleration thereunder, and (iii) no Seller and, to the Knowledge of Sellers, no counterparty thereto, has commenced any Proceeding against any other party to such Contract or given or received any written notice of any breach or default under such Contract that has not been withdrawn or dismissed, except, in the cases of clauses (ii) and (iii), for breaches or defaults (A) caused by or resulting from the Chapter 11 Cases or (B) which are not, and would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole.

SECTION 3.09   *Intellectual Property*.

(a)   Section 3.09(a) of the Disclosure Schedules contains a complete and accurate list of all issued Patents constituting Purchased Intellectual Property, including name, patent number and issuance date.  To the Knowledge of Sellers, all of the Patents set forth on Section 3.09(a) of the Disclosure Schedules are subsisting and in full force and effect.  Except as set forth on Section 3.09(a) of the Disclosure Schedules, all necessary maintenance and renewal documentation and fees in connection with such Patents have been timely filed with the appropriate authorities and paid.

(b)   Section 3.09(b) of the Disclosure Schedules contains a complete and accurate list of all registered and applied for Trademarks constituting Purchased Intellectual Property, including for each the applicable trademark or service mark, application number, filing date, trademark registration number and registration date, as applicable.  To the Knowledge of Sellers, all of the registered Trademarks set forth on Section 3.09(b) of the Disclosure Schedules are subsisting and in full force and effect.  There are no pending oppositions, invalidation or cancellation proceedings against any Seller involving such Trademarks.

(c)   Section 3.09(c) of the Disclosure Schedules contains a complete and accurate list of all registered Copyrights constituting Purchased Intellectual Property, including title, registration number and registration date.  To the Knowledge of Sellers, all of the registered Copyrights set forth on Section 3.09(c) of the Disclosure Schedules are in full force and effect. There are no pending oppositions, invalidation or cancellation proceedings against the Seller involving such Copyrights.

31

(d)     Sellers exclusively own all right, title and interest in and to the Purchased Intellectual Property.  All registered or issued Purchased Intellectual Property is valid, subsisting and, to the Knowledge of Sellers, enforceable, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)     To the Knowledge of Sellers, no Person is infringing or misappropriating any Purchased Intellectual Property in a material manner.  There is no pending dispute, including any pending Proceeding and, to the Knowledge of Sellers, there is no threatened Claim against any Seller, with respect to (i) the Purchased Intellectual Property challenging the ownership, validity or enforceability of any such Purchased Intellectual Property or (ii) any Purchased Contract pursuant to which any Seller receives a license or other right under any Intellectual Property of any other Person, challenging any Seller's rights under such Purchased Contract, the enforceability of such Purchased Contract, or any Seller's compliance with the terms and conditions of such Purchased Contract.  Sellers have not received service of process or been charged in writing as a defendant, in the twelve (12) month period prior to the date of this Agreement, in any Proceeding that alleges that any of the Purchased Intellectual Property infringes any intellectual property right of any Person, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(f)     Sellers and their Affiliates have taken commercially reasonable security measures to protect the secrecy, confidentiality and value of all Trade Secrets and confidential information included in the Purchased Intellectual Property, except as would not, individually or in the aggregate, reasonably be expected to have, a Material Adverse Effect.

SECTION 3.10     *Real Property*.

(a)     Section 3.10(a) of the Disclosure Schedules sets forth a true, correct and complete list of all Owned Real Property.  Sellers have good and marketable fee simple title to the Owned Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances).  To the Knowledge of Sellers, none of the Owned Real Property is subject to any Lease or grant to any Person of any right to the use, purchase, occupancy or enjoyment of such Owned Real Property (or any portion thereof) required to conduct the Business.

(b)     Section 3.10(b) of the Disclosure Schedules sets forth a true, correct and complete list of all Leased Real Property.  Sellers have valid leasehold or sublease interest relating to the Leased Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances).  To the Knowledge of Sellers, except as set forth on Section 3.10(b) of the Disclosure Schedules, none of the Leased Real Property is subject to any sublease or grant to any Person of any right to the use, occupancy or enjoyment of the Leased Real Property (or any portion thereof) that would materially impair the use of the Leased Real Property in the operation of the Business.

SECTION 3.11     *Environmental, Health and Safety Matters*.

(a)     Sellers are in compliance with all applicable Environmental, Health and Safety Requirements with respect to the Purchased Assets, the Owned Real Property and the Leased Real

32

Property, except in any such case where the failure to be in compliance would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. To the Knowledge of Sellers, no Seller has received any written notice or report regarding any material violation of Environmental, Health and Safety Requirements or any material Liabilities relating to the Purchased Assets, the Owned Real Property or the Leased Real Property arising under Environmental, Health and Safety Requirements, other than any such notice or report that has now been resolved. There are no material Orders issued to any Seller outstanding, or any Proceedings pending or, to the Knowledge of Sellers, threatened, relating to compliance with or Liability under any Environmental, Health and Safety Requirements affecting the Purchased Assets, the Owned Real Property or any Leased Real Property.

(b)     Sellers have made available to Buyer (i) all material Permits held by Sellers issued pursuant to any Environmental, Health and Safety Requirements for the Business or the operations of the Purchased Assets, (ii) all material documents held by Sellers with respect to any outstanding Orders or any pending or threatened Proceedings involving the Business or the Purchased Assets under or relating to any Environmental, Health and Safety Requirements and (iii) all material environmental reports, studies, analyses, investigations, audits and reviews in any Seller's possession with respect to the Purchased Assets, the Owned Real Property and the Leased Real Property.

SECTION 3.12     *Taxes*.

(a)     All income and other material Tax Returns required to be filed relating to the Purchased Assets or the Assumed Liabilities have been timely filed. Such Tax Returns are true, correct, and complete in all material respects and have been prepared in compliance with all applicable Laws. No Seller or any Purchased Entity is currently the beneficiary of any extension of time within which to file any Tax Return. All material Taxes (whether or not reflected on such Tax Returns) relating to the Purchased Assets, the Purchased Entities or the Assumed Liabilities required to be paid have been timely paid in full.

(b)     No Claims have been asserted, no material Taxes have been assessed and no proposals or deficiencies for material Taxes, in each case against any Seller or any Purchased Entity, are being asserted, proposed or threatened by any Governmental Authority. No written notice from any Governmental Authority of any proposed adjustment, deficiency or underpayment of Taxes by, or with respect to, any Purchased Entity or the Purchased Assets has been received by any Seller that has not since been fully satisfied by payment or been finally withdrawn, and no written notification has been provided by any Governmental Authority of an intent to raise such issues.

(c)     No Claim has ever been made by a Governmental Authority that Tax Returns are required to be filed in relation to the Purchased Assets, the Purchased Entities, or the Assumed Liabilities in a jurisdiction where no such Tax Returns are currently filed. No Purchased Entity is or has been a resident for Tax purposes, or is or has had, any branch, agency, permanent establishment or other taxable presence, in any jurisdiction other than the jurisdiction in which it was organized. No Purchased Entity that is incorporated or organized in a jurisdiction outside of

33

the United States is a (i) "passive foreign investment company" within the meaning of Section 1297 of the Code or (ii) "surrogate foreign corporation" within the meaning of Section 7874(a)(2)(B) of the Code.

(d)     No agreement or waiver extending the period for assessment, reassessment or collection of any material Taxes relating to the Purchased Assets or the Assumed Liabilities has been executed or filed with any Governmental Authority. No Purchased Entity has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to an assessment or deficiency for Taxes (other than pursuant to automatic extensions of time to file Tax Returns duly obtained in the Ordinary Course).

(e)     No Encumbrances for Taxes (other than Permitted Encumbrances) exist with respect to any of the Purchased Assets or the Purchased Shares.

(f)     No Purchased Entity is, or has ever been, a member of an affiliated group of corporations filing a consolidated federal income Tax Return or has any Liability for the Taxes of any Person under Treasury Regulations Section 1.1502-6 (or any similar provision of any state, local or non-U.S. Law), as a transferee or successor.

(g)     No Purchased Entity has been a party to a "listed transaction" as such term is defined in Section 6707A(c)(2) of the Code and Treasury Regulations Section 1.6011-4(b).

(h)     There are no pending or threatened audits, investigations, disputes, notices of deficiency, assessments or other actions or Proceedings for or relating to any Liability for material Taxes of any Seller or any Purchased Entity or for material Taxes relating to the Purchased Assets.

(i)     Each Purchased Entity has collected or withheld all amounts required to be collected or withheld by such Purchased Entity for all material Taxes or assessments, including on amounts paid to any Person, and all such amounts have been fully and timely paid to the appropriate Governmental Authority. Each Purchased Entity has complied in all material respects with all applicable Laws relating to information reporting and record retention (including to the extent necessary to claim any exemption from sales Tax collection and maintaining adequate and current resale certificates to support any such claimed exemptions).

(j)     None of the Assumed Liabilities includes (i) any obligation to any Person under any Tax allocation, sharing, indemnity obligation, or similar agreement, arrangement, understanding, or practice with respect to Taxes (other than any commercial agreement entered into in the Ordinary Course, the principal purpose of which is not related to Taxes), (ii) an obligation under any record retention, transfer pricing, closing, or other agreement or arrangement with any Governmental Authority that will impose any Liability on Buyer after the Closing or (iii) an obligation to pay the Taxes of any Person as a transferee or successor, by contract or otherwise, including an obligation under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law) (other than any commercial agreement entered into in the Ordinary Course, the principal purpose of which is not related to Taxes).

34

(k)     No Purchased Entity has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or 361 of the Code.

(l)     No Purchased Entity will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date, as a result of any (i) change in method of accounting for a taxable period ending on or prior to the Closing Date, (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or non U.S. income Tax Law) executed on or prior to the Closing, (iii) intercompany transactions or any excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local or non U.S. income Tax Law) arising on or prior to the Closing, (iv) installment sale or open transaction disposition made on or prior to the Closing, (v) prepaid amount received on or prior to the Closing or (vi) investment in "United States property" within the meaning of Section 956 of the Code made on or prior to the Closing.  No Purchased Entity or any of its Affiliates has made an election under Section 965(h) of the Code.

(m)     None of the Purchased Entities or JV Entities is, nor has any of the Purchased Entities or JV Entities been, a "U.S. real property holding corporation" within the meaning of Section 897 of the Code.

(n)     Section 3.12(n) of the Disclosure Schedules sets forth a list of the entity classification of each of the Purchased Entities and JV Entities for U.S. federal income Tax purposes, and, unless otherwise noted on Section 3.12(n) of the Disclosure Schedules, each entity has had such classification at all times since its incorporation or formation, as applicable.

(o)     None of the Purchased Entities and JV Entities has deferred any payment of Taxes otherwise due (including through any automatic extension or other grant of relief provided by a Pandemic Response Law).

SECTION 3.13     *Employee Benefits*.

(a)     Section 3.13(a) of the Disclosure Schedules contains a true, correct and complete list of all material Seller Plans.  With respect to each material Seller Plan, Sellers have made available to Buyer true, correct and complete copies of (i) the current plan document, including any amendments thereto, (ii) the most recent summary plan description (including any material modification), (iii) any material written communication to or from any Governmental Authority, (iv) the most recently filed IRS Form 5500, (v) the most recent actuarial report, financial statement and trustee report and (vi) the most recent determination or opinion letter from the IRS.

(b)     (i) Each Seller Plan has been and is being administered, maintained and operated in all material respects in compliance with all applicable Laws and in accordance with its terms, (ii) each Seller Plan that is intended to be "qualified" within the meaning of Section 401(a) of the Code has received or is the subject of a currently applicable favorable determination letter, opinion letter or advisory letter from the IRS, stating that its related trust is exempt from taxation under

35

Section 501(a) of the Code, and no event or circumstance exists that has affected or is likely to adversely affect the qualified status of any such Seller Plan, (iii) there are no Proceedings (other than routine claims for benefits) relating to any Seller Plan or the assets, fiduciaries or administrators thereof pending or, to the Knowledge of Sellers, threatened, (iv) all contributions (including all employer contributions and employee salary reduction contributions) or premium payments required to have been made to or in respect of any Seller Plan under the terms of such Seller Plan or in accordance with Law, as of the date hereof, have been timely made or reflected on the applicable financial statements, and (v) Sellers and their Subsidiaries have complied in all material respects with the requirements of the Patient Protection and Affordable Care Act.

(c)       No Seller or any Purchased Entity has any obligation to provide or make available postemployment benefits under any Seller Plan which is a "welfare plan" (as defined in Section 3(1) of ERISA), except as may be required under COBRA or similar Law, and at the sole expense of such individual.

(d)       Except as would not result in any Liability to Buyer, (i) neither Sellers nor their respective ERISA Affiliates maintain or contribute to, or have any Liability in respect of any plan that is subject to Section 412 or 430 of the Code, Section 302 or 303 of ERISA or Title IV of ERISA or that is subject to Section 4063, 4064 or 4069 of ERISA ("**Title IV Plans**"), (ii) no Title IV Plan has failed to meet the minimum funding standard (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA, (iii) no Liability under Title IV or Section 302 of ERISA has been incurred by any Seller or any ERISA Affiliate that has not been satisfied in full, and no condition exists that presents a risk to Sellers or any ERISA Affiliate of incurring any such Liability, (iv) all contributions required to be made by Sellers of any of their respective ERISA Affiliates with respect to any Title IV Plan on or prior to the Closing Date have been timely made and (v) no Seller nor any ERISA Affiliate has now or at any time contributed to, sponsored, or maintained a "multiemployer plan" (as defined in Section 3(37) of ERISA).

(e)       The consummation of the transactions contemplated by this Agreement will not, either alone or in combination with another event, (i) increase any benefits or result in the acceleration of the timing of payment, vesting or funding of any benefits under any Seller Plan, (ii) entitle any Service Provider to any Seller or any Purchased Entity who, as of the date of this Agreement, is providing services in connection with the Purchased Assets or the Assumed Liabilities, to, or accelerate the time of payment or vesting, or increase the amount of, any compensation or benefit due any Service Provider to any Seller or any Purchased Entity who, as of the date of this Agreement, is providing services in connection with the Purchased Assets or the Assumed Liabilities, (iii) result in the triggering or imposition of any restrictions or limitations on the rights to amend or terminate any Seller Plan, or (iv) result in any payment that would be nondeductible pursuant to Section 280G of the Code.  No Purchased Entity has any obligation to indemnify any Person for any Tax imposed pursuant to Section 409A or 4999 of the Code.

SECTION 3.14     *Labor Matters.*

(a)       On the date, and in connection with the execution, of this Agreement, the Company has provided Buyer on a confidential basis a true, complete and correct list of the Employees as of

the date hereof specifying each individual's (i) title or position, (ii) base salary, (iii) date of hire, (iv) Fair Labor Standards Act classification, (v) leave status and (vi) accrued paid time-off.

(b)      Except as set forth on Section 3.14(b) of the Disclosure Schedules, (i) no Seller is a party to any Collective Bargaining Agreement with respect to its Employees, (ii) no Employee is represented by any labor organization, (iii) no labor organization or group of Employees has made a demand for recognition or request for certification that is pending as of the date hereof, nor have there been any such demands or requests in the last three (3) years and (iv) there are no representation or certification Proceedings or petitions seeking a representation election presently pending or, to the Knowledge of Sellers, threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving any Seller, its Subsidiaries or any Purchased Entity, nor have there been any such proceedings in the last three (3) years.  There are no strikes, lockouts, work stoppages or slowdowns pending or, to the Knowledge of Sellers, threatened against or involving any Seller or any Purchased Entity.

(c)      Except as set forth on Section 3.14(c) of the Disclosure Schedules, there are no charges, arbitrations, grievances, complaints or Proceedings pending or, to the Knowledge of Sellers, threatened against any Seller or any Purchased Entity relating to the employment or termination of employment of any individual or group of individuals by any Seller or any Purchased Entity.

(d)      No Seller or any Purchased Entity has experienced a "plant closing" or "mass layoff" or similar group employment loss (as defined in the WARN Act) with respect to which there is any unsatisfied Liability.

(e)      Sellers have taken actions such actions as set forth on Section 3.14(e) of the Disclosure Schedules with respect to their employees in response to the COVID-19 pandemic.

SECTION 3.15   *Absence of Certain Changes*.      Other than as a result of the commencement of the Chapter 11 Cases, (a) since June 30, 2020, there has not been or occurred any Material Adverse Effect and (b) from June 30, 2020 through the date of this Agreement, there has not been, occurred or arisen any agreement, condition, action, omission or event which, if occurred or existed after the date hereof, would be prohibited (or require consent from Buyer) under Section 5.01.

SECTION 3.16   *Insurance Policies*.  Section 3.16 of the Disclosure Schedules sets forth each material insurance policy (other than any insurance policy that funds or relates to any Seller Plans) held by any Seller relating to the Purchased Assets or the Assumed Liabilities.  With respect to each such material insurance policy, (a) such policy is in full force and effect and constitutes the legal, valid and binding of the Seller party thereto and, to the Knowledge of Sellers, the counterparty thereto, enforceable against such Seller and, to the Knowledge of Sellers, the counterparty thereto in accordance with its terms and conditions, subject to the Bankruptcy and Equity Exception, (b) no Seller has received any written notice of cancellation or termination with respect to such policy, (c) premiums due and payable by Sellers or their Affiliates under such policy prior to the date hereof have been duly paid and (d) there is no material claim pending under such policy, except in the case

of the foregoing clauses (a) through (c) as would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole.

SECTION 3.17   *Affiliate Transactions*.   Except as set forth in Section 3.17 of the Disclosure Schedules, no Affiliate of any Seller (other than any other Seller, any Purchased Entity, or any of their Subsidiaries) or any officer, director or employee of any Seller (a) is a party to any Contract or arrangement with any Seller having a potential or actual value or a contingent or actual Liability exceeding $250,000, other than (i) employment and indemnification arrangements in the Ordinary Course and (ii) the Seller Plans, (b) has any material interest in any property (tangible or intangible) used by any Seller in the operation of any Purchased Asset or (c) owns any material interest in, or is an officer, director or employee of, any Person which is a Material Customer or Material Supplier.

SECTION 3.18   *Material Customers and Suppliers*.

(a)   Section 3.18(a) of the Disclosure Schedules sets forth a true, correct and complete list of the ten (10) largest customers of the Business during the twelve (12)-month period ending on June 30, 2020 (collectively, the "**Material Customers**"), as measured by the dollar amount of revenue during such period, including the approximate total revenue of the Business from each such customer during such period.  No Material Customer has terminated, cancelled, suspended, failed to renew or reduced, or given any Seller or Purchased Entity notice, in writing, that references its intention to terminate, cancel, suspend, fail to renew or reduce its business relationship with the Business, except for such termination, cancellation, suspension, failure to renew or reduction that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)   Section 3.18(b) of the Disclosure Schedules sets forth a true, correct and complete list of the ten (10) largest suppliers of the Business during the twelve (12)-month period ending on June 30, 2020 (collectively, the "**Material Suppliers**"), as measured by the dollar amount of purchases therefrom during such period, including the approximate total purchases by the Business from each such supplier during such period.  No Material Supplier has terminated, cancelled, suspended, failed to renew or reduced, or given any Seller or Purchased Entity notice, in writing, that references its intention to terminate, cancel, suspend, fail to renew or reduce its business relationship with the Business, except for such termination, cancellation, suspension, failure to renew or reduction that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 3.19   *Company SEC Reports; Financial Statements; Internal Controls*.

(a)   The Company has furnished or filed, on a timely basis, all reports, schedules, forms, statements and other documents (including all exhibits thereto and any other information incorporated by reference therein) required to be furnished or filed by the Company with the SEC since January 1, 2019 (the "**Company SEC Reports**").  As of their respective dates of filing with the SEC (or, if amended, supplemented, superseded or otherwise modified prior to the date of this Agreement, the date of such filing with the SEC), the Company SEC Reports complied in all

material respects with the applicable requirements of the Securities Act and the Exchange Act and did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(b)    The consolidated financial statements of the Company (including all related notes or schedules thereto) included or incorporated by reference in the Company SEC Reports, as of their respective dates of filing with the SEC (or, if such Company SEC Reports were amended, supplemented, superseded or otherwise modified prior to the date of this Agreement, the date of such filing, with respect to the consolidated financial statements that are amended or restated therein), have been prepared in all material respects in accordance with GAAP (as in effect on the date of such financial statement and except, in the case of unaudited quarterly statements, as permitted by the SEC's Quarterly Report on Form 10-Q or other rules and regulations of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto or as permitted by Regulation S-X) and fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown.

SECTION 3.20    *Brokers*.    Except as set forth in Section 3.20 of the Disclosure Schedules, the fees and expenses of which will be paid by the Company on or prior to the Closing Date, no broker, finder, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Company or any of its Subsidiaries.

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller as follows:

SECTION 4.01    *Corporate Existence and Power*.    Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has all power and authority to carry on its business as presently conducted.

SECTION 4.02    *Authorization; Execution and Delivery; Enforceability*.    The execution, delivery and performance of this Agreement and each Transaction Document to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the Closing will be, duly authorized by all necessary corporate or other action on the part of Buyer.  Buyer has all necessary power and authority to execute and deliver this Agreement and each other Transaction Documents to which Buyer is a party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder.  Subject to entry of the Sale Order and any other Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, this Agreement has been, and at or prior to the Closing, each Transaction Document to which each Seller is a party will be,

duly and validly executed and delivered by Buyer and, assuming due authorization, execution and delivery by the other Parties and the entry of the Sale Order, this Agreement constitutes, and each other Transaction Document (when duly and validly executed and delivered) will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to the Bankruptcy and Equity Exception.

SECTION 4.03   *Noncontravention; Consents and Approvals*.

(a)      Neither the execution and delivery by Buyer of this Agreement and each other Transaction Document to which Buyer is a party, nor the consummation of the transactions contemplated hereunder or thereunder, will, subject to entry of the Sale Order, (i) conflict with or result in a breach of the organizational documents of Buyer, (ii) violate any Law or Order to which Buyer or its assets and properties may be subject, (iii) conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel or require any notice under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on, any Contract to which Buyer is a party or by which Buyer or its assets and properties is bound, except, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

(b)      Other than (i) the entry of the Sale Order, (ii) compliance with applicable requirements of the HSR Act or any other Antitrust Laws and (iii) the Permit Approvals, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Buyer in connection with the execution and delivery of this Agreement or any other Transaction Document which Buyer is a party, the compliance by Buyer with any of the provisions hereof or thereof, the consummation of transactions contemplated hereby or thereby or any other action by Buyer contemplated hereby or thereby (with or without notice or lapse of time, or both), except for such consents, waivers, approvals, Orders, authorizations, declarations, filings or notifications, the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

SECTION 4.04   *Availability of Funds; Solvency*.  Buyer will have sufficient funds at the Closing to pay (i) the cash components of the Purchase Price, including the Wind-Down Amount and the Additional Sale Consideration (to the extent that the Wind-Down Amount and the Additional Sale Consideration are not reduced to zero (0) by Retained Cash), (ii) the DIP Payment Amount (to the extent that the DIP Payment Amount is not reduced to zero (0) pursuant to Section 2.06), and (iii) any other costs, fees and expenses which may be required to be paid by or on behalf of Buyer under this Agreement and the other Transaction Documents.  Upon consummation of the transactions contemplated by this Agreement, (a) Buyer will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Buyer will not be left with unreasonably small capital, (c) Buyer will not have incurred debts beyond its ability to pay such debts as they mature, (d) the capital of Buyer will not be impaired and (e) Buyer will have new debt at Closing

of no more than $400 million (plus any letters of credit), inclusive of the Exit Financing Agreement, on terms materially consistent with the RSA.

SECTION 4.05   *Litigation*.   There are no Actions to which Buyer is a party pending, or, to the knowledge of Buyer, threatened against Buyer that would affect in any material respect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

SECTION 4.06   *Brokers*.   Except as to Greenhill & Co., LLC and Rothschild & Co. US Inc., no broker, finder, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer.

SECTION 4.07   *Transfer Taxes*.   All Transfer Taxes required to be paid under applicable Law in connection with the transfer of the Purchased Assets to Buyer have been paid or will be timely paid by Buyer.  To the extent any Seller is required by applicable Law to pay Transfer Taxes, Buyer shall reimburse in full the appropriate Seller the amount of such Transfer Taxes at Closing.

SECTION 4.08   *Credit Bid*.   On the date of this Agreement, Buyer has provided to the Company a copy of the direction letter (the "**Direction Letter**") delivered by the Required Lenders (as defined in the Direction Letter), as holders of outstanding Indebtedness under the Pre-Petition Credit Agreement, to Buyer, on or prior to the date hereof, fully authorizing Buyer to, among other things, enter into and perform and comply with this Agreement and consummate the transactions contemplated hereby, including the credit bid contemplated in Section 2.06.  Without the prior written consent of the Company, the Direction Letter has not been amended in any way that would have an adverse impact to Buyer's ability to perform and comply with this Agreement and consummate the transactions contemplated hereby.

ARTICLE 5

COVENANTS OF SELLERS

SECTION 5.01   *Conduct of the Business*.

(a)   Except (x) as consented to by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), (y) as required or approved by the Bankruptcy Code or any Orders entered by the Bankruptcy Court in the Chapter 11 Cases prior to the date of this Agreement or (z) as otherwise necessary to comply with applicable Law or as set forth on Section 5.01(b) of the Disclosure Schedules, from the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 10), Sellers shall use commercially reasonable efforts to conduct the Business in the Ordinary Course and maintain in all material respect the goodwill associated with the Purchased Assets and Sellers' business relationships with employees, customers, suppliers, vendors, clients, contractors and other Persons in connection with the Purchased Assets.

(b)      Except as otherwise contemplated by Section 5.01(a), as required by applicable Law or as set forth on Section 5.01(b) of the Disclosure Schedules, without the prior written consent or express prior written direction of Buyer, from the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 10), Sellers shall not:

(i)      sell, lease or license on an exclusive basis or otherwise create any Encumbrance (other than Permitted Encumbrances) or dispose of any Purchased Assets, other than (x) in the Ordinary Course and (y) sales and dispositions of obsolete or worn-out assets;

(ii)      renew, materially amend or modify, terminate (other than automatically pursuant to its terms), cancel or waive any material rights under, or create any Encumbrance (other than a Permitted Encumbrance) on, any of the Material Contracts or any material Permits, in each case, other than in the Ordinary Course;

(iii)      change in any material respect their policies or practices regarding accounts receivable or accounts payable, except as required by Law, a change in GAAP (or authoritative interpretation thereof) or by a Governmental Authority;

(iv)      make any capital expenditures in excess of $100,000;

(v)      acquire any Person or all or substantially all of the assets of any Person or make any other investment outside the Ordinary Course;

(vi)      incur, assume or guarantee any indebtedness or Liability of any other Person in connection with the Purchased Assets, other than any indebtedness or Liability that will be repaid or assumed by Buyer under the terms hereof at or prior to the Closing or constitute an Excluded Liability;

(vii)      concede, settle, pay, discharge or satisfy any Proceedings that would constitute a Purchased Asset or Assumed Liability other than, following reasonable advance notice to Buyer, settlements (A) that do not only involve any material obligations on Sellers and (B) that would not have a material impact to the Business;

(viii)      terminate, let lapse or materially amend or modify any material insurance policy maintained by any Seller or any of its Affiliates with respect to any Purchased Assets or any Assumed Liability;

(ix)      (A) sell, transfer, assign, abandon, cancel any Purchased Intellectual Property that is material to the Business, (B) let lapse or fail to renew, continue to prosecute, protect or defend, or otherwise dispose of, any Purchased Intellectual Property that is material to the Business, or (C) enter into any Contract regarding the license, sublicense, agreement or permission to use any Purchased Intellectual Property that is material to the Business, other than non-exclusive license agreements in the Ordinary Course;

42

(x)     (A) fail to exercise any rights of renewal with respect to any Leased Real Property that by its terms would otherwise expire and such expiration would be material to the Business or (B) enter into any Contract for the sublease of Leased Real Property that is material to the Business;

(xi)     grant or announce (i) any increase in the compensation of any employee of Sellers or their Affiliates by more than three percent (3%) of such employee's compensation as of the date of this Agreement (other than as a result of inflation adjustments) or (ii) any material increase to perquisites or benefits (whether through the payment of, agreement to pay or otherwise) of any employee of Sellers or their Affiliates, other than, in each case, increases required by applicable Law or required by the terms of Seller Plans in effect as of the date hereof;

(xii)     make any changes in any accounting methods, principles or practices in connection with the Purchased Assets or the Assumed Liabilities except as required by Law, by a change in GAAP (or authoritative interpretation thereof) or by a Governmental Authority;

(xiii)     except as required by applicable Law, (A) make, change, or rescind any material election or method of accounting relating to Taxes, (B) file any material Tax Return (other than in the Ordinary Course and pursuant to applicable Law) or amend any material Tax Return, (C) enter into any closing agreement relating to material Taxes, (D) surrender any material right or claim to a refund of Taxes or commence, settle or compromise any Tax claim or assessment, (E) consent to any extension or waiver of the statute of limitations period applicable to any Taxes, Tax Returns or Claims for Taxes, or (F) enter into any Tax allocation, sharing, indemnity or similar agreement or arrangement (other than any commercial agreement to be entered into in the Ordinary Course, the principal purpose of which is not related to Taxes), in each case to the extent relating to the Purchased Assets, the Purchased Entities, the JV Entities or the Assumed Liabilities;

(xiv)     enter into, materially amend, or terminate (other than for cause) (A) any Contracts with any Employees with base annual compensation in excess of $200,000 per annum or (B) any Assumed Plan or any other agreement, plan or arrangement that would be an Assumed Plan as in effect on the date hereof (including any Contracts for the administration of any Assumed Plan);

(xv)     terminate the employment of any employee with base annual compensation in excess of $200,000 per annum of a Purchased Entity or any Sellers other than for cause;

(xvi)     except as agreed to in writing by Buyer, hire any individual with base annual compensation in excess of $200,000 per annum;

(xvii)     enter into, amend, terminate or negotiate to enter into or amend any Collective Bargaining Agreement; or

43

(xviii)  agree or commit to do any of the foregoing.

(c)      Notwithstanding the foregoing, nothing contained in this Agreement is intended to give Buyer, directly or indirectly, the right to control Sellers' operations prior to the Closing Date. Any action taken, or omitted to be taken, by Sellers to comply with any Law issued by a Governmental Authority providing for business closures, "sheltering-in-place" or other restrictions in connection with the COVID-19 pandemic shall in no event be deemed to constitute a breach of this Section 5.01; provided that Sellers provide notice to Buyer as soon as reasonably practicable prior to taking (or omitting to take) any such action or, to the extent not possible, as soon as reasonably practicable after taking (or omitting to take) any such action.

SECTION 5.02    *Access to Information*.  From the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 10), subject to entering a customary confidentiality agreement, Buyer shall be entitled, through its Affiliates and representatives, to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, assets, operations and personnel of Sellers relating (and solely to the extent relating) to the Purchased Assets and the Assumed Liabilities as Buyer may reasonable request. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and in a manner not to unreasonably interfere with the Business.  Each Seller shall use commercially reasonable efforts to cause its representatives to cooperate with Buyer and its Affiliates and representatives in connection with such investigations and examinations. Notwithstanding the foregoing, no Seller shall be required to afford such access to the extent that such Seller reasonably believes that doing so would: (A) result in the loss of attorney-client privilege or (B) violate any applicable Law, provided that in the case of each of subclauses (A) and (B), such Seller shall use its commercially reasonable efforts to allow for such access or disclosure in a manner that does not result in a loss of attorney-client privilege or a violation of applicable Law.

SECTION 5.03    *Bidding Protections*.  In connection with the Auction, and as set forth in the Bid Procedures Order, Sellers agree that any higher bid with respect to some or all of the Purchased Assets shall be no less than the Purchase Price (including if and as may be increased by Buyer at the Auction) *plus* the Expense Reimbursement (if and to the extent approved by prior order of the Bankruptcy Court), *plus* a reasonable minimum overbid amount to be calculated by the Debtors'.

ARTICLE 6

COVENANTS OF BUYER

SECTION 6.01    *Preservation of and Access to Books and Records*.  For a period of three (3) years following the Closing Date, Buyer shall provide to Sellers and their respective Affiliates and representatives (after reasonable advance notice and during regular business hours) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Purchased Assets, to the extent necessary to permit Sellers to determine any matter relating to their respective rights and obligations hereunder, to any Proceeding or to any Pre-Closing

44

Tax Period (for example, for purposes of any Tax or accounting audit or any claim or litigation matter) or otherwise related to the Excluded Assets or Excluded Liabilities, for periods prior to the Closing and shall preserve such books and records until the latest of (a) such period as shall be consistent with Buyer's records retention policy in effect from time to time, (b) the retention period required by applicable Law, (c) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases and (d) in the case of books and records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes.  Such access shall include access to any information in electronic form to the extent reasonably available.

SECTION 6.02    *Insurance Matters*.  From and after the Closing, the Purchased Assets, the Assumed Liabilities and the operations and assets and Liabilities in respect thereof, shall cease to be insured by any insurance policies or self-insurance programs maintained by Sellers or any of their respective Affiliates (excluding the Purchased Entities), and neither Buyer nor its Affiliates (including the Purchased Entities) shall have any access, right, title or interest to or in any such insurance policies or self-insurance programs (including to all claims and rights to make claims and all rights to proceeds) to cover the Purchased Assets, the Assumed Liabilities or the operations or assets or Liabilities in respect thereof; provided, however, that Buyer shall have the right to make claims and shall have the right to any proceeds with respect to the Purchased Assets or the Assumed Liabilities under any insurance policy for occurrence-based claims pertaining to, arising out of and inuring to the benefit of any Seller for all periods prior to the Closing, and such Seller shall use commercially reasonable efforts to seek the maximum recovery or allow Buyer to seek recovery (including by executing or delivering any document, agreement, instrument or other information as Buyer may reasonably request to seek such recovery) under such insurance policy, in each case, at Buyer's sole cost and expense (including, if and to the extent unpaid and otherwise payable as a result of such recovery, any deductibles, self-insured retentions or other out-of-pocket expenses required to be paid by Sellers or to the insurer in connection therewith), and such Seller shall cooperate with Buyer's reasonable requests if Buyer seeks recovery, with respect to such matters and shall remit (or, at Buyer's request, direct any such insurer to pay directly to Buyer) any insurance proceeds actually obtained therefrom (net of such Seller's reasonable and documented out-of-pocket costs and expenses of seeking such recovery, to the extent not otherwise paid or reimbursed by Buyer) to Buyer or a Buyer Designee.  Notwithstanding the foregoing, Sellers' obligations under this Section 6.02 shall not restrict or limit their ability to wind-down or otherwise liquidate their estates, in each case, after the Closing, including by confirming and consummating a Chapter 11 plan of liquidation or limit their ability to close the Chapter 11 Cases after the Closing. Sellers' obligations under this Section 6.02 shall terminate upon the Cut-Off Date; provided that, if elected by Buyer prior to the Cut-Off Date, Sellers shall use their commercially reasonable efforts to ensure that Buyer shall (at Buyer's cost and expense) continue to have the benefit of this Section 6.02 following the Cut-Off Date.

SECTION 6.03    *Governance Matters*.  As soon as reasonably practicable after the Closing, Buyer shall appoint the Chief Executive Officer of the Company to the board of directors (or equivalent governing body) of Buyer.  As soon as reasonably practicable after the Closing, Buyer shall adopt a management equity incentive plan for the benefit of Transferred Employees with respect to up to ten percent (10%) of the fully diluted common equity of Buyer in the form of

45

restricted stock, options or other instruments, with such terms as approved by the board of directors (or equivalent governing body) of Buyer.

ARTICLE 7

COVENANTS OF BUYER AND SELLERS

SECTION 7.01   *Confidentiality*.

(a)   Buyer acknowledges that the confidential information provided to Buyer in connection with this Agreement, including under Section 5.02, and the consummation of the transactions contemplated hereby, is subject to Section 10.08 (Confidentiality) of the Pre-Petition Credit Agreement.

(b)   Sellers acknowledge that from and after the Closing, all non-public information relating to the Purchased Assets and the Assumed Liabilities will be valuable and proprietary to Buyer and its Affiliates.   Sellers agree that, from and after the Closing, unless disclosure is requested or required under applicable Law, no Seller will, and Sellers will cause their Affiliates not to, disclose to any Person any confidential information regarding Buyer and its Affiliates, the Purchased Assets or the Assumed Liabilities; provided that (x) confidential information shall not include information that becomes generally available to the public other than through any action by any Seller or any of its Affiliates in violation this Section 7.01(a) and (y) confidential information may be used by Sellers solely to the extent necessary to defend any claims against any Seller; provided that in the case of clause (y), Sellers shall (i) disclose only that portion of such information which such member of such Seller is advised by its counsel is legally required to be disclosed, (ii) other than in connection with any claims involving Buyer or its Affiliates, cooperate with Buyer (at its expense) to obtain a protective order or other confidential treatment with respect to such information and (iii) other than in connection with any claims involving Buyer or its Affiliates, provide Buyer with a reasonable opportunity to review and comment on such disclosure.

SECTION 7.02   *Further Assurances*.

(a)   At and after the Closing, and without further consideration therefor, each of Sellers and Buyer shall execute and deliver such further instruments and certificates (including deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances) and use commercially reasonable efforts to take, or cause to be taken, all actions, and do or cause to be done all things as may be reasonably necessary, to effectuate the purposes and intent of and consummate the transactions contemplated by this Agreement and the other Transaction Documents.

(b)   The Parties agree to (and shall cause each of their respective Subsidiaries to) provide each other with such information and assistance as is reasonably necessary for the preparation of any Tax Returns or for the defense of any Tax claim or assessment, whether in connection with an audit or otherwise, relating to the Purchased Assets, the Purchased Entities and

the Assumed Liabilities, including the furnishing or making available on a timely basis of records, personnel (as reasonably required), books of account, or other necessary materials.

(c)     Sellers shall designate one or more employees, to be mutually agreed between Sellers and Buyer, to communicate with Buyer in connection with, and assist in facilitating, the obligations of Seller following the Closing Date (the "**Transition Employees**"), which employees shall remain employed with Sellers (which cost and expense shall be reflected in the Wind-Down Budget) through the period covered in the Wind-Down Budget ("**Transition Period**").  If any Transition Employee terminates his or her employment prior to the expiration of the Transition Period, Sellers shall promptly designate a replacement.  For the avoidance of doubt, Sellers shall retain all Liabilities related to the Transition Employees in connection with services provided hereunder during the Transition Period (subject to the including the costs and expenses in the Wind-Down Budget); provided, however, that following the expiration of the Transition Period, Buyer may offer employment to such employees pursuant to Section 7.05.

SECTION 7.03     *Certain Filings*.

(a)     Sellers and Buyer shall cooperate with one another (i) with respect to their obligations set forth in Section 7.03(b), including preparing and filing the FCC Applications, (ii) in determining whether any other action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material Contracts, in connection with the consummation of the transactions contemplated by this Agreement and the other Transaction Documents and (iii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

(b)     Buyer and the Company shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Law to consummate and make effective the transactions contemplated by this Agreement, including filing, or causing to be filed, as promptly as practicable, (i) any required notification and report forms under the HSR Act or any other Antitrust Laws with the applicable Governmental Authority and (ii) any applications, notices, reports, disclosures or other filings, including but not limited to the FCC Applications, related to the Permits with the applicable Governmental Authority that are necessary or advisable in connection with the consummation of the transactions contemplated by this Agreement (such applications, notices, reports, disclosures or other filings related to the Permits, including, but not limited to, those as set forth on Section 7.03(b) of the Disclosure Schedules, the "**Permit Approvals**"); provided, however, that no Party shall be obligated to pay any consideration to any third party from whom consent or approval is requested under any Contract.  Buyer and the Company shall consult with each other as to the appropriate time of filing such notifications and shall agree upon the timing of such filings.

(c)     Subject to appropriate confidentiality safeguards, each Party shall (i) respond promptly (and, in any event, within ten (10) days) to any request for additional information, documents or other materials made by any Governmental Authority with respect to any filings or any of the transactions contemplated by this Agreement, (ii) promptly notify counsel to the other

Party of, any communications from or with any Governmental Authority in connection with any of the transactions contemplated by this Agreement and, to the extent reasonably practicable, enable counsel to the other Party to participate in any such communications, (iii) not participate in any prescheduled telephonic or in-person meeting with any Governmental Authority in connection with any of the transactions contemplated by this Agreement unless such Party consults with counsel to the other Party in advance and, to the extent permitted by such Governmental Authority, gives the other Party a reasonable opportunity to attend, participate and speak threat, (iv) furnish such information and assistance as may be reasonably requested in connection with the preparation of necessary filings or submission of information to the applicable Governmental Authority and provide counsel to the other Party the opportunity to review in advance any document, opinion or proposal to be made or submitted to any Governmental Authority, (v) defend all Proceedings to which it or any of its affiliates is a party challenging or affecting this Agreement or the consummation of the transactions contemplated hereby, in each case until the issuance of a final, non-appealable Order with respect to each such Proceeding, (vi) seek to have lifted or rescinded any injunction or restraining order which may adversely affect the ability of the Parties to consummate the transactions contemplated by this Agreement, in each case until the issuance of a final, non-appealable Order with respect thereto, and (vii) take reasonable best efforts to resolve any objection or assertion by any Governmental Authority challenging this Agreement or the transactions contemplated hereby.  Sellers and Buyer shall use their reasonable best efforts to cause the waiting periods under the HSR Act and any other Antitrust Laws to terminate or expire at the earliest possible date after the date of filing and to obtain all Permit Approvals as promptly as practicable.  All filing fees relating to this Section 7.03 shall be borne and paid fully by Sellers.

(d)       Notwithstanding anything to the contrary herein or otherwise, (i) Buyer and Company shall jointly determine strategy and timing and coordinate all activities with respect to seeking Permit Approvals, including FCC Approval, (ii) the Company shall, and shall cause each Seller to, use its commercially reasonable efforts to take such actions as reasonably requested by Buyer, after consultation with the Company, in connection with obtaining any such Permit Approvals, and (iii) Buyer shall use its commercially reasonable efforts to seek to obtain any Permits that are subject to a Permit Approval that are not transferrable and that are required to conduct the business of the Company and its Subsidiaries in the Ordinary Course; provided, however, that neither Buyer nor the Sellers shall be obligated to pay any material consideration to any Person to obtain any such replacement Permits.

(e)       If any Permit Approval is not obtained prior to the Closing, then, until the earlier of such time as (i) such Permit Approval is obtained by Sellers, (ii) Buyer separately obtains any such Permit (sufficient to conduct the business of the Company and its Subsidiaries in the Ordinary Course) and (iii) the closing of the Chapter 11 Cases, Sellers shall, and shall cause their respective Subsidiaries to continue to, use reasonable best efforts to obtain, or cause to be obtained, such Permit Approval, and Buyer shall provide reasonable cooperation to Sellers, at Buyer's sole cost and expense, subject to any approval of the Bankruptcy Court that may be required, and Sellers shall and shall cause their Subsidiaries to enter into an arrangement reasonably acceptable to Buyer intended to both (A) provide Buyer, to the fullest extent not prohibited by applicable Law, the claims, rights, remedies and benefits under, and pursuant to, such Permit(s) and (B) cause Buyer, subject to Buyer receiving such claims, rights, remedies and benefits, to assume and bear all

48

Assumed Liabilities with respect to such Permits from and after the Closing (as if such Permit had been transferred to Buyer as of the Closing) in accordance with this Agreement (including by means of any subcontracting, sublicensing or subleasing arrangement).  Upon obtaining the relevant Permit Approval, each Seller shall, and shall cause any of its applicable Subsidiaries to, promptly sell, convey, assign, transfer and deliver to Buyer such Permit for no additional consideration.

SECTION 7.04    *Public Announcements*.  On and after the date hereof and through the Closing Date, the Parties shall reasonably consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and neither Party shall, except as may be required to comply with applicable Law, issue any press release or make any public statement prior to obtaining, with respect to Sellers, Buyer's, and with respect to Buyer, the Company's, prior written consent (which consent, in each case, shall not be unreasonably withheld, conditioned or delayed).

SECTION 7.05    *Employee Matters*.

(a)    Between the date hereof and Closing, Sellers shall, in consultation with Buyer, implement a reduction in force and consolidation consistent with the long range plan that Sellers have delivered to Buyers as set forth in Section 7.05 of the Disclosure Schedules the ("**Long Range Plan**").  Employees who are terminated in connection with such reductions in force being "**Terminated Employees**".  At least ten (10) Business Days prior to the Closing, Buyer shall, or shall cause a Buyer Designee to, make an offer of employment, to commence as of the Closing, to each Employees who is employed immediately prior to the Closing and who will not be a Terminated Employee prior to the Closing or a Transition Employee (each such Employee, an "**Offered Employee**").  Each Offered Employee who receives and accepts such an offer of employment with Buyer or a Buyer Designee is referred to herein as a "**Transferred Employee**", and Buyer shall, or shall cause the applicable Buyer Designee to, employ each Transferred Employee in accordance with such accepted offer as of the Closing.  Buyer hereby agrees that the offers to the Offered Employees shall include, and for the period immediately following the Closing through and including the twelve (12) month anniversary of the Closing, Buyer shall, or shall cause the applicable Buyer Designee to, provide (i) a level of base salary and wages to each Transferred Employee that is no less favorable to the base salary and wages provided to such Offered Employee as of the date hereof, and (ii) benefit plans for the benefit or welfare of each Transferred Employee (each, a "**Buyer Benefit Plan**"), that are comparable in the aggregate to the benefits (except with respect to equity-based compensation and retention benefits) provided to such Offered Employee as of the date hereof.

(b)    Subject to Section 7.02(c), effective on or prior to the Closing Date, Sellers shall terminate the employment of each Terminated Employee and each Offered Employee who does not accept an offer of employment with Buyer or a Buyer Designee prior to the Closing.

(c)    Seller shall be solely responsible for all Liabilities and obligations with respect to any Employee or former Employee who is not and does not become a Transferred Employee

(including all severance obligations with respect to any Employee or former employee in connection with their termination of employment with Seller and its Affiliates).

(d)       Following the Closing, Buyer shall process the payroll for, and pay (or cause to be paid), the base wages, base salary and ordinary course sales commissions accrued during the payroll period in which the Closing Date falls (the "**Closing Payroll Period**") with respect to each Employee employed at any time during the Closing Payroll Period other than Transition Employees and any Terminated Employees.  The Closing Payroll Period shall extend from the final payroll date preceding the Closing through and including the Closing Date. In connection therewith, Buyer shall withhold and remit, on behalf of Sellers, all applicable Taxes, including payroll taxes, as required by Law.

(e)       Buyer shall assume, pay and discharge the Liabilities of Sellers for all current and deferred salary, wages, unused vacation, sick days, personal days and/or leave earned or accrued by each Transferred Employee through Closing.  In addition, with respect to any Transferred Employee or Offered Employee which Buyer does not offer employment to or whose offer of employment is not consistent with Section 7.05(a), Buyer shall assume, pay and discharge the Liabilities of Sellers for (i) any obligations or Liabilities under any Assumed Plan other than any severance obligations under any Assumed Plan in connection with the termination of any individual's employment with Seller and its Affiliates, and (ii) any Liabilities arising under an employee incentive or retention program or similar arrangement approved by the Bankruptcy Court.  With respect to each Transferred Employee, Buyer shall assume, pay and discharge the Liabilities of Sellers under the WARN Act (provided, however, that to the extent that the WARN Act is applicable to any such Employee, Sellers shall comply with all procedural aspects thereof through the Closing Date) and, with respect to each Transition Employee and Terminated Employee, Seller shall be solely responsible for all obligations under the WARN Act. Notwithstanding anything in this Agreement to the contrary, Buyer shall assume, pay and discharge the Liabilities of Sellers under COBRA (and any comparable state law) for all individuals who are "M&A qualified beneficiaries" (as such term is defined in U.S. Treasury Regulation Section 54.4980B-9) from and after the Closing.  Buyer hereby acknowledges that (A) it will be a "successor employer" for purposes of U.S. Treasury Regulation Section 54.4980B-9 and other applicable purposes under COBRA and (B) that, without limiting the generality of the foregoing clause (A), Transition Employees will be treated as "M&A qualified beneficiaries" for purposes of COBRA as of the earlier of the termination of their employment with Sellers or after the Sellers no longer provide any health, dental or vision benefit plans.

(f)       Transferred Employees shall receive credit for all purposes (including for purposes of eligibility to participate, vesting, benefit accrual and eligibility to receive benefits) under any Buyer Benefit Plan under which each Transferred Employee may be eligible to participate on or after the Closing to the same extent recognized by the Seller under comparable Seller Plans as of the date hereof; provided, however, that such crediting of service shall not operate to duplicate any benefit or the funding of any such benefit or grant service credit with respect to benefit accrual under any defined benefit pension plan, retiree welfare plan or any frozen plan.  With respect to any Buyer Benefit Plan that is a welfare benefit plan, program or arrangement and in which a Transferred Employee may be eligible to participate on or after the Closing, Buyer shall, or shall

50

cause the applicable Buyer Designee to, use commercially reasonable efforts to, (i) waive, or use reasonable efforts to cause its insurance carrier to waive, all limitations as to pre-existing, waiting period or actively-at-work conditions, if any, with respect to participation and coverage requirements applicable to each Transferred Employee under such Buyer Benefit Plan to the same extent waived under a comparable Seller Plan and (ii) provide credit to each Transferred Employee (and such Transferred Employee's beneficiaries) for any co-payments, deductibles and out-of-pocket expenses paid by such Transferred Employee (and such Transferred Employee's beneficiaries) under the comparable Seller Plan during the relevant plan year, up to and including the Closing; provided, however, that such credit shall not operate to duplicate any benefit or the funding of any such benefit.

(g)     Buyer agrees to assume and honor and assume, or to cause a Buyer Designee to honor and assume, in accordance with their current terms, each Assumed Plan and all trust agreements, insurance contracts, administrative service agreements and investment management agreements related to the funding and administrations of such Assumed Plans.  Seller shall take such actions and reasonably cooperate with Buyer with respect to such obligations.

(h)     No provision in this Section 7.05 or otherwise in this Agreement, whether express or implied, shall (a) create any third-party beneficiary or other rights in any employee or former employee of Sellers or any of their subsidiaries or Affiliates (including any beneficiary or dependent thereof), any other participant in any Seller Plan or any other Person; (b) create any rights to continued employment with Sellers, Buyer or any of their respective subsidiaries or Affiliates or in any way limit the ability of Sellers, Buyer or any of their respective subsidiaries or Affiliates to terminate the employment of any individual at any time and for any reason; or (c) constitute or be deemed to constitute an amendment to any Seller Plan or any other employee benefit plan, program, policy, agreement or arrangement sponsored or maintained by Sellers, Buyer or any of their subsidiaries or Affiliates.

SECTION 7.06     *Tax Matters*.

(a)     Sellers shall prepare and timely file (or shall cause to be prepared and timely filed) all Tax Returns with respect to the Purchased Assets, including the Purchased Entities, for any Tax period ending on or before the Closing Date that are due on or prior to the Closing Date.  Sellers shall be liable and responsible for, and timely pay in full any Taxes relating to periods covered by such Tax Returns.  Sellers or Buyer, as required by applicable Law, shall timely file, or cause to be timely filed, each such Tax Return.  To the extent that Buyer or its Affiliates is required by applicable Law to file such Tax Return, Sellers shall pay to Buyer the amount of any Taxes reflected on such Tax Returns (to the extent required to be paid by Seller) within five (5) days following the written demand by Buyer for such payment.

(b)     Buyer shall prepare and timely file (or shall cause to be prepared and timely filed) all other Tax Returns with respect to the Purchased Assets for the Pre-Closing Tax Period and any Straddle Period.  Sellers shall pay to Buyer the amount of any unpaid property Taxes with respect to the Purchased Assets for the Pre-Closing Tax Period and the portion of the Straddle Period

51

ending on the day before the Closing Date within five (5) days following any demand by Buyer for such payment.

(c)      For purposes of this Agreement, in order to apportion appropriately any Taxes, exemptions, allowances or deductions relating to a taxable period beginning on or before and ending after the Closing Date (a "**Straddle Period**"), the amount of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date shall be the amount of such Taxes, exemptions, allowances or deductions for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days in the portion of the Straddle Period ending on and including the Closing Date, and the denominator of which is the number of calendar days in the entire Straddle Period (provided that any Tax exemption or allowance with respect to an annual period shall be pro-rated on an equal daily basis between the pre-Closing Tax period and the remainder of the Straddle Period).

(d)      Any and all existing Tax sharing or similar agreements, except for this Agreement, between any Purchased Entity, on the one hand, and any Sellers, any retained Subsidiaries or any of their Affiliates, on the other hand, shall be terminated as of the Closing Date to the extent they relate to the Purchased Entity, and the Purchased Entity shall have no further liabilities or obligations imposed on it under any such agreements.

(e)      The Parties agree to treat any payment made from one Party to another pursuant to this Agreement that is not reflected as part of the Purchase Price under this Agreement as an adjustment to the Purchase Price for all income Tax purposes.

SECTION 7.07    *Misallocated Assets*.  If, following the Closing, Buyer or its Affiliates own or hold any Excluded Asset (including by having an Excluded Asset located at any Owned Real Property or any Leased Real Property that is or will be owned or leased by Buyer or any of its Affiliates), Buyer shall transfer, or shall cause its Affiliate to transfer, at no cost to Sellers, such Excluded Asset as soon as practicable to any Sellers designated by the Company.  If, following the Closing, Sellers or any of their respective Affiliates own any Purchased Asset, Sellers shall transfer, or shall cause their respective Affiliates to transfer, such Purchased Asset as soon as practicable to Buyer or an Affiliate designated by Buyer.

SECTION 7.08    *Payments from Third Parties after Closing*.  In the event that any Seller receives any payment from a third party (other than Buyer or any of its Affiliates) after the Closing Date pursuant to any of the Purchased Contracts (or with respect to the operation by Buyer of the business of Sellers or any Purchased Asset during the post-Closing period) and to the extent such payment is not made in connection with an Excluded Asset or an Excluded Liability, Sellers shall forward such payment, as promptly as practicable but in any event within thirty (30) days after such receipt, to Buyer (or other entity nominated by Buyer in writing to Sellers) and notify such third party to remit all future payments (in each case, to the extent such payment is in respect of any post-Closing period with respect to the business of Sellers and is not in respect of an Excluded Asset or an Excluded Liability) pursuant to the Purchased Contracts to Buyer (or such other entity). Notwithstanding anything to the contrary in this Agreement, in the event that Buyer or any of its Affiliates receives any payment from a third party after the Closing on account of, or in connection

52

with, any Excluded Asset, Buyer shall forward such payment, as promptly as practicable but in any event within thirty (30) days after such receipt, to the Company (or other entity nominated by the Company in writing to Buyer) and notify such third party to remit all future payments on account of or in connection with the Excluded Assets to the Company (or such other entity as the Company may designate).

SECTION 7.09   *Bulk Transfer Laws*.  The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any security interests in the Purchased Assets, including any liens or claims arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

SECTION 7.10   *Bankruptcy Court Approval*.

(a)   Sellers shall serve on all non-Debtor counterparties to all of their Contracts a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such Contracts and shall notify such non-Debtor counterparties of the deadline for objecting to the Cure Costs, if any, which deadline shall not be less than seven (7) days prior to the Sale Hearing.

(b)   Sellers and Buyer shall cooperate to obtain the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as reasonably practicable, including furnishing affidavits, non-confidential financial information, or other documents or information for filing with the Bankruptcy Court and making such advisors of Buyer and Sellers and their respective Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing adequate assurances of performance by Buyer as required under Section 365 of the Bankruptcy Code, and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Sellers and Buyer acknowledge that in order to obtain such approval Sellers must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets and that such demonstration shall include serving notice of the transactions contemplated by this Agreement to creditors and interested parties as ordered by the Bankruptcy Court.

(c)   Each of the Company and Buyer shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received by such Party from the Bankruptcy Court or any third party or any Governmental Authority with respect to the transactions contemplated by this Agreement.

(d)   Subject to entry of the Sale Order and consummation of the Closing, Buyer shall, promptly following the Closing and in any event no later than eighteen (18) months following the Closing Date, pay the Cure Costs and cure any and all other defaults and breaches under the

Purchased Contracts in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.

(e)     The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances) and (C) the performance by Sellers of their respective obligations under this Agreement, (ii) authorize and empower Sellers to assume and assign to Buyer the Purchased Contracts, (iii) find that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, find that Buyer is not a successor to any Seller and grant Buyer the protections of Section 363(m) of the Bankruptcy Code, (iv) find that Buyer shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Purchased Assets other than as expressly set forth in this Agreement or as required under applicable nonbankruptcy Law, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (v) find that Buyer has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Purchased Contracts and (vi) find that Buyer shall have no Liability for any Excluded Liability.  Without limiting Sellers' obligation to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Buyer agrees that it will promptly take reasonable actions to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.  Nothing in this Agreement shall require Buyer, Sellers or their respective Affiliates to give testimony to or submit any pleading, affidavit or information to the Bankruptcy Court or any Person that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or their respective stakeholders.

(f)     Sellers acknowledge and agree, and the Sale Order shall provide that, except as otherwise provided in Section 2.03, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Purchased Assets.  On the Closing Date, the Purchased Assets shall be transferred to Buyer free and clear of all obligations, Liabilities and Encumbrances, other than Permitted Encumbrances and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code.

(g)     In the event the entry of the Bid Procedures Order, the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bid Procedures Order, the Sale Order or other such Order), Sellers shall use

54

commercially reasonable efforts to defend such appeal. Sellers shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

(h)     Notwithstanding anything contained herein to the contrary, during the pendency of the Chapter 11 Cases, Sellers shall not reject or transfer any Excluded Contract without first obtaining Buyer's prior written consent. In the event that any of the Parties to this Agreement discovers a Contract related to the business of the Company and its Subsidiaries, the Purchased Assets or the Assumed Liabilities (whether prior to, on or following the Closing) and such Contract (i) was not set forth on Section 2.01(a) of the Disclosure Schedules, (ii) is a Contract which Buyer wishes to assume the rights and obligations of and (iii) has not been rejected by Sellers (with Buyer's prior written consent in compliance with the immediately preceding sentence), Buyer and Sellers shall execute, acknowledge and deliver such other instruments and take such further actions as are reasonably practicable for Buyer or Buyer Designee to assume the rights and obligations under such Contract as of the Closing (or, if applicable, as soon as reasonably practicable following the Closing), otherwise in accordance with Section 2.05.

(i)     Notwithstanding anything to the contrary herein, Buyer agrees and acknowledges that Sellers and their Affiliates, including through their representatives, are and may continue soliciting and/or responding to inquiries, proposal or offers from third parties in connection with any Alternative Transaction, including, without limitation, inquiries, proposals or offers related to the Purchased Assets, and may facilitate, including furnishing any information (subject to entering into a customary confidentiality agreement) with respect to, any effort or attempt by any Person to seek to do any of the foregoing in connection with an Alternative Transaction. Sellers shall as promptly as reasonably practicable (and in any event within twenty-four (24) hours after receipt) notify Buyer in writing of (i) receipt by Sellers or any of their respective Affiliates or representatives of any such inquiries, proposals or offer and (ii) any decision by Sellers as to whether to enter into any such discussions or negotiations. Sellers shall provide Buyer any notice with respect to any Alternative Transaction that is required by, and in accordance with, the RSA.

SECTION 7.11    *No Successor Liability*. The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Buyer shall not be deemed to: (a) be the successor of any Seller, (b) have, de facto, or otherwise, merged with or into Sellers, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Purchased Assets other than as expressly set forth and agreed in this Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Buyer shall have no Liability for any Encumbrance (other than the Assumed Liabilities and Permitted Encumbrances on the Purchased Assets) against Sellers or any of Sellers predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of Sellers, the Purchased Assets or any Liability of Sellers arising

55

prior to, or relating to any period occurring prior to, the Closing Date. The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this Section 7.11.

SECTION 7.12    *Change of Name*.    Promptly (and, in any event, within thirty (30) Business Days) following the Closing, each Seller shall discontinue the use of their current name (and any other trade names or "d/b/a" names currently utilized by such Seller) and shall not subsequently change any of their names to or otherwise use or employ any name which includes the words "Global Eagle" and the other names listed on Section 7.12 of the Disclosure Schedules without the prior written consent of Buyer, and each Seller shall cause the name of Sellers in the caption of the Chapter 11 Cases to be changed to the new names of each Seller.

SECTION 7.13    *Communications with Customers and Suppliers*.    Prior to the Closing, the Parties shall reasonably cooperate with each other in coordinating their communications with any Material Customer, Material Supplier or other material contractual counterparty of Sellers in relation to this Agreement and the transactions contemplated hereby.

SECTION 7.14    *Wind-Down Budget*.    The Parties shall reasonably cooperate with each other, and use their respective good faith efforts, to develop and to finalize no later than seven (7) days prior to the Initial Acceptable Bid Deadline (as defined in the Bidding Procedures) a wind-down budget, in form and substance acceptable to the Sellers and the Buyer, with any subsequent adjustments to be mutually agreeable to both the Sellers and the Buyer (such budget, the "**Wind-Down Budget**").    The Wind-Down Budget and Wind-Down Amount shall be subject to adjustment as provided in the Sale Order.

SECTION 7.15    *Investigation*.    Buyer acknowledges that it has conducted its own independent investigation and analysis of the business, operations, assets, liabilities, results of operations, condition (financial or otherwise) and prospects of the Business, the Purchased Assets and the Purchased Entities, and that it and its representatives have received access to certain of the books and records, facilities, equipment, Contracts and other assets of the Business (including the Purchased Assets and the Purchased Entities) for such purpose.    Buyer acknowledges and agrees that, except for the representations and warranties contained in Article 3, none of the Sellers nor any of their respective Affiliates makes or has made any representation or warranty, either express or implied, or other statements or information concerning the Business, the Purchased Assets or the Purchased Entities in connection with the transactions contemplated by this Agreement. Notwithstanding the foregoing, nothing in this Section 7.15 shall limit or alter the rights of Buyer under any other agreement with Sellers, including the RSA, the DIP Credit Agreement and the DIP Facility.

ARTICLE 8

CONDITIONS TO CLOSING

SECTION 8.01    *Conditions to Obligations of Buyer and Sellers*.    The obligations of each of Buyer and Sellers to consummate the Closing are subject to the satisfaction or valid waiver at or prior to the Closing of the following conditions:

56

(a)      all waiting periods (including any extension thereof) applicable to the purchase and sale of the Purchased Assets under the HSR Act or any other Antitrust Law set forth on Section 8.01(a) of the Disclosure Schedules shall have expired or been terminated;

(b)      no provision of any applicable Law and no judgment, injunction or Order shall then be in effect prohibiting or making illegal the consummation of the Closing;

(c)      the FCC Approval shall have been granted;

(d)      the Bankruptcy Court shall have entered the Bid Procedures Order on or before 28 days after the Petition Date; and

(e)      the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order on or before (i) subject to the Bankruptcy Court's availability, 49 days after the Petition Date, in the event the IAB Trigger Event occurs and (ii) 85 days after the Petition Date, in the event the IAB Trigger Event does not occur.

SECTION 8.02   *Conditions to Obligation of Buyer*.   The obligation of Buyer to consummate the Closing is subject to the satisfaction (or valid waiver) at or prior to the Closing of the following further conditions:

(a)      the representations and warranties of Sellers in this Agreement shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except where the failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality," "material adverse effect," "Material Adverse Effect" or similar qualifiers contained therein), has not had or would not reasonably be expected to have a Material Adverse Effect;

(b)      the covenants and agreements that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects;

(c)      Sellers shall have delivered, or cause to be delivered, to Buyer each item set forth in Section 2.08(a); and

(d)      the RSA, the DIP Credit Agreement and the DIP Order shall remain in full force and effect.

SECTION 8.03   *Conditions to Obligation of Sellers*.   The obligation of Sellers to consummate the Closing is subject to the satisfaction (or valid waiver) at or prior to the Closing of the following further conditions:

(a)      the representations and warranties of Buyer in this Agreement shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct (without giving effect to any

limitation as to "materiality," "material adverse effect" or similar qualifiers contained therein) in all respects as of such earlier date, except where such failures to be true and correct would not materially impair or prevent Buyer's ability to consummate the transactions contemplated by this Agreement;

(b)    the covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects; and

(c)    Buyer shall have delivered, or cause to be delivered, to the Company each item set forth in Section 2.08(b).

ARTICLE 9

SURVIVAL

SECTION 9.01    *Survival*.  The Parties, intending to modify any applicable statute of limitations, agree that (a)(i) the representations and warranties in this Agreement and in any certificate delivered pursuant hereto and (ii) the covenants in this Agreement only requiring performance prior to the Closing shall, in each case, terminate and be of no further force and effect effective as of the Closing and shall not survive the Closing for any purpose, and thereafter there shall be no Liability on the part of, nor shall any claim be made by or on behalf of, any Party or any Party's Affiliates in respect thereof and (b) the covenants in this Agreement that contemplate performance at or after the Closing or expressly by their terms survive the Closing shall survive the Closing in accordance with their respective terms (the "**Surviving Post-Closing Covenants**") until the earlier of (i) full performance of such covenant in accordance with its terms and (ii) three (3) years following the Closing Date.  Except with respect to the Surviving Post-Closing Covenants, no other remedy shall be asserted or sought by Buyer, and Buyer shall cause its Affiliates not to assert or seek any other remedy, against Sellers or any of their respective Affiliates under any contract, misrepresentation, tort, strict liability, or statutory or regulatory Law or theory or otherwise, all such remedies being hereby knowingly and expressly waived and relinquished to the fullest extent permitted under applicable Law. Buyer and Sellers acknowledge and agree, on their own behalf and on behalf of their Affiliates that the agreements contained in this Section 9.01 are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this Section 9.01, none of the Parties would enter into this Agreement.

ARTICLE 10

TERMINATION

SECTION 10.01    *Grounds for Termination*.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of the Company and Buyer;

58

(b)      by either the Company or Buyer, if the Closing shall not have been consummated on or before November 30, 2020 (the "**End Date**"); provided, however, if all of the conditions to Closing, other than the conditions set forth in Section 8.01(a), Section 8.01(b) or Section 8.01(c), shall have been satisfied or shall be capable of being satisfied at the End Date, either the Company or Buyer may, by written notice to the other Party, extend the End Date for a maximum of two (2) additional thirty (30)-day periods (each, a "**Renewal Period**") and such date, as so extended to the end of the first or second Renewal Period, as the case may be, shall be deemed the End Date; provided, further, that the right to terminate this Agreement pursuant to this Section 10.01(b) shall not be available to a Party whose breach of any of its representations, warranties, covenants or agreements contained herein has been the primary cause of the failure of the Closing to occur on or before the End Date;

(c)      by either the Company or Buyer, if at the end of the Auction for the Purchased Assets (if any), Buyer is not determined by the Company to be either the "Successful Bidder" or the "Backup Bidder" (each as defined in the Bid Procedures Order);

(d)      by the Company, if Sellers are not then in material breach of their obligations under this Agreement and Buyer breaches or fails to perform any of its representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent the satisfaction of a condition set forth in Section 8.01 or Section 8.03, (ii) cannot be, or has not been, cured within ten (10) days following delivery of written notice to Buyer of such breach or failure to perform and (iii) has not been waived by the Company;

(e)      by Buyer, if Buyer is not then in material breach of its obligations under this Agreement and Sellers breach or fail to perform any of their representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent the satisfaction of a condition set forth in Section 8.01 or Section 8.03, (ii) cannot be, or has not been, cured within ten (10) days following delivery of written notice to the Company of such breach or failure to perform and (iii) has not been waived by Buyer;

(f)      by either Buyer or the Company, (i) if the Bankruptcy Court enters an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under Chapter 11 of the Bankruptcy Code and comprising part of the Chapter 11 Cases without the prior approval of the Required Consenting First Lien Holders (as defined in the RSA), (ii) if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Company is appointed in the Chapter 11 Cases or (iii) an Order or dismissal, conversion or appointment is entered with respect to the Chapter 11 Cases for any reason and not reversed or vacated within fourteen (14) days after entry thereof;

(g)      by Buyer or the Company, if any Governmental Authority issues any Order permanently enjoining or otherwise permanently prohibiting the transactions contemplated by this Agreement and such Order shall have become final and non-appealable; provided, however, that the right to terminate this Agreement pursuant to this Section 10.01(g) shall not be available to a Party that failed to use its reasonable best efforts to contest, resolve or lift such Order; provided, further, that the right to terminate this Agreement under this Section 10.01(g) shall not be available

59

to any Party if such Order was primarily caused by (i) such Party's material breach of any provision of this Agreement or (ii) such Party's failure to comply in any material respect with its obligations hereunder.

(h)      automatically, and without any requirement of any Party to deliver any notice of such termination to any other Party, if Sellers publicly announces their support for any stand-alone plan of reorganization or liquidation (or publicly support any such plan filed by any other party), other than a wind-down plan of Sellers' estates post-Closing including pursuant to a plan of liquidation consistent with the RSA, provided that, for the avoidance of doubt, pursuit of an Alternative Transaction within the meaning of Section 7.10(i) shall not be grounds for termination of this Agreement by Buyer;

(i)      by either Buyer or the Company, if an Order of the Bankruptcy Court is entered denying approval of the Bid Procedures Order or the Sale Order and such Order shall have become final and non-appealable;

(j)      by Buyer if the DIP Facility is accelerated and the Required DIP Lenders (as defined in the RSA) exercise remedies as set forth in the DIP Credit Agreement and DIP Orders;

(k)      by Buyer if, under Section 363(k) of the Bankruptcy Code, Buyer is unable, pursuant to any Final Order of the Bankruptcy Court to provide a credit bid (or otherwise bidding on such other terms as may be agreed by Buyer, in its sole discretion) as contemplated by this Agreement in connection with the payment of the Purchase Price;

(l)      by Buyer upon the occurrence of any RSA Termination Event (other than as a result of a breach by the Required Consenting First Lien Lenders (as defined in the RSA)); or

(m)      by the Company upon the occurrence of any RSA Termination Event (other than as a result of a breach by Sellers).

The Party desiring to terminate this Agreement pursuant to this Section 10.01 (other than pursuant to Section 10.01(a)) shall give written notice of such termination to the other Party in accordance with Section 12.01.  For the avoidance of doubt, each condition permitting termination of this Agreement set forth in this Section 10.01 shall be considered separate and distinct from each other such condition and, if more than one termination condition set forth in this Section 10.01 is applicable, the Party exercising any such termination right shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

SECTION 10.02   *Effect of Termination*.

(a)      If this Agreement is terminated as permitted by Section 10.01, (i) this Agreement shall become null and void and of no further force and except, except for the provisions of Section 7.01(a), this Section 10.02, 10.03 and Article 12, which shall survive such termination of this Agreement and (ii) no Party (nor any stockholder, director, officer, employee, agent, consultant or representative of any such Party) shall thereafter have any Liability hereunder; provided that nothing in this Section 10.02 shall be deemed to release any Party from any Liability

60

(x) for any breach of this Agreement occurring prior to its termination and (y) that may otherwise be provided in, or contemplated by, the provisions of Section 7.01(a) or Section 10.02(b).

(b)     Notwithstanding anything contained in this Agreement to the contrary, in the event (i) this Agreement is terminated pursuant to Section 10.01(c), Section 10.01(e), Section 10.01(f), Section 10.01(h), Section 10.01(i), Section 10.01(j) or Section 10.01(l) or (ii) (A) this Agreement is terminated pursuant to Section 10.01(b) or Section 10.01(g) and (B) at the time of such termination, Buyer is entitled to terminate this Agreement pursuant to Section 10.01(e), Sellers agree, on a joint and several basis, to pay Buyer the Expense Reimbursement (without duplication of the payment of such expenses under any other agreement with Sellers) by wire transfer of immediately available funds promptly within five (5) Business Days of such termination of this Agreement.

SECTION 10.03   *Costs and Expenses*.   Except as otherwise expressly provided in this Agreement, including as set forth in Section 10.02(b) whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

ARTICLE 11

TAXES

SECTION 11.01   *G Reorganization*.

(a)     Buyer has the right to elect at any time at least five (5) Business Days prior to the Closing to structure or restructure the transactions contemplated by this Agreement as a reorganization under Section 368(a)(1)(G) of the Code, with any actual or deemed distribution by the Company (or, if applicable, any of its Subsidiaries) qualifying under Sections 354 and 356 of the Code but not under Section 355 of the Code ("**G Reorganization**" and such election, the "**G Reorganization Election**"); provided that such G Reorganization would not materially delay the Closing.

(b)     In the event that a G Reorganization Election is made, Buyer and Sellers shall (i) agree on the transaction steps to implement the G Reorganization in a manner that is otherwise consistent with the rights and obligations of Buyer and Sellers under this Agreement, (ii) treat the G Reorganization as a corporate acquisition of assets by Buyer to which Section 381 of the Code applies, (iii) agree that this Agreement (together with any other applicable documents) constitutes a "plan of reorganization" within the meaning of Treasury Regulations Section 1.368-2(g) with neither Buyer nor any Seller taking any action or failing to take an action that will preclude the transactions contemplated by this Agreement (together with any other applicable documents) from qualifying as a G Reorganization and (iv) take (or not take) any other actions reasonably necessary to secure and preserve the qualification of any of the transactions set forth in this Agreement (together with any other applicable documents) as a G Reorganization, including, without limitation, with respect to (A) repayment, cancellation or settlement of, or other actions with respect to, any intercompany accounts on or before the Closing Date, (B) the merger of one

member of the Company or its Subsidiaries with another member of the Company or its Subsidiaries on or before the Closing Date or conversion (or liquidation) of any such member into a limited liability company on or before the Closing Date, (C) the filing of any Tax elections to treat any such entity as a disregarded entity for U.S. federal income Tax purposes on or before the Closing Date, (D) causing the formation of an entity that will act as the acquiror in the G Reorganization and (E) satisfaction of the ownership requirements set forth in Section 382(l)(5)(A) of the Code ("**L5**") to the extent that Buyer is potentially eligible to utilize L5 and Buyer agrees that the preservation of the ability to make such election is in the best interests of Buyer; <u>provided</u> that Sellers shall not be limited in respect of disposing of any of their assets if and to the extent permitted under the other provisions of this Agreement and taking or refraining from taking any action required by Law, including if such actions would be inconsistent with their obligations under the Bankruptcy Code.

(c)    To the extent not addressed by the foregoing, Buyer and each Seller shall also furnish or cause to be furnished to each other all documentation and information of Sellers or any of their Affiliates as reasonably requested in connection with (i) the treatment of the transactions contemplated by this Agreement as one or more reorganizations under Section 368 of the Code or in connection with qualifying for the application of Section 382(l)(5) of the Code and (ii) the Tax basis, losses, and credits (including carryovers), income, gains, deductions and other attributes or Tax items of Sellers or any of their Affiliates.

## ARTICLE 12

## MISCELLANEOUS

SECTION 12.01    *Notices*.    All notices, requests and other communications to any Party hereunder shall be in writing and shall be delivered to the addresses set forth below (or pursuant to such other address(es) as may be designated in writing by the Party to receive such notice):

if to Buyer:

GEE Acquisition Holdings Corp.
P.O. Box #1793
Concord, NH 03302
Attention: Stephen Gould
Email: stephenagould@gmail.com

with a copy, which shall not constitute notice, to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention:    Scott J. Greenberg, Michael J. Cohen and Barbara L. Becker
Email:        sgreenberg@gibsondunn.com;

mcohen@gibsondunn.com;
bbecker@gibsondunn.com

if to Sellers, to:

Global Eagle Entertainment Inc.
1821 E. Dyer Road
Santa Ana, CA 92705
Attention:        Christian Mezger and Kim Nakamaru
Email             Christian.Mezger@globaleagle.com;
                  Kim.Nakamaru@globaleagle.com

with a copy, which shall not constitute notice, to:

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022-4834
Attention:        George Davis, David Zaheer and Ted Dillman
Email             george.davis@lw.com;
                  david.zaheer@lw.com;
                  ted.dillman@lw.com

All such notices, requests and other communications shall be deemed received (a) if delivered prior to 5:00 p.m. New York time on a day which is a Business Day, then on such date of delivery if delivered personally, or, if by email, upon written confirmation of delivery by email (which may be electronic), and if delivered after 5:00 p.m. New York time (whether personally or by email) then on the next succeeding Business Day, (b) on the first (1st) Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.

SECTION 12.02   *Amendments and Waivers*.

(a)    Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each of Buyer and the Company (on behalf of itself and each Seller) or, in the case of a waiver, by the Party against whom the waiver is to be effective; provided that any waiver asserted against any Seller shall be valid if given by the Company on behalf of such Seller.  For clarity, Bankruptcy Court approval shall not be required for any amendment to this Agreement.

(b)    No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

SECTION 12.03  *Successors and Assigns*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided that subject to Buyer's right to designate a Buyer Designee as set forth in Section 2.01, Buyer, on the one hand, may not assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Company, and each Seller, on the other hand, may not assign, delegate or otherwise transfer any of their respective rights or obligations under this Agreement without the prior written consent of Buyer.  Any attempted assignment in violation of this Section 12.03 shall be null and void, *ab initio*.

SECTION 12.04  *Governing Law*.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware, without regard to the conflicts of law rules of such State.

SECTION 12.05  *Jurisdiction*.  The Parties agree that, during the period from the date hereof until the date on which the Chapter 11 Cases are closed or dismissed (the "**Bankruptcy Period**"), any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court.  The Parties further agree that, following the Bankruptcy Period, any Action with respect to this Agreement or the transactions contemplated hereby shall be brought against any of the Parties exclusively in either the United States District Court for the District of Delaware or any state court of the State of Delaware located in such district, and each of the Parties hereby irrevocably consents to the jurisdiction of such court and the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such Action (including any Proceeding) and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Action (including any Proceeding) in such courts or that any such Action (including any Proceeding) which is brought in such courts has been brought in an inconvenient forum.  Process in any such Action (including any Proceeding) may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court, the United States District Court for the District of Delaware or any state court of the State of Delaware.  Without limiting the foregoing, each Party agrees that service of process on such Party in the manner as provided in Section 12.01 for notices shall be deemed effective service of process on such Party.

SECTION 12.06  *WAIVER OF JURY TRIAL*.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSES OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT OR THE SUBJECT MATTER HEREOF OR THEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE.  ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 12.06 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

64

SECTION 12.07 *Counterparts; Third-Party Beneficiaries.* This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party. No other provision of this Agreement is intended to confer upon any Person other than the Parties any rights, benefits, Proceedings or remedies hereunder. Delivery of a .pdf version of one or more signatures to this Agreement shall be deemed adequate delivery for purposes of this Agreement.

SECTION 12.08 *Specific Performance.* It is understood and agreed by the Parties that money damages (even if available) would not be a sufficient remedy for any breach of this Agreement by Sellers or Buyer and as a consequence thereof, after the Bankruptcy Court's entry of the Sale Order, Sellers and Buyer shall each be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach in addition to any other remedy to which such Party may be entitled in Law or in equity, including an Order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer or Sellers, as may be applicable, to comply promptly with any of their obligations hereunder. Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the other Party has an adequate remedy at Law or that any award of specific performance is not an appropriate remedy for any reason at Law or in equity. Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with such Order.

SECTION 12.09 *Entire Agreement.* This Agreement and the other Transaction Documents (together with the Schedules and Exhibits hereto and thereto) constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to such subject matter. No Party to this Agreement shall be liable or bound to any other Party in any manner by any representations, warranties, covenants or agreements relating to such subject matter except as specifically set forth herein and therein. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

SECTION 12.10 *No Strict Construction.* Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

65

SECTION 12.11   *Severability*.   If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.   Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transaction contemplated hereby be consummated as originally contemplated to the fullest extent possible.

SECTION 12.12   *Disclosure Schedules*.   The representations and warranties of Sellers set forth in this Agreement are made and given subject to the disclosures in the Disclosure Schedules. Inclusion of information in the Disclosure Schedules will not be construed as an admission that such information is material to the business, operations of condition (financial or otherwise) of Sellers or their respective businesses, in whole or in part, or as an admission of Liability or obligation of Sellers to any Person.   The sections of the Disclosure Schedules have been organized for purposes of convenience in numbered sections corresponding to the sections in this Agreement; provided, however, that any disclosure in any section of the Disclosure Schedules will apply to and will be deemed to be disclosed with respect to any other representation and warranty, so long as the applicability of such disclosure is reasonably apparent on its face.   It is understood and agreed that the specification of any dollar amount in the representations and warranties or covenants contained in this Agreement or the inclusion of any specific item in the Disclosure Schedules is not intended to imply that such amounts or higher or lower amounts, or the items so included or other items, are or are not material, and no Party or other Person shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Disclosure Schedules in any dispute or controversy as to whether any obligation, item or matter not described in this Agreement or included in the Disclosure Schedules is or is not material for purposes of this Agreement.   Nothing in this Agreement (including the Disclosure Schedules) shall be deemed an admission by either Party or any of its Affiliates, in any Proceedings, that such Party or any such Affiliate, or any third party, is or is not in breach or violation of, or in default in, the performance or observance of any term or provisions of any Contract or Law. The Disclosure Schedules and the information and disclosures contained therein are intended only to modify the representations or warranties of Sellers contained in this Agreement.   Where the terms of a contract or document have been summarized or described in the Disclosure Schedules, such summary or description does not purport to be a complete statement of the material terms of such contract or document, and all such summaries and descriptions are qualified in their entirety by reference to the contract or document being summarized or described to the extent such contract or other document has been made available to Buyer prior to the date hereof.

SECTION 12.13   *No Recourse*.   Notwithstanding anything in this Agreement or in any other Transaction Document, the Parties hereby acknowledge and agree that, except to the extent a Person is a named party to this Agreement, no Person, including any current, former or future director, officer, employee, incorporator, member, manager, director, partner, investor, shareholder, agent, representative, or Affiliate of any, shall have any liability to the other Party, and each Party shall have no recourse against, any Person other than the other Party in connection with any liability,

66

claim or cause of action arising out of, or in relation to, this Agreement, any other Transaction Document or the transactions contemplated hereby and thereby, whether pursuant to any attempt to pierce the corporate veil, any claims for fraud, negligence or misconduct or any other claims otherwise available or asserted at law or in equity.

[Signature Pages Follow.]